# EXHIBIT A

Charles Baker

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

JOSEPH J. FREEBERY,    :
    : Civil Action
     Plaintiff,    : No. 05-748 KAJ
    :
      vs.    :
    : TRIAL BY JURY OF 12
CHRISTOPHER COONS, in his    :
official capacity as County    :
Executive of New Castle County:
and in his individual capacity:
and NEW CASTLE COUNTY, a    :
municipal corporation; and    :
JOHN DOES 1-25,    :
    :
     Defendants.    :

- - -

Deposition of   CHARLES L. BAKER,
taken pursuant to notice before Gail Inghram Verbano,
CSR, RMR, in the law offices of Knepper & Stratton,
1228 King Street, Wilmington, Delaware, on Monday,
August 14, 2006, beginning at approximately
10:0 a.m., there being present:

APPEARANCES:

          JOSEPH F. LAWLESS, ESQ.
          6 Harvey Lane
          Newtown Square, Pennsylvania 19083
           Attorney for Plaintiff

          CORBETT & WILCOX
      Registered Professional Reporters
   230 North Market Street, Wilmington, DE 19801
           (302) 571-0510
          www.corbettreporting.com

Charles Baker

2 (Pages 2 to 5)

Page 2

```
1   APPEARANCES (CONT'D.)
2          RICHARD R. WIER, JR., ESQ.
           RICHARD R. WIER, JR., P.A.
3       Two Mill Road, Suite 200
        Wilmington, Delaware 19806
4          Attorney for Defendants
5       MICHELLE ALLEN, ESQ.
        NEW CASTLE COUNTY LAW DEPARTMENT
6       87 Reads Way
        New Castle, Delaware 19720-1648
7          Attorney for The County of New Castle
8
9              - - -
10
11          CHARLES L. BAKER, having first been
12   duly sworn according to law, was examined and
13   testified as follows:
14              - - -
15              EXAMINATION
16   BY MR. LAWLESS:
17      Q   Would you state your full name and spell
18   your last name, please.
19      A   Charles L. Baker, B-A-K-E-R.
20      Q   And Mr. Baker, how old are you -- what's
21   your date of birth?
22      A   November 22nd, 1963 so --
23      Q   So that would make you 40- --
24      A   42.
```

Page 3

```
1       Q   And what's your current work address?
2       A   Work address is New Castle County, 87
3    Reads Way, R-E-A-D-S, New Castle, Delaware, 19720.
4       Q   And your office phone number?
5       A   (320)395-5463.
6       Q   I'm not going to ask you your home or
7    your -- your home address. I'm assuming if we need
8    you, we can get you through Mr. Wier.
9       A   Okay.
10      Q   Have you ever been deposed before?
11      A   Yes.
12      Q   How many times?
13      A   I believe twice.
14      Q   And they were civil cases, I assume, if
15   they were depositions?
16      A   Yes.
17      Q   And I also understand you've at least
18   testified under oath on one other occasion?
19      A   Yes.
20      Q
21
22
23
24
```

Page 4

```
1
2
3
4
5
6
7
8
9
10      Q   Who was your lawyer?
11      A   Her name is Megan Hills.
12      Q   Is she a member of a firm or is she sole
13   practitioner?
14      A   And I don't recollect who. A firm in
15   Washington.
16
17
18
19
20
21
22
23
24
```

Page 5

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Corbett & Wilcox

Charles Baker

| Page 6 | Page 8 |
|---|---|
| 1 | 1 |
| 2 | 2 |
| 3 | 3 |
| 4 | 4 |
| 5 | 5 |
| 6 | 6 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | |
| 24  Am I correct that you have not been | |

**Page 7**

1 charged with anything in connection with any
2 investigation?
3     A   Yes.
4
5
6
7
8
9
10
11
12
13
14
15
16
17     Q   As far as you're concerned, did you do
18 anything illegal in connection with the Fieldstone
19 project?
20     A   No.
21     Q   Did anyone ask you to do anything that
22 you believe was illegal in connection with the
23 Fieldstone project?
24     A   No.

19 BY MR. LAWLESS:
20     Q   Did you observe them do anything illegal,
21 all three of those people, at any time?  And did you
22 testify to that?
23         MR. WIER:  That's two questions.
24 Can we break the first part down.

Corbett & Wilcox

Charles Baker

4 (Pages 10 to 13)

Page 10

1 BY MR. LAWLESS:
2    Q   Mr. Baker, am I confusing you? Do you
3 want me to break this down so it's easier to answer?
4    A   Yeah, that would be --
5    Q   They were not the most artful of
6 questions.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22    Q   Okay. Prior to coming here today, did
23 you review any documents in connection with this
24 lawsuit?

Page 11

1    A   Yes.
2    Q   What did you look at?
3    A   In response to the subpoena, I pulled
4 four documents from my files
5    Q   Okay. May I see them?
6    A   Absolutely.
7    Q   Okay. Did you review any other documents
8 in cor    ction with this case?
9    A   I don't believe so, no.
10    Q   Do you recall whether or not you've ever
11 seen th  Complaint in this case?
12    A   Yes, I've seen the Complaint once. Last
13 November maybe.
14    Q   When it was filed, around that time?
15    A   Yeah; it may have been shortly after
16 that.
17    Q   Do you -- having seen that Complaint, do
18 you recall whether there was anything in that
19 Complaint that you believed to be inaccurate or
20 untrue?
21        MR WIER: Objection.
22 BY MR. LAWLESS:
23    Q   You can answer
24    A   I don't remember.

Page 12

1    Q   Did you read any depositions that have
2 been taken in this case?
3    A   No.
4    Q   Did you discuss any depositions that have
5 been taken in this case with anyone?
6    A   No.
7    Q   Without telling me what you may or may
8 not have said, did you prepare for your testimony
9 here today by speaking with either Mr. Wier or
10 Ms. Allen?
11    A   Yes.
12    Q   Okay. After Chris Coons got the
13 Democratic nomination, after he beat Freebery in the
14 Democratic primary, did you have any conversations
15 with Joe Freebery regarding whether or not he wanted
16 to stay on was the general manager of the Department
17 of Special Services?
18        MR. LAWLESS: Excuse me. Off the
19 record.
20        (Discussion off the record.)
21 BY MR. LAWLESS:
22    Q   After the Democratic primary and before
23 the general election, did you have any conversations
24 or discussions, or even two-sentence exchanges, with

Page 13

1 Joe Freebery about whether or not Joe Freebery wanted
2 to stay on as the general manager of the Department
3 of Special Services?
4    A   I don't remember specifically. Possibly.
5    Q   Okay. We'll see if we can do this, then,
6 according to your recollection.
7        Without saying when, do you
8 remember having any conversations/exchanges with Joe
9 Freebery about that topic? From the time Coons won
10 the primary until now
11    A   I don't remember specifically having
12 conversations post primary  If I took the six months
13 after that and the year and a half before that, that
14 two-year span, yes.
15    Q   As best you can remember, what did he say
16 to you about his desire to stay on if Coons won the
17 election?
18    A   To the best of my recollection, he
19 indicated that he'd like to stay in his job for the
20 next few years.
21    Q   Okay. Did he say anything to you about
22 expecting that that wouldn't happen once Coons had
23 won the primary?
24        MR. WIER: I'm sorry  The answer

Charles Baker

5 (Pages 14 to 17)

Page 14

1 was volunteered, so I asked you not to volunteer.
2          The answer was a year before? Can
3 you read his answer back. Because the question was
4 primary --
5          MR. LAWLESS: Yeah, he started --
6          MR. WIER: Primary forward, and
7 then he went --
8          MR. LAWLESS: He went a year back.
9 So I'm taking as a year before the primary, within
10 there, at some point, he said he wanted to stay with
11 his job.
12          MR. WIER: Right. And your
13 question then is if Coons was elected. Because there
14 could be conversations in that prior year, because
15 Sherry was running. So I'm unclear as to the time
16 frame the witness was referring to.
17 BY MR. LAWLESS:
18     Q    Did you follow what Mr. Wier just said?
19     A    I understand the issue, I believe
20     Q    Do you recall when it was Joe Freebery
21 might have made these statements to you?
22     A    I don't really recall specifically having
23 conversations with him in September 2004 or
24 thereafter about it. It may have been mentioned in

Page 15

1 passing.
2     Q    Okay. But it is your recollection that
3 he said he wanted to stay in that job for the next
4 few years?
5          MR. WIER: Objection
6          THE WITNESS: Yeah.
7 BY MR. LAWLESS:
8     Q    Do you ever recall, after the primary or
9 after the general election, where Joe Freebery said
10 to you something different than that, that he didn't
11 want to stay in his job?
12          MR. WIER: Objection to form.
13 BY MR. LAWLESS:
14     Q    You can answer.
15     A    No, I don't remember that.
16     Q    Do you know why Joe Freebery got
17 terminated from his position as the general manager
18 of the Department of Special Services?
19     A    Not other than I read in the newspaper
20     Q    And that would have been the article in
21 the News Journal, or whatever newspaper --
22     A    I believe so.
23     Q    Did you ever ask anybody -- we'll break
24 it down

Page 16

1          Did you ever ask Mr. Coons why Joe
2 Freebery got terminated?
3     A    No.
4     Q    Did you ever ask -- and I'm going to
5 mispronounce his name -- Mr. Pryzwara --
6     A    That's --
7     Q    Is that correct?
8     A    I believe that's a good pronunciation.
9     Q    Okay -- if he knew or could tell you why
10 Joe Freebery got terminated?
11     A    I don't remember having a conversation
12 with Mr. Pryzwara about it.
13     Q    Did you have a conversation with anybody
14 in the Coons administration regarding Joe Freebery's
15 termination, just generally?
16     A    Yes.
17     Q    And who do you recall having those
18 conversations with?
19     A    I believe I had short conversations both
20 with Allison Taylor Levine and David Singleton
21     Q    And do you recall -- we'll start with
22 Allison Taylor Levine. Do you recall when you had
23 that conversation with her?
24     A    That would have been the day that it was

Page 17

1 hitting the newspapers or the day that the reporters
2 were calling.
3     Q    Were they calling you?
4     A    I may have gotten calls from the reporter
5 to my office. I did not talk to reporters that day.
6     Q    I'm assuming they called everybody
7 assuming to see --
8          MR. WIER: Objection.
9          MR. LAWLESS: That's the way
10 reporters are.
11          MR. WIER: Is that a question or --
12          MR. LAWLESS: It's just a passing
13 comment on the state of the Fourth Estate.
14 BY MR. LAWLESS:
15     Q    Do you recall where it was that you had
16 the conversations with Allison Taylor Levine?
17     A    I was at a meeting in Lancaster,
18 Pennsylvania, and I was on my cellphone.
19     Q    What did you say to her, what did she say
20 to you?
21     A    We had a short conversation about what
22 was happening, which was the fact circumstance of --
23 I guess Joe being terminated.
24     Q    Let me interrupt. How did that come up,

Corbett & Wilcox

Charles Baker

6 (Pages 18 to 21)

Page 18

1  if you were in Lancaster that morning? How did you
2  first find out about it, I guess is my question.
3      A   I believe my -- public information
4  officer in my department was starting to get calls
5  about it, and so he called me to let me know what was
6  happening.
7      Q   Were you surprised when you heard that?
8      A   Not in a big way surprised. I don't
9  remember being particularly surprised.
10     Q   Okay. Why weren't you surprised? Did
11 you have any indication prior to that that it was
12 going to happen?
13     A   Not specifically.
14     Q   How about generally?
15     A   Generally I had the impression that there
16 was quite a bit of tension going on between Joe and
17 the new administration.
18     Q   What gave you that impression?
19     A   I think budget conversations. I think we
20 were in the process of trying to get the budget
21 prepared for Council in the time leading up to that.
22     Q   What about that period and those
23 conversations led you to believe that there was some
24 tension that at least sticks out in your mind as

Page 19

1  unusual?
2      MR. WIER: Objection. I don't
3  think he testified as "unusual."
4  BY MR. LAWLESS:
5      Q   Let me ask you this. Let me back up for
6  a second, Mr. Baker.
7          Is it fair to say that, at least in
8  your experience, that general managers of the various
9  departments in New Castle County have certain goals
10 in mind with respect to their own individual
11 department's budget every year?
12     A   Yes, that's fair.
13     Q   Is it also fair to say that those goals
14 are sometimes in conflict with what might be a
15 broader picture taken by an administration?
16     A   Yes, generally.
17     Q   What I'm saying is that the tension that
18 you noticed, was it something different than the
19 normal tension would be in a budget preparation
20 period, or was there more than that that sticks out
21 in your mind between Freebery and the
22 administration -- Joe Freebery and the
23 administration?
24     MR. WIER: Objection to form.

Page 20

1      THE WITNESS: I had the sense that
2  there was frustration that what Joe was proposing in
3  his budget, in terms of trying to meet the budget
4  targets, those broader goals, the way that he was
5  proposing to meet those budget targets was
6  frustrating to the administration.
7  BY MR. LAWLESS:
8      Q   You're going to have to explain that to
9  me, because I'm not quite sure I understand it. You
10 mean like he was going to --
11     MR. WIER: Objection.
12 BY MR. LAWLESS:
13     Q   What do you mean?
14     A   And again, I don't know the specific. I
15 just had the sense -- it may have been at a GM's
16 meeting or some group meeting that we were having, as
17 GMs and the administration, to work on the budget --
18 that the cuts proposed in the Special Services budget
19 were of a type that might be difficult to swallow
20 publicly. And I don't know what they were, just that
21 there was some frustration of why would we be trying
22 to cut that when there's probably other places we
23 could be cutting.
24     Q   Okay. And the concern about -- so as I

Page 21

1  understand what you just testified, that your
2  recollection is that Freebery was proposing cuts that
3  were, for whatever reason, not politically acceptable
4  to the administration and there was a tension because
5  of that?
6      MR. WIER: Objection.
7      THE WITNESS: I don't think I heard
8  that specifically, but that was my general sense.
9  BY MR. LAWLESS:
10     Q   Okay.
11     A   Or that they felt like the cuts were
12 deliberately designed to be politically unpopular.
13     Q   And you can't recall specifically what
14 cuts you're talking about?
15     A   No.
16     Q   Were any of these proposed budget cuts in
17 writing?
18     A   I do not know. I believe so. I believe
19 we all had to submit memos to the administration with
20 a list of ways to meet the budget objectives.
21     Q   Mr Baker, I don't want to put words in
22 your mouth, but I want to make sure I understand what
23 you're testifying to.
24         Are you testifying that it's your

Corbett & Wilcox

Charles Baker

7 (Pages 22 to 25)

## Page 22

1  recollection that there was a tension between Joe
2  Freebery and the Coons administration because -- your
3  perception of it was that Joe Freebery was proposing
4  budget cuts that had been designed to politically
5  embarrass the administration? Is that what you're
6  saying?
7      A    That was the kind of impression that I
8  had.
9      Q    What gave you that impression?
10     A    I really couldn't say specifically. I
11 think it was my sense of the conversation around the
12 budget GM table.
13     Q    Okay. What conversations are you talking
14 about, other than just this general recollection?
15     A    I believe I'm getting that impression
16 from -- and I can't remember exactly what was said,
17 other than what I've just testified to, that there
18 was conversation, when we're all sitting around
19 talking about the budget, where, I believe, David
20 Singleton was saying that he was frustrated with what
21 Joe had proposed in his budget cuts.
22     Q    And did he say that to Joe?
23     A    Yeah, Joe was in the meeting.
24     Q    And did he say why he was frustrated --

## Page 23

1  Dave Singleton?
2      A    Yeah. I don't remember, again, the
3  specific words. But my sense was that he felt that
4  there were other areas that could be cut in Joe's
5  budget that wouldn't have the public impact.
6      Q    Did he say public impact -- and when you
7  say "public impact," at least in my mind, is a little
8  different than what you said earlier.
9           When you said "public impact," did
10 you mean the impact upon services provided to the
11 public, or the impact upon the political perception
12 of the cuts? Or are you speaking of those two things
13 at the same time?
14     A    I don't separate those things very far in
15 my mind. If there's something that's going to impact
16 the public, some facet of the public is going to get
17 upset about that, and then that turns into a negative
18 political situation.
19     Q    And when was this conversation, if you
20 can recall?
21     A    It had to be early 2005 January,
22 February, March.
23     Q    Did Singleton -- when he said this, do
24 you recall Singleton coming out and just confronting

## Page 24

1  Joe Freebery and saying, "Are you trying to
2  politically embarrass us by doing this?" What about
3  the conversation stands out in your mind?
4      A    There may have been something like that
5  said.
6      Q    Okay. Who else was present at that
7  meeting, if you recall?
8      A    I don't recall specifically.
9      Q    It was a GM meeting?
10     A    That's my sense, or a budget meeting.
11     Q    Who were the GMs at that time?
12     A    I believe most of the old GMs were still
13 there.
14     Q    So that would have been who? Sapp?
15     A    Jim Sapp, Pat DiIenno, Ron Morris, Dave
16 McAllister.
17     Q    Who else?
18     A    I'm missing a couple. My apologies to
19 them.
20     Q    Your recollection is going to be better
21 than mine. You were there, obviously.
22     A    And Diane Baker.
23     Q    Were minutes taken in this meeting?
24 Anybody record what was said at this meeting?

## Page 25

1      A    It's possible there were notes, but I
2  don't remember specifically seeing notes or
3  recordings of any of these meetings.
4      Q    Did you take notes?
5      A    Probably not.
6      Q    Prior to this -- let me ask you a
7  question.
8           Am I correct that the GMs were told
9  to prepare their budget proposals for the coming year
10 and that was the purpose of this meeting?
11     A    Yeah, we had to propose budgets. I think
12 we went through two or three iterations of that,
13 which -- so I expect there were two or three
14 iterations of this type of meeting.
15     Q    And would there have been any kind of
16 written directive that went out to the GMs that you
17 saw with respect to the purpose of these meetings?
18     A    I believe there was, but I'm -- I'm
19 pretty sure there was.
20     Q    Okay. Was there, to your knowledge or
21 your recollection, a written directive prior to these
22 meetings specifically directing the GMs to make
23 budget cuts to propose to the administration?
24           And again, just to kind of

Charles Baker

8 (Pages 26 to 29)

| Page 26 |
| --- |

1 characterize it, did a memo go out saying, Fellas, we
2 got to cut the budget; come back with your proposals,
3 and that will be the topic of the meeting, or
4 something like that?
5          MR. WIER: Objection to the form.
6          THE WITNESS: I believe either
7 there was a memo, or it may have just been a number
8 target presented at a meeting. We're looking for --
9 off the top of my head -- a 10 percent, cut or
10 6 percent cut. I can't remember what the number was.
11 BY MR. LAWLESS:
12    Q   Okay. Other than Dave Singleton, was he
13 the only person from the administration at that
14 meeting? When I say "administration," I'm talking
15 about the executive leadership, the Coons team, for
16 want of a better word.
17          MR. WIER: Objection to the
18 characterization.
19          THE WITNESS: I don't recall
20 specifically. It wasn't typical that Rich Przywara,
21 Nicole Majeski, Lynne Howard would be in these kinds
22 of meetings.
23 BY MR. LAWLESS:
24    Q   When Dave Singleton said that to Joe

| Page 27 |
| --- |

1 Freebery, do you recall Joe Freebery responding to
2 it?
3          MR. WIER: Let me object to the
4 characterization of his prior answer as a statement
5 by Dave Singleton.
6          You may answer.
7          THE WITNESS: Yeah, I believe that
8 he responded. I don't remember specifically what he
9 said.
10 BY MR. LAWLESS:
11    Q   Did he say, Yeah, I'm trying to embarrass
12 you politically?
13          MR. WIER: Objection; asked and
14 answered.
15          THE WITNESS: No, I don't believe
16 so.
17 BY MR. LAWLESS:
18    Q   Was there -- how would you describe the
19 exchange? Was it hostile? Was it warm and fuzzy?
20 Was it polite? Was it civil? How was the exchange?
21    A   I think both parties were frustrated.
22    Q   Frustrated? Okay.
23          Were there any other -- do you
24 recall any other budget proposal made by any of the

| Page 28 |
| --- |

1 other GMs that received that kind of response from
2 Dave Singleton: There are less visible cuts you
3 could make, or words to that effect?
4          MR. WIER: Objection to form.
5          THE WITNESS: No, I don't recall
6 any specifically like that. I do recall generally
7 that that was a mandate: Try to make cuts that will
8 not impact public service.
9 BY MR. LAWLESS:
10    Q   Or public political perceptions?
11    A   Yes
12          MR. WIER: Objection
13 BY MR. LAWLESS:
14    Q   And you kind of use -- go ahead, finish.
15          MR. WIER: Let me just object to
16 your testifying, because I think these questions is
17 testimony. So object to the form of the question. I
18 don't believe there's been any testimony to support
19 the question as framed.
20 BY MR. LAWLESS:
21    Q   Okay. Mr. Baker, I don't want to put
22 words in your mouth If I do, you feel free to tell
23 me. Okay?
24          MR. WIER: Slap him around a little

| Page 29 |
| --- |

1 bit.
2          MR. LAWLESS: I'll give you one
3 free shot.
4 BY MR. LAWLESS:
5    Q   My recollection what you testified to is
6 you used the concept affecting public services and
7 what I think was a concomitant political effect of
8 that kind of interchangeably. Am I correct?
9    A   Yeah. There's a relationship between the
10 two of them. If it affects the public, it's going to
11 be a tough political fight also.
12    Q   Gotcha. Let me just back up for a
13 second.
14          In your experiences as a GM over
15 the period of years that you've done it, were there
16 usually more than one meeting between the County
17 administration and the GMs in terms of setting up the
18 budget each year?
19          MR. WIER: Are you talking about
20 the Coons administration or any administration?
21          MR. LAWLESS: Any of them.
22          THE WITNESS: I would say in tight
23 budget years, you had more meetings. If there was
24 enough money, maybe we only had one meeting.

Corbett & Wilcox

Charles Baker

## Page 30

1 BY MR. LAWLESS:
2    Q   Okay. Do you believe that this budget --
3 let me back up for a second.
4         After this exchange with Joe
5 Freebery and Dave Singleton, did anything else happen
6 at that meeting that sticks out in your mind
7 regarding Joe Freebery?
8         MR. WIER: Objection to form.
9         THE WITNESS: No.
10 BY MR. LAWLESS:
11    Q   Were there any subsequent budget meetings
12 between the GMs and Dave Singleton or anyone from the
13 Coons administration?
14    A   I can't recall -- excuse me, sorry. I
15 can't recall if the situation happened in the last
16 meeting or in intermediate meetings. There may have
17 been meetings after or not.
18         MR. LAWLESS: Let me take a
19 two-minute break, if you don't mind.
20         (Brief recess.)
21 BY MR. LAWLESS:
22    Q   Mr. Baker, let me just back up for a
23 second and ask you, can you give me your educational
24 background real quick.

## Page 31

1    A   Sure. I have a bachelor's degree in
2 urban and regional studies from Cornell University;
3 and I had done most of the coursework towards the
4 master's degree in regional planning.
5    Q   Did you graduate from Cornell?
6    A   Undergrad, and went for grad school but
7 didn't get my degree.
8    Q   What year undergrad?
9    A   I graduated in '87.
10    Q   My wife is a Cornell alum.
11         Can you give me your employment
12 history from the time you graduated from college.
13 I'm not going to hold you to specific weeks, months
14 and years, but just general.
15    A   Okay. From '88 to '89, worked for the
16 Delaware Valley Regional Planning Commission in
17 Philadelphia. From '89 to '92, worked for the
18 Burlington County engineer's office in Mount Holly,
19 New Jersey. From 1992 to 1994 worked for the Cross
20 County Connection Transportation Management
21 Association in Marlton, New Jersey. From '94 to '96,
22 worked for a consulting firm called Trip Reduction
23 Services in Union, New Jersey.
24         From 1996 to 2000, worked for the

## Page 32

1 Wilmington Area Planning Council in Newark, Delaware.
2 And from 2000 until current, worked for New Castle
3 County Department of Land Use.
4    Q   Okay. Did you believe that the budget
5 reductions that Joe Freebery proposed at that meeting
6 that you just described were intended to embarrass
7 the Coons administration?
8         MR. WIER: Objection. You can
9 answer.
10         THE WITNESS: I don't remember
11 specifically even knowing what they were.
12 BY MR. LAWLESS:
13    Q   So the answer to my question is you
14 didn't have a belief one way or the other?
15    A   I didn't know what they were and didn't
16 have an opinion. I just knew that that was a sense
17 of the conversation going on.
18    Q   Did you have any conversations with Dave
19 Singleton after that meeting and regarding those
20 proposed budget cuts?
21    A   Not that I recall.
22    Q   Do you recall whether or not the budget
23 cuts that Joe Freebery proposed at that meeting were
24 the budget cuts that eventually made it into the

## Page 33

1 final budget?
2    A   I do not know. I don't know what they
3 were.
4    Q   Do you know -- or do you recall if any of
5 the other GMs made any proposed budget cuts that
6 received a similar response from Dave Singleton as
7 the ones proposed by Joe Freebery?
8    A   Not that I recall.
9    Q   So when you say you don't recall, you
10 don't know whether they did or they didn't, you just
11 don't have a recollection?
12    A   I don't recall any other ones with that
13 reaction.
14    Q   What is it about Freebery's exchange with
15 Singleton that causes you to remember that?
16    A   In the course of normal business, people
17 are usually pretty calm, and this seemed to be a
18 situation where people were more frustrated.
19    Q   When you say "people," you mean Singleton
20 and Freebery?
21    A   Yeah, both parties.
22    Q   Did either of them raise their voice?
23    A   I don't remember. It's possible.
24    Q   When you say you don't remember but it's

Charles Baker

10 (Pages 34 to 37)

Page 34

1  possible, what about your recollection makes you
2  think it's possible? Isn't that something you'd
3  remember, if they were yelling at each other?
4         MR. WIER: Objection to the form of
5  the question.
6  BY MR. LAWLESS:
7      Q  You can answer.
8      A  Joe would sometimes raise his voice
9  trying to make a point, so --
10     Q  Generally?
11     A  Yeah. Over my course of being in
12  meetings with Joe, it would not be an uncommon
13  experience.
14     Q  Let me ask you a question about that,
15  since you brought it up.
16         How long did you work with Joe
17  Freebery as general managers in New Castle County
18  government?
19     A  I became GM in early 2001. So from 2001
20  until he left in early 2005.
21     Q  What was the nature of your work with
22  him? Good? bad? indifferent? How would you describe
23  it?
24     A  Okay.

Page 35

1      Q  Okay. As far as you could tell, was he
2  good at what he did?
3      A  I think I heard positive things about his
4  labor relations. And there were other projects that
5  didn't seem to get done on time; or there were issues
6  between our two departments in terms of projects, the
7  capital projects, construction projects and how they
8  were getting done. I'm not sure I can attribute all
9  that to Joe personally.
10     Q  You're going to have back up a little bit
11  and explain to me, how would the Department of
12  Special Services get involved in that with your
13  department? I'm not sure I understand.
14     A  The Department of Special Services would
15  construct projects, design and build projects.
16     Q  Such as?
17     A  Such as a library, PAL building, a park.
18         And the other area that we
19  interacted quite a bit on was sewer capacity. Every
20  developer that comes through our process needs to get
21  approvals from Special Services department for sewer.
22     Q  And were there times that you and
23  Freebery disagreed on what should or shouldn't be
24  done with respect to those projects?

Page 36

1      A  I remember a couple times Joe being
2  frustrated that my staff was requiring them to follow
3  the codes; and my staff was frustrated that sometimes
4  things were happening without permits or without
5  approvals from my department as they were happening.
6      Q  Who from your staff, if you recall?
7      A  It was something that I would hear from
8  planners and from our permitting section, maybe from
9  our engineering section. Not any individuals. It
10  was a pretty widespread reputation.
11     Q  And what was that reputation again? Go
12  ahead.
13     A  That there were projects happening
14  without all the appropriate approvals in place first.
15     Q  Can you give me what those projects were?
16     A  I really wouldn't -- couldn't tell you
17  best. You'd have to talk to some of the individual
18  staff people, planners and engineers and --
19     Q  Who, of the individual planners or
20  engineers, gave you these complaints?
21     A  Any number of them. I couldn't even put
22  a specific name.
23     Q  Tell me who gave you these complaints.
24     A  You need some names?

Page 37

1      Q  Tell me who gave you these complaints.
2      A  I think it's something I heard from Joe
3  Day.
4      Q  And who is Joe Day?
5      A  He manages our permits section.
6      Q  And what did you hear from Joe Day?
7      A  I couldn't recall a specific project. My
8  recollection is some project or other, or various or
9  multiple projects, a concern about permitting.
10     Q  Would it be illegal for a project to
11  proceed without a permit?
12     A  That's my understanding. It would be a
13  violation of County code.
14     Q  Okay. To your knowledge, did Joe Day
15  ever reduce any of these concerns or claims to
16  writing in any way? A complaint, memorandum,
17  anything like that?
18     A  Not necessarily that I'm aware.
19         In general, when these situations
20  were occurring, we were trying to work with the
21  Department of Special Services staff to get the
22  appropriate documentation and applications in to us,
23  to get into compliance. So there may be emails,
24  communications back and forth between different

Charles Baker

11 (Pages 38 to 41)

| Page 38 | Page 40 |
|---|---|

**Page 38**

1  inspectors or planners and engineers and Special
2  Services project management staff.
3      Q   Let me just back up for a second. And
4  again, I don't want to put words in your mouth, but
5  did Joe Day ever make any kind of written complaint
6  to you -- and you were his boss; right? You were his
7  superior?
8      A   He reported to somebody in between.
9      Q   Well, if -- all right. Who was the
10  person in between you and Joe Day?
11      A   George Haggerty.
12      Q   To your knowledge, was there ever any
13  kind of written complaint about Joe Freebery trying
14  to push through a project without the proper
15  permitting? Any kind of writing at all?
16      A   That mentioned Joe Freebery?
17      Q   Yeah.
18      A   I honestly can't remember if there was or
19  wasn't. I don't recall any specifically that
20  mentioned Joe Freebery.
21      Q   Your recollection of these writings were
22  about the Department of Special Services generally?
23      A   Yeah. If there were any, it was
24  typically like, The Department of Special Services

**Page 39**

1  has not gotten X permit, Y approval.
2      Q   Can you give me any specific project that
3  you recall where that was said?
4      A   I think one that sticks in my mind is a
5  canopy installation on Base D.
6      Q   Okay. You've got me completely blank
7  there. Tell me what that is.
8      A   The canopies over the gas filling
9  pumps --
10      Q   Okay.
11      A   -- I believe needed a building permit.
12  That didn't get a building permit.
13          I think there may have been a
14  couple other issues at that site with buildings that
15  were built or maybe site work done without approvals.
16      Q   And to your knowledge, would that have
17  been a decision by Joe Freebery or decision by the
18  Department of Special Services; or were Joe Freebery
19  and the Department of Special Services one and the
20  same?
21      A   I don't know where the -- where the
22  decision was. I think if you talked to Land Use
23  staff, there was a sense of generally not taking the
24  code seriously

**Page 40**

1      Q   Okay. To your knowledge, was there ever
2  any written -- was there ever any writing, at any
3  time during the period that you were the general
4  manager of land development, that made a specific
5  complaint that the Department of Special Services was
6  not taking the code seriously, or words to that
7  effect?
8      A   I believe there may have been emails from
9  staff at Land Use to staff in Special Services
10  informing them of the need to get certain permits or
11  approvals.
12      Q   Whose job was it to know the code? Would
13  that have been the Department of Special Services or
14  the Land Use department? And wasn't that Land Use's
15  job to tell the Department of Special Services, You
16  need to get a permit for this, or, You don't need to
17  get a permit for this?
18      A   Yes, if we're asked.
19      Q   Okay. Isn't it your job to oversee this
20  kind of thing?
21      A   We oversee the review function. The
22  project general manager in Special Services is
23  supposed to know what permits and things they need to
24  get their engineer and their architects to get.

**Page 41**

1      Q   And am I correct that if the project
2  manager doesn't know or has a question, he's free to
3  ask someone in Land Use, What do I need, what do I
4  don't need?
5      A   Yes. I think there's a frequent
6  conversation between Special Services project manager
7  and our review staff.
8      Q   Anything unusual about that, or did that
9  happen all the time?
10      A   No, that should happen as they're going
11  through to build a project. But there was a sense
12  that sometimes projects were moving ahead of
13  themselves, that they were getting built without
14  everything getting done.
15      Q   Okay. To your knowledge, did you ever
16  put anything in writing about that to Joe Freebery?
17  You, Charlie Baker, to Joe Freebery?
18      A   Not to my knowledge.
19      Q   Where was your office? where was Joe's
20  office?
21      A   My office is at 87 Reads Way, the
22  government center. Joe's is in the Connor building,
23  which is over on, I guess, Old Churchmans Road. I'm
24  not sure what that road is called.

Charles Baker

12 (Pages 42 to 45)

**Page 42**

1    Q   You said you don't recall ever putting it
2  in writing that there was this problem, to either Joe
3  Freebery or to Tom Gordon or anybody in the Gordon
4  administration.
5    A   Not specifically.
6    Q   Generally?
7    A   It may have. I just can't remember a
8  specific one.
9    Q   Did you ever pick up the phone and just
10 call him and say, Joe, what's going on? This is
11 happening; it shouldn't be happening?
12   A   May have had a conversation like that
13 about a project or two over time. I was more likely
14 to have that conversation with Sherry Freebery, as
15 Joe's supervisor --
16   Q   Okay.
17   A   -- to alert her to a specific.
18   Q   Do you recall any conversation like that
19 that you had with Sherry Freebery?
20   A   Again, nothing more than what I've
21 already said.
22   Q   You brought up her name; let me ask you a
23 question.
24        Did there come a point of time

**Page 43**

1  during the Grand Jury investigation when you had a
2  conversation with Sherry Freebery regarding the Grand
3  Jury investigation itself?
4    A   Yeah, I believe -- yes.
5    Q   Was there more than one?
6    A   Yes.
7    Q   Do you recall a conversation where it was
8  more than just a normal discussion about what was
9  happening, where you criticized Sherry or said
10 something to the effect that, If it wasn't for you,
11 you wouldn't have to go through this, or words to
12 that effect?
13   A   Yes.
14   Q   Do you recall that conversation?
15   A   Yes.
16   Q   About when did that take place?
17   A   Probably after the indictments came out.
18 So early summer 2004.
19   Q   You're sure it wasn't before the
20 indictments but after you got the target letter?
21   A   I'm not sure.
22   Q   Who else was present when you had that
23 conversation, if you remember?
24   A   I believe Tom Gordon.

**Page 44**

1    Q   Was anybody else present?
2    A   Possibly. I don't remember.
3    Q   Do you recall where the conversation took
4  place?
5    A   In what we called the small executive
6  conference room.
7    Q   And that's in the building on Reads Way?
8    A   Yes.
9    Q   And what did you say to Sherry Freebery,
10 what did she say to you in that conversation?
11   A   I said something to the effect of, If you
12 hadn't gone and taken the money from Mosely, this
13 wouldn't had happened and you wouldn't have hurt me
14 and my department's reputation; because we did
15 nothing wrong, you just took money.
16   Q   Be fair to say that that was in a
17 slightly different tone of voice than the one you
18 just delivered?
19   A   Absolutely.
20   Q   You were pretty angry?
21   A   Absolutely.
22   Q   By the way, just to your knowledge, is
23 that -- with respect to the Fieldstone project, is
24 that the only thing that was wrong about the

**Page 45**

1  Fieldstone project, the fact that Sherry Freebery
2  look the loan from Lisa Dean Mosely?
3        MR. WIER:  Objection to form to the
4  form of the question. It's vague and ambiguous. You
5  can answer.
6        THE WITNESS:  I'm not aware of any
7  Land Use problems with that project. It had a long
8  history, but it was in compliance.
9  BY MR. LAWLESS:
10   Q   Did Sherry Freebery ever come to you, as
11 the general manager of Land Use, and try to cut any
12 corners for the Fieldstone project or do anything
13 that would be inappropriate or illegal regarding the
14 Fieldstone project? Other than taking that loan,
15 which, clearly, you have an issue with.
16   A   Yes.
17   Q   What did she do?
18   A   I felt that -- not disclose the loan
19   Q   Uh-huh.
20   A   So there was conversation about the
21 project getting a certain of occupancy to get done.
22   Q   Right.
23   A   And after she had taken the loan, which,
24 from my standpoint, she should not have been involved

Charles Baker

13 (Pages 46 to 49)

| Page 46 | Page 48 |
|---|---|

**Page 46**

1  with -- it created an appearance -- I had no
2  knowledge that she had done that, and -- she should
3  not have been involved -- she should not have been
4  involved.
5      Q  With?
6      A  With the project approval process
7  whatsoever.
8      Q  Okay. To the extent of her involvement,
9  though, what was her involvement other than checking
10  on the status of various approvals?
11          MR. WIER: Let me object to the
12  question, because it assumes -- it's testimony,
13  assumes facts that aren't in evidence. You can
14  answer it
15  BY MR. LAWLESS:
16      Q  Mr. Baker, let me back up  What was the
17  extent of her involvement in that project?
18      A  That there was a property owner,
19  applicant, that was struggling in our process -- not
20  an unusual situation -- and could I look into it.
21      Q  That's all she ever asked you to do?
22      A  Yes.
23      Q  And just so I understand your position,
24  the fact that there was that loan to her that was not

**Page 47**

1  disclosed, that was the problem?
2          The combination of those two
3  things -- the fact she made the inquiry and the fact
4  the loan was there -- that, in your mind, is what the
5  problem was? From your perspective
6      A  And it wasn't disclosed.
7      Q  Had there not been that loan there, did
8  anything she did in connection with the Fieldstone
9  project -- in your mind, was there anything improper
10  or illegal about that?
11      A  No.
12      Q  Okay. So what you're talking about then
13  is the conflict of interest more than anything?
14      A  Appearance.
15      Q  Appearance. Okay. That's fine.
16          When you first applied for the
17  position of general manager of Land Use, was that a
18  classified position under the County merit system?
19  And if I'm not speaking the right language, tell me,
20  because I'm still trying to learn it myself.
21      A  I'm not an HR expert either. It's my
22  understanding it was in the merit system.
23      Q  Okay. Had you worked for the County
24  before you became the general manager of the

**Page 48**

1  Department of Special Services -- or Land Use?
2      A  I was the planning manager, began in
3  2000.
4      Q  Was that a merit-system-protected
5  position?
6      A  Yes, that's also my understanding.
7      Q  Okay. I'm sorry. When did you join the
8  County again? Give me that date
9      A  Right at the beginning of 2000. I think
10  January 10th, I believe, may be my start date.
11          MR. WIER: Take a quick break.
12      (Brief recess.)

Corbett & Wilcox

Charles Baker

14 (Pages 50 to 53)

Page 50

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    Okay   Let's start with this, if I
24  can, Mr. Baker.  Can I have this marked.

Page 51

1
2
3
4
5
6
7
8
9
10  Ms. Allen mentioned something about a ruling by Vice
11  Chancellor -- who was that?
12        MR. WIER: John Noble, N-O-B-L-E.
13        MR. LAWLESS: Who is a --
14        MR. WIER: He's a chancellor with
15  the Court of Chancery in Delaware  I'm not familiar
16  with the lawsuit or the ruling
17        MR. LAWLESS: As I recall, it's a
18  civil suit relating to something arising out of the
19  Gordon/Freebery administration. No. 1, I don't
20  believe that that ruling would any way bind a
21  deposition in a federal civil case.
22
23
24

Page 53

1        (C. Baker Exhibit No. 1 was marked
2     for identification.)
3        MR. WIER: Can you identify Baker 1
4  for the record, please.
5  BY MR. LAWLESS:
6     Q   Mr. Baker, I'll show you what has been
7  marked as Baker 1, which is a document that you
8  produced here today.  Could you tell me what that is,
9  please.
10        MR. WIER: I'm sorry.  Off the
11  record for a minute.
12        (Discussion off the record.)
13  BY MR. LAWLESS:
14     Q   Can you tell me what that is, Mr. Baker.
15     A   Yes.  This is a memo to me from Thomas
16  Gordon, County Executive/Sherry Freebery, Chief
17  Administrative Officer, regarding conditions of
18  employment dated November 24th, 2003.
19     Q   Do you recall receiving that memo?
20     A   Yes.
21     Q   What do you understand that memo to mean
22  to you?
23     A   I understood this memo to be --
24        MR. WIER: Let me just object to

& Wilcox

Charles Baker

16 (Pages 58 to 61)

Page 58

1    A  I don't remember.
2    Q  James Sapp?
3    A  I think so.
4    Q  Richard -- Ron Morris?
5    A  Ron Morris?  Yes, I believe he was there.
6    Q  Did you personally say anything to Chris
7  Coons that day?
8    A  I don't remember specifically saying
9  anything to Chris. I could have, though.
10   Q  Do you recall Joe Freebery saying
11  anything to Chris Coons on that day?
12   A  Yes.
13   Q  What did he say to Chris Coons that you
14  recall?
15   A  I believe Joe was the primary
16  communicator, and I believe there was a conversation
17  where Joe basically asked him if he was trying to get
18  this bill adopted to fire him. And my sense is that
19  Chris said something -- "No," or just, It's a
20  philosophical debate about how government should be
21  run, if the newly elected executive can bring in
22  their own people.
23          And so it was a philosophical piece
24  of legislation; it wasn't going to get anybody fired.

Page 59

1    Q  Before the general managers became the
2  heads of the department, do you know what the
3  department heads were titled?  What their title was?
4    A  I overlapped just a little bit in
5  Delaware in my work career at, I believe -- there was
6  also a merger of departments.  So I think there
7  was -- a planning director did a portion of what my
8  department does, as an appointee.
9    Q  So if I were to tell you that they
10  were -- the people who ran the departments were
11  called directors before you came in, would you accept
12  that?
13   A  Yes, that's my understanding.
14   Q  Okay  And it's your understanding that
15  they were political appointees as opposed to the
16  general managers, when you were there, who were
17  merit-system-classified employees?
18   A  Yes.
19          MR. WIER: Objection to the use of
20  the word "political."
21  BY MR. LAWLESS:
22   Q  Mr Baker, when you were the general
23  manager of the Department of Land Use and you were
24  protected by the merit system, would it have been

Page 60

1  possible to remove you as the GM of the Department of
2  Land Use and move you either laterally or
3  horizontally to a lower position within that
4  department?
5          MR. WIER: Objection to the extent
6  it calls for a legal conclusion.
7  BY MR. LAWLESS:
8    Q  If you know. If they wanted to remove
9  you as GM but wanted to keep you in the department.
10  Said, Okay, instead of the No. 1 guy, we're going to
11  move you to the No. 4 guy, would that have been
12  possible?
13          MR. WIER: Objection to form
14          If you can answer that question
15  without calling upon any legal analysis, you may do
16  so. Otherwise, I believe it's irrelevant.
17  BY MR. LAWLESS:
18   Q  I am just asking for your understanding.
19   A  To my understanding, they could have
20  somebody come in above me --
21   Q  Right.
22   A  -- a higher pay grade or something above
23  me and say -- or lower pay grade and say I report to
24  that person

Page 61

1    Q  Could they have changed your title?
2          MR. WIER: Objection to form
3          MR. LAWLESS: If you know
4          MR. WIER: Just continuing
5  objection
6          MR. LAWLESS: Yeah, I understand.
7          THE WITNESS: I don't know enough
8  about the HR process or the legalities. I think we
9  do have people whose positions have gone out of the
10  budget and they've been able to be moved into other
11  positions in the County government
12  BY MR. LAWLESS:
13   Q  During the time that you were the GM of
14  the Department of Land Use and Freebery was the GM of
15  the Department of Special Services, was Joe Freebery
16  given any kind of special privileges or anything like
17  that because of who his sister was, that you saw?
18   A  You'll have to be more specific  I can't
19  think of one off the top of my head
20   Q  No, if you can't think of one, you can't
21  think of one
22          Did you ever observe Joe Freebery
23  do any political work on County time while he was the
24  GM of Special Services?

Charles Baker

15 (Pages 54 to 57)

| Page 54 | Page 56 |
|---|---|
| 1 the extent it calls for a legal conclusion, and the | 1 when you read this, Tom Gordon and Sherry Freeberg |
| 2 documents speaks for itself. | 2 at least, had the apparent authority to make that |
| 3      MR. LAWLESS: Sure. That's why I | 3 representation to you? |
| 4 asked him what did it mean to him. | 4      MR. WIER: Objection. |
| 5 BY MR. LAWLESS: | 5 BY MR. LAWLESS: |
| 6   Q. Go ahead. You can answer. | 6   Q. You can answer. |
| 7   A. That clarified that I accepted the | 7   A. As far as I knew. |
| 8 position of general manager as a merit-system job, | 8   Q. "Yes"? |
| 9 and I should only be able to be terminated for just | 9   A. Yes. |
| 10 cause or nonperformance, and that I should be able to | 10   Q. Okay. Do you know why this memo was sent |
| 11 rely on this as binding as an employment of contract, | 11 out? |
| 12 as it states. | 12   A. I believe it was a reaction to a concern |
| 13   Q. Did you believe that that was binding as | 13 that, as it states in the fourth paragraph, that |
| 14 an employment contract? | 14 someone could change state law and change our |
| 15   A. That's what I was being told. I do not | 15 positions in state code to specifically say that |
| 16 know really otherwise what the legal status of it is. | 16 they're appointed positions. |
| 17   Q. Did you have any reason to doubt that Tom | 17   Q. Did somebody, prior to this memo going |
| 18 Gordon or Sherry Freebery could make that | 18 out, try to change state law? |
| 19 representation to you? | 19   A. Yes. To the best of my recollection, I |
| 20      MR. WIER: Objection | 20 think in maybe June of this year, 2003, there was |
| 21 BY MR. LAWLESS: | 21 such a bill that went through the House and the |
| 22   Q. Based on what you knew at that point | 22 General Assembly. |
| 23      MR. WIER: Objection to the extent | 23   Q. Okay. Did you, at any time while that |
| 24 it calls for a legal conclusion. | 24 bill was pending, going to Dover, Delaware, while |

| Page 55 | Page 57 |
|---|---|
| 1      MR. LAWLESS: I understand. | 1 that bill was pending, to in any way, lobby for or |
| 2      THE WITNESS: I am not a lawyer | 2 against the bill or to try to find out what was going |
| 3 BY MR. LAWLESS: | 3 on with respect to the bill? |
| 4   Q. How lucky for you. | 4   A. Yes. I recollect going down one |
| 5     Do you have any reason to believe | 5 afternoon -- must have been a day or two after that |
| 6 they couldn't make that representation to you, based | 6 bill had gone through the House -- and talking to a |
| 7 on what you know? | 7 couple of the state senators, encouraging them not to |
| 8      MR. WIER: Objection. | 8 adopt the legislation. |
| 9      THE WITNESS: No, not that I know. | 9   Q. Why did you think the legislation |
| 10 And it was --it did reflect my understanding of my | 10 shouldn't be adopted? |
| 11 situation. | 11   A. I guess, on one hand, I wasn't sure what |
| 12 BY MR. LAWLESS: | 12 the implications would be to me as an employee; and |
| 13   Q. If you look at the second page, down at | 13 on second note, I did have some belief in the |
| 14 the bottom it also has a cc, "Personnel file, law | 14 principal of trying to professionalize the government |
| 15 department." | 15 as opposed to politicize the government. |
| 16     What did you understand that to | 16   Q. When you were in Delaware that day, was |
| 17 mean in terms of cc the law department? | 17 Chris Coons there that day? |
| 18      MR. WIER: Objection | 18   A. Yes, I do remember a conversation outside |
| 19 BY MR. LAWLESS: | 19 of legislative hall with Chris. |
| 20   Q. Did you attach any significance to that | 20   Q. Who else was present at that time; do you |
| 21 fact or did you just not notice it when you got it? | 21 remember? Was Joe Freebery there? Let's start with |
| 22   A. I don't think I even noticed it. | 22 that. |
| 23   Q. Okay. So I understand, and I want to | 23   A. Yes. |
| 24 make sure it's clear, as far as you knew, based on | 24   Q. Was Diane Baker there? |

Charles Baker

17 (Pages 62 to 65)

Page 62

1    A    Not that I'm aware of.
2    Q    I'm asking if you saw any.
3    A    I may have seen -- I don't recall seeing
4  Joe on political activity during the workday.
5    Q    Were you involved at all in either the
6  general or the primary election campaign for County
7  Executive when Chris Coons first ran against Sherry
8  Freebery and then ran in the general election? Were
9  you involved in that at all, other than as a voter?
10    A    The primary -- Chris Coons versus Sherry
11  Freebery?
12    Q    Yes.
13    A    No, not even as a voter.
14    Q    Did you -- am I correct then that you
15  didn't attend any functions, debates, rallies,
16  anything like that?
17    A    I may have been at a couple of, like,
18  Chamber events where one or both of them were
19  speaking.
20    Q    At any of those events, do you recall
21  seeing Joe Freebery with his sister?
22    A    I can't recall.
23    Q    Okay. Do you recall, during the period
24  of time of the primary, hearing or reading anything

Page 63

1  about Joe Freebery supporting Sherry Freebery as
2  opposed to Chris Coons in the primary election?
3    A    Hearing about it publicly?
4    Q    Well, let's start with privately. Since
5  you're making the distinction, I can understand it.
6         Did you hear anything privately --
7  water-cooler stuff, conversations in the office --
8  about Joe Freebery working on Sherry's campaign?
9         MR. WIER: Well, the question is --
10  is the question limited to conversations in the
11  office?
12         MR. LAWLESS: No, anywhere.
13         MR. WIER: All right. If you can
14  answer it.
15  BY MR. LAWLESS:
16    Q    Do you want me to repeat it?
17    A    I believe that I had heard maybe either
18  from Joe or other people that Joe was going to or was
19  working on Sherry's primary campaign.
20    Q    So it wasn't particularly hidden?
21         MR. WIER: Objection --
22  BY MR. LAWLESS:
23    Q    It was kind of public knowledge, common
24  knowledge around the office, as far as you know?

Page 64

1         MR. WIER: Objection to form.
2         THE WITNESS: I would say as far as
3  I knew, people did know that.
4  BY MR. WIER:
5    Q    When did you became aware that a law was
6  being proposed to change the status of the general
7  managers from merit system to serving at the pleasure
8  of the County Executive?
9    A    Wayne Smith gave me a heads-up at, I
10  believe, some sort of Chamber function that he was
11  exploring some legislation to make the department
12  heads appointees.
13    Q    Who was Wayne Smith?
14    A    Wayne Smith -- I'm sorry -- is the House
15  of Representatives member in the General Assembly.
16    Q    And he said he was exploring it? Or can
17  you tell me what he said?
18    A    I believe he said that he was
19  exploring -- or he was either considering or about to
20  introduce a bill.
21    Q    Can you tell me where, in time, that
22  conversation occurred to when you heard the bill had
23  been passed, ballpark
24    A    And you're talking about the bill in

Page 65

1  2003?
2    Q    Now I'm talking about the bill in 2005.
3  I'm not talking about the first one; I'm talking
4  about the one that actually changed it.
5         Let's back up. We're talking about
6  the one after Mr. Coons became the County Executive.
7  When did you hear about that bill being passed?
8    A    At a general managers meeting some
9  morning -- maybe the day after it passed.
10    Q    Had you heard anything about it being
11  considered, debated or anything prior to the day it
12  had passed?
13    A    Not that specific bill.
14    Q    Okay. When you say "not that specific
15  bill," then I have to ask you the next question:
16  What had you been hearing?
17    A    I had heard the 2003 bill.
18    Q    Okay. From the time Mr. Coons took the
19  position as County executive until the day you just
20  told us about, had you heard anything about there
21  being any attempt to change the GMs from merit-system
22  protected to serving at the pleasure of the County
23  Executive?
24    A    Could you repeat that question.

Charles Baker

18 (Pages 66 to 69)

Page 66

1      (Record read.)
2          THE WITNESS: I don't recall that
3  there was discussion of a specific bill or attempt.
4  There may have been conversation about, again, the
5  general philosophy that Chris still believed
6  appointees were more appropriate than merit-system
7  positions.
8  BY MR. LAWLESS:
9      Q   Okay. After Mr. Coons became the County
10 executive, did he ask for the resignations of the
11 GMs?
12     A   No.
13     Q   Did you submit a resignation letter
14 saying, Here it is. If you want me, keep me; if not
15 I resign?
16     A   No.
17     Q   Do you know if anyone else did that?
18     A   I do not know.
19     Q   Do you know if any of the other GMs
20 had -- had any of the other GMs expressed to you
21 whether or not they intended to stay on with the
22 Coons administration after either the primary or the
23 general election?
24     A   Not specifically. I would say generally

Page 67

1  that I may have had some conversations, with those
2  that had the years in, that they were talking about
3  that they would probably retire at some point in the
4  coming months anyway.
5      Q   Who would they have been?
6      A   I think that would have been Diane Baker,
7  Pat DiIenno, Ron Morris.
8      Q   James Sapp?
9      A   Possibly Jim Sapp also in that group.
10     Q   Who else, after that group, was there?
11 There was you; there was Joe Freebery. Anybody else
12 as a general manager?
13     A   I guess Dave McAllister.
14     Q   And he was the?
15     A   Chief of Police.
16     Q   And he's no longer with the County, is
17 he, Dave McAllister?
18     A   No, he's no longer with the County.
19     Q   Okay. After Mr. Coons became the County
20 Executive, from that date until the present time,
21 have you received any written evaluations of your
22 performance as the general manager of the Department
23 of Land Use?
24     A   No.

Page 68

1      Q   And how long has he been the County
2  Executive?
3      A   From January.
4      Q   January of '05?
5      A   Until -- whatever, almost 20 months now.
6      Q   Were you -- under the other
7  administration, I guess the Gordon administration,
8  were you annually or semiannually or however
9  annually -- did you receive any reviews of your
10 performance during that period?
11     A   Yes, we did an annual review.
12     Q   Okay. Have you been told why you haven't
13 been given an annual review by this administration?
14     A   No.
15     Q   Do you have any -- do you know why you
16 haven't been given an annual review?
17         MR. WIER: Objection; calls for
18 speculation. Instruct him not to speculate. If you
19 can answer that without speculating --
20         THE WITNESS: No.
21 BY MR. LAWLESS:
22     Q   Has anyone ever said to you why you
23 haven't been given an annual review?
24     A   No.

Page 69

1          MR. WIER: Asked and answered.
2  BY MR. LAWLESS:
3      Q   Do you know if the other general managers
4  have been given annual reviews during this same
5  period of time, since Mr. Coons has been County
6  Executive?
7      A   I don't believe so.
8      Q   Has anyone made -- and you were talking
9  about GM meetings.
10         Do they still have weekly or daily
11 general managers meetings?
12     A   Yes. There's a weekly GM meeting.
13     Q   Okay. Did anyone say, at any of those
14 GMs meetings, We're not doing annual reviews any
15 more, or anything like that?
16     A   No, I don't recall that.
17     Q   And it's your testimony you have no idea
18 why you haven't been given an annual review or any
19 kind of review of your performance since Mr. Coons
20 took over as County Executive?
21         MR. WIER: Objection; asked and
22 answered.
23 BY MR. LAWLESS:
24     Q   You can answer.

Charles Baker

19 (Pages 70 to 73)

Page 70

1    A   I've had conversations with other GMs
2   that, the fact that we're appointees means there's
3   not a purpose to documenting performance anymore, if
4   we're at-will employees.
5    Q   Did you ever go to either Chris Coons or
6   Mr. Pryzwara or Mr. Singleton after the law was
7   changed and ask them about your status continuing on
8   as the general manager of the Department of Land Use?
9    A   Yes
10   Q   When did you do that?
11   A   I believe I probably had one conversation
12   with David Singleton shortly after. And then I
13   think -- maybe I've had -- maybe a couple
14   conversations with David Singleton and maybe one or
15   two conversations -- maybe one with Chris and David
16   combined, and one with Chris alone subsequent to
17   that.
18   Q   Okay. When did they take place? I'm not
19   going to hold you to a specific date, but give me a
20   time frame.
21   A   I'd say one was probably shortly after
22   Joe was terminated; and then another, more
23   specifically, I remember in October of 2005 with
24   Chris.

Page 71

1    Q   Let's start with the first one, a
2   conversation that took place shortly after Joe was
3   terminated. Who was that with?
4    A   I believe that was with David Singleton
5    Q   Anyone else present?
6    A   I don't believe so
7    Q   What did you say to Mr. Singleton, what
8   did Mr. Singleton say to you in that conversation?
9    A   I think I was asking how my performance
10   was stacking up to their expectations; if he could
11   give me some feedback, something more or less or
12   different than I should be doing; and generally how I
13   was doing.
14       And he gave me some positive
15   feedback about having shown commitment to the team,
16   working on the things that they wanted me to work on,
17   getting things done. So that's my general sense of
18   that conversation
19   Q   In that conversation, did Joe's name come
20   up at all?
21   A   I may have made some reference to not
22   wanting to end up in Joe's situation.
23   Q   What did he say to that? Dave Singleton
24       MR. WIER: Objection.

Page 72

1       MR. LAWLESS: You can answer.
2       MR. WIER: Well, let me state my
3   objection on the record. The witness is speculating.
4   Instruct him not to speculate.
5       If he recalls a conversation,
6   testify to it. I think his testimony was, "I may
7   have," and then you followed up with a question
8   assuming that was said. And I think that's
9   speculation, and I instruct the witness not to
10   speculate.
11       MR. LAWLESS: Okay. I don't
12   particularly care about what you're doing right now,
13   but I just do want to point out that you're making
14   the same kind of objections that you turned a
15   cartwheel about me making during Joe's deposition
16   last week.
17   BY MR. LAWLESS:
18   Q   I'm not asking you to speculate; I'm
19   asking you, what did he say?
20       MR. WIER: If you recall -- if he
21   recalls. That's right.
22       THE WITNESS: I believe Joe's name
23   did come up and that Singleton's response was similar
24   to what I previously stated

Page 73

1   BY MR. LAWLESS:
2    Q   Which was?
3    A   Why I was not in Joe's situation was
4   because of performance and working on what they
5   wanted to have work done on and -- positive feedback.
6    Q   Did you ever ask anyone in the Coons
7   administration why Joe Freebery got fired?
8    A   Nothing other than that conversation in
9   which my understanding was that they were not
10   satisfied with the performance of Joe.
11   Q   And your understanding is based on
12   specifically what?
13   A   That one conversation where David
14   contrasted Joe's performance to my performance: That
15   I wasn't in that situation because I was performing
16       MR. LAWLESS: I need to take one
17   minute, and then I'll be right back.
18       (Brief recess.)
19       MR. LAWLESS: Could we have this
20   marked.
21       (C. Baker Exhibit No 2 was marked
22       for identification.)
23   BY MR. LAWLESS:
24   Q   Mr. Baker, I'm going to show you a

Charles Baker

20 (Pages 74 to 77)

Page 74

1  document marked C. Baker 2, which appears to me to be
2  a memorandum from the Office of Law to the Honorable
3  Christopher A. Coons, County Executive, from Dennis
4  J. Siebold, Acting County Attorney, re: House
5  Bill 29, dated January 27, 2005.
6        Can you tell me what -- when it is
7  you first saw that memorandum?
8    A  I believe that day that David Singleton
9  told the GMs at the GM meeting that the bill had been
10  passed. I'm not sure the date of that meeting, but
11  shortly after or maybe the day after the bill had
12  been passed.
13    Q  And Baker 2 speaks for itself. I'm going
14  to characterize it here, at least, for the purpose of
15  the question. It's a memorandum from Siebold to
16  Coons purporting to respond to a question about
17  whether any County action would be necessary to
18  implement the provisions of House Bill 29
19        Can you give me the context in
20  which this memorandum was distributed to the GMs?
21  Was there a question about whether or not that bill
22  could be passed without action by County Council that
23  came up, or were you just handed the memorandum?
24    MR. WIER: Objection. Three

Page 75

1  questions in one; object to the form.
2    THE WITNESS: To the best of my
3  recollection, we were handed this memo at that GMs
4  meeting. There was not a discussion or questions at
5  the GMs meeting; it was something we were delivered.
6  I don't know what the question is that precipitated
7  it.
8  BY MR. LAWLESS:
9    Q  All right. Was there any conversation
10  among the GMs, right after the statute was passed,
11  regarding whether or not that could be done in the
12  absence of action by County Council that might have
13  precipitated this?
14    A  I don't recall specific conversation of
15  the GMs.
16    Q  Okay. Based on your observations, from
17  the time Mr. Coons took office until the time Joe
18  Freebery was terminated, was Joe Freebery trying to
19  antagonize Chris Coons or embarrass him in any way
20  while he performed the functions of the general
21  manager of the Department of Special Services?
22    A  Other than the testimony I've already
23  provided about the budget process, I don't recall
24  anything other than that.

Page 76

1    Q  Okay. Would it -- do you think, in the
2  budget process, in that meeting, that what you saw
3  and what you described to us, that that was Joe
4  Freebery attempting to embarrass the Coons
5  administration; or was that just a general manager
6  trying to protect whatever turf he was trying to
7  protect in the normal budgetary dynamic?
8    MR. WIER: Objection to the form of
9  the question.
10    THE WITNESS: I really don't know
11  enough of the specifics of the situation to give a
12  perception or a judgment about it.
13  BY MR. LAWLESS:
14    Q  Okay. Based on what you saw -- well, no.
15  I think you might have answered that question. You
16  just couldn't tell one way or another?
17    A  Again, I don't remember what the
18  specifics were to say whether he was deliberately
19  trying to do that. I just remember that sense.
20    Q  Did you have that sense?
21    A  It would not have surprised me if Joe was
22  trying to do that.
23    Q  Why?
24    A  Just Joe's personality.

Page 77

1    Q  Did Joe ever try to do that when Tom
2  Gordon or Sherry Freebery were in charge? Was there
3  ever any of that kind of antagonism going back and
4  forth in terms of the budget?
5    A  Yes. I think I remember budget arguments
6  between, particularly, Joe and Sherry during previous
7  years also.
8    Q  Would it be fair to say that the budget
9  arguments between Joe and Sherry were probably a
10  little bit more heated than the budget argument that
11  you described between Dave and Joe Freebery at that
12  one meeting?
13    A  Yes, that would probably be fair to say.
14    Q  Okay. So other than that meeting that
15  you described where there was that exchange between
16  Joe Freebery and Dave Singleton regarding the budget,
17  are you aware of anything that Joe Freebery did that
18  you would have observed and concluded would be an
19  attempt to embarrass the Coons administration?
20    A  Not that I was aware of.
21    Q  Okay. Do you have any idea why Joe
22  Freebery was fired?
23    MR. WIER: Objection; asked and
24  answered.

Charles Baker

21 (Pages 78 to 81)

Page 78

1        THE WITNESS: No, not any
2 specifics.
3 BY MR. LAWLESS:
4    Q    Did you ever -- and I think I probably
5 know the answer to this: Did you ever ask Chris
6 Coons, Why did Joe Freebery get fired?
7    A    No.
8    Q    Did either Chris Coons or Dave Pryzwara
9 or -- Richard Pryzwara or Dave Singleton ever tell
10 you why Joe Freebery was fired?
11    A    No.
12        MR. WIER: Objection; asked and
13 answered.
14 BY MR. LAWLESS:
15    Q    Do you know Jen Thacker?
16    A    Excuse me?
17        MR. LAWLESS: I'm sorry. What's
18 Jen's last name?
19        MR. WIER: Farrell.
20        MR. LAWLESS: Farrell. Sorry about
21 that.
22        THE WITNESS: Okay.
23 BY MR. LAWLESS:
24    Q    Do you know Jen Farrell?

Page 79

1    A    Yes.
2    Q    What position does she hold with the
3 administration right now?
4    A    I'm not certain.
5        MR. LAWLESS: I believe that she
6 may have resigned her position or -- do you know if
7 she was ever employed in the Coons administration?
8        THE WITNESS: Yes, I believe she
9 was an executive assistant.
10 BY MR. LAWLESS:
11    Q    To?
12    A    To the County Executive.
13    Q    Okay. Did you ever see whether or not
14 she had any dealings with Joe Freebery?
15    A    She was in kind of a support staff role,
16 so I assume they had some interaction. Whether it
17 was scheduling meetings or helping the executive
18 office communicate with the GMs, it wouldn't surprise
19 me. I don't know any specifics about communication
20 between them.
21    Q    Other than what you've testified to
22 today, are you aware of anything or any actions by
23 Joe Freebery which would have interfered with his
24 ability to continue to act as the general manager of

Page 80

1 the Department of Special Services, other than the
2 fact that he was Sherry Freebery's brother?
3        MR. WIER: Let me object to the --
4 let me object to the question. And I'm going to
5 instruct him not to answer that question as phrased,
6 because it assumes a fact not in evidence. It's
7 like, When did you stop beating your wife? So I
8 think it's an improper question.
9        MR. LAWLESS: Okay.
10        MR. WIER: You can rephrase it if
11 you want to.
12        MR. LAWLESS: Okay. We'll rephrase
13 it.
14 BY MR. LAWLESS:
15    Q    With the exception of the budget
16 conversation that you told us about, do you know of
17 any reason why Joe Freebery could not have continued
18 to serve as the general manager of the Department of
19 Special Services in the Coons administration?
20        MR. WIER: Let me object, because I
21 believe it misstates his testimony.
22        MR. LAWLESS: I wasn't
23 mischaracterizing testimony; I was asking him a
24 question.

Page 81

1        MR. WIER: You limited it to the
2 problems with the budget, and I think there's
3 testimony as to other issues.
4 BY MR. LAWLESS:
5    Q    Mr. Baker, do you understand my question?
6    A    I'm not sure that there were not other
7 concerns out there. And specifically, I know that
8 there was conversations subsequently that evolved
9 about Special Services following all the
10 code/permitting processes.
11    Q    So subsequent to Joe Freebery being
12 terminated --
13    A    I should strike the word "subsequently."
14    Q    Do you remember when they were, one way
15 or the other?
16    A    I don't remember when.
17    Q    Okay. You told us earlier, because you
18 mentioned them, about the relationship between the
19 Department of Special Services and Land Use regarding
20 whether or not permits were being obtained,
21 et cetera, et cetera. Do you recall testifying about
22 that?
23    A    Yes.
24    Q    Did you ever communicate any of that to

Corbett & Wilcox

Charles Baker

22 (Pages 82 to 85)

Page 82

1  Chris Coons, Richard Pryzwara or David Singleton
2  prior to Joe Freebery being terminated?
3      A  I am not sure about the dates.
4      Q  Okay. Well, when you say you're not sure
5  about the dates, are you telling me that you did
6  communicate that to Coons, Pryzwara or Singleton at
7  some point?
8      A  Yeah, I believe that I did have
9  conversations at least with David Singleton and I
10  believe with Richard Pryzwara about that topic.
11      Q  And was that before or after Joe Freebery
12  was terminated?
13      A  I do not recall.
14      Q  Do you recall whether or not you ever put
15  any of that in writing to them?
16      A  Not that I recall.
17      Q  So you can't -- well, strike that.
18          Other than what you have testified
19  to to this point in the deposition right now, this
20  moment, is there anything else you can testify to
21  which would, in your mind, have prevented Joe
22  Freebery from continuing to serve as the general
23  manager of the Department of the Special Services?
24      MR. WIER: Objection to form.

Page 83

1          THE WITNESS: Not that I would be
2  aware of.
3  BY MR. LAWLESS:
4      Q  Okay. Based on everything you've told us
5  this far, up to this moment, is there anything that
6  you have testified to which, in your mind would have
7  disqualified him from serving as the general manager
8  of the Department of Special Services?
9          MR. WIER: Objection. To the
10  extent it calls for a legal conclusion, I instruct
11  him not to answer.
12      MR. LAWLESS: Why?
13      MR. WIER: Because you're asking
14  him to state a legal conclusion as to what the --
15  what would constitute a disqualification under some
16  statute, and I'm instructing him not to answer that
17  question as phrased. He's not a lawyer; he's not the
18  County Executive; therefore, I object. You can
19  rephrase it.
20      MR. LAWLESS: I'm trying to come up
21  with a word here that Mr. Wier will find acceptable.
22      MR. WIER: It's also irrelevant,
23  but that's not a basis for objecting at this stage.
24  BY MR. LAWLESS:

Page 84

1      Q  Mr. Baker, let me ask you this: You
2  don't know why Joe Freebery got fired, do you?
3          MR. WIER: Objection; asked and
4  answered.
5          THE WITNESS: No.
6  BY MR. LAWLESS:
7      Q  Do you have a belief why Joe Freebery got
8  fired?
9          MR. WIER: Objection; asked and
10  answered, irrelevant.
11  BY MR. LAWLESS:
12      Q  Go ahead. You can answer.
13      A  Beyond what I said previously, no.
14      Q  And your belief as to the reasons Joe
15  Freebery got fired is what? Just so I'm clear.
16          MR. WIER: Asked and answered.
17          THE WITNESS: Again, nothing more
18  than what was in the newspaper and the previous
19  things that I just testified about. I don't know if
20  they were contributing factors or not, but just that
21  they were not satisfied with his job performance.
22          MR. LAWLESS: All right. Mark that
23  real quick.
24          (C. Baker Exhibit No. 3 was marked

Page 85

1  for identification.)
2  BY MR. LAWLESS:
3      Q  Mr. Baker, you are being shown what has
4  been marked as C. Baker 3. Can you tell me what that
5  is.
6      A  This is a letter from -- addressed to me
7  from Pat DiIenno, who is the Chief Human Resources
8  Officer, dated February 28th, 2005.
9      Q  And that's the letter telling you that
10  you now served at the pleasure of the County
11  Executive; is that correct?
12      A  Yes. The third sentence says,
13  "Therefore, effective immediately, you are now
14  serving at the pleasure of the County Executive."
15      Q  When you received that letter, who were
16  the general managers of the departments? Was James
17  Sapp one of the general managers?
18      A  Yes. I believe -- and if you don't mind,
19  I'm going to consult the Exhibit 2 -- on the cc list
20  was myself, Joe Freebery, Diane Baker, James Sapp,
21  Ron Morris, Pat DiIenno; and I believe those were all
22  GMs that this law applied to.
23      Q  And correct me if I'm wrong, but I
24  believe you testified that it was your understanding

Corbett & Wilcox

Charles Baker

23 (Pages 86 to 89)

Page 86

1 that Baker, Sapp, Morris, and DiIenno had said to you
2 at various times, after Coons won the Democratic
3 primary, that it was their plan to retire at any
4 rate, regardless of what happened?
5        MR. WIER: Objection.
6        THE WITNESS: I believe I either
7 had conversations with each of those four or people
8 had secondhand conversations where I had that
9 impression.
10 BY MR. LAWLESS:
11     Q    So would I be correct then, at least as
12 far as you knew, that at the time House Bill 29 -- is
13 it House Bill 29? -- there you go, thank you -- House
14 Bill 29 was passed, you, Joe Freebery, and -- who was
15 the police chief?
16        MR. WIER: McAllister.
17 BY MR. LAWLESS:
18     Q    -- McAllister were the only three general
19 managers who had not indicated that they were
20 preparing to resign or were going to resign after
21 Mr. Coons became the CAO; that is correct? CEO.
22        THE WITNESS: That was my sense.
23        (C. Baker Exhibit No. 4 was marked
24        for identification.)

Page 87

1 BY MR. LAWLESS:
2     Q    You're being shown what's been marked as
3 C. Baker 4. And am I correct that's a copy of House
4 Bill 29?
5     A    Yeah. I believe this is a copy of House
6 Bill 29.
7     Q    Have you ever been told by anyone in the
8 Coons administration what rights or options you would
9 have if you were to be told you were no longer
10 serving as the general manager of the Department of
11 Land Use?
12     A    I believe at the meeting or maybe
13 subsequent meeting at the GM table where this bill
14 was discussed, there was a conversation about if you
15 wanted to be a merit employee, then you could
16 certainly apply for a merit-system job; but the GM
17 positions were not merit system anymore.
18     Q    So it's your understanding then that once
19 that law was passed, that you would have to apply for
20 a merit-system job separately and independently, as
21 if you were never a County employee?
22     A    That's what was stated.
23     Q    And that was right after the bill was
24 passed? Or close -- a week or two, whatever --

Page 88

1     A    Yes.
2     Q    -- after the bill was passed?
3     A    I believe Pat DiIenno actually may have
4 stated that; and with David Singleton, they were both
5 supporting that position.
6     Q    Okay. At that moment or at any time,
7 whenever that issue was discussed, did you ever raise
8 the question of the content of C. Baker 1 -- and I'm
9 specifically referring to that portion of the memo
10 where it says -- I may be mischaracterizing it --
11 where it says that you're to consider that a contract
12 of the employment. Did you ever ask anyone in the
13 Coons Administration, What about what this memo
14 says --
15     A    No.
16     Q    -- Don't we have a contract of
17 employment?
18     A    No.
19     Q    Do you believe that memo gave you a
20 contract of employment?
21     A    I'm not sure, honestly.
22     Q    That's what it says, though; right?
23     A    That's what it says.
24        MR. WIER: I mean, object.

Page 89

1 Objection.
2        MR. LAWLESS: I don't think I have
3 any more questions for you.
4        MR. WIER: Let me just object to
5 the gratuitous conclusion as -- I guess my objection
6 is as to form.
7        MR. LAWLESS: Give me one more
8 second, Mr. Baker, and I believe you're out of here.
9        Mr. Baker, unless Mr. Wier or
10 Ms. Allen have some questions for you, I have nothing
11 further. Thank you very much.
12        MR. WIER: Thank you. No
13 questions. We will not waive reading and signing.
14        (Deposition concluded at 12:20 p.m.)
15     C E R T I F I C A T I O N
16
17        I hereby certify that I have read
18 the foregoing transcript of my deposition testimony,
19 and that my answers to the questions propounded, with
20 the attached corrections or changes, if any, are true
21 and correct.
22

------------------------------
23     CHARLES L. BAKER
24

Charles Baker

24 (Pages 90 to 91)

Page 90

```
 1              INDEX
 2  WITNESS:                  PAGE
 3  CHARLES L. BAKER
 4    Mr. Lawless              2
 5           EXHIBITS
 6  C. BAKER      DESCRIPTION        PAGE
 7  1    Memo from Mr. Gordon and     53
         Ms. Freebery to Mr. Baker dated
 8       11-24-03
 9  2    Memo from Dennis Siebold to   73
         Mr. Coons dated 1-27-05
10
     3   Letter from Pat DiIenno to    84
11       Mr. Baker dated 2-28-05
12  4    House Bill 29                 86
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 91

```
 1       CERTIFICATE OF SHORTHAND REPORTER
 2
 3         I, Gail Inghram Verbano, CSR, RMR,
 4  the officer before whom the foregoing proceedings
 5  were taken, do hereby certify that the foregoing
 6  transcript is a true and correct record of the
 7  proceedings; that said proceedings were taken by me
 8  stenographically and thereafter reduced to
 9  typewriting under my supervision; and that I am
10  neither counsel for, related to, nor employed by any
11  of the parties to this case and have no interest,
12  financial or otherwise, in its outcome.
13
14
15
16
         _____
         Gail Inghram Verbano, CSR, RMR
17       CSR No. 8635
         Certification No.: 220
18       (Expires 1-31-2008)
19
20
21
22
23
24
```