# EXHIBIT E

*Barker file*

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

NEW CASTLE COUNTY, a political :
subdivision of the State of
Delaware,                        :

              Plaintiff,    :

         vs.          :    Civil Action No.
                          20604 - NC

CHRISTIANA TOWN CENTER, LLC,     :
a Delaware limited liability
company,                         :

           Defendant.    :

- - -

Chancery Courtroom No. 12D
New Castle County Courthouse
Wilmington, Delaware
Tuesday, November 29, 2005
2:05 p.m.

- - -

BEFORE:  HON. JOHN W. NOBLE, Vice Chancellor.

- - -

ARGUMENT ON DEFENDANT'S MOTIONS TO COMPEL
AND FOR PROTECTIVE ORDER

- - -

CHANCERY COURT REPORTERS
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0525



2

1  APPEARANCES:

2          COLLINS J. SEITZ, JR., ESQ.
           MAX B. WALTON, ESQ.
3          Connolly, Bove, Lodge & Hutz
             for Plaintiff

4
           RICHARD L. ABBOTT, ESQ.
5          Abbott Law Firm, LLC
             for Defendant

6
           MARY A. JACOBSON, ESQ.
7          New Castle County Law Department
                        -and-
8           DANIEL D. WILLIAMS, ESQ.
            of the District of Columbia Bar
9           8Williams & Connolly LLP
              for Intervenor Baker

10                    -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

3

1          THE COURT:  Good afternoon.

2          MR. ABBOTT:  Good afternoon, Your

3    Honor.  Richard Abbott on behalf of defendant,

4    Christiana Town Center, LLC.  May it please the Court,

5    this is the time the Court has scheduled to consider a

6    number of issues, a round of pending motions, and I

7    guess also the question of whether certain motions are

8    pending or not.

9          THE COURT:  Excuse me.  Would it make

10   sense to deal with the matters involving Mr. Baker

11   first?

12         MR. ABBOTT:  That was what I just

13   asked Mr. Williams, so that he could be on his way, if

14   the Court would excuse him.

15         THE COURT:  He is certainly welcome to

16   stay if he wants to.

17         MR. ABBOTT:  Given that, Your Honor,

18   that is, of course, the motion regarding the

19   depositions of Mr. Hubbard, Mr. Baker and

20   Ms. Freebery.

21         Dealing with Mr. Baker's issue first,

22   I think it is fairly straightforward.  It deals with a

23   question that certainly might elicit additional

24   questions beyond that, but essentially it revolves

CHANCERY COURT REPORTERS

4

1  around a question at his deposition now preceding

2  that.  And I think it is important to understand the

3  immediately preceding background.

4           It is our contention that Mr. Baker

5  gave testimony which was at variance at least with

6  what Mr. Hubbard had testified to relative to

7  Ms. Freebery's involvement or role with respect to the

8  issues at the Christiana Town Center and the

9  litigation, this case.

10          To explore whether he might be

11  concealing any involvement on her part, Mr. Tucker,

12  who was then co-counsel in the case, asked Mr. Baker

13  if he would do something that Sherry Freebery asked

14  him to do that might be unlawful.  He said no -- and I

15  am paraphrasing, obviously -- no, essentially that

16  type of thing would not happen, and even if it did, I

17  wouldn't do it.

18          That was followed up with an issue,

19  given his answer, a question by Mr. Tucker on whether

20  or not he had ever been asked to remove certain

21  documents, and I think Mr. Tucker was about to say

22  "from land use department files," but he was cut short

23  by counsel for Mr. Baker at the deposition.  There was

24  then a colloquy to some degree about their objection

CHANCERY COURT REPORTERS

5

1

10  from files or at least one document -- I don't know

11  whether it was plural, but at least a document from a

12  land use department file at Ms. Freebery's request.

13              We think that issue is relevant

14  because certainly, as we have noted in our motion, if,

15  indeed, Mr. Baker had at a prior time undertaken

16  something which may not be permissible under the

17  county code, which is take documents, original

18  documents, and remove them from the county's files at

19  Ms. Freebery's request for the purpose of concealing

20  her involvement in a particular matter, then we

21  believe that it is also similarly possible that

22  Mr. Baker may not be telling us about some of

23  Ms. Freebery's involvement with respect to matters

24  relevant to this suit.  That is basically it.

CHANCERY COURT REPORTERS

6

1        It is a credibility issue.  We think

2    it establishes, you know, that when he gave his

3    answers, specifically, "She wouldn't ask me to do

4    that, and if she did, I wouldn't do it," if, indeed,

5    he

6

7

8    knowledge of the law, then he would not have been

9    truthful because, indeed, he would have done something

10    which is not legally permissible at Ms. Freebery's

11    request.

12        These original documents are obviously

13    public records of the county.  You are not allowed to

14    take them and remove them so that the record is left

15    incomplete.  And, of course, in that case, the way

16    that they found that document was that it was

17    discovered pursuant to a search warrant execution of

18    Ms. Freebery's house.

19        So that is pretty much where we are.

20

21

22

23

24

CHANCERY COURT REPORTERS

7

8            All we want to know about

9    is whether, indeed, Mr. Baker had done something in

10   the past in a fashion which may have been in violation

11   of at least the county code, maybe the state code, at

12   Ms. Freebery's behest to conceal her involvement in a

13   particular matter that we think would be relevant to

14   his credibility, given his prior testimony.

18            This is much more narrow, much more simple.

19   And certainly to the extent that the Court is

20   concerned about some of those issues, we would be

21   happy to agree upon an appropriate limitation so that

CHANCERY COURT REPORTERS

8

1    extent that is suggested by Mr. Baker's counsel.

2                    THE COURT:  Why shouldn't I view this

3    as so collateral to the issue in front of me that it

4    is just not worth the effort?

5                    MR. ABBOTT:  Well, we think that --

6    well, it becomes certainly relevant, too, to the

7    extent that we get to Ms. Freebery's deposition and

8    that issue.  I think it certainly provides us with an

9    extra element of argument as to why we should be

10   permitted to take Ms. Freebery's deposition.

11                   But why?  I guess the answer would be

12   I don't see this as a very complex issue.  I see this

13   as a very narrow, Rule 26, Rule 30 issue regarding the

14   general rules of discovery and the scope of deposition

15   testimony.  And, of course, the rules are that

16   anything that is relevant or reasonably calculated to

17   lead to the discovery of admissible evidence.

18                   And I do note in Mr. Williams's or his

19   cohort's filing with the Court they mention something

20   about how you can only use this on cross-examination.

21   Well, certainly if we were to call Mr. Baker at trial,

22   we would ask that he be treated as a hostile witness,

23   given the fact that he is adverse, and cross-examine

24   him, so that it would, indeed, be cross-examination,

9

1    credibility-type questioning.

2               And again, you know, why is that

3    important?  It is important in this case because one

4    of the central premises of our defense is that the

5    reason that this case was initiated and that it has

6    continued to be pursued -- well, there is other

7    reasons why it is continuing to be pursued, but the

8    reason that it was initiated at the outset was in

9    part, one, because it was to advance Ms. Freebery's

10   political agenda, personal agenda, and, number two,

11   that she had a bias against Mr. Acierno, who owns the

12   property, and that it was in furtherance of that

13   particular animus that she holds towards him.  So it

14   was a two-for.  And we believe that's why we are here.

15               And obviously, I think what is going

16   to come down at trial in this case, if we get there,

17   is that the county is going to say the site was not in

18   compliance.  We are going to say the site was in

19   compliance.  And the Court may -- you may scratch your

20   head, Your Honor, and say this is a close call.  Why

21   are we here?  The county has got some evidence that

22   there were problems in the past, but yet Christiana

23   Town Center has got evidence that at the time this

24   case was filed the site was fine.  So why are we here?

CHANCERY COURT REPORTERS

10

1          That gap-filler is precisely the

2    information that we are trying to put forward, which

3    is to say it is very simple.  Because this isn't about

4    the environment.  This isn't about the merits of

5    enforcement.  This is about Frank Acierno and

6    political agendas, and that is how you can explain it.

7    So we believe that provides the Court with some

8    helpful guidance in terms of the ultimate outcome of

9    the case.

10          And we think, since Mr. Baker is

11   essentially saying, "I have never done anything at

12   Ms. Freebery's behest before that might be unlawful,"

13   we are entitled to find out that answer at least to

14   that one question, that did he, in fact, do something

15   of the nature of taking a document from a file at her

16   request involving her involvement

17

18

19          So, you know, sorry for the

20   long-winded answer, but that's the explanation.

21          THE COURT:  Well, the question I asked

22   probably prompted a long-winded answer.

23          Why isn't Mr. Mullaney's testimony

24   sufficient?

CHANCERY COURT REPORTERS

11

THE WITNESS:  Well, Mr. Mullaney's

testimony was not on point here in that he said, "I am

the one that made the ultimate decision to file this

case."  In Mr. Baker's deposition he had first said

that he and his staff were involved in deciding to

pursue the case, and then later he corrected himself,

and I am not suggesting it was inconsistent.  He may

just not have understood the question.  But he later

corrected himself and said, "Well, I think you would

have to ask Mr. Mullaney."

        And what I gather from that is that

essentially the issue about site conditions and

whether there should be enforcement pursued and so

forth was something that Mr. Baker and his staff gave

input on, but Mr. Mullaney obviously as the county

attorney had to make that final call and say pull the

trigger; let's file.  So all Mr. Mullaney told us is a

statement of the obvious, which is that the county

attorney is the one that has to ultimately make that

call to Mr. Seitz and his firm and so forth that go

ahead and proceed to file.

        And it wasn't that difficult in this

case, because as Your Honor may be aware, this case

is -- about 90 percent of this case is verbatim a case

CHANCERY COURT REPORTERS

12

1    that was filed in August of 2003 that the county

2    alleged all the same facts in, and then this case adds

3    a September additional factual series of averments.

4    But the relief is essentially the same and the facts

5    are predominantly the same. So Mr. Mullaney really

6    didn't tell us anything about what was behind the

7    scenes the role of Ms. Freebery.

8                    It is no mystery, Your Honor, that

9    Ms. Freebery ran the county, that she ran it almost

10   unilaterally in many instances, but certainly in

11   conjunction with the County Executive. And there is

12   certainly no question that as a matter of law the

13   County Attorney and the Department of Land Use general

14   manager ultimately are reportable and responsible to

15   her as the day-to-day manager of the county

16   government. So, you know, it is not that -- it

17   wouldn't be that surprising that the head of the

18   county government would talk to a general manager or

19   an inferior management person and talk about these

20   issues.

21                   So, you know, that is really -- and I

22   guess Mr. Baker's attorney said, "Well, you know, why

23   don't you ask Ms. Freebery?" Well, I am not sure that

24   that necessarily resolves it, because again, we want

CHANCERY COURT REPORTERS

13

1    to know from Mr. Baker specifically is that the case.

2           And I just see this as a very

3    straightforward, narrow issue, and it is under the

4    Court's general discovery rules and analysis.

5           Thank you, Your Honor.

6           THE COURT:  Thank you.  Mr. Walton,

7    Mr. Seitz, do you want to be heard on this?

8           MR. WALTON:  Your Honor, I am going to

9    turn Mr. Baker's over to Mr. Williams.

10          THE COURT:  That is fine.

11          MS. JACOBSON:  Good afternoon, Your

12   Honor.  My name is Mary Jacobson.  I am local counsel

13   for Charles Baker.  I would like to introduce

14   Mr. Williams, who is going to argue the motion.  He

15   has been admitted pro hac.  The motion was signed by

16   Judge Gebelein, who was sitting previously on this

17   case by designation.

18          THE COURT:  Good afternoon.

19          MR. WILLIAMS:  Good afternoon, Your

20   Honor.  Thank you for having me.  Your Honor, I

21   represent intervenor Charles Baker, who is a witness

22   but not a party in this action.

23          Christiana's requested additional

24   discovery from Mr. Baker is just miles away from

CHANCERY COURT REPORTERS

14

1  anything that is necessary or relevant to this

2  lawsuit. I myself when I found out what the issue was

3  had to go back and look at the complaint, because I

4                                                              to

5

6        It turns out it doesn't have anything to do

7  with those subjects, as I am sure everyone else in the

8  courtroom is well aware.

9        Your Honor, Rule 26(b) limits

10  discovery to matters that are relevant to the subject

11  matter of the pending action. And I believe counsel

12  actually misstated the rule when he said it also

13  permits discovery and he said discovery of anything

14  that might be admissible. But that is not what

15  Rule 26 says. Rule 26 says it is limited to matters

16  that are relevant to the subject matter of the pending

17  action.

18        Now, how did we get here today? Well,

19  in April of 2004 this Court issued a protective order

20  saying that the defendant was not allowed to take a

21  deposition of Ms. Freebery. They had said they wanted

22  to take the deposition of Ms. Freebery to understand

23  what her role was with this lawsuit, and the Court

24  said no, you can't do that. It appears that she

CHANCERY COURT REPORTERS

15

1  didn't have a central role, so you can get information

2  you need about the conduct of this lawsuit from

3  others.  The Court added a footnote to its opinion,

4  saying it would be willing to reconsider that order if

5  there were some evidence that Ms. Freebery was

6  actively involved in decision-making as to the matters

7  raised in this action.  So defendant then decided to

8  take discovery for the purpose of satisfying that

9  footnote.

10              Now, Your Honor, I would submit that

11  while maybe that is relevant in some way, that has got

12  to be a periphery of what is permitted by Rule 26(b)

13  of discovery relevant to the subject matter of the

14  action.  But they did.  They took the discovery.  And

15  they took the discovery from my client, from

16  Mr. Baker.

17              Counsel says that this is the issue

18  that he wants to explore with Mr. Baker, what

19  Ms. Freebery's role was with respect to this lawsuit.

20  Well, that question was answered in the deposition

21  repeatedly by Mr. Baker.  There is no dispute that

22  Mr. Baker testified in his deposition that he is

23  unaware of Ms. Freebery having any role with respect

24  to the initiation of this lawsuit.  There is no

CHANCERY COURT REPORTERS

16

1  dispute that Mr. Baker testified in his deposition

2  that Ms. Freebery was not involved in the day-to-day

3  management of the lawsuit, the week-to-week management

4  of the lawsuit, the month-to-month management of the

5  lawsuit.  So to the extent that this peripheral issue

6  qualifies as relevant, there has already been

7  discovery on that subject.

8         But what happened is, counsel for

9  defendant didn't like that answer because it wouldn't

10  satisfy the Court's footnote, allowing it to depose

11  Ms. Freebery, so it then moved on to a different

12  subject, which was information that Mr. Baker had

13  concerning Ms. Freebery's role with respect to wholly

14  unrelated land use matters.

15         And as I think is now clear from the

16  papers and certainly argument today, '

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

17

1

2

3

4

5          this whole line of

6   questioning is about a different land use matter.  So

7   given that it is about a different land use matter, we

8   have now traveled far past what was even remotely

9   relevant to the issues in dispute in this lawsuit.  I

10  think the Court hit the nail on the head when it

11  raised that very question.  So even if the questions

12  that were asked and answered of Mr. Baker concerning

13  Ms. Freebery's role with this lawsuit were remotely

14  relevant, these additional questions just are not

15  relevant at all.

16          Counsel in his papers stated that his

17  rationale for asking these questions about this

18  unrelated land use matter is to impeach the

19  credibility of Mr. Baker's testimony.  But, Your

20  Honor, if questions to impeach a deponent's

21  credibility would satisfy the Rule 26 rule even if the

22  questions were wholly unrelated to the subject matter

23  of the litigation, then that impeachment exception

24  would swallow Rule 26(b).  Any question could be

CHANCERY COURT REPORTERS

18

1    asked, because a lawyer could always have some

2    document in his back pocket for which he sought to get

3    contradictory testimony on some wholly unrelated

4    subject, and the lawyer could have questioning on any

5    subject matter at all in a deposition. But clearly

6    that is not the law.

7            The law does permit impeachment

8    questioning during a deposition, but it limits the

9    impeachment questioning. It limits the impeachment

10   questioning to questioning about matters that are

11   relevant to the specific lawsuit. And for that

12   proposition there are several cases, but I will cite

13   the Court to Burns vs. Phillips, which was cited in

14   the county's papers.

15           Your Honor, not only is this issue not

16   at all relevant to the lawsuit, but after the July

17   2004 hearing the issue is now moot, and that is what I

18   explained in my letter to the Court a week or so ago.

19   At the hearing in July of 2004 counsel for defendant

20   testified that the only way to get Freebery's full --

21   to figure out what Freebery's full involvement was

22   with this lawsuit would be to question Ms. Freebery or

23   Mr. Mullaney, who was then the county attorney. And

24   that is in the transcript from that hearing, page 104,

19

1  lines 12 through 14.

2           So if the two sources of the

3  information are Mr. Mullaney and Ms. Freebery, why

4  were they deposing Mr. Baker?  Well, they answered

5  that question -- counsel for defendant answered that

6  question during the hearing as well.  Counsel

7  explained that under the shunt rule he was required to

8  exhaust all nonattorney source of that information

9  before he could depose Mr. Mullaney.  So Mr. Baker was

10  clearly a secondary source for the information, but he

11  was being deposed under the shunt duty to exhaust all

12  other sources.

13           Well, at the July 2004 hearing, as the

14  Court noted, Mr. Mullaney testified in open court, and

15  the Court asked why that testimony wasn't fully

16  satisfactory.  Counsel today said that Mr. Mullaney

17  had given, just to characterize this, a narrow answer,

18  that he was the ultimate decision-maker, but actually

19  what Mr. Mullaney said was much more than that.  I

20  refer the Court to page 106 of the transcript,

21  starting on line 12.  What Mr. Mullaney said is:  "I

22  want to make it clear that the decision to enter into

23  the lawsuit was a decision that I made in conjunction

24  with the land use department, Mr. Baker, Mr. Haggerty,

20

1    and members of the staff, and was in no way influenced

2    by the CAO or the CE." So Mr. Baker testified in open

3    court that the CAO, Ms. Freebery, had no role with

4    respect to the lawsuit.

5                THE COURT: Mr. Baker or Mr. Mullaney?

6                MR. WILLIAMS: I am sorry.

7    Mr. Mullaney testified. Thank you. Mr. Mullaney

8    testified in court that the CAO had no role with

9    respect to the filing of the lawsuit, which is the

10   precise question that counsel explained to you he

11   wanted to explore further with Mr. Baker.

12                Your Honor, now that they have gotten

13   the information from the best source that they

14   identified at the hearing, Mr. Mullaney, the issue is

15   now moot. They have no need to exhaust.

16                Moreover, any additional discovery

17   would be duplicative or cumulative, and Rule 26(b)(1)

18   provides that discovery "shall be limited" by the

19   court if the discovery is "unreasonably cumulative or

20   duplicative." We have now had three people testify

21   concerning Ms. Freebery's lack of a role. We have

22   Mr. Mullaney, who defendant's counsel said was one of

23   the two best sources. We have Mr. Haggerty of the

24   land use department, who testified in full accord with

CHANCERY COURT REPORTERS

21

1  these other witnesses, and we have the testimony of

2  Mr. Baker himself on this question. So I respectfully

3  submit that further testimony on this subject would

4  clearly be duplicative or cumulative.

5          Finally, Your Honor, it would just

6  impose an undue burden and be oppressive to reconvene

7  this deposition to ask the two questions.

8          Now, there is some dispute about what

9  it is that counsel wants to ask Mr. Baker. At the

10 July 2004 hearing, recognizing the undue burden,

11 counsel specifically limited his questioning, and it

12 wasn't what counsel said today. In the July 2004

13 hearing counsel said -- and this is on page 75 -- "And

14 there is only two areas we want to explore: One -- I

15 will say them again so it is really clear to all the

16 parties here -- did Mr. Baker ever conceal

17 Ms. Freebery's involvement in other land use matters;

18 yes or no? If so, why would he do that?"

19         Now, we would respectfully submit that

20 if that discovery really were necessary, the most

21 straightforward way to get it would just be to send

22 Mr. Baker an interrogatory with those two specific

23 questions, have him answer them under oath. That

24 would prevent the need to file another motion to

CHANCERY COURT REPORTERS

22

1   quash, and if counsel tries to expand it into other

2   subjects.  Today counsel said he wanted to question on

3   the supposed removal of some files, of some paper from

4   a file.  That is not the question that they said in

5   July 2004 was the one question they wanted to ask with

6   the follow-up why or why not.  But in any event, Your

7   Honor, even asking the limited question they said in

8   July 2004 they wanted wouldn't comport with Rule

9   26(b), because it is wholly irrelevant, the issue is

10  moot after Mr. Mullaney's testimony, and it is all an

11  attempt to tread on the secrecy of the grand jury.

12          Finally, Your Honor, I would just note

13  that there was some speculation today in court about

14  what Mr. Baker may or may not have done with respect

15  to some file and whether it complied with county

16  policy or state law.  We feel that that is wholly

17  inappropriate.

18

19

20

21

22          For all those reasons, Your Honor, I

23  would respectfully ask that you deny the motion.

24  Thank you.

CHANCERY COURT REPORTERS

23

1          THE COURT: Thank you.

2          MR. ABBOTT: Your Honor, I just have

3  three points. One, I don't agree with counsel that

4  the standard is relevance, period. I don't know. I

5  mean, we have cited cases. The standard, as I have

6  always known it and always seen it applied, is

7  relevant or reasonably calculated to lead to the

8  discovery of admissible evidence.

9          Two, some of the cases we cited in the

10  motion in this regard stand for the proposition that,

11  for example, in the Clearline v. Local Union 451,

12  relevancy objections should only be sustained where it

13  appears to be beyond a reasonable doubt that the

14  information sought could not be relevant or material

15  and would not be reasonably calculated to lead to the

16  discovery of admissible evidence. So I don't think

17  there is any problem in that regard.

18          And the final point I would make is in

19  our motion itself. And I think I hear what

20  Mr. Williams is saying, and I will take him at his

21  word as to what Mr. Tucker said at the July 2004

22  hearing, but what we are proceeding on is based on our

23  motion. And what our motion says is what I stated at

24  the outset: That the question that Mr. Tucker was

CHANCERY COURT REPORTERS

24

1    interrupted by the objection on was with respect to

2    removing documents, and Mr. Tucker was going to

3    proceed to say, "from a file in the land use

4    department regarding the Fieldstone project." So

5    hopefully, that clarifies those issues.

6              And he alluded to some of the issues

7    involving Ms. Freebery, but I am going to reserve any

8    comments in that regard for when we get to that

9    component of the motion. Thank you, Your Honor.

10             THE COURT: Thank you. I am not going

11   to suggest that the decision I am going to announce

12   right now is independent of the pending matters in the

13   Third Circuit and the District Court, but this is one

14   of those rare instances where I am satisfied that to

15   ask Mr. Baker questions about a totally unrelated

16   project is beyond the scope of either relevance or

17   likely to lead to the discovery of admissible evidence

18   standard.

19             I do not believe that Mr. Baker's

20   testimony in that limited area will help me ultimately

21   decide those issues which I have to decide. At some

22   level that is too simplistic a formulation of the test

23   that I apply, but it does guide me to an extent. I

24   simply don't want to go too far afield; and I don't

25

1    want to get into collateral issues.

2                    And I am also concerned that no matter

3    how I try to limit the scope of the questioning, it is

4    going to most likely breed the need for follow-up

5    questioning, and hence, I will simply be called upon

6    down the road to draw the line again, and I won't have

7    any better way of doing it then than I have now. So

8    as far as I am concerned, I see no need to move

9    forward with bringing Mr. Baker back for additional

10   deposition testimony.

11                   MR. ABBOTT:  Thank you, Your Honor.

12                   THE COURT:  With that, Mr. Williams,

13   you are welcome to stay.  If you want to head south,

14   you are welcome to do so.

15                   MR. WILLIAMS:  Thank you, Your Honor.

16   I will take you up on the latter offer.

17                   THE COURT:  Have a safe trip.

18                   (At this point Mr. Williams left the

19   courtroom.)

20                   MR. ABBOTT:  Your Honor, the next

21   matter I thought I would take up, since we are on this

22   particular motion, is the most narrow part of it,

23   which the Court has already addressed in part and

24   maybe in all.  I am just not sure, given the motion

CHANCERY COURT REPORTERS

26

1   and the argument. That is, with respect to

2   Mr. Hubbard and some documents.

3            Your Honor undertook an in-camera

4   review of two documents. There were at least three,

5   if not more than three, documents that were at issue

6   in that motion, and I guess there is something that

7   the Court still, I assume, would need to look at in

8   camera to determine if the claim of attorney-client

9   privilege is correct or not. And that is the only

10  issue, as I see it, with respect to Mr. Hubbard.

11           THE COURT: My recollection -- and I

12  claim no pride of authorship with respect to this

13  recollection, so if I am wrong, don't be hesitant to

14  correct me -- was the two documents. I reviewed them

15  and concluded they were subject to attorney-client

16  privilege. If there were more than those two

17  documents at issue, I have lost track of that, and I

18  am trying to figure out what the other documents are

19  that are at issue.

20           MR. ABBOTT: I think there is a couple

21  things that happened. Number one, obviously, this

22  case was given to you from Judge Gebelein, number one.

23  Number two, Mr. Tucker was originally handling these

24  matters, and then he withdrew from the case. And when

CHANCERY COURT REPORTERS

27

1    you originally took over the case I would say probably

2    last October, as I recall, we had a teleconference and

3    we talked about what was pending, and there was a

4    discussion of two documents.  Not having that

5    particular -- this motion in front of me at the time,

6    I was not aware that there were, at least according to

7    our motion, more than two documents.

8              And so the county submitted to Your

9    Honor two documents.  I believe there is one or more

10   documents that still remain at issue, and that is the

11   only reason I brought this up.  I don't think -- I

12   mean, it may be my fault.  It just fell through the

13   cracks essentially.

14             THE COURT:  I am certainly not trying

15   to blame anybody for it.  I am just trying to figure

16   out what it is that needs to be resolved here.

17             MR. ABBOTT:  Well, I don't know what

18   the Court reviewed, but I thought the Court reviewed a

19   couple drafts of press releases with handwritten

20   marginality on them.  But there was also an e-mail.

21   So either the Court reviewed an e-mail and one draft

22   or two drafts, but in either event there is at least

23   one or perhaps more documents that are at issue that

24   the Court has not reviewed in camera.

CHANCERY COURT REPORTERS

28

1        I would suggest that would be the most

2    sensible thing for the Court to do with respect to

3    that remaining one or more documents, undertake an in-

4    camera review. If you believe that they are

5    privileged, then the issue is resolved, as we handled

6    the other two documents previously.

7            MR. WALTON: Excuse me. May I hand up

8    the in-camera documents just so we have them?

9            MR. ABBOTT: Sure.

10           MR. WALTON: Your Honor, if I may.

11   That is a copy of the letter I submitted to Your Honor

12   with the attachments.

13           THE COURT: I reviewed two documents

14   in my letter to counsel of January 26 of this year. I

15   did not identify them with great -- with any agree of

16   specificity, but I do recognize the documents that

17   Mr. Walton has passed up. One is an e-mail. The

18   other is a marked-up news release.

19           So I am not sure what other documents

20   there are that are at issue.

21           MR. ABBOTT: In my understanding,

22   there was more than one draft of the press release.

23           THE COURT: Well, the e-mail relates

24   to the press release.

CHANCERY COURT REPORTERS

29

1          MR. ABBOTT:  Meaning that there is

2  another press release attached to the e-mail?

3          THE COURT:  Maybe I will just give

4  them to Mr. Abbott and he can review them and tell

5  me --

6          MR. ABBOTT:  I don't want to know the

7  content.  I just want to know the form.  I don't want

8  to know the substance.

9          THE COURT:  Yes, you do.

10         MR. ABBOTT:  It doesn't matter to me,

11  Your Honor.  I am just trying to resolve the issue.  I

12  am not trying to be cute.

13         THE COURT:  No.  There is a news

14  release and there is an e-mail that relates to a news

15  release, and that's probably as far as I dare go.  And

16  I have got to be guided by counsel as to whether there

17  is anything else that is out there.

18         My understanding is that the only

19  documents that were responsive to the request were

20  those letters that were submitted for in-camera

21  inspection.

22         MR. WALTON:  Your Honor, Max Walton.

23  When I received counsel's letter, I went back and

24  looked.  I reread Mr. Hubbard's deposition, trying to

CHANCERY COURT REPORTERS

30

1    determine if there was anything else, and my

2    recollection and my files confirmed that those were

3    the only two documents that we had.  That was the only

4    one that was withheld, the news release.

5                The e-mail was already produced to

6    counsel, except there was a portion of it that was

7    marked "redacted," and we withheld the redacted

8    portion.

9                That is all I could find, Your Honor.

10               THE COURT:  I am inclined, Mr. Abbott,

11   unless you have something else -- and I recognize

12   reconstructing this is difficult -- that the county

13   has responded.  These are the only two documents -- or

14   I am sorry.  It has produced all documents that are

15   appropriately produced as that is what you get in this

16   world except for the two documents which it withheld

17   in part because of the attorney-client privilege.

18               I have reviewed those two documents

19   and have concluded that, yes, the redactions do have

20   the protection of the attorney-client privilege.  I

21   think that resolves it.

22               MR. ABBOTT:  I am satisfied with that.

23   Perhaps it is just, again, lost in the translation.

24               With that, Your Honor, I will move on

CHANCERY COURT REPORTERS

31

1   on the same motion to the main event under this motion

2   at least, which is the deposition request for Sherry

3   Freebery.

4           Now, at the outset I think it is

5   important, as the Court is probably already aware, to

6   note that what happened before was, we pursued

7   Ms. Freebery's deposition through the issuance of a

8   notice.  There was a motion for protective order

9   filed, and the motion was based on the fact that there

10  is a heightened standard of scrutiny to take the

11  deposition of high-level governmental officials.  Some

12  of the cases cited by the county in that instance

13  involved former mayor Giuliani in New York and so on

14  and so forth.  And, indeed, Ms. Freebery was the chief

15  administrative officer for New Castle County and fit

16  that bill.

17          As a result of that, Judge Gebelein's

18  analysis in his decision of April 7, 2004 granting the

19  protective order was based on a two-pronged standard,

20  one of which talked about a heightened requirement in

21  terms of not just relevance but that it was some type

22  of unique personal knowledge that could not be

23  obtained elsewhere and/or in some other form or

24  fashion.  And the second prong was the extent to which

32

1    the governmental operations and day-to-day important

2    high-level decision-making and governance that that

3    official needed to undertake would be interrupted.  So

4    ultimately, Judge Gebelein found that both prongs of

5    the standard were met and entered the protective

6    order.

7              What we have today is a far different

8    circumstance.  First, Ms. Freebery is no longer the

9    chief administrative officer.  Now, that was not the

10   case at the time we filed the motion in June of 2004,

11   but it is today.  So first, we would submit that there

12   is no cause for any heightened level of scrutiny to be

13   applied because she is not in that position.  The

14   purpose behind that heightened scrutiny standard is,

15   for common sense and good governance purposes, that

16   you don't want to have to have high-level officials

17   that have some passing knowledge or some duplicative

18   knowledge interfered with in terms of their ability to

19   run the government.

20             Well, obviously, that is not a problem

21   anymore.  Ms. Freebery is not in that position

22   anymore.  She doesn't carry that role.  We are not

23   going to be disturbing the New Castle County

24   government one iota.

CHANCERY COURT REPORTERS

33

1          So as I said, in the first instance,

2     we are in a different position today, and I think

3     based on that, the Court need only apply the Rule 26

4     standard that we just talked about:  Can she provide

5     us with information which is relevant or reasonably

6     calculated to lead to the discovery of admissible

7     evidence?

8          Well, one thing we know for certain

9     from discovery is that she was, indeed, intimately

10    involved in determining when, the timing of this suit,

11    when it would be filed.  We have an e-mail from

12    Mr. Hubbard to Ms. Freebery advising her as to the

13    maximum public relations media coverage advantage that

14    could be obtained based on the timing of this case's

15    filing.  There was some discussion -- I don't have it

16    in front of me, but I think it had to do maybe with

17    the Columbus Day holiday or something of that nature.

18    But in any event, Mr. Hubbard said, you know, if you

19    file it at this time, we have got a good shot at

20    getting double coverage.  And that seemed very

21    important, obviously.

22          And so, you know -- and we also know

23    that there was back-and-forth exchange between

24    Mr. Hubbard and Ms. Freebery on the specific contents

34

1    of that press release.

2              This goes to what I noted in the first

3    argument we presented here today, which is one of the

4    central premises of our defense, which is that this

5    is -- we are here today, in our opinion, because this

6    was in part at least something that Ms. Freebery felt

7    would be helpful to her political advancement.  No

8    question in our filing we have provided the Court with

9    additional documents that were prepared by the county

10   that again attack my client.  They attack Mr. Tucker.

11   They attack me.  We are all bad guys, and we are all

12   representing evil developers.  This is tactic.  This

13   is classic Ms. Freebery.  And so, you know, that's

14   really what is going on.

15             So her deposition is, indeed,

16   critical, because we now have her fingerprints over

17   one of the central questions in this case, you know:

18   Why did this thing get filed?  They say, well, these

19   other people made the decision.  Well, then why is it

20   that Mr. Hubbard is telling her when the best time for

21   media coverage would be to file it?  If she really has

22   no say over when it is going to be filed, why would he

23   even be talking about that?  So there is no question

24   based on Mr. Hubbard's information that Ms. Freebery

CHANCERY COURT REPORTERS

35

1    was involved to some extent.

2              The Department of Land Use clearly

3    knew the substance of this lawsuit.  Mr. Mullaney

4    clearly knew what was going to happen with respect to

5    the form of the complaint and, you know, the final

6    authority to file it and all those legal issues.  But

7    some of the impetus behind this suit was, indeed,

8    Ms. Freebery.  We know that.

9              So for that reason we don't think the

10   Court really needs to go any further.  We would simply

11   ask that the Court dissolve the protective order,

12   because the central premise that it is based on, which

13   is this heightened scrutiny standard and ultimately

14   Ms. Freebery's position as CAO, is no longer in

15   existence.

16              Now --

17              THE COURT:  So it is your view that if

18   someone is a high-level government official who for

19   all kinds of reasons which tend to tie back somewhat

20   to the "if I am going to run the government, I can't

21   be off having my deposition taken twice a day" -- once

22   that person leaves office, then you can just sign up

23   for about two months' worth of depositions on every

24   matter that you couldn't have been deposed on while

CHANCERY COURT REPORTERS

36

1    you were working for the government, but now you are

2    no longer working for the government, you have to be

3    working for the government?  Doesn't the idea of

4    protecting people at the top carry over after they

5    have left the job or not?

6              MR. ABBOTT:  I don't see how it could,

7    because the purpose of the heightened scrutiny

8    standard is to prevent that disturbance of the

9    operation of the government.  And obviously, that is

10   not a problem anymore.

11             The other factor is, the second prong

12   of the two-part test talks about how much interference

13   would there be.  So even if the heightened scrutiny

14   standard applied, so an argument in the alternative

15   certainly that I was prepared to address is even if

16   you apply that standard, clearly there would be no

17   interference with the operations of New Castle County

18   government.  So Prong No. 2 cannot possibly be

19   satisfied by the county.

20             The Prong No. 1 is, you know, the

21   relevance-plus, you know, requirement that you have

22   some connection here.  Well, we have established that

23   connection.  You know, I mean, this is not a case

24   where we just established the fact that Ms. Freebery

37

1    had a meeting and said, "Hey, how is the case going?"

2    She is working to orchestrate the timing of the filing

3    of the lawsuit to gain maximum advantage in terms of

4    public relations.  You know, that in and of itself

5    shows the Court, we believe, that there is more to

6    this case than just this is a basic, simple,

7    straightforward enforcement proceeding.  If it was,

8    then why are they having this discussion with the

9    press secretary on the coverage at a time that

10   Ms. Freebery, not we don't believe uncoincidentally is

11   an announced candidate to run for County Executive,

12   and then subsequently continues to hammer on this same

13   theme of "I am going to beat up Mr. Acierno and his

14   attorneys because they are bad people."

15               And so we think it is important to get

16   her under oath, to answer these questions, to explain

17   what other things she was involved in.  Mr. Mullaney

18   hasn't testified, because he can't because of the

19   attorney-client privilege, about what he discussed.

20   And he can't -- we can't find out from Mr. Baker

21   maybe, or maybe it wasn't Mr. Baker.  Maybe somebody

22   else, Mr. Baker's right-hand person, was told by

23   Ms. Freebery to do thus and such or to convey a

24   message.

38

1           This is the way it works.  It is

2   not -- the county government has never been a simple

3   animal.  There is lots of ways that they get things

4   done.  We believe that is why we need to take her

5   deposition, to find out if we are getting answers to

6   questions that are very strictly limited to language,

7   and if we are not asking the question exactly right,

8   then they are going to deny that they have any

9   knowledge about it.

10          THE COURT:  Is it your purpose to

11  depose Ms. Freebery only about matters directly

12  related to the issues in this litigation or is it your

13  desire to go further?  And if so, what would be the

14  limit on the scope of your interrogation?

15          MR. ABBOTT:  The only other thing I

16  could see delving into other than this action would be

17  the closely related preceding action that was sort of

18  superseded by this case; in other words, the case that

19  was filed in August, and then this case sort of

20  engulfed it and took it on from there.

21          You know, we have no intention of -- I

22  want to know -- obviously, we believe that she has

23  personal animus against Mr. Acierno, so obviously,

24  there would be questions in that area.  And obviously,

CHANCERY COURT REPORTERS

39

1  we believe that she had a particular purpose behind

2  this to advance her own political, personal political

3  agenda.  And so obviously, we would ask questions

4  related to that.  But beyond that, and the timeframe,

5  you know, I mean, we may have to ask questions that

6  go -- that are prior to 2003 with respect to her

7  dealings vis-a-vis Mr. Acierno.  But with respect to

8  the issue of her involvement, the press release, the

9  timing issue, why are you worried about that, why did

10  you issue these campaign brochures attacking

11  Mr. Acierno and his legal counsel and calling him

12  various names, because we think that is certainly

13  relevant to the motive for the county to file this

14  suit, which will essentially explain why we are all

15  here on this he said-she said kind of situation.

16          So I am not sure if Your Honor wants

17  me to say I am not going into certain areas.  I don't

18  intend to go into any areas about the indictment,

19  whether charges were dismissed or still pending.  I

20  don't intend to go into matters that would be

21  regarding the Christiana Town Center site from 1995 or

22  some, you know, long-ago timeframe.

23          So, you know, we want to get to the

24  heart of this case, which we believe is motivated at

CHANCERY COURT REPORTERS