## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOSEPH J. FREEBERY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 05-748-KAJ |
| | : | |
| CHRISTOPHER COONS, in his official | : | |
| capacity as County Executive of New Castle | : | |
| County and in his Individual capacity; and | : | |
| NEW CASTLE COUNTY, a municipal | : | |
| corporation; and JOHN DOES 1-25, | : | |
| | : | |
| Defendants. | : | |

**OPENING BRIEF IN SUPPORT OF UNITED STATES' MOTION
TO INTERVENE, UNDER RULE 24 OF THE FEDERAL
RULES OF CIVIL PROCEDURE, FOR THE
LIMITED PURPOSE OF SEEKING A STAY OF DISCOVERY**

COLM F. CONNOLLY
United States Attorney

Patricia C. Hannigan,
Assistant United States Attorney
Delaware Bar I.D. No. 2145
The Nemours Building
1007 Orange Street, Suite 700
P. O. Box 2046
Wilmington, Delaware 19801
(302) 673-6277

Dated: **October 27, 2006**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     The Government Should be Permitted to Intervene . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     The Captioned Case Should be Stayed, Pending the Conclusion of a
Related Criminal Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     (1)    The Extent to Which the Issues in the Civil and Criminal
Cases Overlap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     (2)    The Status of the Criminal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     (3)    The Plaintiff's Interests in Expeditious Civil Proceedings Weighed
Against the Prejudice to the Plaintiff Caused by the Stay . . . . . . . . . . . . . . . . . 19

     (4)    The Burden on the Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     (5)    The Interests of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     (6)    The Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE**

*Afro-Lecon v. United States*
    820 F.2d 1198 (Fed.Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ashworth v. Albers Medical, Inc.*
    229 F.R.D. 527 (S.D.W.Va. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*AWS Management, LLC v. United States*
    2006 WL 824506 (N.D.Ca. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Board of Governors of the Federal Reserve System v. Pharaoh*
    140 F.R.D. 634 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bridgeport Harbor Place I, LLC v. Ganim*
    269 F.Supp. 2d 6 (D.Conn 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Campbell v. Eastland*
    307 F.2d 478 (5th Cir. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*Gaither v. District of Columbia*
    2005 WL 3272130 (D.D.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In Re Adelphia Communs v. Secs. Litig.*
    2003 U.S. Dist. LEXIS 9736
    (E.D.Pa. May 14, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Javier H. v. Garcia-Botello*
    218 F.R.D. 72 (W.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Keating v. OTS*
    45 F.3d 322 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Landis v. North American Co.*
    299 U.S. 248 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Maloney v. Gordon*
    328 F.Supp. 2d 508 (D.Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 17, 20, 21

**CASES**                                                                                    **PAGE**

*Securities and Exchange Commission v. Chestman*
     861 F.2d 49 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Securities and Exchange Commission v. Doody*
     186 F. Supp. 2d 379 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Securities and Exchange Commission v. Kornman*
     2006 WL 148733 (N.D.Tex.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Securities and Exchange Commission v. Mutuals.Com, Inc.*
     2004 WL 1629929 (N.D.Tex.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Securities and Exchange Commission v. Treadway*
     2005 WL 713826 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tobin v. Gordon*
     2004 WL 2915337 (D.Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

*Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*
     886 F.Supp. 1134 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Twenty First Century Corp v. LaBianca*
     801 F.Supp. 1007 (E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20

*United States v. Kordel*
     397 U.S. 1 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Walsh Securities, Inc. V. Crist Prop. Mgmt., Ltd.*
     7 F.Supp.2d 523 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17


**OTHER AUTHORITIES**

Federal Rules of Civil Procedure
     Rule 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     Rule 24(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16
     Rule 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

## NATURE AND STAGE OF THE PROCEEDING

The Complaint in this matter alleges, *inter alia*, wrongful discharge and defamation as well as constitutional violations.

On information and belief, during the course of discovery in this matter, witnesses have been questioned under oath regarding matters central to a related criminal case, but irrelevant to this civil action. Accordingly, the United States has moved to intervene in order to stay discovery in this civil case, until the criminal charges are resolved.

This is the United States' Opening Brief in support of that motion.

**STATEMENT OF FACTS**

According to the Complaint, Plaintiff Joseph Freebery was a long-time employee of New Castle County, as was his sister Sherry Freebery. (Complaint, Paragraphs. 8 and 14 (hereinafter "Comp. Para.")). In 1996, then-County Executive Thomas Gordon appointed Ms. Freebery to the office of Chief Administrative Officer. Comp. Para. 18. As Mr. Gordon's term came to an end, Ms. Freebery ran for her party's nomination for the office of County Executive, but was defeated in the September, 2004 primary by Christopher Coons. Comp. Para. 54. Mr. Coons was eventually elected and, shortly after he took office, fired Mr. Freebery, giving rise to this lawsuit.

In May of 2004, a Delaware Grand Jury returned an eleven count indictment against the previous County Executive, Thomas Gordon, and Ms. Freebery, alleging various fraudulent schemes while they were in office. Two civil suits were also filed against Mr. Gordon and Ms. Freebery, arising from the same or related facts. Those civil matters, in which Ms. Freebery is represented by the same attorney as represents Plaintiff, Joe Freebery in this case, have been stayed by this Court, pending the outcome of the criminal case. *See Maloney v. Gordon*, 328 F.Supp.2d 508 (D.Del.); *Tobin v. Gordon*, 2004 WL 2915337 (D.Del.). Trial has been set for February of 2007 on the criminal charges against Ms. Freebery and a co-defendant; no trial date has yet been set on the charges against Mr. Gordon.

During the course of discovery in this case, Mr. Lawless, counsel for Plaintiff, has questioned witnesses about matters relevant to the criminal charges against Plaintiff's sister and Mr. Gordon, but not relevant to the substance of this lawsuit, nor likely to lead to the discovery of admissible evidence. The indictment charges several fraudulent schemes, all of which are

irrelevant to Plaintiff's claims in this matter, claims which did not even arise until after

Ms. Freebery and Mr. Gordon had left office. The alleged schemes relevant to this matter are

identified as "The Election Scheme" and "The Fieldstone Conflict of Interest Cover-Up Scheme."

The Election Scheme alleges that Freebery and her co-defendants used County resources,

including County employees during working hours, to perform political campaign activities, on

various elections between 1994 and 2002. The Fieldstone Scheme alleges (among other things)

that Freebery accepted/received $2.3 million from the developer of the Fieldstone Golf Course,

thereafter intervened in the County's review of the golf course, lied about her financial

relationship with Fieldstone's developer on required Statements of Financial Interest, and used

County money to cover-up her transgressions.

Despite the fact that the allegations in the indictment are completely unrelated to the facts

underlying this suit, Plaintiff's counsel (who also represents Ms. Freebery) has questioned

witnesses about the facts underlying the alleged criminal schemes. For example, the attachments

to the redacted Brief in Support of Motion To Designate Discrete Portions of the Deposition

Testimony by Charles F. Baker as Confidential Pursuant to the Court's March 16, 2006

Protective Order ("Baker Brief") (D.I.-75) show that Mr. Baker was asked about his knowledge

of the facts underlying the Fieldstone Scheme:[1]

> Q. As far as you're concerned, did you do anything illegal in connection with the Fieldstone project?
> A. No
> Q. Did anyone ask you to do anything that you believe was illegal in connection with the Fieldstone project?
> A. No.

---

[1] In addition to these excerpts, of course, much of the Baker transcript was redacted, so the Government is unaware if counsel probed further into these issues.

Baker Brief at Exhibit A, page 3.

Later in the deposition, counsel returned to the Fieldstone Scheme:

Q. By the way, just to your knowledge, is that -- with respect to the Fieldstone project, is that the only thing that was wrong about the Fieldstone project, the fact that Sherry Freebery took the loan from Lisa Dean Mosely?

Mr. WEIR: Objection to form to the form of the question. It's vague and ambiguous. You can answer.

THE WITNESS: I'm not aware of any Land Use problems with that project. It had a long history, but it was in compliance.

BY MR. LAWLESS:

Did Sherry Freebery ever come to you, as the general manager of Land Use, and try to cut any corners for the Fieldstone project or do anything that would be inappropriate or illegal regarding the Fieldstone project? Other than taking that loan which, clearly, you have an issue with.

A. Yes.

Q. What did she do?

A. I felt that -- not disclose the loan.

Q. Un-huh.

A. So there was conversation about the project getting a certain [sic] of occupancy to get it done.

Q. Right.

A. And after she had taken the loan, which, from my standpoint, she should not have been involved with -- it created an appearance -- I had no knowledge that she had done that, and -- she should not have been involved.

Q. With?

A. With the project approval process whatsoever.

Q. Okay. To the extent of her involvement, though, what was her involvement other than checking on the status of various approvals?

MR. WEIR: Let me object to the question, because it assumes -- it's testimony, assumes facts that aren't in evidence. You can answer it.

BY MR. LAWLESS:

Q. Mr. Baker, let me back up. What was the extent of her involvement in that project?

A. That there was a property owner, applicant, that was struggling in our process -- not an unusual situation -- and could I look into it.

-4-

Q. That's all she ever asked you to do?

A. Yes.

Q. And just so I understand your position, the fact that there was that loan to her that was not disclosed, that was the problem?

The combination of those two things -- the fact she made the inquiry and the fact the loan was there -- that, in your mind, is what the problem was? From your perspective.

A. And it wasn't disclosed.

Q. Had there not been that loan there, did anything she did in connection with the Fieldstone project -- in your mind, was there anything improper or illegal about that?

A. No.

Q. Okay. So what you're talking about then is the conflict of interest more than anything?

A. Appearance.

Q. Appearance. Okay. That's fine.

Baker Brief at Exhibit A, page 12-13. These questions certainly appear designed to elicit

testimony relevant to the criminal charges, not to this civil suit.

Mr. Lawless subsequently attempted to question another witness, one Jennifer Rich

Farrell, regarding her testimony before the Grand Jury in connection with its investigation of

Sherry Freebery and Thomas Gordon. When Ms. Farrell's attorney objected and stated his

intention to instruct the witness not to answer, Mr. Lawless vigorously insisted that such

questioning was proper, in the following lengthy exchange:[2]

Q. While you were at the executive offices, were you involved at all in responding to any subpoenas that were served on the executive office in connection with the Grand Jury investigation of Tom Gordon or Sherry Freebery?

A. Huh-uh. You mean subpoenas that were served to the executive office?

Q. To the executive office or to the County. Were you involved at all in responding to any records or document subpoenas?

A. I was subpoenaed by the Grand Jury, if that's what you mean. I was.

Q. That was my next question. Okay.

A. Yes, I was.

Q. Okay. And I assume that you've testified?

---

[2] Counsel apologizes for the length of the transcript quotations, but it was thought important for the Court to have an opportunity to review as much of the questioning as is relevant to the instant motion.

A. I did.

Q. More than once?

A. No.

Q. And am I correct that you testified before Tom Gordon or Sherry Freebery were indicted?

MR. WIER: Let me stop for a moment, because the questions to Charlie Baker raised my antennae about this, because I didn't represent him.

It's my position that questions to this witness about what she said or did not say in any investigation relating to Sherry Freebery, Tom Gordon is not relevant to this lawsuit and is potentially being used indirectly to benefit her in some other litigation; I don't know.

MR. LAWLESS: Benefit - - when you say "her" - -

MR. WIER: Sherry Freebery or Tom Gordon. I mean, I don't know what the interconnection is.

But if you're going to ask her questions about what she testified to, et cetera, I'm going to object, and we're going to probably instruct her not to answer until I have an opportunity to find out - -

MR. LAWLESS: If you're going to instruct - - well, let me ask you one other question.

MR. WIER: the relevance of any of this stuff.

BY MR. LAWLESS:

Q. Did you receive any kind of an immunity agreement from the Grand Jury?

MR WIER: Objection.

MR. LAWLESS: Then we're going to have to get the judge on the phone, because I don't think you can instruct this witness not to answer a question, particularly a question about anything that she was asked in front of the Grand Jury.

You don't even know what I'm going to ask her.

MR. WIER: I think I can instruct her, and I think I can argue it. And I think, in fact, there's a - - apparently there's a ruling in another lawsuit, that you may or may not have been aware of, where the Chancellor ruled that a witness, in a civil case, who was questioned in front of the Grand Jury would not have to testify as to what the contents were.

MR. LAWLESS: I'm going to have Judge Gordon [sic] instruct me not to do that.

MR. WIER: You're going to have to at some point.

MR. LAWLESS:  We're going to do it now.  We're going to stop and we're going to call him.

MR. WIER:  No we're not, because - -

MR. LAWLESS:  Yes, we are.

MR. WIER:  She's entitled to talk to her lawyer who represented her in the Grand Jury proceedings, if you're going to question her.

MR. LAWLESS:  Who was your lawyer who represented you in connection with the Grand Jury proceedings?

THE WITNESS:  Charlie Oberly.

MR. WIER:  Okay.  So until she's able to talk or I'm able to talk to her with her lawyer and find out is there a problem or not a problem, I'm not comfortable having her answer questions that clearly, in my view, are totally irrelevant to Joe Freebery's lawsuit.  They can have no other purpose other than to find out what witnesses testified against Sherry or Tom Gordon in the Grand Jury federal prosecution.

MR. LAWLESS:  And you think they don't know that already?

MR. WIER:  Who doesn't know what?

MR. LAWLESS:  Tom Gordon or Sherry Freebery's lawyers don't already know who the witnesses were that testified against them?  Because, quite frankly, I'd be astounded if they didn't.

MR. WIER:  I'm not saying that they don't know who testified.  And I don't know whether the word "against" them is an appropriate characterization of the testimony.

All I'm saying is, in this civil lawsuit that Joe Freebery has brought, I don't see how questioning any witness about what they said about Sherry Freebery or Tom Gordon before the Grand Jury is relevant to this, and the only purpose that I can see is a fishing expedition to benefit them.

See excerpts of Deposition Transcript of Jennifer Rich Farrell, page 11, line 17 to page 16, line 3, attached at A-002-007.

Even following this exchange, counsel for Plaintiff continued to press the point:

-7-

Q.    Did you testify in front of the Grand Jury?
A.    Yes.
Q.    Were you told by any judge in connection with that proceeding that you were not permitted to reveal what you testified to before the Grand Jury?

MR. WIER:  Objection.  I'm going to stop any questions about that until I have an opportunity to talk and find out what happened.  It may be - - it may be prophylactic, but I have a right to represent her - -

MR. LAWLESS:  You're instructing this witness not to answer the question?

MR. WIER:  What I'm saying is I'm instructing her - - I'm instructing her not to answer any questions abut the Grand Jury process, because

MR. LAWLESS:  I'm not asking about the Grand Jury process.  I'm asking her about what she was asked and what she testified to.  It's very specific, and that's prior sworn testimony in connection with her employment by New Castle County.

*Id.*, page 22, line 19 through page 23, line 16, attached at A-008-009.

Counsel also questioned Ms. Farrell about facts related to the Election Scheme, thus:

Q.    Were you active at all in politics - -
A.    No.
Q.    - - for either the Democratic or Republican party?
A.    No.
Q.    Your father was Nicholas Rich?
A.    Uh-huh.
Q.    Was he ever active in politics for either the Democratic or Republican party?
A.    No.
      In Sherry's - - or Tom's first campaign, I think my dad did do some campaign work.  So I take that back.  My dad did do campaign work when I was still in college, '96, '95, somewhere around there.  But no, the only campaign work I did was phone calls.
Q.    For whom?
A.    I did phone calls for Bill Tansy and - - who was the other one?  Patty Powell, those two.
Q.    When did you do phone calls?

MR. WIER:  Can we go off the record for a second?

MR. LAWLESS:  Yeah.

(Discussion off the record.)

-8-

*Id.*, page 30, line 16 through page 31, line 1, attached at A-010-011.

Following that off-the-record conversation, counsel dropped this line of questioning.

On yet another occasion, Mr. Lawless again attempted to question a witness about both her knowledge of facts relating to the Election Scheme and to her involvement in the criminal investigation of Sherry Freebery and Thomas Gordon. Below are excerpts from the transcript of deposition testimony by Tracy Surles.

Q.    And am I correct, then, that you were not subpoenaed before nor did you testify before the Grand Jury that investigated New Castle County?
A.    Correct.

See Deposition Transcript of Tracy Surles, page 3, line 24 through page 4, line 3, attached at A-014-015.

And later, Plaintiff's counsel continued:

BY MR. LAWLESS:

Q.    Were you aware, when you were employed by the Department of Special Services, that there was a Grand Jury investigation going on of the Gordon Administration?
A.    Yes.
Q.    Were you aware that other people who worked in the department were being subpoenaed?
A.    Yes.
Q.    Did you read newspaper articles that related to that investigation?
A.    Yes.
Q.    Did you read newspaper articles that related to phone banks to make phone calls on behalf of campaigns of individuals running for County Council?
A.    Yes.

MR. WIER: I am sorry. Was there an answer?

MR. LAWLESS: Yes. She nodded yes.

BY MR. LAWLESS:

-9-

Q. Is it fair to say that what you read that was reported was similar to what Tammy Ammerman came to you and told you she was having a problem with what Joe Freebery having told her to do?

A. Yes.

Q. And at that point, did you ever decide you should go to the FBI or the police or the U.S. Attorney and - -

A. The U.S. - -

Q. Let me finish my question - - and tell them that you saw something similar to what they were investigating that was going on in the Department of Special Services?

A. The FBI and the U.S. Attorney's Office did contact me and talk to me. I answered questions they had, but I was never subpoenaed or followed up. They did not follow-up.

Q. Did you tell them what you just told me about Joe Freebery?

A. I just wanted to ask - -

MR. WIER: Can we take a second?

(Discussion off the record)

MR. WIER: Let me state that I - - subject to my reviewing just the circumstances, which I don't know what the circumstances are in terms of the parameters of her dicussions with the U.S. Attorney and the FBI, I am going to instruct her not to answer.

MR. LAWLESS: Okay.

MR. WIER: And then if we determine there is not a privilege - - I just don't have requisite information to permit her to answer and I don't want to have it - - and then if I determine the question is not objectionable, then you can recall her.

BY MR. LAWLESS:

Q. Let me ask you one question: You did tell us you didn't testify before the Grand Jury?

A. I did not.

Q. And that you just testified that you - - you were interviewed by the FBI or the U.S. Attorney?

A. Correct.

Q. And that was not in the presence of a Grand Jury?

A. Correct. I was not subpoenaed.

Q. And was that pursuant to any kind of a plea bargain or plea agreement for you?

A. No.

MR. LAWLESS: What's your objection?

-10-

MR. WIER: I just object because I want to evaluate the circumstances with my client of what was said and what was not. There is an ongoing investigation. There may be ongoing issues. I don't know what the parameters are in connection with the circumstances of that investigation.

So, right now, I am not comfortable having her answer those kinds of questions because I am not certain that that's likely to lead to the discovery of admissible evidence in this case.

MR. LAWLESS: I know the next few questions I wanted to ask her and I think it was - -

(Discussion off the record)

BY MR. LAWLESS:

Q.    You told us that you were - - and just let me kind of lay a foundation - - you told us that you were interviewed by the FBI and the U.S. Attorney's Office; correct?
A.    Correct.
Q.    Would I be correct that you were interviewed by the FBI as opposed to the U.S. Attorney's Office?
A.    No. I was interviewed by them jointly.
Q.    And was Mr. Connolly present at the interview?
A.    No.
Q.    It was another U.S. Attorney?
A.    Yes.

(Discussion off the record)

BY MR. LAWLESS:

Q.    Is it Ferris Wharton who was present at the interview?
A.    Yes.
Q.    I will do it this way: Were you represented by counsel at that interview?

MS. ALLEN: You can say it.

THE WITNESS: No.

BY MR. LAWLESS:

Q.    Were there any promises or threats or anything made prior to that interview or were you just asked questions and you just answered the questions honestly as best you could?
A.    The latter. No threats or promises or anything whatsoever.

-11-

Q.      Were you asked any questions regarding Joe Freebery?

A.      Yes.

Q.      And what were those questions?

        MR. WIER: Objection.

        MR. LAWLESS: That's one question I am going to ask.

        MR. WIER: Okay.

BY MR. LAWLESS:

        Q.      I am going to ask you what those questions were and what your answers were to those questions.

        A.      All right.

        Q.      And then I am going to ask you if - - the other question would be if you repeated to the FBI and/or Mr. Wharton, in that interview, anything that you just told us today regarding your concerns with what Joe Freebery was or was not doing on County time that may have been either a violation of County policy or illegal?  And they are the questions I am going to ask her.

        MR. WIER: Okay.

        MR. LAWLESS: Quite frankly, I don't see where they are objectionable.

        MR. WIER: They may not be.

See excerpts of Deposition Transcript of Tracy Surles, page 48, line 4 through page 53, line 13,

attached at A-017-022.  These questions, too, seem more clearly related to the criminal

investigation against Sherry Freebery and Thomas Gordon than to Plaintiff's claims.

        Finally Jonathan Husband was questioned at deposition about his involvement in the

criminal investigation of Sherry Freebery and Thomas Gordon.

        Q.      Am I correct you didn't testify in front of the Grand Jury in this case?

        A.      You are correct.

        Q.      Were you ever questioned or interviewed by the FBI in connection with anything having to do with the County by the FBI?

        A.      Yes.  I was asked by the FBI.

-12-

Q.    And how long ago was that, approximately?  Let me see if I am giving you a time frame.  Was it prior to Tom Gordon and Sherry Freebery being indicted?

A.    No.

Q.    It was after?

A.    Oh, yeah.

Q.    When was that?

A.    I am going to say it was last summer.

Q.    It was after the indictments?

A.    (Witness nods.)

Q.    Were you in any way questioned about Joe Freebery in that interview?

A.    No.

Q.    You are not sure?

A.    Yeah.  It was a short interview.

Q.    And it focused on specific things?

A.    Yes.

Q.    And none of them had anything to do with Joe Freebery?

See excerpts of Deposition Transcript of Jonathan Husband, page 56, line 1 through page 57 line

8, attached at A-026-027.

**ARGUMENT I:**

**The Government Should be Permitted to Intervene**

Pursuant to Rule 24(a) of the Federal Rules of Civil Procedure, a party may intervene as

"of right" when the party "claims an interest relating to the property or transaction which is the

subject of the action and ... is so situated that the disposition of the action may as a practical

matter impair or impede the applicant's ability to protect that interest." Alternatively, Rule 24(b)

provides for permissive intervention "when an applicant's claim or defense and the main action

have a question of law or fact in common."

Courts have routinely permitted intervention in civil litigation by state and federal

prosecutors seeking a stay of discovery, although not always specifying which subsection of the

rule applies. *See, e.g., Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1009

(E.D.N.Y. 1992)(in civil RICO action, federal government's motion to intervene for the purpose

of staying discovery was allowed; apparently under Rule 24(b); *Board of Governors of the

Federal Reserve System v. Pharaon*, 140 F.R.D. 634, 638 (S.D.N.Y.1991) (district attorney

permitted to intervene under Rule 24(b), and stay of discovery granted to protect related Grand

Jury proceedings); *Securities and Exchange Commission v. Kornman*, 2006 WL 148733

(N.D.Tex.)(United States granted leave to intervene without discussion of rule, motion for stay

denied); *Ashworth v. Albers Medical, Inc.*, 229 F.R.D. 527, 529 (S.D.W.Va. 2005)(United States

permitted to intervene under Rule 24(b), court declined to consider "the additional contention

that intervention is required" under Rule 24(a).).

As the Second Circuit has stated, the general finding is that the government has a

"discernible interest in intervening in order to prevent discovery in [a] civil case from being used

-14-

to circumvent the more limited scope of discovery in the criminal matter. Allowing intervention under either Rule 24(a) or (b) was therefore not a "clear abuse of discretion."" *Securities and Exchange Commission v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988). *Accord, Securities and Exchange Commission v. Treadway*, 2005 WL 713826 (S.D.N.Y.), (the court permitted the Office of the New York State Attorney General (OAG) to intervene in order to seek a stay in certain depositions, ruling "the OAG plainly has an interest in the parallel criminal proceedings that may be adversely affected by events in the civil action, and the OAG's charges in the criminal cases potentially share common factual and legal issues with this case"; *id.*, *2 (opinion observes that "[w]hether couching the decision in terms of mandatory or permissive intervention or simply referring to Rule 24 without specifying the subsection on which they rely, courts in this circuit have routinely allowed federal or state prosecutors to intervene in civil litigation in order to seek a stay of discovery." *Id.*); *Securities and Exchange Commission v. Mutuals.Com, Inc.*, 2004 WL 1629929 (N.D.Tex.)(government moved, in the alternative, under both rule 24(a) and 24(b); Court noted that "permissive intervention entails a lower standard then intervention as of right" (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clemente*, 884 F.2d 185, 189 (5th Cir. 1989)); intervention of United States was granted as of right, in order to stay the civil matter pending resolution of a related criminal case).

The Government here asserts that it should be permitted to intervene under either subsection of the rule. As in *Mutuals.Com*, the United States clearly "has an interest in the subject matter of the present action because it has a recognizable interest in preventing discovery in the civil case from being used to circumvent the more limited scope of discovery in the related criminal case." 2004 WL 1629929 at *1. In addition, discovery in the civil action could "impair

-15-

the government's right to more limited discovery in the related criminal case." *Id*. Therefore, intervention "as of right" appears appropriate, under Rule 24 (a).

In the alternative, it is the Government's position that it should be permitted to intervene under Rule 24(b) because the facts being developed in discovery overlap facts critical to the criminal prosecution. *Ashworth v. Albers Medical, Inc.*, 229 F.R.D. at 530 ("the criminal proceedings ... and the civil action here involving common questions of fact ... the United States should be permitted to intervene under Rule 24(b)").

## **ARGUMENT II**

### **The Captioned Case Should be Stayed, Pending the Conclusion of a Related Criminal Case**

"It is well-settled that a court has authority to stay civil proceedings (citation omitted), and that a proper circumstance in which to exercise such authority is when a civil action threatens to interfere with a related criminal case." *AWS Management, LLC v. United States*, 2006 WL 824506, *2 (N.D.Cal. 2006)(citing *United States v. Kordel*, 397 U.S. 1, 12 n. 27 (1970)(citing cases); *Keating v. OTS*, 45 F.3d 322, 325 (9th Cir. 1995); *Afro-Lecon v. United States*, 820 F.2d 1198, 1202-04 (Fed.Cir. 1987); *Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1962).)

As this Court has already recognized in one of the related civil cases involving Ms. Freebery and Mr. Gordon, "'[t]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with the economy of time and effort for itself, for counsel, and for litigants.'" *Maloney v. Gordon*, 328 F. Supp.2d

-16-

at 511(quoting *Landis v. North American Co.*, 299 U.S. 248, 254-255 (1936)). The Court went

on to elucidate the factors to be considered in deciding a motion to stay,

> including: (1) the extent to which the issues in the civil and criminal cases overlap (2) the
> status of the criminal proceedings, including whether any defendants have been indicted;
> (3) the plaintiff's interests in expeditious civil proceedings weighed against the prejudice
> to the plaintiff caused by the delay; (4) the burden on the defendants; (5) the interests of
> the court; and (6) the public interest.

*Maloney*, 328 F. Supp. at 511, *citing In Re Adelphia Communs. Secs. Litig.* 2003 U.S. Dist.

LEXIS 9736 at *7 (E.D.Pa. May 14, 2003*), Javier H. v. Garcia-Botello*, 218 F.R.D. 72, 74

(W.D.N.Y. 2003); *Walsh Securities, Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F.Supp.2d 523, 527

(D.N.J. 1998). *Accord, Tobin v. Gordon*, 2004 WL 2915337 (D. Del. 2004). We address each of

these factors in turn.

     (1)    The Extent to Which the Issues in the Civil and Criminal Cases  Overlap

     Although an argument could be made that this civil matter should not overlap the

criminal case, in fact, discovery is being carried out here in such a way as to create an overlap.

The same witnesses being deposed in this case are very likely to be called as witnesses in the

criminal trial. As noted above, counsel for Plaintiff has repeatedly attempted to question the

witnesses at deposition regarding facts that are central to the criminal prosecution, and related –

if at all – only very tangentially to this civil case. The most effective way to avoid discovery in

the civil case from bleeding over to the criminal case is to stay the civil discovery. This approach

is well supported in the case law reviewed *supra. See, e.g. Securities and Exchange Commission

v. Chestman*, 861 F.2d at 50.

     The most worrisome aspect about the overlap between this civil case and the related

criminal case, in the view of the Government, is that criminal Defendant Sherry Freebery will

have the opportunity, through civil Plaintiff Joseph Freebery, of using the far more extensive

reach of civil discovery in order to learn details of the Government's case and to prepare her

criminal defense. "Where a civil and criminal proceeding overlap in subject matter, there is a

concern that the broad scope of civil discovery may be used as an end run around the stricter

rules of criminal procedure to permit an otherwise impermissible preview of the Government's

criminal case." *AWS Management, LLC v. United States*, 2006 WL 824506 at *2 (citing

*Campbell v. Eastland*, 307 F.2d at 487-490). That possibility is substantially enhanced by the

fact that a single attorney – Mr. Lawless – represents both Joe Freebery and Sherry Freebery.

      (2)   The Status of the Criminal Proceedings

      The second factor of the analysis is also met, as Sherry Freebery and Thomas Gordon are

under indictment. True, none of the parties in the instant case is indicted or under threat of

indictment, but that is not legally a significant distinction. For example, in *SEC v. Treadway*, a

civil enforcement action, the defendants were Stephen J. Treadway and Kenneth W. Corba. The

Office of the New York State Attorney General (OAG) moved to intervene "for the purpose of

seeking a stay of certain depositions until the conclusion of two criminal proceedings that the

OAG is prosecuting in New York State Supreme Court." 2005 WL 713826 at *1. The

defendants in the state's criminal prosecutions were two other individuals, Theodore C. Sihpol,

III and Grant Seeger. Two witnesses, Edward Stern and Noah Lerner, were subpoenaed to testify

at discovery depositions, and were also expected to be called as witnesses in the criminal trial. In

granting the OAG's motion for stay of the depositions, the court specifically noted "'[a] stay of

discovery is often necessary where liberal discovery rules will allow a litigant to undermine, or

gain an unfair advantage in, a potential criminal prosecution which parallels the subject matter of

the civil action.' [citation omitted]. To be sure, it is not Mr. Treadway or Mr. Corba who would reap such an advantage, since they are not defendants in any criminal proceeding. But counsel for Mr. Sihpol could certainly monitor the depositions of Mr. Stern and Mr. Lerner in this litigation and use it to the advantage of the defense in the criminal case." *Id.* at *4.

According to this reasoning, the Government urges, the second factor also weighs in favor of staying this civil proceeding.

    (3)    The Plaintiff's Interests in Expeditious Civil Proceedings Weighed Against the Prejudice to the Plaintiff Caused by the Stay

Turning to the third factor, the court must weigh the plaintiff's interest in "expeditious civil proceedings" against any prejudice to the plaintiff caused by the delay. One consideration in such balancing is that staying civil discovery until after the criminal trial may well actually be helpful to the plaintiff. For example,

> a stay of discovery in a civil case until the resolution of a criminal case may well later streamline discovery in the civil case. *See, e.g., Bridgeport Harbour Place I, LLC v. Ganim*, 269 F.Supp.2d 6, 9 (D.Conn. 2002); *Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F.Supp. 1134, 1140 (S.D.N.Y. 1995) [additional citation omitted]. Such streamlining is likely to be the case here, as the transcript of the criminal trial may well resolve many of the instant discovery issues in this case.

*Gaither v. District of Columbia*, 2005 WL 3272130, *4 (D.D.C.). At the very least, resolution of the criminal charges against Ms. Freebery and Mr. Gordon will eliminate any perceived need for discovery on those issues. The Government argues that this factor also weighs in favor of a stay.

    (4)    The Burden on the Defendants

The fourth factor to be considered is the burden on the defendants if the stay is not granted. The Government is not aware of any burden the defendants in this civil case will bear

-19-

whether or not the stay is granted; on information and belief, the defendants take no position on the Government's Motion.

(5)    The Interests of the Court

The "interests of the court", the fifth factor of the analysis, is served by a stay in this matter because concluding the criminal trial first will have the beneficial effect of streamlining the discovery in this case. As this court noted in granting a stay of discovery in *Maloney v. Gordon*, a stay "obviates the need to make rulings regarding potential discovery disputes involving issues that may affect the criminal case.... Furthermore, the outcome of the criminal proceedings may guide the parties in settlement discussions and potentially eliminate the need to litigate some or all of the issues in this case.... Thus, staying this case preserves judicial resources and may streamline other aspects of the civil case. As a result, this factor also weighs in favor of granting a stay." *Maloney*, 328 F. Supp.2d at 513.

The United States urges the same result here.

(6)    The Public Interest

The final consideration before the Court is the public interest. In any case, it is in the public interest to prevent such circumvention of the limitations on discovery in the criminal proceeding, by preventing criminal defendants from using civil discovery. *See Securities and Exchange Commission v. Doody*, 186 F. Supp.2d 379, 381 (S.D.N.Y. 2002); *Twenty First Century Corp.*, 801 F. Supp. at 1010. But more significantly, the Government urges the Court to find that the public's interest in having an important public corruption case tried to conclusion without interference from any related civil case is paramount. As this Court observed in *Maloney*, "[t]he 'public has a substantial interest in the integrity or lack of integrity of those who

-20-

serve them in public office.'" *Maloney v. Gordon*, 328 F.Supp.2d at 513. And as in *Maloney*, "a

stay in this case would benefit the public by allowing the criminal prosecution of [Sherry

Freebery and Thomas Gordon], who are public officials, to proceed unimpeded and unobstructed

by any concerns that may arise in discovery in the civil case." *Id.*, citing *Walsh Securities*, 7

F.Supp.2d at 529 and *Javier H.*, 218 F.R.D. at 75.

## CONCLUSION

For the reasons and upon the authorities cited herein, the United States' Motion to

Intervene and Motion for Stay should be granted.

> COLM F. CONNOLLY
> United States Attorney
>
> By:/s/Patricia C. Hannigan
> Patricia C. Hannigan,
> Assistant United States Attorney
> Delaware Bar I.D. No. 2145
> The Nemours Building
> 1007 Orange Street, Suite 700
> P. O. Box 2046
> Wilmington, Delaware 19801
> (302) 673-6277

Dated: **October 27, 2006**

## CERTIFICATE OF SERVICE

I, Patricia C. Hannigan, hereby certify that on **October 27, 2006**, I electronically filed the foregoing **OPENING BRIEF IN SUPPORT OF UNITED STATES' MOTION TO INTERVENE, UNDER RULE 24 OF THE FEDERAL RULES OF CIVIL PROCEDURE, FOR THE PURPOSE OF SEEKING A STAY OF DISCOVERY** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

**Barbara H. Stratton**
Knepper & Stratton
P.O. Box 1795
Wilmington, DE 19899
(302) 658-1717
bhs@knepperstratton.net

*ATTORNEY FOR Joseph Freebery*

**Richard R. Wier, Jr.**
Law Offices of Richard R. Wier, Jr., P.A.
Two Mill Road
Suite 200
Wilmington, DE 19806
(302) 888-3222
Fax: (302) 888-3225
rwier@wierlaw.com

**Gregg E. Wilson**
New Castle County Law Dept.
New Castle Corporate Commons
87 Reads Way
New Castle, DE 19720
(302) 395-5146
gewilson@co.new-castle.de.us

*ATTORNEYS FOR Christopher A. Coons, New Castle County & John & Jane Does*

COLM F. CONNOLLY
United States Attorney

By:/s/Patricia C. Hannigan
    Patricia C. Hannigan
    Assistant United States Attorney
    Delaware Bar I.D. No. 2145
    The Nemours Building
    1007 Orange Street, Suite 700
    P. O. Box 2046
    Wilmington, DE 19899-2046
    (302) 573-6277
    Patricia.Hannigan@usdoj.gov