IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOSEPH J. FREEBERY | : | |
| Plaintiff | : | |
| | : | |
| v. | : | C.A. No. 05-748-KAJ |
| | : | |
| CHRISTOPHER COONS, in his official capacity as | : | |
| County Executive of New Castle County and in his | : | |
| individual capacity; and NEW CASTLE COUNTY, | : | |
| a municipal corporation; and JOHN DOES 1-25 | : | |
| Defendants. | : | |

**PLAINTIFF'S ANSWERING MEMORANDUM OF LAW IN SUPPORT OF
UNITED STATES' MOTION TO STAY DISCOVERY**

**KNEPPER & STRATTON**

**OF COUNSEL:**
Joseph F. Lawless, Esq.
PA Id. No. 23691
6 Harvey Lane
Newtown Square, PA 19083
610.356.0875

Barbara H. Stratton, Esq.
1228 North King Street
Wilmington, Delaware 19801
302.658.1717
Delaware Bar ID # 2785
Counsel for Joseph J. Freebery

## TABLE OF CONTENTS

Table of Citations…..………………………………………………………….... ii

Nature and Stage of the Proceedings………………………..……………………..…1

Summary of Argument………………..……. …………………………………….. 2

Counter-Statement of Relevant Facts ……………………………………………… 3

      a)  The Civil Compliant ……………………………………………………… 4

      b)  The Initial Indictment ……………………………………………………....7

Argument ………………………………………………………………………… . . 11

      a)  Plaintiff Has a Right to Seek Discovery Pursuant
         to Federal Rule of Civil Procedure 26 …………………………………… 11

      b)  The Overall Circumstances Lead to the Conclusion that
         the Stay of Proceedings Requested by the Government is
         Not Inappropriate and Should be Granted………………………………….18

Conclusion …………………………………………………………………….... 22

# TABLE OF AUTHORITIES

**CASES:**                                                    **PAGES(S)**

**Federal**

*AWS Management, LLC. v. United States*, 2006 WL 824506……………………….…..20

*Cosnex Corp. v. Nat'l Instruments Corp.*, C.A. No. 00-442-JJF,
2001 WL 34368283, at * 1 (D.Del. June 29, 2001)………………………………………...18

*Clinton v. Jones*, 520 U.S. 681, 706-07 (1997) ……………………………………………..18

*Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068,1077 (3d Cir. 1983)…………….. 18

*Golden Quality Ice Cream Co., Inc. v. Deerfield
Specialty Papers, Inc.*, 87 F.R.D. 53, 58 (E.D. Pa. 1980)……………………….…..…….21

*In re: Grand Jury Summoned Oct. 12 1970*, 321 F. Supp. 238
(N.D. Ohio 1970)…………………………………………………………………………........12

*In re: Oliver L. North*, 16 F.3d 1234 ……….…………………………………………... 12

*In re: United States of America*, 441 U.S. 44 (1st Cir. 2006)……………….………........12

*In re: Vescovo Special Grand Jury*, 473 F. Supp. 1335 (C.D. Cal. 1979)……………….12

*Joseph J. Freebery v. NCCo, et al.*, No. 05-748-KAJ………………………………………..3

*Maloney et al. v. Gordon, et al.*, Civil Action No. 03-999-KAJ………………..…..5, 6, 18

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)……………………….............13

*Shirsat v. Mutual Pharm. Co., Inc.*, 1995 WL 695109,
at *3 (E.D. Pa. Nov. 21, 1995)…………………………………………………..…….21

*State Farm. v. Beckham-Easley*, 2002 WL 31111766,
at * 1 (E.D. Pa. Sept 18, 2002)…………………………………………………………..…….19

*Tr. of the Plumbers and Pipefitters Nat'l Pension Fund v.
Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995)…………….........19, 20

*United States. v. Brever*, 41 F.3d 884, 893 (3d Cir. 1994)………………………………18

*United States v. Gordon*, 380 F.Supp.2d 356 (E.D. Pa. 2005)……………………………7

ii

*United States v. Gordon & Freebery,* U.S.D.Ct. No. 05-541-JPF............................ 1
*United States v. Kilpatrick,* 594 F. Supp. 1324 (D.Colo. 1984),
rev'd, 821 F.2d 1456 (10th Cir. 1987), *aff'd sub nom. Bank of
Nova Scotia v. United States,* 487 U.S. 250 (1988)...........................................12

*Walsh v. Cristo Prop. Mgmt., Ltd.*, 7 F. Supp.2d
523, 527 (D.N.J. 1998)......................................................................19, 20

**Federal**

Fed. R. Civ.  P. 26(b)(1)......................................................................13

Fed. R. Crim. P. 6(e)(2)(A)..................................................................12

Fed. R. Crim. P. 6(e)(2)(B)..................................................................12

**Other Authorities**

J. Lawless, *Prosecutorial Misconduct, 3d ed.* (LEXIS, 2003).............................. 12

*Secret Justice: Grand Juries*, The Reporters' Committee
for Freedom of the Press, available at
www.rcfp.org/secretjustice/grandjuries/pg2.html ..............................................12

## NATURE AND STAGE OF THE PROCEEDINGS

While plaintiff disagrees with the government's analysis of what is and what is not relevant in this litigation, after careful consideration of the government's motion, the current status of discovery and the discovery which remains to be completed, plaintiff believes that the government's request for a stay of discovery pending the resolution of the criminal matter in the case of *United States v. Gordon & Freebery*, U.S.D.Ct. No. 05-541-JPF is appropriate and the government's motion should be granted.

On October 27, 2006, the government filed its Motion to Intervene Under Rule 24 of the Federal Rules of Civil Procedure for the Limited Purpose of Seeking a Stay of Discovery ("Government Motion"). Counsel for plaintiff spoke with counsel for the County defendants on Wednesday, November 2, 2006, to advise defendants that plaintiff would not oppose the motion. Counsel for the county stated that the defendants were likewise not going to oppose the motion. Counsel both discussed the possibility of so informing the Court by a single letter on behalf of both parties and agreed to discuss the question of how to proceed the following day. The following day, plaintiff's counsel told defendants' counsel that he thought it best that the parties send separate letters to the Court.

Plaintiff's counsel also spoke with counsel for the government and advised her of plaintiff's position. In subsequent conversations, counsel for the government confirmed to plaintiff's counsel her understanding, as a result of her conversations with counsel for the defendants, that the defendants did not oppose the government's motion to stay. Plaintiff's counsel was then notified by email dated November 3, 2006 from counsel for

1

the defendants that the Court directed the parties to file briefs regarding the government's motion by November 11, 2006.

The complaint in this case was filed in October, 2005. Discovery was delayed by preliminary motions and commenced with the service of plaintiff's first spate of discovery in March, 2006. While discovery has been contentious, plaintiff has taken ten depositions and a substantial number of documents have been produced by both sides. One of plaintiff's depositions, that of Charles Baker, generated collateral motion practice between plaintiff and Mr. Baker, individually which is still pending. Defendants have deposed plaintiff's wife and daughter and are approximately 8 hours into plaintiff's deposition, which is still ongoing. Plaintiff's expert economic and vocational rehabilitation report has been served. Defendant's response to one set of Plaintiff's document requests is still outstanding. A few weeks ago, the parties agreed to identify those witnesses they expect to call at trial in order that either side could depose them if they wish and, as of this date, approximately 12 depositions remain to be taken.

## SUMMARY OF ARGUMENT

Contrary to the government's argument, the discovery the government objects to is perfectly appropriate and relevant to the civil litigation. Notwithstanding its propriety, plaintiff does not oppose the government's request for a stay pending completion of the criminal trial. While plaintiff's counsel has always believed that, in criminal prosecutions, the government should maintain an "open file" policy on discovery, particularly in white-collar prosecutions, the government's argument regarding the flow of discovery in criminal vs. civil cases does have legal support. Should the stay not be granted, plaintiff believes that discovery will become a "second front" of collateral

2

litigation which will cause unnecessary expense, inconvenience and intrude on judicial resources. Under these circumstances, given the fact that the period for the requested stay will be relatively short, and since this Court has stayed other civil cases for similar reasons relating to the same criminal prosecution, plaintiff does not oppose the government's motion. The stay of the civil proceedings serves the interests of judicial economy and the parties, in that it will (i) eliminate the need for contentious, collateral litigation with respect to the scope of discovery; (ii) result in all parties having full access to all witnesses relevant, thus aiding in the search for truth; (iii) not prejudice either party to this litigation: (iv) be only for a short period of time. The government motion meets the criteria for a stay request articulated in the case law in this and other Circuits.

## COUNTER-STATEMENT OF RELEVANT FACTS

The government seeks a stay of discovery. The complaint in this case sets forth the facts which help define the proper parameters of that discovery. The facts alleged in plaintiff's complaint cover the entire period of Mr. Freebery's service with New Castle County, including the period of his service as General Manager of Special Services ("GM") during both the Gordon and Coons administrations. The complaint specifically discusses the grand jury investigation of the Gordon administration and alleges alternative causes of action arising in that context, including, *inter alia,* plaintiff's allegation that he was fired because he was Sherry Freebery's brother; supported her political campaign against her political rival, defendant Christopher Coons; and publicly supported her both before her indictment, during the grand jury investigation and after she was indicted. Complaint, *Joseph J. Freebery v. NCCo, et al.,* No. 05-748-KAJ, D.I. 1, ¶¶ 8-90; 115-127; 137-144 ("Complaint"). The facts relevant to the determination of

3

the government's motion are those alleged in plaintiff's complaint in this case and in the initial indictment of Tom Gordon and Sherry Freebery in the criminal case, since the indictment presumably lays out the scope of the investigation itself and demonstrates the relationship which makes certain discovery by plaintiff relevant and necessary.

    a) The Civil Compliant

The complaint alleges that, in 2000, Christopher Coons was elected President of the New Castle County Council.  Both Coons and Sherry Freebery were members of the Democratic Party.  Complaint, ¶ 41.  During the period that Coons served on New Castle County Council, he was a vocal, political opponent of then sitting County Executive Gordon and Gordon's Chief Administrative Officer Sherry Freebery.  Complaint, ¶ 41.

In September, 2002, it became public knowledge that Gordon and Freebery were the subjects and/or targets of a federal grand jury investigation in the District of Delaware.

In February 2004, Sherry Freebery announced her candidacy for the Democratic nomination for County Executive.  On April 19, 2004, Coons announced his candidacy for the same position.  Complaint, ¶ 44.-45.

On May 27, 2004, Gordon and Sherry Freebery were indicted on various charges allegedly arising during their tenure in county government.  Despite the fact that she was under indictment, Ms. Freebery continued to actively campaign.  The primary campaign was bitter and hotly contested.  During the primary campaign, Coons and Ms. Freebery personally attacked each others competence and integrity in office.  Complaint, ¶ 47.-50.

The complaint alleges that, after it became public knowledge that Ms. Freebery was a grand jury target and after her eventual indictment, Joe Freebery, in the proper

exercise of his First Amendment rights to freedom of speech and familial association, was privately and publicly supportive of his sister, as a brother and friend. Between September 2002 and Ms. Freebery's indictment, Mr. Freebery, in the proper exercise of his First Amendment rights to freedom of speech and familial association, also made truthful public statements which were supportive of his sister and which contradicted what appeared to be the government's theory of the criminal liability of his sister. During the primary campaign and, in the exercise of the rights secured him under the First, Ninth and Fourteenth Amendments to the Constitution of the United States, Joe Freebery publicly supported his sister's candidacy and voted for her in the primary election. Complaint, ¶ 51.-53.

The complaint alleges that, on September 11, 2004, Coons won the nomination for County Executive. During the primary and the general election, Joe Freebery continued to perform his role as General Manager of the Department of Special Services in an exemplary and professional manner.

Despite the fact that Joe Freebery was and had been serving in a merit system protected position, Coons publicly and privately stated during both the primary and general election campaigns that, should he be elected, there would be "no room" for Joe Freebery in his administration. Coons made similar statements about Joe Freebery after he was elected and assumed the office of County Executive. The complaint further alleges that despite the fact that Joe Freebery was and had been serving in a merit system protected position, defendant Coons and/or authorized agents stated publicly and privately, during both the primary and general election campaigns, that Coons intended to run an administration "free of corruption" and that there would be "no room" for

5

"someone like Joe Freebery" in any Coons administration. Defendant Coons' authorized agents and representatives made similar statements about Mr. Freebery on behalf of Coons after Coons was elected and after he assumed the office of County Executive. Complaint, ¶ 54.-57.

The complaint alleges that the public and private statements made by and on behalf of Coons regarding Joe Freebery, even prior to his receiving the Democratic nomination and eventual election as County Executive, demonstrated his intention to remove Mr. Freebery from his merit system protected position in retaliation for Mr. Freebery's exercise of his constitutional rights. Complaint, ¶ 58.

In November, 2004, Defendant Coons was elected County Executive. He took office as County Executive on January 4, 2005. The complaint alleges that, almost immediately after his election as County Executive, Coons began the process of doing whatever had to be done to remove plaintiff from his merit system protected position *in retaliation for his public and private support of his sister and/or her candidacy and because he was Sherry Freebery's brother,* which conduct by Coons and/or his agents was in violation of those rights secured Mr. Freebery pursuant to the First, Fifth, Ninth and Fourteenth Amendments to the Constitution of the United States of America, 42, U.S.C. § 1983, the laws of the State of Delaware and Mr. Freebery's express and/or implied contract of employment with New Castle County. Complaint, ¶ 60.-61 (emphasis supplied).

The complaint outlines the steps taken to remove plaintiff and then alleges that Joe Freebery was fired by the defendants in *retaliation for being Sherry Freebery's brother; and/or because during the period of time when Ms. Freebery was under*

6

*investigation and indictment, and in the proper exercise of his First Amendment right to Freedom of Speech, Joe Freebery was privately supportive of his sister and publicly supportive of her as her brother, to the extent he was permitted to do so as an employee of New Castle County; and/or because he made truthful public statements which were supportive of his sister and which contradicted what appeared to be the government's theory of criminal liability of his sister.* The complaint further alleges that Freebery was fired because of his exercise of his First, Fifth, Ninth and Fourteenth Amendment rights in supporting and voting for his sister and a political candidate running against defendant Coons; and in retaliation for the nature of the campaign conducted by Sherry Freebery against defendant Christopher Coons. Complaint, ¶ 74.-76 (emphasis supplied).

a) The Initial Indictment[1]

On May 27, 2004, the grand jury returned a 47-page, 11-count indictment charging Tom Gordon and Sherry Freeebery with RICO conspiracy, substantive RICO, and various related mail and wire fraud counts. The initial indictment (the "indictment") is extremely broad and lays out the areas of investigation pursued by the FBI and the grand jury.[2]

The various counts of the indictment relate to what the government described as five separate "schemes"; (1) the "Election Scheme"; (2) the "Fieldstone Scheme"; (3) the "Harassment Scheme"; (4) the "Investigation Scheme"; and (5) the "Benefits Scheme." The conspiracy count, Count I, included all five of these schemes; the substantive RICO count sets forth five alleged racketeering acts, associated with some of these schemes. Counts III and IV charge mail fraud in connection with the Election Scheme; Counts V

---

[1] The factual summary of the initial indictment is taken from the District Court's Opinion in *United States v. Gordon, et al.*, 380 F. Supp. 2d 356; 2005 U.S. Dist. LEXIS 16441 (E.D. Pa. 2005).
[2] The initial indictment has gone through several procedural iterations.

through VII charged mail and wire fraud in connection with the Fieldstone Scheme;
Count VIII charged wire fraud in connection with the Benefits Scheme; Count IX
charged obstruction of justice against co-defendant Janet Smith ; and Counts XI and XII
charge Sherry Freebery  alone with wire fraud relating to certain mortgages

I. The Election Scheme(s)

The initial indictment charged that from 1994 to late 2002, the defendants caused
*various County employees* to engage in partisan political activity during working hours,
in violation of state law.  The government's theory was that this caused resources of the
County to be improperly diverted for the benefit of particular political candidates.  Joe
Freebery was a county employee during this period and the civil complaint alleges that he
publicly and privately supported his sister's candidacy.

II. The Fieldstone Project

The initial indictment alleged that a wealthy resident of New Castle County,
identified by her initials (now known to be Lisa Dean Mosley) transferred a total of $ 2.3
million to Sherry Freebery during the period from October 2000 to February 1, 2001.
When these transfers were completed, Ms. Freebery executed a promissory note to the
benefactor.

According to the indictment, Ms. Mosely was interested in developing a golf
course and country club on certain real estate which she owned, and needed to obtain
certain approvals from the Land Use Department of the County. At the relevant time, the
General Manager ("GM") of the Land Use Department was Charles Baker.  A couple of
months after the financial transaction, the indictment alleges that Mosley left a telephone
message with a County employee, who in turn relayed it to the Ms. Freebery  as an

8

"SOS" to the effect that the benefactor wanted Ms. Freebery's help in obtaining the necessary approvals for the Fieldstone Project. Thereafter, Ms. Freebery asked a County employee identified in the indictment as "C.B." to find out why the project had not yet been approved, and to ask the Land Use Department to "work with" the Fieldstone Project. Some time later, the Fieldstone Project received its final use and occupancy permit. The indictment further alleged that the defendants caused the County to incur legal expenses in attempting to prevent a local newspaper from disclosing the scandal in connection with the Fieldstone Project.

Discovery in the civil case and plaintiff's pre-trial preparation established that there was an interrelationship between the Land Use and Special Services Department, headed by Joe Freebery and that Baker had a demonstrated anger and bias toward Sherry Freebery, discussed, *infra*, making this a relevant area of inquiry in the civil discovery.

III. The Personal Benefits Scheme

The indictment charged that the defendants caused a County employee, to spend about 10 days painting Ms. Freebery's house and doing yard work at her premises during working hours; that in 2001 Ms. Freebery caused a County employee, during working hours, to decorate Ms. Mosley's Christmas tree; and that, from time to time, County employees performed personal errands for Ms. Freebery while being paid by the County. As noted above, Joe Freebery was a county employee during this period and supervised the largest department in the county, a department whose work included property and grounds maintenance.

IV. The Private Investigation Scheme

The initial indictment charged that Gordon and Freebery caused the County to hire a firm of private investigators to conduct surveillance of certain County employees who were suspected of carrying out a clandestine affair during working hours.

V. The Sexual Harassment Scheme

In Count I of the indictment (the RICO conspiracy count), another one of the alleged fraudulent schemes is referred to as the "Sexual Harassment Scheme." It was alleged that a female County employee complained that she had been the victim of sexual harassment at the hands of another County employee. The employee either resigned or was fired, consulted an attorney and threatened to sue the County for damages. She and her attorney were in possession of certain recorded telephone conversations among other County employees, including Gordon and Ms. Freebery, which allegedly disclosed various other sexual improprieties among County employees, including Gordon and Freebery. The lawyer asserted that, if it became necessary to file the lawsuit, it would "blow the lid off" the County government.[3]  The defendants thereupon caused the case to be settled for $ 260,000, caused the necessary transfer of funds between various County insurance accounts, and, allegedly, accomplished all this without notice to the County Council.

---

[3] The lawyer referred to in the indictment is counsel for the county defendants in this case.  While the count was dismissed in the initial indictment, the government is attempting to have it reinstated in the Gordon prosecution, which has been severed from the Freebery and Smith cases.

10

## ARGUMENT

### a) Plaintiff Has a Right to Seek Discovery Pursuant to Federal Rule of Civil Procedure 26

Mr. Freebery's complaint alleges that defendant Coons' actions were in retaliation for his political and familial relationship with his sister Sherry Freebery.

Approximately 12 witnesses remain to be deposed in this case, including the lead defendant and current New Castle County Executive Coons; two former county attorneys and two sitting Delaware legislators. In support of its assertion that plaintiff's deposition inquiries are irrelevant, the government cites excerpts from several witnesses' depositions and complains that counsel was asking "irrelevant" questions about the criminal prosecution, "completely unrelated to the facts underlying this suit". Government Memorandum, pp. 3-5. The deposition transcripts in this case were not filed of record but were kept in counsel's custody. Plaintiff has confirmed with the court reporter that no one other than plaintiff's and defendants' counsel purchased copies of the deposition. Presumably, therefore, the County defendants provided the deposition transcripts to the government. It may also be presumed at this point that the government is aware of those witnesses whose depositions are noticed of record and is seeking to protect inquiries similar to those it cites in its memorandum. For example, the government objects to questions asked of Charles Baker, flatly and wrongfully concluding that counsel's questions were "designed to elicit testimony relevant to the criminal charges and not this action". Government Memorandum, p. 5. While plaintiff does not oppose the government's motion, the relevance of such inquiries further support the reason why, in the final analysis, the government motion makes the most sense for all concerned.

11

None of the questions asked by plaintiff's counsel and cited by the government are improper.

> One prominent commentator has noted that:
>
> There are no restrictions on witnesses before the grand jury. If anybody is called as a witness to the grand jury – whether as a witness to a crime, or a reporter or someone suspected of a crime – that person is completely free to walk out of the grand jury room, stand in front of a tv camera, and recite in detail everything that happened in the grand jury room.[4]

Federal Rule of Criminal Procedure 6(e)(2)(B) does not impose any obligation of secrecy on a grand jury witness. Rule 6(e)(2)(A) expressly states that a court may *not* impose (and so sanction for noncompliance with) an obligation of secrecy on any person except in accordance with Rule 6(e)(2)(B). Witnesses who have been called to testify before the grand jury are simply not covered by Rule 6(e). *In re: United States of America*, 441 F.3d 44, 62 (1st Cir. 2006); *In re: Oliver L. North*, 16 F.3d 1234, 1242 ("[I]t is well established that a witness is not bound to secrecy as to his own testimony"); *In re: Vescovo Special Grand Jury*, 473 F. Supp. 1335 (C.D. Cal. 1979); *United States v. Kilpatrick*, 594 F. Supp. 1324 (D.Colo. 1984), rev'd, 821 F.2d 1456 (10th Cir. 1987), aff'd sub nom. *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988); *In re: Grand Jury Summoned Oct. 12 1970*, 321 F. Supp. 238 (N.D. Ohio 1970); *see generally, J. Lawless, Prosecutorial Misconduct, 3d ed.* § 2.07 (LEXIS, 2003).

In addition to the fact that there is no secrecy requirement imposed on grand jury witnesses, none of the underlying reasons which provide the rationale for grand jury secrecy are present in this case. The grand jury which was conducting the investigation

---

[4] *Secret Justice: Grand Juries*, The Reporters' Committee for Freedom of the Press, available at www.rcfp.org/secretjustice/grandjuries/pg2.html, *quoting*, Kevin T. Blaine, Esquire, Williams and Connolly, Washington, D.C.

into the Gordon Administration completed its investigation and expired long ago. On
May 26, 2004, it indicted three individuals in two indictments.

Similarly, there is nothing sacrosanct about statements given to federal or state
law enforcement officials or any law which prohibits counsel from asking any witnesses
if they have ever given a statement to any law enforcement agency about anything.
Counsel would be committing malpractice if he or she did *not* attempt to determine if a
hostile witness had ever given a prior statement regarding facts at issue. Statements of
witnesses are statements of witnesses, regardless of to whom or in what context they are
made.

Federal Rule of Civil Procedure 26(b)(1) provides that discovery need not be
confined to matters of admissible evidence, but may encompass that which appears to be
reasonably calculated to lead to the discovery of admissible evidence. Relevancy is to be
broadly construed for discovery purposes and is not limited to the precise issues set out in
the pleadings or to the merits of the case. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S.
340, 351 (1978). The discovery rules are accorded broad and liberal construction.

Charles Baker, for example, was the only "hold-over" General Manager from the
Gordon Administration. Two of the other witnesses identified in defendants' Initial
Disclosures, Jon Husband and Tracey Surles, were members of plaintiff's department
who had significant interaction with the Land Use Department. As the result of
plaintiff's trial preparation, plaintiff's counsel believed that part of the defendants' theory
of defense would be that there was a less than productive relationship between the
departments and that Baker, Husband and Surles would provide negative testimony

13

regarding plaintiff's performance as General Manager in that context.[5] This theory was bolstered by counsel's knowledge that, during the grand jury investigation, Mr. Baker had loudly confronted Sherry Freebery, angrily shouting at her that her conduct "hurt me and my department's reputation". Baker Deposition, pp. 43-45.[6] The reality of this case – and one of the facts alleged in support of the causes of action in the complaint – is that Sherry Freebery is Joe Freebery's sister. It was a logical conclusion that there could be a strong possibility that Baker's anger and negative animus toward plaintiff's sister might also extend to plaintiff and may have manifested itself in sworn testimony before the grand jury regarding Joe Freebery, hence the questions posed.

Plaintiff's counsel was further aware that there was an ongoing give and take between the Land Use and Special Services Departments regarding various building and capital projects, including sewer issues, which relationship was confirmed by Baker during his deposition. Baker Deposition, pp. 35-36. Given the scope of the criminal indictment handed down before this lawsuit was filed, plaintiff's counsel again concluded that there was the possibility that Mr. Baker had been interviewed by the investigating authorities and may have given sworn testimony regarding Joe Freebery's conduct with respect to one or more of the schemes alleged in that indictment.

In this context, counsel asked Mr. Baker if he had ever been deposed or had ever given sworn testimony on prior occasions. Attempting to determine whether a witness, whom counsel correctly expects will be hostile, has given prior statements to anyone or

---

[5] This has been confirmed by the depositions of Husband and Surles, as well as the depositions of Lynne Howard. The attack on Freebery's competence was expanded to his overall competence. *See* Coons' Answers and Objections to Plaintiff's First Set of Interrogatories, Exhibit "A" attached hereto. Husband and Surles were also two of the witnesses whose depositions are referenced by the government in its motion.

[6] The excerpted sections of the Baker deposition are cited in the government's memorandum and are also exhibits in the unsealed version of Mr. Baker's pending motion also pending in this court.

14

sworn testimony regarding a plaintiff is a legitimate and relevant area of inquiry. Counsel chose not to "telegraph" the intent of his question regarding plaintiff by including the other two individuals who, by the time of the deposition, were known to the world to have been indicted. While Mr. Baker's recollection was clear as to what he said or did not say regarding his conduct and that of Mr. Gordon and Ms. Freebery, his initial responses to similar questions regarding plaintiff were evasive, stating "Not that I recall" and "I really can't remember". Baker Deposition, p. 8. Eventually, when pressed, Mr. Baker testified at his deposition that he never testified before the grand jury that plaintiff had ever asked him to do anything illegal or that he had ever seen plaintiff do anything illegal. Baker Deposition, p. 10.

One of the upcoming deponents in this case is defendant Christopher Coons. As part of his defense, Coons has attacked Joe Freebery's competence and job performance during the entire period of time that he [Coons] was President of New Castle County counsel, as well as during his own administration. *See* Coons Answers and Objections to Plaintiff's First Set of Interrogatories, ¶¶ 1.-3, Exhibit "A' attached hereto. The complaint alleges, *inter alia*, that Coons fired Joe Freebery as retaliation against Sherry Freebery or in retaliation against Joe Freebery for his support of his sister.

At this point, it is not unreasonable for counsel to conclude that Coons either has been a grand jury witness and/or has been interviewed by law enforcement authorities in connection with the criminal case. As with Mr. Baker, it is logical to conclude that, if Coons had a personal vendetta and negative animus toward plaintiff's sister (which the circumstances of this case strongly support) this might also extend to plaintiff and may have manifested itself in gratuitous, negative information provided and statements made

15

by Coons to law enforcement or in sworn testimony before the grand jury regarding Joe Freebery.

The criminal indictment is remarkably broad and the allegations of the civil complaint cover the same period. Several of the schemes referenced in the initial indictment refers to "county employees" without naming them and any one of them could have been identified by any grand jury or cooperating witness as Joe Freebery. Freebery also supervised a department with 475 employees.

By asking questions about a witness's grand jury testimony or statements to law enforcement, plaintiff may obtain information necessary to determine whether to seek formal disclosure and discovery of that witnesses' grand jury testimony under Federal Rule of Criminal Procedure Rule 6 for purposes of this case. By asking questions about a witness's grand jury testimony or statements to any investigating authorities, plaintiff may discover whether a defense witness' hostile testimony regarding Joe Freebery's performance as GM included any accusations of illegal or criminal behavior, which if such statements *ever* made, would certainly have to have been made before the grand jury. By asking questions about a witness's grand jury testimony or statements to any investigating authorities, plaintiff may eliminate any possibility that these witnesses might later testify that Joe Freebery had engaged in any criminal or illegal conduct and locked in his testimony with respect to any such allegation. By asking questions about a witness's grand jury testimony or statements to any investigating authorities, plaintiff would obtain sworn testimony which could not now be contradicted by any other witness and which could be used to impeach him if such witness later claimed at trial that plaintiff *had* engaged in criminal conduct. Finally, plaintiff can obtain testimony which

can be used to impeach or contradict other defense witnesses who might try to claim that Coons or other defense witnesses told *them* plaintiff had engaged in illegal conduct.

In summary, plaintiff is absolutely entitled to ask each and every deponent if he or she has ever testified before the grand jury investigating the Gordon Administration or has given statements to law enforcement officers in connection with that investigation and to probe the extent and content of those statements. Unfortunately, the problem does not resolve itself simply because plaintiff has the law on his side.

The reality is that the government has now made it clear, as part of the public record, that it does not want witnesses answering questions about the details of the criminal case, regardless of whether there is any legal support for its position. As is seen from at least one email in this case to plaintiff's counsel, relating to this very issue, some lawyers are simply cowed by prosecutors and will instruct their clients to refuse to answer questions because they believe that "the U.S. attorney's office is quite sensitive about discussions regarding its investigations, especially when they are under oath," regardless of whether there is any legal basis for the witness' counsel to do so. *See* Exhibit "B", Email from Megan Hills, Esquire dated 9/25/06. It is almost inevitable that some or all of the remaining deponents who cooperated (and presumably are continuing to cooperate) with the government investigation and/or testified before the grand jury will refuse to or be instructed to refuse to respond to such questions. This will require plaintiff's counsel to seek relief from the Court, thereby causing and unnecessary imposition on the Court's time, unnecessary motion practice and injecting issues into this case which can be avoided by the brief stay the  government requests.

**b) The Overall Circumstances Support the Conclusion that the Stay of Proceedings Requested by the Government is Appropriate and Should be Granted**

District Courts have broad discretion to stay proceedings as an incident to its power to control its own docket. *Clinton v. Jones*, 520 U.S. 681, 706-07 (1997); *accord Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068,1077 (3d Cir. 1983). The power to stay is incidental to the power inherent in every court to dispose of cases so as to promote their fair and efficient adjudication. *U.S. v. Brever*, 41 F.3d 884, 893 (3d Cir. 1994).

The proponent of a stay bears the burden of establishing its need. *Clinton,* 520 U.S. at 708. In determining whether a stay is appropriate, the court should weigh the competing interests of the parties and attempt to maintain an even balance. *Cosnex Corp. v. Nat'l Instruments Corp.,* C.A. No. 00-442-JJF, 2001 WL 34368283, at * 1 (D.Del. June 29, 2001). It is well settled that before a stay may be issued, the petitioner must demonstrate a clear case of hardship or inequity if there is even a fair possibility that the stay would work damage on another party. Gold, 723 F.2d at 1075-16. Accordingly, only a lesser showing is required if the stay would *not* injure another party. See Gold, 723 F.2d at 1075-76.

In this case, there is no showing that a stay will injure *either* plaintiff or defendants in any way. Courts, including this Court, have developed a six factor test for a stay when there are parallel civil and criminal proceedings. In *Maloney v. Gordon,* 328 F. Supp.2d 508 (D. Del. 2004), this Court enumerated the factors to be considered:

1.  the extent to which the issues in the criminal and civil cases overlap;

2.  the status of the case, including whether defendants have been indicted;

3,  the plaintiffs interest in proceeding expeditiously weighed against the prejudice to plaintiff caused by a delay;

18

4.    the private interests of and burden on defendants;

5.    the interests of the court; and

6.    the public interest.

*Id.* at 511. *See also  Walsh v. Cristo Prop. Mgmt., Ltd.*, 7 F. Supp.2d 523, 527 (D.N.J. 1998); *State Farm Mutual Automobile Insur. Co. v. Beckham-Easley,* 2002 WL 31111766, at * 1 (E.D. Pa. Sept 18, 2002); *Tr. of the Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995).

While these cases deal primarily with situations where the defendants in the criminal case are also the defendants in the civil case, the rationale is applicable to the instant case as well.

1. The Extent to Which the Issues in the Criminal and Civil Cases Overlap

The similarity of issues has been termed the most important issue at the threshold in determining whether or not to grant a stay. *Walsh*, 7 F. Supp.2d at 527; *accord State Farm,* 2002 WL 31111766, at *2. As noted above, the facts alleged in the initial criminal indictment temporally overlap the facts alleged in the civil action. Joe Freebery was a county employee who worked in New Castle County government (the RICO "enterprise"). Joe Freebery held an upper level management possession in that government. It is more likely than not that, when asking questions about county government, the prosecutor would make inquiry regarding someone so prominent, particularly since he was the brother of the grand jury target. Plaintiff controlled a department with numerous employees who could easily be the county employees referenced in the indictment. Given this obvious overlap, plaintiff is entitled to

aggressively seek information which may have been given to the grand jury or law enforcement regarding Joe Freebery's conduct during this period investigate.

These legitimate inquiries will complicate the remaining discovery immeasurably, making it more costly, time consuming and hostile. This can be avoided by the brief stay the government seeks. This most important threshold issue of overlap "weighs in favor of granting a stay." Moreover, this factor may weigh in favor of a stay even when the wrongful conduct in the criminal and civil actions are not identical if the findings or outcome of the criminal trial may affect the outcome of the civil case. *Hicks v. City of N.Y.*, 268 F. Supp.2d 238, 241-42 (E.D.N.Y. 2003). While it will not be determinative, the outcome of the criminal case will certainly impact the parties' approach to the civil case moving forward. This issue weighs in favor of a stay.

2. The Status of the Case, Including Whether Defendants Have Been Indicted

"The strongest case for a stay of discovery in the civil case occurs during a criminal prosecution after an indictment is returned." *Walsh,* 7 F. Supp.2d at 527; *accord Trustees,* 886 F. Supp. at 1139. Indeed a "court will generally stay a civil proceeding when a criminal investigation has ripened into an indictment against the proponent of a stay." Hicks, 268 F. Supp.2d at 242. The defendants in the criminal case have been indicted. They are not, however, parties to the civil action.

The government voices a concern that the civil discovery process will allow plaintiff's sister, a defendant in the criminal case, to circumvent the more restrictive criminal discovery rules, *citing AWS Management, LLC. v. United States,* 2006 WL 824506 at *2 (*citing Campbell v. Eastland,* 307 F.2d at 487-490). Government Memorandum, pp. 17-18. While this suggests that the Government's approach to

discovery is far more gamesmanship than the search for the truth it should be, it is an argument which can be made and which some courts do consider.

3) The Plaintiff's Interest in Proceeding Expeditiously Weighed Against the Prejudice to Plaintiff Caused by a Delay

The absence of prejudice to [a plaintiff] from a delay of the case weighs in favor of a stay. *Walsh*, 7 F. Supp.2d at 528. A plaintiff may waive his or her "interest in proceeding expeditiously" with a civil action in favor of parallel criminal proceedings and may explicitly request that the court grant a stay of discovery pending disposition of the criminal matter. Here, plaintiff recognizes the overall advantage of the stay requested by the government to both parties in the civil action and believes the stay requested to be appropriate. This third factor weighs in favor of a stay.

4) The Private Interests of and Burden on Defendants

The defendants have represented to both the government and the plaintiff that they do not oppose the government's motion. Plaintiff is not aware of any burden the stay requested by the government would impose on the defendants.

5) The Interests of the Court

Judicial efficiency also weighs in favor of granting a stay. "[C]onvenience to a court will militate in favor of a stay where the outcome of a criminal case can be expected to remove the predicate for the assertions of the Fifth Amendment rights against self-incrimination by potential deponents and lighten the work load of a court to review those assertions." *Shirsat v. Mutual Pharm. Co., Inc.*, 1995 WL 695109, at *3 (E.D. Pa. Nov. 21, 1995); *see Golden Quality Ice Cream Co., Inc. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53, 58 (E.D. Pa. 1980) ("whatever the outcome of the criminal case, its termination can be expected to remove the predicate for the assertion of the Fifth

21

Amendment right against self-incrimination by potential deponents; and this should allow civil discovery to proceed more smoothly than would otherwise be possible"). Once defendants' criminal trial has concluded, the predicate for any Fifth Amendment assertions in the civil case will be gone.

6) The Interests of the Public

The interests of the public is always furthered by expeditious resolution of civil and criminal cases and the government's request for a stay of discovery in this case furthers those interests.

Once the testimony in the civil case is completed, the testimony of those witnesses for the government will be of record. The existence of other statements to both law enforcement and possibly the grand jury will be public record and then more easily available to plaintiff for use in the civil case. The fear of government retribution on the part of deponents will be eliminated. Any Fifth Amendment issue for any witness will be eliminated and the remaining depositions in the case may move forward smoothly to completion. Neither the parties nor the Court will have to face collateral issues as they have in the case of at least one other deponent.

The government's request is for a relatively short period of time and the stay will not prejudice anyone. Accordingly, plaintiff does not oppose the government's motion and believes the relief it seeks to be appropriate.

## CONCLUSION

The government's request for a stay should be granted and discovery in this case should be stayed pending the completion of the criminal trials.

KNEPPER & STRATTON

**OF COUNSEL:**

Joseph F. Lawless, Esquire
P.A. Id. No. 23691
6 Harvey Lane
Newtown Square, PA 19073
(610) 356-0875
Jlaw6@comcast.net
Counsel for Joseph J. Freebery

  /s/ Barbara H. Stratton
Barbara H. Stratton, Esquire
1228 North King Street
Wilmington, DE 19801
(302) 658-1717
DE Bar I.D. No.:  2785
bhs@knepperstratton.net
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH J. FREEBERY, | ) C.A. No.: 05-748(KAJ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) |
| | ) |
| CHRISTOPHER COONS, IN HIS OFFICIAL CAPACITY | ) |
| AS COUNTY EXECUTIVE OF NEW CASTLE COUNTY AND | ) |
| IN HIS INDIVIDUAL CAPACITY; AND NEW CASTLE | ) |
| COUNTY, A MUNICIPAL CORPORATION, AND JOHN | ) |
| DOES 1-25, | ) |
| | ) |
| DEFENDANTS. | ) |

## CERTIFICATE OF SERVICE

I, Barbara H. Stratton, hereby certify that on November 10, 2006, a copy of the Plaintiff's Answering Memorandum of Law in Support of United States Motion to Stay Discovery was served electronically upon the following:

Gregg E. Wilson, Esquire
County Attorney
New Castle County
87 Reads Way
New Castle, DE 19720

Richard R. Wier, Jr., Esquire
Two Mill Road, Suite 200
Wilmington, DE 19806

Patricia C. Hannigan, Esquire
U.S. Attorney's Office
The Nemours Building
1007 Orange Street, Ste. 700
P.O. Box 2046
Wilmington, DE 19899-2046

KNEPPER & STRATTON

**OF COUNSEL:**
Joseph F. Lawless, Esquire
P.A. Id. No. 23691
6 Harvey Lane
Newtown Square, PA 19073
(610) 356-0875
Jlaw6@comcast.net
Counsel for Joseph J. Freebery

By:    /s/  Barbara H. Stratton
Barbara H. Stratton, Esquire
1228 North King Street
Wilmington, DE 19801
(302) 658-1717
DE Bar I.D. No.: 2785
bhs@knepperstratton.net
Attorney for Plaintiff