# EXHIBIT "A"

Senator Karen E. Peterson

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH J. FREEBERY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 05-748 KAJ |
| ) | |
| CHRISTOPHER COONS, ) | |
| in his official ) | |
| capacity as County ) | |
| Executive of New ) | |
| Castle County and in ) | |
| his individual ) | |
| capacity, and NEW ) | |
| CASTLE COUNTY, a ) | |
| municipal ) | |
| corporation, and ) | |
| JOHN DOES 1-25, ) | |
| ) | |
| Defendants. ) | |

     A deposition of Senator Karen E. Peterson was taken pursuant to notice before Ellen Corbett Hannum, Registered Merit Reporter, in the New Castle County Law Offices, located at 87 Reads Way, New Castle, Delaware, on Thursday, January 31, 2008, beginning at approximately 12:30 p.m., there being present:

APPEARANCES:

                    JOSEPH F. LAWLESS, ESQ.
                      843 Mt. Morrow Road
                      Villanova, PA  19085
                      For the Plaintiff
                      CORBETT & WILCOX
         Registered Professional Reporters
   The Parcels Building - 230 N. Market Street
                  Wilmington, DE 19801
                       (302) 571-0510
                 www.corbettreporting.com
Corbett & Wilcox is not affiliated with Wilcox & Fetzer,
                      Court Reporters

Page 2

1  APPEARANCES (CONTINUED):
2      MICHELE D. ALLEN, ESQ.
       Richard R. Wier, Jr., P.A.
3      Two Mill Road, Suite 200
       Wilmington, Delaware 19806
4      For the Defendants
5
6      - - - - -
7      SENATOR KAREN E. PETERSON, having first been
8  duly sworn according to law, was examined and testified
9  as follows:
10          EXAMINATION
11 BY MR. LAWLESS:
12     Q. Would you state your full name, please?
13     A. Karen E. Peterson.
14     Q. And am I correct that your title is Senator
15 Karen E. Peterson?
16     A. That's correct.
17     Q. And can you tell us what your position is in
18 government in the state of Delaware, please?
19     A. A State Senator representing the 9th
20 Senatorial District.
21     Q. How long have you been a State Senator?
22     A. Six years.
23     Q. Have you ever given a deposition before in a
24 civil case?

Page 3

1      A. Yes.
2      Q. So I don't have to give you the 15-minute
3  speech, you know you are under oath.
4      A. Yes.
5      Q. And if I ask you a question and you respond to
6  it, we are going to assume you understood the question
7  and that your answer was intended to be responsive to the
8  question.
9      A. Yes.
10     Q. And, obviously, now you also know to say yes
11 every time instead of nodding, like a lot of witnesses
12 do. If you don't understand a question, either Ms. Allen
13 or I, ask, please interrupt us. We are here for one
14 reason, and that's to get to the truth. And if you
15 understand the questions, then that way we can assure the
16 answers are going to be truthful.
17         Senator, can you give me your
18 educational background very quickly, please?
19     A. Sure. I earned my Bachelor of Science degree
20 summa cum laude from Neumann College. I've done some
21 graduate work at the University of Pennsylvania. Earned
22 my paralegal certification from Widener University; my
23 labor relations certification from the University of
24 Delaware. I attended Duke University's Governor's

Page 4

1  Center; Cornell's School of Labor and Industrial
2  Relations.
3      Q. Cornell, my wife is an alum.
4      A. And my favorite was Disney University.
5      Q. It's a small world!
6         Senator, it's my understanding you have
7  also held a number of other offices in both the state of
8  Delaware and in New Castle County.
9      A. That's correct.
10     Q. Could you please outline that for us?
11     A. Yes. I worked for the Delaware Department of
12 Labor from 1974 to 2001. I worked my way up through the
13 ranks, reaching the position of Director of the Division
14 of Industrial Affairs, which I held from 1993 to March of
15 2001. Also, during that time, I was, had an elected
16 office, President of New Castle County Council, from 1981
17 to 1989. I was elected to two terms and then chose not
18 to run again.
19     Q. And when did you become a State Senator, what
20 year?
21     A. I was elected in 2002.
22     Q. I want to jump around a little bit, if I may.
23 Senator, again, you understand that I'm here representing
24 Joe Freebery in connection with a lawsuit that he filed

Page 5

1  against the current New Castle County President,
2  Christopher Coons, and New Castle County?
3      A. Yes.
4      Q. You understand --
5         MS. ALLEN: County Executive.
6         MR. LAWLESS: I'm sorry. Yes. County
7  Executive.
8         THE WITNESS: Yes.
9  BY MR. LAWLESS:
10     Q. A lot of offices to keep track of.
11        I would like to direct your attention to
12 the period after Mr. Coons was elected County Executive.
13 Did there come a point in time when a piece of
14 legislation came before the State Senate to change the
15 status of the New Castle County general managers from
16 merit-system employees to employees who served at the
17 will of the County Executive?
18     A. Yes.
19     Q. And to get a little background on that, do you
20 have a general understanding of what the New Castle
21 County merit system is?
22     A. Yes.
23     Q. Could you explain, briefly, what your
24 understanding of the merit system is?

Senator Karen E. Peterson

3 (Pages 6 to 9)

### Page 6

1   A. The merit system was created in the 1960s,
2   around the same time that the County government was
3   switched from a levy court to the executive council form
4   of government. It was to basically eliminate the old
5   patronage system of employment, where people depended on
6   who won the election for their jobs, and replaced it with
7   a system much like the State's, where you are protected
8   unless there is just cause for you to be disciplined,
9   discharged. So it's based on your merits as opposed to
10  your political affiliations.
11     Q. Okay. What would the benefit of a merit
12  system be to the functioning of the County government as
13  a general concept?
14     A. Well, stability, some continuity, some
15  institutional knowledge that would carry from -- mostly
16  stability to stabilize the government so that every time
17  an election occurs you don't throw all the employees out
18  and start all over again. It was to bring some
19  professionalism to the County.
20     Q. Would it have any benefit for the County
21  attracting higher quality employees?
22        MS. ALLEN: Objection to the form.
23  BY MR. LAWLESS:
24     Q. You can answer.

### Page 7

1   A. I believe so.
2   Q. And again, Senator, I know you have been
3   through depositions, but this is just a reminder just so
4   you know, there may come a point in time where both
5   Ms. Allen or I may make an objection to a question. It's
6   a deposition, there is no judge here saying overruled or
7   sustained, so the objection will be stated and then you
8   can continue to answer the question.
9   A. Okay.
10  Q. In the New Castle County merit system, are you
11  aware of a concept called progressive discipline and how
12  that works?
13  A. Yes.
14  Q. How does that work?
15  A. Progressive discipline is designed in two
16  ways: One, in the merit rules themselves, and then the
17  union contracts usually state progressive disciplinary
18  action. What it means is that the punishment should fit
19  the crime, so to speak, and that a person shouldn't be,
20  shouldn't lose their job for minor infractions or even
21  major infractions. That is, the employer should have to
22  first let the employee know that what they are doing is
23  not acceptable, and usually that's the first step, an
24  oral warning. And then if it recurs, then you would move

### Page 8

1   up through the process to a, perhaps, a written
2   reprimand, perhaps a suspension for any subsequent
3   offense, and then eventually on to termination if the
4   employee didn't correct whatever the problem was.
5   Q. Was there a provision or is there a provision
6   in the New Castle County merit system law that allows you
7   to jump over those steps in the event there is an
8   egregious violation right out of the box, if you know?
9   A. I can't speak to now. I can speak to when I
10  was Council President. There was. You could go from no
11  reprimand to directly to termination of employment if it
12  was something egregious like theft from the government or
13  you punched your supervisor in the mouth. It had to be
14  egregious.
15  Q. Punching your supervisor in the mouth is
16  egregious?
17  A. It depends who the supervisor is.
18  Q. Okay. Since you were on County Council from
19  '81 to '89, am I correct that was before the changes that
20  are now in place for the New Castle County government
21  were made, and they were the changes that were made in
22  the Gordon administration, a restructured government?
23  A. That's correct, yes.
24  Q. If I can shortcut this a little bit. Am I

### Page 9

1   correct that what is now called the County Department of
2   Special Services used to be called the Department of
3   Public Works?
4   A. That's correct.
5   Q. Do you know or do you have any recollection as
6   to whether or not the Department of Public Works had a
7   narrower scope of responsibilities or was it a scope of
8   responsibility that is consistent with what is now called
9   the Department of Special Services?
10  A. It had a narrower scope, as I recall.
11  Q. Do you recall what it was?
12  A. I'm going back to the days when Al Madura was
13  head of that department. And it was sewers -- he was
14  responsible mostly for sewers and --
15  Q. Parks?
16  A. No. Parks was a separate department.
17  Q. Administrative Services was a separate
18  department, too?
19  A. As I recall, yes. So my dealings with the new
20  Department of Special Services was that -- and I had
21  dealings with them as Senator, was that several of these
22  offices that used to be standalones were now pulled
23  together under one umbrella.
24  Q. Okay. As a member of the County Council, I

Page 10

1  guess, did you have dealings with the Director of the
2  Department of Public Works?
3      A.  Yes.
4      Q.  Was there more than one of them during your
5  tenure or was there just one; do you recall?
6      A.  Just one.
7      Q.  And in terms of just how you observed that
8  department functioning, did -- well, let me ask you this:
9  How would you compare how the Department of Public Works
10 functioned under whoever that gentleman's name was and
11 the Department of Special Services functioned under Joe
12 Freebery, can you compare them?
13     A.  Do you mean in terms of responsiveness?
14     Q.  Responsiveness, flexibility, running smoothly
15 as opposed to a cumbersome bureaucracy? How did they
16 compare?
17         MS. ALLEN: Objection to the form.
18         THE WITNESS: Al Madura, who was
19 Director of Public Works, when I was Council President,
20 ran, in my view, a benevolent dictatorship without the
21 benevolence. He was it. What he said was it and nobody
22 dared disagree. Did he do a good job? I think he did.
23 I can tell you he was not responsive to, at least me, as
24 Council President. In fact, he persisted in calling me

Page 11

1  sweetheart on the floor of Council until I told him that
2  was not an option anymore.
3      Q.  Ouch.
4      A.  But that was Al. That was the way he treated
5  everybody. Dealing with the Department of Special
6  Services for me was a whole different thing. I had been
7  out of office for 12 years, between the time I stepped
8  down as Council President until the time I was elected to
9  the Senate. So a dozen years had passed between my
10 dealings with the department. And from day one as a
11 Senator, I learned early on that I could pick up the
12 phone, call Special Services, whether it was for a tree
13 down in a creek or whatever, any problem, and get
14 immediate response.
15         So that was real different, a different
16 experience for me in dealing with that department from
17 when I was Council President.
18     Q.  Okay. Did there come a point in time when you
19 became involved -- actually, as I understand it, you have
20 always been something of a champion in removing pay
21 disparities between men and women in the workplace?
22     A.  Yes.
23     Q.  And you have been also in terms of those
24 disparities in New Castle County. Did there come a point

Page 12

1  in time when you became involved, where you observed Joe
2  Freebery becoming involved in that issue as well?
3      A.  That was 1985, when I did the pay equity
4  legislation, and that's the only pay equity study that's
5  been done in Delaware for a government agency to date.
6  As I recall, Joe was with the parks department at the
7  time, and I don't remember if he was a member of the
8  steering committee or not. He might have been. But that
9  study was done in 1985.
10     Q.  You don't have any recollection one way or
11 another whether you worked with him on that? And if you
12 don't remember, that's fine.
13     A.  It was a large committee. I think there were
14 20-some people on that committee, some of whom were
15 directors, I just don't recall.
16     Q.  Okay. Do you know or were you aware of -- and
17 I understand you are certainly a union person, what is
18 Local 459 in New Castle County?
19     A.  It's the blue-collar union. It's mostly
20 trades people, electricians, plumbers.
21     Q.  Were you aware when Joe Freebery took over as
22 the director -- general manager of the Department of
23 Special Services, that there were a large number of union
24 grievances left over from the Greenhouse Administration

Page 13

1  that were pending when he took over, approximately 300
2  grievances?
3      A.  I don't have any knowledge of that.
4      Q.  You don't have any knowledge of that either
5  way?
6      A.  No.
7      Q.  So you wouldn't know if they were all resolved
8  within the first year he took over as general manager of
9  the department?
10     A.  No.
11     Q.  Okay. Did there come a point in time,
12 Senator, when your district was hit by a tropical storm
13 and there was a lot of flooding involved?
14     A.  Yes.
15     Q.  And when was that? And what can you tell me
16 about that?
17     A.  That was September 15th, 2003. The community
18 of Glenville, which is in my district, was hit by a
19 tropical storm, and the community was basically wiped
20 out. 168 homes were declared uninhabitable. It was the
21 second time in four years that the community had been hit
22 -- Hurricane Floyd had done significant damage to the
23 community, and those folks were told to just rebuild and
24 that was a 100-year storm and wouldn't happen again for

Senator Karen E. Peterson

5 (Pages 14 to 17)

Page 14

1  100 years. And here it's four years later, and the water
2  was seven-feet deep in the streets of Glenville.
3     Q. Dog hairs.
4     A. Yes. So, yes, I was involved in that. I just
5  happened to be there when the water came over Route 4,
6  and I had a video camera with me and I got a good bit of
7  the beginnings of the flood on video. And I called the
8  Governor's office for help.
9     Q. What happened?
10    A. I called for help. I said, We need National
11 Guard or something out here because -- you are not going
12 to believe this, but ten feet of water just came over
13 Route 4 and is washing cars off Route 4, and it's headed
14 right towards Glenville. And I know there are people who
15 are stranded in there who are going to be stuck, because
16 that's how fast the water was coming across the road.
17 And they thought it was a joke originally. When I
18 insisted that it really was flooding, and they said, That
19 can't be, because the sun is shining. I said, Yeah, the
20 sun is shining, but I can tell you that the water that is
21 coming across the road is carrying cars with it.
22    Q. Wow!
23    A. So they put me through to constituent
24 relations, after putting me on hold for I don't know how

Page 15

1  long.
2     Q. And this is while they knew you were a State
3  Senator at that time?
4     A. Yes. And, finally, she said they would pass
5  the information on to somebody, and that was that. I
6  never saw or heard from them again for, I guess, about
7  nine days.
8     Q. Did the Department of Special Services of New
9  Castle County under Joe Freebery become involved in that
10 problem?
11    A. Yes.
12    Q. What did they do and what did you observe?
13    A. Well, the State didn't send anybody, even
14 though Representative Gilligan was also on the phone
15 trying to get help from the State. But New Castle County
16 dispatched -- well, first of all, we had, I think, 23
17 volunteer fire companies showed up from a three-state
18 area to rescue people. There were people who ended up
19 being stuck in their houses, in some cases in basements
20 where the walls had collapsed, we had people trapped.
21 The Coast Guard sent a helicopter to airlift people off
22 rooftops.
23          Special Services showed up, waiting for
24 the, for whatever they needed to do. And I guess around

Page 16

1  4 o'clock in the afternoon it was like somebody pulled
2  the plug on the bathtub and it went glub, glub, glub, and
3  the water was all gone after two hours of, you know,
4  people almost being washed away by the water.
5          And at that point Special Services
6  kicked in and never left that community for, at least,
7  six months on a daily basis. Just in there -- the next
8  morning I was back down there at 8 o'clock in the
9  morning, because the community -- Route 4 was completely
10 shut down. It was full of 8, 10 inches of mud on Route
11 4. Part of the bridge had been damaged, the concrete
12 under the bridge had caved in. We didn't know if the
13 Route 4 bridge was safe.
14         When I got down there at 8 o'clock in
15 the morning, Special Services was already in there. They
16 had made arrangements to have all the streets hosed down,
17 to get all the mud off the streets, to open up the storm
18 drains. And from that day forward, and I lived in
19 Glenville for probably the next -- I still go through
20 Glenville every day, my car just makes the turn. They
21 were in there every day hauling away what people could
22 save.
23         Now, the day that Henri hit, September
24 15th, '03, three days later Hurricane Isabel was

Page 17

1  scheduled to hit. And the people were concerned that the
2  houses would collapse. The houses that had been damaged
3  were very -- they had been declared uninhabitable by New
4  Castle County. So these people said, now a hurricane is
5  on its way, and our houses are going to blow down because
6  the foundations were blown out of many of the houses. So
7  Special Services went in and shored them up, in, like, a
8  24-hour period went in and put timbers under what was
9  left of the foundations so the houses wouldn't blow down
10 through the hurricane.
11         They then went back after people were
12 allowed back in to salvage what they could in the houses.
13 And I have videotape of this, I mean, just week, after
14 week, after week of all people's belongings, sofas, TVs,
15 stoves, mattresses, carpeting, drywall, they were there
16 every, single day picking up everything that people had
17 pulled out of their houses.
18    Q. You actually have a videotape of the people
19 from Special Services doing this?
20    A. I think there is one clip where the Special
21 Services truck is going by, loading up. But this was on
22 a daily basis because people spent months emptying those
23 houses out. Because we didn't know if they were going to
24 have to go back and live in those houses or not. We

Senator Karen E. Peterson

6 (Pages 18 to 21)

Page 18

1  didn't know about the buyout for a little bit.
2    Q. I didn't know you had the videotape, if I were
3  to ask you to preserve that for some point in the future,
4  would you do that for us?
5    A. Absolutely.
6    Q. Well, and during this period of time, who was
7  the general manager of the Department of Special
8  Services?
9    A. Joe Freebery.
10   Q. Did you see Joe Freebery in Greenville during
11 this period of time?
12       MS. ALLEN: Glenville.
13 BY MR. LAWLESS:
14   Q. GLenville, during this period of time?
15   A. Yes.
16   Q. Sorry, excuse me. Glenville.
17   A. Yes, he was a regular also.
18   Q. And so he wasn't just sitting back in the New
19 Castle County offices supervising, he was actually out
20 shoring up basements?
21   A. He was out traipsing around in the mud with
22 the rest of us, directing the people to shore up the
23 foundations. I remember one case in particular from -- I
24 don't know if you want this.

Page 19

1    Q. Absolutely, please.
2    A. There was a family at 2 Madairy Drive, or
3  whatever it is, this is the day after -- this is when,
4  the day after the hurricane had past, and people were now
5  going to be allowed back in, to try to salvage what they
6  could of their valuables. And I happened to be walking
7  past, because no cars could get back in there because of
8  the mud and the limbs down on the streets and all that
9  that was being cleared out. And there was a family
10 sitting on the front steps of 2 Madairy Court, and they
11 were crying. They were young girls, and they all were
12 crying. And I said, "What is the matter?" They said,
13 Our grandmother's belongings are in there, but they told
14 us we can't go in because the house is probably going to
15 collapse. They said her wedding band is in there. Her
16 medicines are in there. I said, "Don't move."
17       I ran back up. They had moved an
18 emergency trailer in as a headquarters for us. We had
19 really nowhere for people to come to get tetanus shots.
20 We needed people to get tetanus shots; we didn't know
21 what was in the water. Barrels of chemicals had floated
22 down from Marshalton. We really didn't know what people
23 were being exposed to at the time.
24   Q. Sure.

Page 20

1    A. So New Castle County -- I guess the County
2  police, I think it was, brought their emergency
3  communications trailer in, and that became our
4  headquarters for the residents.
5       So I ran up and I said, Could somebody
6  help this family? They are just beside themselves. They
7  are just distraught over the grandmother's belongings in
8  the house. Joe dispatched a crew with me. They went
9  over, took timbers over, shored up the back of the house.
10 We then hoisted the smallest of the nieces and
11 grandchildren up through a window. And Special Services
12 said, Now, when you get in there, don't move. Just reach
13 what you can, because the house is so unstable. And so
14 this young girl was in there throwing things out the
15 window to us -- jewelry. And that was 168 families were
16 in the same position, and Special Services -- no matter
17 what we needed or where we needed it, Special Services
18 went over and took care of it.
19   Q. So you would say the Department of Special
20 Services really did their job and did their job in an
21 exceptional way?
22   A. I said publicly that they were spectacular.
23       MR. LAWLESS: Excuse me for a second.
24 BY MR. LAWLESS:

Page 21

1    Q. In addition to saying they were spectacular,
2  did there come a point in time when the Senate gave an
3  accommodation or an award to either the Department of
4  Special Services or Joe Freebery individually?
5    A. Yes. I was the sponsor of that. That was
6  recognizing them and the volunteer fire companies, who
7  had brought their boats here from New Jersey,
8  Pennsylvania, Maryland, just commending them for the
9  outstanding job they did in getting people to safety and
10 helping them salvage what they could, and then cleaning
11 up afterwards. This was September, and it was hot, and
12 the mold started to grow right away.
13   Q. Sure.
14   A. And so they were just there every day,
15 including Saturdays and Sundays. They were there picking
16 up every bit of stuff that people were putting out from
17 168 destroyed homes.
18   Q. Based on your experience in government and
19 public service, having watched governmental departments
20 function, would you say that in order for the Department
21 of Special Services to do the job that it did, there had
22 to be a certain amount of coordination within the
23 department and organization?
24   A. Oh, absolutely.

Page 22

1    Q. Would it be fair to say that in order for
2 Special Services to do the job that it did, there would
3 have to be not only dedication from the bottom up, but
4 leadership from the top down?
5    A. Absolutely.
6    Q. Would it be fair to say, then, based on your
7 observations of the Department of Special Services,
8 particularly in connection with the Glenville flood, that
9 Joe Freebery demonstrated significant leadership within
10 the Department of Special Services?
11    A. Absolutely.
12    Q. You mentioned that there was a buyout of these
13 homes. Do you recall how that took place or where that
14 money came from? Who set that up?
15    A. Yeah. As I said, four years earlier they had
16 been flooded by Hurricane Floyd and had been told, you
17 know, Don't worry, it won't happen for another 100 years,
18 go on back and rebuild. And a lot of these people had
19 gone out and taken out second mortgages to rebuild
20 because they didn't have flood insurance. A good number
21 of them didn't, anyway.
22         And so the night of the flood, I
23 remember we were standing up on Route 4, Route 4 was
24 closed, and Tom Gordon and I actually had gone out in a

Page 23

1 rescue boat, Tom Gordon and I had gone out in a rescue
2 boat and he said to me, as we were riding through the
3 streets of Glenville in a boat -- and they were tapping,
4 they had oars, and they were tapping to make sure we
5 weren't going to hit the roof of a car under water.
6 That's how deep the water was. And Tom said to me, We
7 have to get these people out of here. And I said, Well,
8 I agree. Of course, I am nine months -- I have been in
9 the Senate now nine months at this point in time. So I
10 had no idea where money was going to come from. I agree.
11 It's not safe to live here anymore.
12         So when we got out of the boat, Channel
13 6 or Channel 3, one of those news channels was there, and
14 they said, What do you think needs to happen here? And
15 Tom said, We need to buy these people out. Again, I
16 said, Yeah, we need to buy these people out. Again, not
17 thinking, gee, I wonder where the money was going to come
18 from.
19    Q. Reaching for your checkbook, right?
20    A. Yes.
21         The next morning when I was down there
22 at 8 o'clock, Representative Gilligan was also there.
23 The people were up in arms. They said, Look, four year
24 ago we were told to go back, we would be safe, and here

Page 24

1 we are four years later with just the clothes on our
2 back. What are you going to do?
3         And I said, We are going to try to buy
4 you out. And I remember Representative Gilligan saying,
5 Yeah, where do you think you are going to get $33
6 million? I thought, that's a good question.
7    Q. He wasn't reaching for his checkbook, either?
8    A. He said, I'm not going to stand here and lie
9 to these people. You can stand here and lie to them, but
10 there is not going to be a buyout. Well, maybe there is
11 not, but we need to try.
12         And the County -- Tom Gordon had already
13 said the County would be in, if we could get the State to
14 get in on it also. And so after some arm twisting,
15 after, I guess, about nine days of me calling the
16 Governor's office on almost a daily basis to say, When is
17 the State going to step up to the plate? You know, we
18 have a commitment from the County to chip in to buy these
19 houses and clear the land. Finally, the Governor's
20 office convened some meetings and they said, Okay, the
21 State would chip in half, because we knew FEMA wasn't
22 going to show up. Although, they did come to one meeting
23 and say they would pay 38 cents on the dollar, and it
24 would take about six years to get it done.

Page 25

1         And I said to Tom Gordon, Well, maybe
2 you can go back and tell the people in Glenville that
3 answer, but I'm not, because we won't get out of there
4 alive. And so a decision was made that there would be a
5 buyout, a joint County/State buyout of the property. So
6 those houses have all been bought and torn down.
7    Q. Do you know if that budget came, do you know
8 if $15 million of that came from the budget of the
9 Department of Special Services or how that came to be?
10    A. I don't know exactly where the money came
11 from, just that Gordon said that he would find it.
12    Q. I guess the way we got into this originally,
13 Senator, was I had asked you about whether or not you
14 were aware of the piece of legislation that came before
15 the Senate after -- by the way, 2003, was Chris Coons a
16 member of New Castle County Council; do you know?
17    A. Yes, he was president.
18    Q. And did you ever see Mr. Coons out there
19 during the floods?
20    A. Just once, when I suggested that he come out
21 and look at it, because I had heard that he was opposed
22 to a buyout. And I called him and said, You need to see
23 the extent of the damage here. So I actually walked him
24 through, so he could see what had happened to this

Senator Karen E. Peterson

8 (Pages 26 to 29)

Page 26

1  community and why it had to be -- why it was no longer
2  safe for people to live there.
3  Q. So in fairness to President Coons, I mean, he
4  was out there and he did take a look?
5  A. About, maybe, two weeks after the flood.
6  Q. Okay. Do you know if Joe Freebery was out
7  there when he was out there, by any chance?
8  A. I don't recall if Joe was there that day.
9  Q. As president of Council, however, would he
10 have been aware that the Department of Special Services
11 was really running that operation down in Glenville at
12 that time?
13 A. He would have to have, because the trucks were
14 still in there. The trucks were still in there every day
15 hauling out more debris, and sawing limbs off trees that
16 were about ready to fall into the streets.
17 Q. Do you know whether or not, as Council
18 President, Mr. Coons might have actually commended the
19 Department of Special Services on the floor of County
20 Council regarding the job they did during the flood down
21 at Glenville? Are you aware of that one way or the
22 other?
23 A. No, I'm not.
24 Q. Now, we are, again, back after Mr. Coons has

Page 27

1  been elected County Executive, at the point in time when
2  some legislation came before the State Senate changing
3  the position of general managers from being protected by
4  the merit system to serving at the pleasure of the County
5  Executive.
6     Do you recall that piece of legislation?
7  A. I do.
8  Q. Do you recall whether or not Mr. Coons
9  testified before the Senate or a subcommittee of the
10 Senate on in connection with that legislation?
11 A. He testified on the floor of the Senate.
12 Q. Okay. Was there anything unusual about the
13 process by which that law was passed? I recall something
14 in what I have read about there was a suspension of the
15 rules of the Senate to consider the bill under certain
16 circumstances. Do you know anything about that?
17    MS. ALLEN: Objection as to the term
18 unusual.
19    THE WITNESS: I don't recall if it was
20 done under suspension of rules. It was done very early
21 in the term.
22 BY MR. LAWLESS:
23 Q. When you say "early in the term," what do you
24 mean?

Page 28

1  A. It was voted on on January 25th, which means
2  we were only in session, at that point -- we go in the
3  second Tuesday of January, so that would have been maybe
4  the second week we were down there. And it was a House
5  bill. So I don't know whether it skipped the committee
6  hearing process on our side, but I do know it was in
7  January that we got the bill.
8  Q. Do you have any recollection of who the
9  primary sponsors of the bill were?
10 A. It was a House bill, so it would have been --
11 no, I don't recall.
12 Q. Do you recall whether or not you were lobbied
13 by anyone in connection with this bill to seek your
14 support for the bill?
15 A. No, I was not.
16 Q. Do you recall whether or not either counsel
17 for the Senate or counsel for the House had spoke to the
18 Senate regarding the legality of this bill, whether or
19 not it was a legally sound piece of legislation?
20 A. That's three years ago, I don't recall that.
21 Q. Were you present when -- and I'm going to
22 mispronounce her name again, is it Minner or Miner?
23 A. Minner.
24 Q. Were you present at all when Governor Minner

Page 29

1  made a remark regarding this piece of legislation, that
2  she was concerned that the State was going to be sued as
3  a result of this bill, and someone assured her that the
4  State wouldn't be sued, it would just be New Castle
5  County? Were you present for that?
6  A. No, I wasn't.
7  Q. Do you recall whether or not there were any or
8  was there any discussion or debate regarding this bill in
9  the Democratic caucus prior to the vote regarding the
10 legislation?
11 A. I don't recall whether there was or not.
12 Q. You say Mr. Coons testified?
13 A. Yes.
14 Q. Do you recall anything specific about his
15 testimony?
16 A. Yes. Because I was asking him questions about
17 it.
18 Q. What do you recall?
19 A. I said to him that --
20 Q. By the way, he was testifying under oath; is
21 that correct?
22 A. No.
23 Q. They don't have to do that?
24 A. No. They don't have to do that in the Senate.

Senator Karen E. Peterson

9 (Pages 30 to 33)

Page 30

1    Q. Okay.
2    A. What I said to him was, I wasn't here when the
3    Legislature passed the law to put all these folks under
4    the merit system, and I may or may not have voted for it
5    if I had been there, I don't know. But I said, I am here
6    when you are attempting to take them out, and I said my
7    concern was that maybe some people took these jobs only
8    because they knew that there was some security there,
9    that maybe otherwise they wouldn't have taken them if
10   they were at the will of the, that they served at the
11   pleasure of the County Executive. And that I didn't
12   think that was fair to change the rules of employment
13   after people are already in the positions.
14           So I asked him if he would be willing
15   to, if he would support an amendment that would
16   grandfather the folks in who were already there, and as
17   people would leave, by resignation or retirement or for
18   cause or whatever, then the positions would -- the new,
19   the people who would take those positions would then come
20   in and realize, recognize that they are not under the
21   merit system. And he said, no, he would consider that an
22   unfriendly amendment.
23           And so I pressed him on what criteria he
24   was going to use to determine who would stay and who

Page 31

1    would go. And he said, Well, he said two directors have
2    already said -- or two managers have already said they
3    are leaving. That leaves four. And he said, Whether or
4    not those people stay will depend on how willing they are
5    to work with the administration. So I said to him, then,
6    You are telling me that the remaining four could all keep
7    their positions? And he said, Like I said, if they are
8    willing to work with the administration, I am sure there
9    is a place for them, either in their current positions or
10   we will try to find something else for them in the merit
11   system, although we have no obligations to do that
12   because there are no bumping rights.
13   Q. What is a bumping right?
14   A. It's usually reserved for folks who come out
15   of the merit system to take an appointed position. And
16   when their time is up, for whatever reason, they have a
17   right to bump back into the merit system -- maybe not the
18   exact same job, but a comparable job.
19   Q. Right. Based on what you know of the merit
20   system, if someone is in the merit system in a job, can
21   they be moved laterally out of that position? For
22   instance, if you are the general manager of the
23   Department of Special Services, could the County
24   Executive say, Okay, Joe Freebery, I don't want you to be

Page 32

1    the general manager anymore, I want Michele Allen to be
2    the general manager. She is now the general manager.
3    You are just a member of the department. Could the
4    County Executive do that?
5    A. Sure, once you have been taken out of the
6    merit system. So if his bill passed, then that would
7    have been possible. But prior to that, it would have
8    been merit system and there would have been merit system
9    rights, and then there are a whole different set of rules
10   kick in as to how and why you can remove somebody.
11   Q. But can that be done under the merit system
12   depending on what those rules are?
13   A. I haven't looked at the County merit rules in
14   years. I would have to look at them.
15   Q. Do you recall anything else about what
16   Mr. Coons said other than what you have just told us?
17   A. No. Just that he -- oh, yes. I had
18   questioned him about the fact that there were directors'
19   positions that had been created by the General Assembly
20   when they put these positions in the merit system. And I
21   said, Well, why wouldn't you just have directors make
22   sure that the general managers are doing their jobs, if
23   that's your certain? He said that he basically didn't
24   want to spend the money to fill those positions. I said,

Page 33

1    But there is a mechanism for overseeing the general
2    managers and making sure that they are doing what your
3    administration wants them to do. And he said, yeah, but
4    he didn't want to spend the money for those positions.
5    Q. Now, who is Senator Patty Blevins?
6    A. Senator Patty Blevins represents the Elsmere
7    area. She used to sit -- at the time this was being
8    debated, she sat next to me on the floor of the Senate.
9    And she was a close friend of Chris Coons.
10   Q. Okay.
11         MS. ALLEN: Objection.
12   BY MR. LAWLESS:
13   Q. During your questioning of Mr. Coons or
14   immediately after the questioning finished of Mr. Coons,
15   did Senator Blevins say anything to you regarding
16   Mr. Coons' testimony or this bill?
17   A. Yes.
18   Q. What did she say?
19   A. She leaned over and she said, This is the Joe
20   Freebery bill.
21   Q. What did you understand that to mean?
22   A. That the bill was designed to get rid of Joe
23   Freebery. I said, That may be the case, but it's still
24   not fair. And from my years in the Department of Labor,

Page 34

1  this is not a fair employment practice.
2      Q. Okay. Let me ask you this. Talking about
3  fair employment practices, because you are a union labor
4  person -- which, by the way, I commend -- do you remember
5  when New Castle County started or instituted something
6  called a prevailing wage program?
7      A. Yes, I do.
8      Q. What is that?
9      A. It is a law, first of all, that would require
10 that certain wages be paid to laborers and mechanics
11 working on public-funded construction projects. The
12 federal version would be the Davis-Bacon law, and the
13 State has its own version of it for State-funded
14 construction, and New Castle County was interested in
15 having a County law for County-funded construction. And
16 it simply mandates that certain wages be paid to certain
17 classes of mechanics and laborers.
18     Q. Okay. I'm sorry, one more time again, real
19 quick. Restate that for me again. I want to make sure I
20 understand it.
21     A. It's a law that requires that laborers and
22 mechanics working on County -- in this case, County-
23 funded construction projects, be paid a specific rate of
24 pay.

Page 35

1      Q. Okay.
2      A. That's determined, in the County's case,
3  determined by a survey that's done by the Department of
4  Labor.
5      Q. Would that result in --
6          MR. LAWLESS: Excuse me one second.
7  BY MR. LAWLESS:
8      Q. Am I correct that laborers, mechanics as a
9  term also includes plumbers, carpenters and other people
10 also working in the trades?
11     A. Yes. Any skilled laborer and unskilled
12 laborer, for that matter.
13     Q. So would that result, then, in outside
14 contractors being brought in to work on County projects
15 actually getting paid more than the County employees
16 working side by side doing the same thing?
17     A. Typically more, yes.
18     Q. Is it fair to say that there was an aspect of
19 the County employees that weren't happy about the
20 prevailing wage law that was being passed, that was being
21 enacted in the Legislature?
22         MS. ALLEN: Objection. Calls for
23 speculation.
24         THE WITNESS: It's my understanding that

Page 36

1  the union, the public employees' union was not happy
2  about that prospect.
3  BY MR. LAWLESS:
4      Q. Am I correct that this piece of legislation
5  was proposed by the Coons administration after Mr. Coons
6  was elected?
7      A. I don't know that.
8      Q. Okay. Do you know when this legislation was
9  pending whether or not Joe Freebery, as the general
10 manager of the Department of Special Services, was
11 supporting it or was he opposed to it?
12     A. Opposed to it.
13     Q. Okay. And you know that how?
14     A. From discussions with him.
15     Q. Okay. Was that piece of legislation
16 eventually passed?
17     A. Yes.
18     Q. Do you know if at the point the legislation
19 was passed, was Mr. Coons Council President or was he at
20 that point the County Executive?
21     A. That would have been -- I am trying to think
22 when the bill was passed. I'm trying to think of the
23 sequence of events. I believe that Gordon -- I know that
24 Joe Freebery was still there, and I know that Chris Coons

Page 37

1  came to one of our meetings over at Special Services as a
2  proponent of the bill -- reask me the question.
3      Q. Do you know what Chris Coons' office, what
4  office he held at the time?
5      A. I believe he was still Council President.
6      Q. Was that piece of legislation eventually
7  passed?
8      A. Yes.
9      Q. Do you know whether or not Joe Freebery was
10 responsible for implementing that within the Department
11 of Special Services?
12     A. Yes, he was.
13     Q. Even though he, apparently, opposed the
14 legislation, did he implement it and do the job he was
15 supposed to do?
16     A. Yes.
17     Q. As president of the Council, did you have
18 occasion to observe the way Joe Freebery, as the general
19 manager the Department of Special Services, or
20 superintendent of parks, when he was running that
21 department, how would you describe the way he did that
22 job?
23     A. I didn't have much dealings with Parks in
24 those days. Usually, the legislators worked through

Page 38

1  their aides. And so my direct contact was not as much.
2  What contact I did have was fine. We saw directors at
3  budget time, when they would come in to make their
4  presentations. But it wasn't the direct contact, as I
5  had as Senator with Glenville, when we were both out in
6  the mud together.
7       Q. In your experiences with Joe Freebery as the
8  GM of the Department of Special Services, based on your
9  observation, was he engaged in his work?
10      A. Oh, absolutely.
11      Q. Was he doing his job?
12      A. Every time.
13           MS. ALLEN: Objection. Calls for
14  speculation.
15  BY MR. LAWLESS:
16      Q. Did you know other employees of Special
17  Services having been out in the mud with him and stuff
18  like that, did you know them by name, by sight?
19      A. Folks from his shop?
20      Q. Yes.
21      A. Oh, sure.
22      Q. Did anybody ever come and complain to you
23  about the way Joe Freebery was running the department or
24  he was unfair or goofing off or doing anything

Page 39

1  inappropriate?
2           MS. ALLEN: Objection.
3           THE WITNESS: No. In fact, I can tell
4  you that I handle a lot of my own constituent work, so I
5  would be the one to pick up the phone if there was a
6  problem. And I did that dozens of times, to call the
7  office and ask for Joe, and he was always there to take
8  the call when I called there.
9  BY MR. LAWLESS:
10      Q. I appreciate that.
11          Senator, you may or may not be aware of
12  this. Are you aware of a provision in the State merit
13  system that permits people to be appointed to
14  nonclassified positions and then go back to the merit
15  system with the same position and pay guarantee?
16          MS. ALLEN: Objection to form.
17  BY MR. LAWLESS:
18      Q. In the State system?
19      A. It's not exactly that way in the State system.
20      Q. Okay. If you would explain that to me and
21  then is there a difference between the State system and
22  County system so I will understand it?
23      A. The State system, if you are a merit system
24  employee and you are asked to serve in an exempt

Page 40

1  position, which is what kind of happened to me in the
2  State system, I left a merit position and became director
3  of the Division of Industrial Affairs for eight years.
4  And then what the law says is that when you leave that
5  position, the exempt position for whatever reason, you
6  have a right to go back into the merit system in a
7  comparable position. So not necessarily the position
8  that you left, but something comparable. And you have a
9  first dibs on jobs that open up.
10      Q. Okay.
11      A. As to what the County code says now, I don't
12  know what it says. I haven't looked at it in a long
13  time.
14      Q. Okay. Based on what you saw and what your
15  experience was with Joe Freebery as the general manager
16  of the Department of Special Services, did you observe or
17  did you ever learn of anything that he did which you
18  believe would give grounds for him to be fired for cause
19  under the merit system?
20           MS. ALLEN: Objection. Calls for
21  speculation.
22  BY MR. LAWLESS:
23      Q. Do you understand the question?
24      A. Yes. Nothing that I ever heard of.

Page 41

1       Q. Saw?
2       A. Saw, no.
3       Q. Why do you think he got fired?
4       A. I have a personal opinion on that.
5       Q. What is your personal opinion?
6           MS. ALLEN: Objection.
7           THE WITNESS: Sherry's brother.
8  BY MR. LAWLESS:
9       Q. One other thing. I'm sorry, that was meant to
10  be my last question, but there is another one, and I
11  apologize.
12          Wasn't there a problem in White Clay
13  Basin regarding flooding as well, which was in your
14  district?
15      A. Oh, yeah.
16      Q. What was that problem and what was Special
17  Services' involvement in that?
18      A. Well, there were problems throughout the whole
19  district. The big one was Glenville, but that storm, and
20  a storm exactly a year later, September of '04, there was
21  flooding again. And it was all along the White Clay
22  Creek and the Red Clay Creek, and the White Clay and Red
23  Clay converge at Glenville.
24      Q. Forming the Pink Clay Creek?

Senator Karen E. Peterson

12 (Pages 42 to 45)

Page 42

1  A. There you go.
2  Q. Sorry about that, go ahead.
3       MS. ALLEN: I suppose that was the witty
4  one you wrote down?
5       MR. LAWLESS: No, that was actually
6  spontaneous.
7  Q. Go ahead.
8  A. There was flooding all along both creeks.
9  Marshalton was destroyed, lots of houses were destroyed
10 in Marshalton, which is not in my district, but that's
11 up-creek. Newkirk Estates there was flooding;
12 Brookhaven; Sheffield Manor, we had some more homes
13 destroyed outside of Glenville. The plumbers/pipefitters
14 hall was destroyed. In every one of those cases, Special
15 Services came out and removed debris, because things
16 floated down. We had cars floating down. We had sheds.
17 We had those big metal dumpsters that floated down.
18 Q. Floating?
19 A. Yes.
20 Q. Wow!
21 A. And they all had to be cleaned out of the
22 creeks, because the next time it rained, the water had to
23 be able to get through. So I didn't mean to lead you to
24 believe that Glenville was it. White Clay Creek

Page 43

1  continued to be a problem.
2  Q. Are you aware of what ordinance -- was a $17
3  million ordinance passed to deal with that problem in the
4  White Clay Creek area?
5  A. Yes. And that was different from the $15
6  million for Glenville.
7  Q. Right. Am I correct that both those
8  ordinances called -- oh, the $15 million was for the
9  buyout of Glenville; is that right?
10 A. Yes.
11 Q. The $17 million for the White Clay project
12 dealt with reconstruction in that area and other projects
13 to get that area stable again?
14 A. It dealt with getting some homes out of the
15 way, that is, opening up the creeks, nine homes were
16 purchased -- I think it was nine homes were purchased in
17 Newkirk Estates and torn down. It was also to do a study
18 of the White Clay Creek to see what needed to be done,
19 all the way from the Pennsylvania line on down, to open
20 the stream up, because it had filled in with silt pretty
21 badly over the years.
22      There were some homes over on Route 40
23 that were bought out, that had been destroyed in the '04
24 storm, that the County wanted to buy and build a

Page 44

1  retention basin there to capture the water there. So
2  there was $17 million of projects kind of all through
3  the -- around, in and around the creeks.
4  Q. Am I correct that those projects, the decision
5  as to what project would be performed, who would perform
6  them, how they would be performed, how all that would be
7  coordinated, that was all done once the legislation was
8  passed by the Department of Special Services; is that
9  correct?
10 A. That's correct.
11 Q. And Joe Freebery was the general manager of
12 that department at that time?
13 A. That's correct.
14 Q. And how did that eventually evolve? Was that
15 project, the overall project completed, at least to your
16 satisfaction, as someone who was involved in it?
17 A. It is, except that after -- since Joe has been
18 gone, they kind of, in my view, dropped the ball. We
19 recognized at that time that there was no funding
20 mechanism for all of these flood issues, whether it was a
21 house that needed to be torn down to get it out of the
22 way of the flood waters or a bridge that needed to be
23 fixed or widened, you know, to let the water get under.
24 So the Legislature authorized the counties to create a

Page 45

1  stormwater utility districts, so there would be a fund.
2  So the next time this happened, the County wouldn't have
3  to be scrounging around for money and the State
4  scrounging around for money.
5  Q. You and Senator Gilligan don't have to reach
6  for your checkbooks?
7  A. That's right.
8       And so we passed that. And the County
9  has done nothing with that enabling legislation. And so
10 there is still no fund.
11 Q. And that's occurred since Joe left the
12 department?
13 A. That's correct.
14      MR. LAWLESS: I have nothing further.
15 Michele, could I just have two minutes?
16      MS. ALLEN: Yes.
17      (Discussion off the record.)
18 BY MR. LAWLESS:
19 Q. Senator, I have one other question. You had
20 mentioned your colleague Senator Blevins.
21 A. Um-hmm.
22 Q. Do you recall whether or not she was involved
23 in Mr. Coons' election campaign to run for County
24 Executive?

Senator Karen E. Peterson

13 (Pages 46 to 49)

Page 46

1  A. She was.
2  Q. Was she a member of one of his committees in
3  supporting his election?
4  A. She was.
5      MR. LAWLESS: Okay. Nothing further.
6          EXAMINATION
7  BY MS. ALLEN:
8  Q. Senator, how long have you known Joe Freebery?
9  A. Since I was County Council President, so it
10 was -- I was elected in 1980.
11 Q. Is that the first time that you met him?
12 A. Probably not, because we both grew up in the
13 same area, New Castle County, and our fathers were
14 friends.
15 Q. Is that the Westminster area?
16 A. No.
17 Q. So would you consider yourself a friend of Joe
18 Freebery's?
19 A. I would consider myself an acquaintance. Our
20 fathers were friends.
21 Q. And did you do anything to prepare for your
22 deposition here today?
23 A. Yes.
24 Q. And what did you do?

Page 47

1  A. I asked the secretary to the Senate to pull
2  the testimony from the floor of the Senate so I didn't
3  misstate anything that I had asked or requested answers
4  for. And I downloaded a copy of the bill that we were
5  talking about, House Bill 29.
6  Q. And did you just listen to an audio tape or
7  was there an actual transcription?
8  A. It was actually on a disk, I just listened to
9  it.
10 Q. Okay. You talked extensively about Glenville
11 and the involvement of Special Services; there were other
12 departments of New Castle County that were also involved
13 in Glenville, helping out Glenville or Glenville
14 assistance; is that accurate?
15 A. Just the police department, as I recall.
16 Q. Do you recall whether or not the Land Use
17 Department was involved?
18 A. Later. Land Use became involved in
19 determining whether the houses were condemned or not.
20 They were involved in the buyout process.
21 Q. And the police department had a continued
22 presence there on a regular basis?
23 A. Mostly for security. In the beginning it was
24 to keep people out, because not even the residents were

Page 48

1  allowed back in, initially. So the police were stationed
2  right there on Route 4, because Route 4 was closed, and
3  then they were there -- and then they set up the
4  communications trailer and staffed that.
5  Q. And do you recall the County attorney sending
6  some lawyers from the law department down there to help
7  out with the residents at all?
8  A. No, I do not.
9  Q. You talked about a lot that in the merit
10 system you can be terminated for cause. What would be
11 your definition of for cause?
12 A. It would be -- cause could be a lot of things.
13 It used to be that they listed all the various offenses
14 in the law. Of course, that's all been thrown out and
15 now it's just for cause. It could be anything from
16 repeated failure to follow instructions to excessive
17 absences, where the employee doesn't respond to the
18 progressive disciplinary action. It could be -- I was a
19 manager for almost 30 years with the State -- all kinds
20 of things. But, initially, the discipline is to correct
21 the behavior, and whatever that behavior is, whether the
22 person is not getting their work done or they are goofing
23 off when they are supposed to be working, then, you know,
24 you warn them. And then you give them a written

Page 49

1  reprimand, and then you run through to suspension, all,
2  of course, trying to correct the behavior.
3  Q. And if that pattern continued, at a certain
4  period of time they could be terminated for cause?
5  A. Yes, that would be the last resort. Or you
6  could go right from nothing to termination, depending on
7  what the offense was.
8  Q. You had said that nobody had contacted you or
9  lobbied you to support House Bill 29. Did anybody, on
10 the contrary, contact you to lobby to vote against House
11 Bill 29?
12 A. No. After I answered that question, I vaguely
13 recall Chris Coons being at Senator Blevins' office that
14 day before we went into session. And I know at the very
15 beginning of my testimony or my questioning of Mr. Coons
16 on the floor, I made reference to: I know you and I have
17 discussed this. And the only thing I could think of was
18 it was right before we went into session. That was the
19 only thing I could recall, the only conversation I could
20 recall. Because I think the bill came up in a hurry.
21 That is, we weren't, like, prepared for it to come.
22 Q. And I know we talked about earlier what you
23 did to prepare for your deposition today.
24     Have you talked to Joe Lawless at all

## Page 50

1 prior to today?
2   A. Prior to today, you mean prior to --
3       MR. LAWLESS: This morning.
4       THE WITNESS: Just to schedule this.
5 BY MS. ALLEN:
6   Q. Did you talk to him about anything with regard
7 to House Bill 29 prior to your deposition, I guess, I
8 should say?
9   A. We talked this morning. I don't recall if we
10 discussed House Bill 29, just that he was going to ask me
11 about -- here are the kind of things I'm going to ask
12 you. If you know the answer, answer it; if you don't,
13 say you don't. Just tell the truth. He said, I'm going
14 to ask you about the bill. So that was this morning.
15  Q. And your deposition may or may not have been
16 noticed prior to this; do you recall talking to him
17 before a stay was issued in this case?
18  A. Maybe, I think --
19  Q. If you don't recall, that's fine.
20  A. I don't recall.
21  Q. Okay. You had stated that Senator Patty
22 Blevins was a close friend of Chris Coons. How do you
23 know that?
24  A. I mean, she was very open about it. She was

## Page 51

1 very open about her involvement in his campaign. She
2 raised some money for him. She tried to get others of us
3 to support him. When he was there that day, when he came
4 down that day, he was kind of parked in her office
5 waiting for the bill to come up.
6   Q. Okay. Do you know them to be friends outside
7 of, like, the political arena, whether or not they go to
8 dinner or anything like that?
9   A. I don't know. I don't know that.
10  Q. So she was just -- you are just saying she was
11 a political supporter of Chris Coons?
12  A. Yes.
13  Q. And did you politically support Chris Coons?
14  A. No.
15  Q. Did you support Sherry Freebery?
16  A. It depends what you mean by support. I was
17 not, I did not contribute to her campaign. I did not
18 volunteer in her campaign. I was invited to attend one
19 fundraiser, because a friend had bought two tickets and
20 asked me did I want to go; I did. But I didn't work on
21 her campaign.
22  Q. Would you consider yourself a close friend of
23 Tom Gordon?
24  A. Tom Gordon and I go way back to my days of

## Page 52

1 County Council President. He worked on my campaign in
2 1980, we also lost touch for many years. We have since
3 kind of reconnected since he has been out of office. And
4 following the Glenville, we kind of got reconnected after
5 12 years of no contact. I would consider Tom a friend.
6 I have never been to his house. He is not that kind of
7 friend. But I would consider him a friend. I think he
8 would be there if I needed him at a personal level.
9   Q. What about Sherry Freebery, do you consider
10 her a friend?
11  A. I don't know. I mean, I filed discrimination
12 charges against Sherry a couple of years ago, so I don't
13 know if she would consider me a friend. But I would say
14 with Sherry, an acquaintance. I can't tell you where she
15 lives. I know her well enough, I wouldn't call her a
16 friend. I would say more of an acquaintance.
17  Q. The discrimination charges you filed against
18 Sherry, is that case still pending?
19  A. No, it is not. I withdrew it.
20  Q. And was it a gender discrimination claim?
21  A. Yes, it was. It was not against Sherry, it
22 was against New Castle County.
23  Q. And who was County Executive at the time, if
24 you recall?

## Page 53

1   A. Tom Gordon.
2   Q. And was it for you personally?
3   A. Yes.
4   Q. At some point you had said that during the
5 discussions on House Bill 29 that Patty Blevins had said
6 to you, this is the Joe Freebery bill. Did you question
7 her at all more about that?
8   A. No. I just said -- because it's kind of
9 understood. I don't know what kind of made me already
10 know that, that Chris was out to get rid of Joe. So when
11 she said it, she said, Well, this is the Joe Freebery
12 bill. I said, You are probably right. It's probably the
13 Joe Freebery bill. Guess what, I still don't think it's
14 right. I don't think it's fair, I mean, to any of the
15 directors or the general managers. I didn't think it was
16 fair to any of them.
17  Q. Do you recall why you believed that it was the
18 Joe Freebery bill?
19  A. It must have, there must have been discussions
20 prior to it, I mean, just in passing. And as I said,
21 Chris Coons was there that day and he was in Patty's
22 office. And I just remember saying to him, This isn't
23 fair. You don't change -- because people might not have
24 taken these jobs if they knew you could pull the rug out

Senator Karen E. Peterson

15 (Pages 54 to 57)

Page 54

1  from under them. They might have made other decisions.
2  I just don't think it's right.
3      But for some reason, it was pretty much
4  common knowledge. I don't recall whether it came up in
5  the caucus, I can't remember. I'm not sure if it did or
6  not.
7      Q. And Patty Blevins didn't say that Chris Coons
8  told her this is the bill I'm trying to use to get rid of
9  Joe Freebery, did she?
10     A. No.
11     Q. And you have never heard Chris Coons say that?
12     A. No.
13     Q. Do you recall stating on the Senate floor that
14 you support the right of a County Executive to choose
15 their own team?
16     A. Yes.
17     Q. And you still agree with that?
18     A. Yes, I think I said earlier, had I been a
19 member of the Senate when that bill was brought there, I
20 don't know whether I would have voted for it or not
21 because of that.
22     Q. And when you had these questions of County
23 Executive Chris Coons, when he was on the floor, about,
24 you know, taking an amendment or keeping people on, he

Page 55

1  stated that he would work with the individuals who were
2  still there? Do you recall that?
3      A. Yes.
4      Q. And do you recall him saying that he was
5  currently working with a particular person to move them
6  back into the merit system?
7      A. Yes.
8      Q. Do you know whether or not Joe Freebery
9  attempted to go back to the merit system?
10     A. I don't know.
11     Q. You stated that you believe that Joe Freebery
12 was terminated because he was Sherry's brother?
13     A. Yes.
14     Q. What leads you to that opinion?
15     A. Just an animosity that I had seen towards the
16 Freeberys by Chris Coons.
17     Q. Did you see --
18         MR. LAWLESS: She wasn't finished. She
19 was still talking. Go ahead.
20         THE WITNESS: I mean, it was like every
21 day you picked up the newspaper and there was some other
22 shot being fired. Chris -- I heard him give
23 presentations during the campaign, and he referred to the
24 corrupt Freebery and Gordon, and how he had great ethics,

Page 56

1  and he was going to clean everything up, which I thought
2  was a cheap shot. In my opinion, Joe had certainly done
3  nothing but a good job, from my viewpoint.
4  BY MS. ALLEN:
5      Q. Well, I have a couple of questions. You said
6  there was animosity towards the Freeberys by Chris Coons?
7      A. No. I meant the other way. Chris Coons
8  towards the Freeberys.
9      Q. Chris Coons towards the Freeberys.
10         Putting aside the political race between
11 Chris and Sherry, what animosity did you see by Chris
12 Coons towards Joe Freebery?
13     A. Well, I don't know, it was more of an
14 anti-Freebery thing than saying Joe or Sherry or Jim or
15 -- you know, what I mean? -- it was more, I'm going to
16 clean house; I'm going to get rid of the likes of the
17 Freeberys. You know, what I mean? It was a constant, so
18 it's hard to say there was a particular article or -- I
19 mean, there was just open animosity there.
20     Q. I agree that there was open animosity between
21 Chris Coons and Sherry Freebery. I don't recall, and I
22 guess my question is, can you specifically cite to
23 anything where either a newspaper article or a debate
24 that you heard or anything that you heard where Chris

Page 57

1  said or showed animosity toward Joe Freebery?
2      A. I would have to think about it. I can't think
3  of anything off the top of my head. What crystalized it
4  for me was when Senator Blevins said, This is the Joe
5  Freebery bill, and I thought, Well, that's not right.
6      Q. Did you ever have any discussions with Chris
7  Coons about Joe Freebery's termination?
8      A. No.
9      Q. Anything else other than the animosity that
10 occurred between Chris Coons and Sherry Freebery,
11 anything else that you base your opinion on that Joe was
12 terminated because he was Sherry's brother?
13     A. No. I would have to think about why, how I
14 know that, through the whole thing. I mean, it was clear
15 from -- this goes to political circles, because you are
16 out at political events all the time. And, you know,
17 County employees who expressed fear that they were all
18 going to get bounced because the Coons versus the Gordon-
19 Freebery camp, and anybody who was in the wrong camp,
20 that heads were going to roll. And people were paranoid
21 about it. They were scared to death about it. They
22 feared for their jobs about it.
23         And so when the bill came along, it
24 didn't surprise me that, you know, Patty said to me, This

**Page 58**

1  is the Joe Freebery bill. I thought this kind of fits in
2  with what County employees expressed all during the
3  campaign, about who -- well, pick your team, chose up
4  your sides, because when this is over, one side is going
5  to win and the other side is going to lose. And that was
6  kind of the whole theme for the whole election process.
7       So, I mean, that's where I got the
8  impression that if you weren't on the Coons team, then
9  you were going to pay for it.
10      Q. Are you aware that there were several nonmerit
11 County employees that supported Sherry in her candidacy
12 that still remain here that work at the County?
13      A. I don't know who is still here and who isn't
14 here. I don't have much experience with the County.
15      Q. Did any of the County employees that came to
16 you and said that they were concerned about their jobs,
17 to your knowledge, did any of them lose their jobs?
18      A. Some have left.
19      Q. Not terminated?
20      A. I don't know the circumstances of their
21 leaving, I just know that they are not here anymore.
22      Q. And when you referred to Coons talking about
23 the corrupt Gordon and Freebery, I assume administration
24 is what he was saying?

**Page 59**

1       A. Yes.
2       Q. He did not specifically say that Joe Freebery
3  was corrupt; right?
4       A. Not that I recall.
5          MS. ALLEN: I don't have any other
6  questions.
7             EXAMINATION
8  BY MR. LAWLESS:
9       Q. Senator Peterson, one or two little follow-up
10 ones. You said this morning that Mr. Coons testified
11 before the Senate in support of the bill to change the
12 GMs from the merit system to serving at the pleasure of
13 the County Executive, and I think the phrase you used was
14 he was either parked or camped out in Senator Blevins'
15 office?
16      A. Yes.
17      Q. And that was just before you went into
18 session?
19      A. It was just before we went into session, which
20 was in the afternoon. What we would do is we would go
21 into session -- if it were a Tuesday, I don't know if
22 that was a Tuesday or not, then we would immediately
23 break for party caucus, and then go back in and then
24 conduct business.

**Page 60**

1       Q. But I guess I'm asking what the chronology is
2  generally. He was in Blevins' office, and then he
3  appeared in front of the Senate. And then after he
4  testified, that's when Senator Blevins made the Joe
5  Freebery remark to you?
6       A. Yes.
7       Q. The same day?
8       A. Yes.
9       Q. Ms. Allen testified about Coons said he was
10 trying to work with someone else in the administration
11 who was merit-system protected to try to find them
12 something else in the administration. Do you know who
13 she was talking about?
14      A. No.
15      Q. Do you know that happened?
16      A. No.
17      Q. If I were to tell that you that the only
18 director -- I'm sorry, the only general manager to be
19 fired after the passage of what you heard described as
20 the Joe Freebery bill was Joe Freebery, would that
21 surprise you?
22      A. No.
23      Q. Approximately, how long have you known Chris
24 Coons?

**Page 61**

1       A. I guess I met him after he was elected County
2  Council President, so however long ago that was, eight,
3  ten, 11 years.
4       Q. You have had a chance to observe him both as
5  -- well, you have had a chance to observe him as a
6  politician; is that a fair statement?
7       A. Yes.
8       Q. How he conducts himself in the world of
9  politics?
10      A. Yes. And, also, some issues dealing with the
11 flood issues and so forth. I have been here with him.
12      Q. Ms. Allen asked you if Chris Coons ever came
13 to you and said, I want the bill passed because I want to
14 fire Joe Freebery because he is Sherry Freebery's
15 brother, and you said no. In your experience, would
16 anyone come to you, particularly Chris Coons, come right
17 out and say that to someone?
18         MS. ALLEN: Objection. Calls for
19 speculation.
20 BY MR. LAWLESS:
21      Q. You can speculate. Go ahead.
22      A. I doubt it. That would be foolish to do it.
23      Q. The smarter, shrewder way to do it would be to
24 do it under the guise of something else?

Page 62

1  MS. ALLEN: Objection.
2  THE WITNESS: Sure.
3  MR. LAWLESS: I have nothing further.
4  (The deposition concluded at 2:00 p.m.)
5
6  SIGNATURE PARAGRAPH
7
8  THE FOREGOING TRANSCRIPT IS TRUE AND
9  CORRECT TO THE BEST OF MY KNOWLEDGE.
10
11  SENATOR KAREN E. PETERSON
12
13
14      INDEX
15
16  TESTIMONY OF SENATOR KAREN E. PETERSON
17  EXAMINATION BY MR. LAWLESS        2
18  EXAMINATION BY MS. ALLEN         46
19  EXAMINATION BY MR. LAWLESS       59
20
21
22
23
24

Page 63

1      CERTIFICATE
2
3  STATE OF DELAWARE:
4  NEW CASTLE COUNTY:
5      I, Ellen Corbett Hannum, a Notary Public within and
6  for the County and State aforesaid, do hereby certify
7  that the foregoing deposition of SENATOR KAREN E.
8  PETERSON was taken before me, pursuant to notice, at the
9  time and place indicated; that said deponent was by me
10  duly sworn to tell the truth, the whole truth, and
11  nothing but the truth; that the testimony of said
12  deponent was correctly recorded in machine shorthand by
13  me and thereafter transcribed under my supervision with
14  computer-aided transcription; that the deposition is a
15  true record of the testimony given by the witness; and
16  that I am neither of counsel nor kin to any party in said
17  action, nor interested in the outcome thereof.
18      WITNESS my hand and official seal this 1st day of
19  February A.D. 2008.
20
21  Ellen Corbett Hannum, RMR, CMRS
    Notary Public - Reporter
22  Delaware Certified Shorthand Reporter
    Certification No. 118-RPR, Expires 1-31-11
23
24