# EXHIBIT "B"

William J. Tansey

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOSEPH J. FREEBERY, :

    Plaintiff, :

  vs. : Civil Action No.
         05-748 KAJ
CHRISTOPHER COONS, in his :
official capacity as County
Executive of New Castle County :
and in his individual capacity;
and NEW CASTLE COUNTY, a :
municipal corporation, and JOHN
DOES 1-25, :

    Defendants. :

     - - -

    Deposition of WILLIAM J. TANSEY, taken pursuant to notice in the law offices of Richard R. Wier Jr., P.A., Suite 200, Two Mill Road, Wilmington, Delaware, on Monday, January 21, 2008, at 12:11 p.m., before Lorraine B. Marino, Registered Diplomate Reporter and Notary Public.

     - - -

CORBETT & WILCOX
230 North Market Street
Wilmington, Delaware 19801
(302) 571-0510
Corbett & Wilcox is not affiliated with
Wilcox & Fetzer, Court Reporters

William J. Tansey

2 (Pages 2 to 5)

Page 2

```
 1  APPEARANCES:
 2        JOSEPH F. LAWLESS, ESQ.
          843 Mt. Morrow Road
 3        Villanova, PA 19085
            for Plaintiff
 4
          MICHELE D. ALLEN, ESQ.
 5        Richard R. Wier, Jr., P.A.
          Two Mill Road - Suite 200
 6        Wilmington, DE 19806
            for Defendants
 7
    ALSO PRESENT:
 8
          JOSEPH J. FREEBERY
 9
                 - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1        WILLIAM J. TANSEY, having been first
 2  duly sworn, was examined and testified as follows:
 3  BY MR. LAWLESS:
 4     Q.  Councilman Tansey, my name is Joe
 5  Lawless, and I represent Joe Freebery in a lawsuit
 6  that he filed against New Castle County, Delaware, and
 7  president of county council, Chris Coons, both as
 8  president and in his personal capacity.
 9        You are here today to give a
10  deposition. Have you ever given a deposition before?
11     A.  Yes, I was going to say yes, because I
12  don't know, you know, what --
13     Q.  Well, where they bring you in --
14     A.  I told you, the U.S. Attorney, I sat
15  down with those guys, and they went through --
16     Q.  That was the grand jury?
17     A.  No --
18     Q.  So you testified under oath --
19     A.  -- it was beyond the grand jury. It
20  was, you know, they took testimony from me.
21     Q.  Statements?
22     A.  Yes.
23     Q.  Was it under oath and was there
24  somebody there writing down --
```

Page 4

```
 1     A.  No, it wasn't under oath, and it was
 2  only recorded by the people present.
 3     Q.  Okay. Then so you understand then you
 4  are under oath now?
 5     A.  Yes.
 6     Q.  This is the same -- I am sorry. We
 7  sued not as president of county council --
 8     A.  That was what I was going to say.
 9     Q.  We sued as county executive.
10     A.  I was going to question you on that,
11  because as president of county council --
12     Q.  We sued him as county executive and in
13  his individual capacity.
14        You are under oath. You are
15  testifying today as if you were testifying in court in
16  front of a judge or a jury.
17     A.  Sure.
18     Q.  If I ask you a question and you don't
19  understand the question, interrupt me, ask me to
20  rephrase it. If you answer the question, we are going
21  to assume that you understood the question and that
22  your answer was intended to be responsive to the
23  question.
24        Could you state your age, please?
```

Page 5

```
 1     A.  Seventy-one.
 2     Q.  And just tell me the town. Where do
 3  you currently reside?
 4     A.  Greenville, Delaware.
 5     Q.  Could you give me your educational
 6  background, please?
 7     A.  I have a bachelor's in mechanical
 8  engineering and a master's in business administration.
 9     Q.  Are you a member of any specific
10  political party?
11     A.  Yes. I am a Republican.
12     Q.  And have you been a Republican since
13  you first registered to vote or have you ever changed
14  parties?
15     A.  No. I changed parties I believe it
16  was in -- boy, let's see. Maybe May of '92.
17  February. I am not sure.
18     Q.  Okay. But at some point?
19     A.  Sometime. Yes, it was sometime in
20  '92.
21     Q.  In your capacity as a member of New
22  Castle County Council, do you serve on any committees?
23     A.  Presently I am chair of the finance
24  committee, co-chair of the finance committee. Two
```

William J. Tansey

3 (Pages 6 to 9)

Page 6

1  council members share each chair of different
2  committees.
3      Q.   Did there come a point in time when
4  you were involved in the committee on special
5  services?
6      A.   Yes. I served as -- at that time
7  there was only one chair. I was the chair of special
8  services for approximately 18 months.
9      Q.   Who was the general manager of the
10 Department of Special Services when you were the chair
11 of the committee on special services?
12     A.   Joe Freebery.
13     Q.   Did you know Joe Freebery before you
14 became chair of the special services committee?
15     A.   Actually, no. I knew his uncle. I
16 went to school with his uncle.
17     Q.   When did you first go on council?
18     A.   In November of '92. 2002. I am
19 sorry.
20     Q.   So it was 2002?
21     A.   Yes, 2002. Correct.
22     Q.   So you didn't meet Joe until you got
23 on county council?
24     A.   Correct.

Page 7

1      Q.   And when you met him, he was the
2  general manager of the Department of Special Services?
3      A.   Correct.
4      Q.   Okay. When you got elected, who was
5  the county executive? When you first got elected, who
6  was the county executive?
7      A.   Tom Gordon.
8      Q.   And who was the chief administrative
9  officer?
10     A.   Sherry Freebery.
11     Q.   As chairman of the special services,
12 what was the role of the special services committee?
13 What did it do?
14     A.   Actually, the committee consists -- in
15 council we have a committee of the whole, so
16 committees are -- the members of the committee are all
17 council members, and the chair chairs the meetings and
18 interacts with the special services department and
19 brings any issues to the council that needs council
20 action or to inform council.
21     Q.   Okay. In that capacity then would it
22 be fair to say that you had closer dealings with the
23 Department of Special Services and with the GM of the
24 department, closer dealings than other members of

Page 8

1  council?
2      A.   Oh, most assuredly.
3      Q.   Okay. Did there come a point in time
4  after Chris Coons was elected county executive that
5  you wrote a letter to Mr. Coons regarding Joe
6  Freebery?
7      A.   Yes.
8      Q.   And I am going to apologize because it
9  is sitting on my desk in my office. It is part of the
10 discovery in this case. But can you tell us what was
11 in that letter and why you wrote it?
12     A.   Well, the reason I wrote it was in
13 support of Mr. Freebery's continued management of
14 special services, because there was a lot of talk
15 about, you know, turnover of the general managers. It
16 was actually, I think -- there was some legislation
17 that was crafted to return the general managers to
18 the -- to serve at the discretion of the county
19 executive or to make them directors again. So I was
20 just trying to, you know, support his effort.
21     Q.   Okay. Why?
22     A.   Well, because, you know, I was
23 impressed with his -- with the way, you know, the
24 special services department was being administered,

Page 9

1  and I thought that he deserved that.
2      Q.   Okay. Were you aware or when you said
3  there had been talk, was there any talk specifically
4  of Joe Freebery being removed from that position that
5  you were aware of?
6      A.   Yes. You know, yes, there was talk,
7  but there was, you know -- a lot of it, you know, was
8  just talk. That's it. I -- you know, for example, I
9  had a discussion with somebody, and they said, "Well,
10 no way can Chris keep Joe Freebery on."
11     Q.   Do you recall who that discussion was
12 with?
13     A.   You know, it was a staff person that
14 was presently, you know, on the, you know, when --
15 after the election, the majority of the, for whatever
16 reason, the majority of the general managers left, and
17 so they were replaced by Chris Coons's selection, and
18 it was one of those people. I don't recall -- you
19 know, I would hesitate to say who exactly it was.
20 Just it was --
21     Q.   Do you recall why they said he
22 couldn't keep Joe Freebery on or your words was there
23 was no way he could keep Joe Freebery on? Do you
24 recall whether or not he said why or do you have a

William J. Tansey

4 (Pages 10 to 13)

Page 10

1  belief as to what he meant?
2      MS. ALLEN: Objection as to belief.
3      THE WITNESS: Pardon me?
4      MR. LAWLESS: She just objected. You
5  know what? Let me --
6      THE WITNESS: I agree. I don't know.
7      MS. ALLEN: Why don't you explain that
8  to him.
9      MR. LAWLESS: Yes. In the course of
10 this deposition Ms. Allen might make objections --
11     THE WITNESS: Sure. That's fine.
12     MR. LAWLESS: -- to questions. I
13 might make an objection to the question.
14     THE WITNESS: Okay.
15     MR. LAWLESS: In deposition this isn't
16 like in court, where there is a judge that is going to
17 say "sustained" or "overruled." We make our objection
18 for the record, and down the road a judge may rule on
19 that objection.
20     But the objection will be made. You
21 can then answer the question. So if I make an
22 objection or she does, we will state it, and then we
23 just let you answer the question.
24     THE WITNESS: Okay.

Page 11

1      MR. LAWLESS: Okay?
2      THE WITNESS: The way I would answer
3  that, in a political atmosphere there is a lot of
4  talk.
5      MR. LAWLESS: Okay.
6      THE WITNESS: And it was a very --
7  from, you know, again, my -- I am speaking for myself.
8  From my observation, it was a very mean-spirited
9  primary between Sherry Freebery and Chris Coons. And
10 that -- and the perception was after having gone
11 through that, because of the relationship of Joe and
12 Sherry, that, you know, yes, that, you know, they
13 couldn't continue. I don't know, you know.
14 BY MR. LAWLESS:
15     Q.    Okay. That's --
16     A.    You know, again --
17     Q.    No. I mean, that's fine.
18     A.    Anybody who walked down the street who
19 talked to anybody about politics, that was kind of,
20 you know -- there was the general feeling that there
21 was a problem there. That's -- again, that's my
22 perception.
23     Q.    Okay. Based on your observation --
24 let's back up and talk about something you spoke

Page 12

1  about. You said that there was a change in the law
2  that would permit -- that would change the general
3  managers from being protected by the merit system to
4  serving at the pleasure of the county executive.
5      A.    Per se, because before, when the
6  Gordon administration came in, they made all the at
7  that time the directors, made all the directors -- put
8  them under the merit system --
9      Q.    Right.
10     A.    -- and made, you know -- for whatever
11 reason, you know.
12     Q.    Right. That law, though, that law was
13 changed so that all the general managers would serve
14 at the pleasure of the county executive. That law was
15 passed; correct?
16     A.    Yes.
17     Q.    And that law was passed after
18 Mr. Coons became the county executive; right? It
19 wasn't --
20     A.    I am not sure. You know, I had some
21 feeling that it was going on -- well, let me see.
22 Yes, I would say after, yes, after November, when the
23 election was.
24     Q.    Okay. Okay. And it was after that

Page 13

1  law was changed that Joe Freebery was fired; correct?
2      A.    Yes.
3      Q.    Was any other general manager fired
4  after that law was changed by Chris Coons?
5      A.    No.
6      Q.    And there was Charlie Baker who was a
7  member of the Gordon-Freebery administration stayed on
8  in his position as general manager of the land use
9  department; is that right?
10     A.    Correct.
11     Q.    Okay. So the law was changed to take
12 the general managers out from under the merit system?
13     A.    To facilitate that, yes.
14     Q.    Well, to make it legal?
15     A.    Right.
16     Q.    So they would serve at the pleasure of
17 the county executive. And then the only general
18 manager that was fired immediately after that was Joe
19 Freebery; is that right?
20     MS. ALLEN: Objection as to immediacy.
21 BY MR. LAWLESS:
22     Q.    You can answer. The only guy that got
23 fired after the law was changed was Joe Freebery;
24 right?

William J. Tansey

5 (Pages 14 to 17)

Page 14

1  A.  He was -- whatever. If you want to
2  say fired, dismissed. I don't know.
3  Q.  He was gone, out of there?
4  A.  What I understood, that he could --
5  there were two, you know, two options. He could
6  either leave or he could get fired.
7  Q.  In other words, they took him in the
8  room, gave him the gun and the bullet and said, "Do
9  the honorable thing or you are gone"?
10      MS. ALLEN: Objection.
11      THE WITNESS: Right. Again, that's
12  what I heard. You know, I don't --
13  BY MR. LAWLESS:
14  Q.  Okay. But just in terms of the
15  chronology --
16  A.  I don't think Mr. Freebery wanted to
17  leave the county's employment. That's what --
18  Q.  Okay. What makes you say that?
19  A.  Because we have had this -- we had
20  this discussion. Joe had told me he wants to, you
21  know, retire at the county. You know, good gravy, he
22  had a lot of service there, I know.
23  Q.  And are you familiar with what his
24  record was of service to the county? Was it a record

Page 15

1  of solid performance, doing a good job?
2  A.  I never heard anything different.
3  Q.  Okay. After the election and
4  Mr. Coons was elected county executive up to the time
5  Joe Freebery was gone, were you still the chairman of
6  the department of -- of the special services
7  committee?
8  A.  Yes.
9  Q.  During that period did you see Joe
10 Freebery do anything that was in any way an attempt to
11 undermine anything the Coons administration was trying
12 to do or did he just continue to do his job?
13 A.  No to your first one and yes to your
14 second one. You said did he do anything to undermine
15 the Coons administration.
16 Q.  No?
17 A.  No. Did he continue to do his job?
18 Yes.
19 Q.  Okay. And if you were a lawyer, you
20 would have objected to what was called a compound
21 question which I just asked. You answered it very
22 well, and I won't do it again.
23 A.  Well, that's --
24 Q.  Okay. Do you know a woman named Tracy

Page 16

1  Surles?
2  A.  Who?
3  Q.  Tracy Surles.
4  A.  Oh, sure.
5  Q.  And by the way, does she hold a
6  position right now in the Department of Special
7  Services?
8  A.  She is acting general manager;
9  correct.
10 Q.  Okay. And you wouldn't know if she
11 has testified in this case at this point, would you,
12 in Joe's case against the county? Do you know if she
13 has given a deposition in this case?
14 A.  No, I don't know that.
15 Q.  Do you know somebody named Jon
16 Husband?
17 A.  Yes.
18 Q.  And what does he do for the county?
19 A.  He worked for -- well, it was Joe,
20 Tracy, and then Jon Husband worked for Tracy, and he
21 generally does parks.
22 Q.  During the period of time that Joe
23 Freebery was the general manager of the Department of
24 Special Services and you were the chairman of the

Page 17

1  special services committee, did either Tracy Surles or
2  Jon Husband ever come to you and complain in any way
3  about Joe Freebery?
4  A.  No.
5  Q.  Did anybody ever come to you and
6  complain about the way Joe Freebery ran that
7  department?
8  A.  No.
9  Q.  Did you ever have occasion to see
10 Mr. Freebery, Ms. Surles and Mr. Husband together
11 either before committee or in meetings that you would
12 have with them?
13 A.  Sure.
14 Q.  Was there anything unusual about their
15 interactions? Did there appear to be any hostility or
16 awkwardness or was it professional and cordial?
17 A.  As far as I know --
18     MS. ALLEN: Objection; compound.
19     THE WITNESS: Okay.
20 BY MR. LAWLESS:
21 Q.  Was there anything -- did their
22 relationship appear to be professional?
23 A.  Yes.
24 Q.  Did it appear to be cordial?

Page 18

1   A.   Yes.
2   Q.   Did either -- well, did Tracy
3   Surles -- now I am going to be asking individual
4   questions. Did Tracy Surles ever appear to be
5   uncomfortable around Joe Freebery?
6   A.   No, not to my knowledge. Again,
7   not --
8   Q.   I am just asking your observation.
9   A.   Yes. No.
10  Q.   Did he treat her with courtesy and
11  professionalism?
12  A.   I think he went beyond that. I
13  think --
14  Q.   What makes you say that?
15  A.   Well, I don't know. You know, when
16  she was going through her pregnancy, he used to -- you
17  know, if she would show up at a meeting, and he would
18  tell her to go home, you know, because she didn't look
19  like she was so -- I thought, you know, he was very
20  humanitarian with her.
21  Q.   Okay. Same with Jon Husband, except
22  for the pregnancy part?
23  A.   Well, I can't say. You know, Jon
24  Husband, you know, I didn't see a lot of interaction,

Page 19

1   because again, there was a level between Joe and Jon
2   Husband.
3   Q.   Okay. And again, during the period of
4   time that you were chairman of the special services
5   committee, did you observe or did you learn of any
6   problems with the way in which the Department of
7   Special Services was being managed by Joe Freebery?
8   A.   No.
9   Q.   Other than meeting with Mr. Freebery
10  in council meetings, did you ever meet with Joe
11  Freebery outside council meetings to discuss what was
12  going on in the department?
13  A.   Oh, yes. We met weekly.
14  Q.   Where?
15  A.   Well, you know, I suggested we ought
16  to get together more often, because I was trying to
17  educate myself on the workings of the department, how
18  it functioned, and I suggested that why don't we, you
19  know, we get together, like. And Joe decided that,
20  you know, that Tracy and Wayne ought to be there.
21  They were like the assistant general managers.
22  Q.   Wayne who? I am sorry. We have got
23  to get his last name. Do you remember Wayne's last
24  name? Wayne Merritt?

Page 20

1   A.   Wayne Merritt and Tracy Surles and Joe
2   Freebery. The four of us used to meet, and sometimes
3   it was, you know, like if one of us couldn't make, you
4   know, one of them couldn't make it, there were two of
5   us, it was always someone from special services, one
6   of those three or all three or sometimes two or three,
7   met weekly to talk about the general operation and,
8   you know, a lot of particulars, too, things that were
9   going on.
10  Q.   When you had those meetings and had
11  those discussions, did Joe Freebery appear to you to
12  know what was going on in the department?
13  A.   Sure.
14  Q.   Was there ever a period of time in any
15  of those meetings when you found yourself thinking,
16  "This guy doesn't have a clue about what is going on
17  in his department"?
18  A.   No, I never questioned that. You
19  know, granted, he didn't have the detail that Tracy
20  might have, you know, in her section or Wayne have in
21  his section, you know, the detail, you know, what --
22  Q.   The minutia?
23  A.   -- what pumping station was working or
24  what, you know, things that -- but, you know, he

Page 21

1   certainly had a general knowledge of --
2   Q.   While you were on council, did you
3   have occasion to observe Chris Coons's relationship
4   with the Gordon administration while he was the
5   president of council?
6   A.   It is hard to say there was a
7   relationship, you know.
8   Q.   Okay.
9   A.   I mean, I thought that, you know, it
10  was pretty much council was here and the executive
11  branch was over here (indicating), and I didn't think
12  there was -- I thought, you know, there would be more
13  interaction, but maybe that's -- I don't think -- I
14  don't think there is to this day, you know, that
15  communications, for whatever reason. But no, I
16  didn't --
17  Q.   Was Chris Coons -- when you first came
18  on council in 2002, did Mr. Coons appear to be
19  supportive of the Gordon administration's efforts?
20  A.   Well, coincidentally, when I came on
21  council, there was indictments. You know, I was --
22  Q.   Or the investigation?
23  A.   Yes. I mean, in fact, I think it was
24  right after my -- I won the primary, I think there was

Page 22

indictments came down. So I campaigned under a veil of whatever was going on. And so it was -- you know, I don't think -- if you are asking if Chris Coons was supportive, I don't think he was and, you know, only because of the situation.
Q. So --
MS. ALLEN: I am sorry. Chris Coons was not supportive of what?
THE WITNESS: Well, I mean, I mean, what was going on was, you know, indictments came down. There was a lot of, you know -- obviously it was the RICO thing, corruption, the whole nine yards, and I don't -- you know, Chris was at arm's length from that, you know. I think everyone was.
BY MR. LAWLESS:
Q. Did you ever hear Coons be publicly critical of anything Sherry Freebery did?
A. Well, you know, some of the things like -- well, okay, I can tell you this is crystal clear in my mind. I said to Chris one time, I said -- you know, there was accusations that Sherry Freebery took $2,700,000 from, you know, a DuPont heiress who happened to be involved with the golf course, and, you know, I guess there was some interaction between the

Page 23

CAO and the land use department when this was going on.
Q. That would have been Charlie Baker? Charlie Baker was the GM of land use at that point?
A. Yes.
Q. Okay.
A. So, you know, I said to Chris, I said, "How could you make a quid pro quo out of that?" I said, you know, "If a constituent calls me about a land use issue, I pick up the phone and I talk to Charlie Baker. I say, 'Charlie, I want to look into this. I want to know all the details of this.'" You know, I don't think that's intimidating to Charlie. I think that is part of his job.
So if -- you know, so, you know, again, I am having this conversation with Chris, and I said, "Chris, you know, if I did that, there was nothing wrong with it." He said, "Yes, but you didn't take $2.7 million from the same person" or something, you know. And I said, "Well, you know, I don't think you can make a quid pro quo there," but that's all.
Q. Okay. And was that before or after the indictments or aren't you sure?
A. Oh, it was after the indictments came

Page 24

down, sure.
Q. Did Chris Coons ever say that he thought Joe Freebery was ever involved in corruption or anything like that?
A. Oh, no.
Q. Did you ever hear Chris Coons in any way be critical of Joe Freebery during this period of time?
A. Honestly, I can't say I did, you know.
Q. Okay. Did Chris Coons ever come to you during this period of time or after he took over and ask you as the chairman of the special services committee your opinion of how Joe Freebery ran the department?
A. No.
Q. And that, of course, you said in the letter? You volunteered your belief to Coons?
A. I sent the letter and I also approached Chris Coons and asked him personally, you know, what was, you know, Joe Freebery's future.
Q. What did he say to you about that?
A. Well, he said, you know, he hadn't made a decision, but he thought that -- he told me that -- how can I put it? He said, "If you were in

Page 25

that -- if you were in that position and you wanted to continue as general manager, wouldn't you be more, you know, trying to show me that you could do the job or trying to be more, you know, aggressive as to -- to solidify your position?"
And again, I am paraphrasing, but that's, you know, that's kind of the conversation we had. And I said, "Well," you know, I said, you know, "I don't think that's Joe's style. I think he is more, you know, of a -- you know, he is more like a delegator and following up on things like that. You know, his management style is different than, you know, aggressive type."
Q. Okay. But at that point, that was after he had been elected county executive; right?
A. Yes.
Q. And at the point --
A. Because, you know, it was going on for so long.
Q. Right.
A. All the rumors were stirring, and I thought, you know, I would try to, you know, find out what is going on.
Q. Sure. But at the point Mr. Coons said

Page 26

1  that, am I correct that Joe Freebery had worked for
2  the county for 20-some odd years? Is that right?
3      A.   Yes.
4      Q.   He had a track record that Coons could
5  have looked at had he wanted to, for example?
6      A.   I assume he did. You know, he had to
7  have a track record.
8           (Discussion off the record.)
9  BY MR. LAWLESS:
10     Q.   What do you understand the merit
11 system to be? What is the merit system in New Castle
12 County?
13     A.   Well, it is to protect employees
14 from -- what can I say? -- unduly being fired or, you
15 know, to protect -- it is a protection for employees
16 to maybe the longevity or the issues that might
17 develop while they are doing their job.
18     Q.   Okay. Am I correct that under the
19 merit system an employee can only be removed for
20 cause?
21     A.   Cause; exactly. That's -- sure.
22     Q.   Am I also correct that there is a
23 system of graduated discipline? If they do something,
24 they are disciplined at one level, and then it

Page 27

1  progresses?
2      A.   That's my understanding. Again, I
3  don't know the intricacies of the system, but I
4  understand that it should be documented and you go
5  through phases and --
6      Q.   Okay. During the period of time that
7  you were the chair of the Department of Special
8  Services committee and Joe Freebery was the GM, did
9  you see or -- did you see Joe Freebery do anything
10 that you believed would have constituted cause to
11 remove him from his job?
12     A.   No.
13     Q.   Okay. Excuse me for one second. Do
14 you know -- once the law was changed, do you know what
15 the process was that resulted in Joe Freebery being
16 told, "You can resign or be fired"? Were you involved
17 in that at all?
18     A.   No, no. I just heard maybe -- I don't
19 know how I heard that. Maybe through someone in the
20 county or -- I can't remember. That's what I was told
21 happened, you know, that you were given a choice, that
22 he was given a choice to --
23     Q.   Resign or be fired?
24     A.   Resign or be fired.

Page 28

1      Q.   Under the merit system, as you
2  understand it, can someone be moved from their
3  position laterally into another position? For
4  example, if someone is a general manager, can the
5  county executive come in and say, "Okay, I don't want
6  Michele Allen to be the general manager anymore. I
7  want it to be Bill Tansey. You are no longer general
8  manager. You are the general manager"? Could that be
9  done?
10     A.   Sure. The county executive can do
11 whatever he wants. It is his --
12     Q.   It is just the merit system would
13 protect that person's job status and seniority and
14 pension and et cetera?
15     A.   To my knowledge it would, yes.
16     Q.   Okay. Was there ever any discussion
17 or did you ever have any discussion with Chris Coons
18 doing that with respect to Joe Freebery?
19     A.   No.
20     Q.   Do you know whether or not at the time
21 when you came into the council in '02 and the
22 departments were being run by general managers, do you
23 know if the positions of director, which had been the
24 previous heads of the departments -- did the positions

Page 29

1  of director still exist --
2      A.   I heard --
3      Q.   -- under the law?
4      A.   Again, I heard that they did and that
5  that was an option; that if Chris wanted his own, you
6  know, people, he could put directors in over the
7  general managers if he, you know, if he so chose. The
8  law was still -- would honor that.
9      Q.   Okay. So am I correct though that
10 when Mr. Coons came in, the only holdovers from the
11 Gordon-Freebery administration by either resignation
12 or retirement or whatever, the only holdovers of the
13 general managers were Joe Freebery and Charlie Baker?
14     A.   Correct.
15     Q.   Is that correct?
16     A.   Yes.
17     Q.   And the only one who got fired after
18 the law was changed or told you can resign or be fired
19 was Joe Freebery; is that correct, of the two?
20     A.   Correct.
21     Q.   Do you know, were you ever aware --
22 well, first, did you see an exchange between Charlie
23 Baker and Sherry Freebery where Charlie Baker was
24 screaming at Sherry Freebery?

William J. Tansey

9 (Pages 30 to 33)

Page 30

1   A.   No.
2   Q.   Were you advised that something like
3   that had taken place?
4   A.   No.
5   Q.   Is it fair to say that when Joe
6   Freebery was removed as the general manager of the
7   Department of Special Services, he wasn't given the
8   benefit of any of the removal-for-cause provisions of
9   merit protection, merit system protection?
10       MS. ALLEN: Objection.
11       THE WITNESS: I didn't hear that he
12  was. You know, again, I am not privy to a lot of
13  things that go on.
14  BY MR. LAWLESS:
15  Q.   How would you describe the Department
16  of Special Services? Is it a small, medium or a large
17  department?
18  A.   Oh, it is large. I think it is --
19  next to the police, it is the largest.
20  Q.   Do you know how many -- are there
21  divisions within the Department of Special Services or
22  departments?
23  A.   I am not sure. I can't answer that
24  accurately. I guess I didn't do my homework when I

Page 31

1   was chair.
2   Q.   Well, let me ask you --
3   A.   I know there is parks, libraries --
4   Q.   -- phrasing it --
5   A.   -- sewers, you know.
6   Q.   Okay. So we will call them divisions.
7   A.   Yes.
8   Q.   Parks, libraries, sewers. What else?
9   Planning, engineering?
10  A.   Oh, there is planning and engineering
11  involved, sure.
12  Q.   Okay. Would it be easy for any one
13  person to know all the minutia or low-level details of
14  every department?
15  A.   It would be impossible.
16  Q.   Give me a second.
17       Let me ask you this. After the law
18  was changed to make the general managers serve at the
19  pleasure of the county executive, was that ever
20  approved by any vote of county council?
21  A.   No.
22  Q.   Was there ever any effort to do that?
23  Did anybody ever propose that be done?
24  A.   Not to my knowledge.

Page 32

1   Q.   Was there ever any discussion at
2   council about that change or why that was not done or
3   suggested?
4   A.   Nothing formal.
5   Q.   When you say "nothing formal," that
6   means --
7   A.   I mean, there was talk among the
8   council members, but I don't --
9   Q.   About what?
10  A.   About having the law being changed
11  and, you know, the general managers now serving at the
12  pleasure of the --
13  Q.   The fact that --
14  A.   And there was also a lot of talk prior
15  to that, you know, that -- well, I say a lot of talk.
16  There were several people that felt strongly that the
17  county executive should have his own people in place,
18  so to speak.
19  Q.   Okay. But as you just testified,
20  there would be nothing about the merit protection
21  given the directors to prevent him from simply
22  removing a director and appointing another director;
23  isn't that correct?
24  A.   Yes.

Page 33

1   Q.   And there is nothing about the
2   existing law that would have prevented him from
3   appointing a director to serve over a GM?
4   A.   Correct.
5   Q.   Okay. So if Chris Coons wanted to
6   remove Joe Freebery as the director of the Department
7   of Special Services, he could have done it without
8   changing the law. He could have just said, "You are
9   no longer the director. Michele Allen is the
10  director," and had his own person run that department;
11  right?
12  A.   Correct. That was my evaluation, if
13  you could call it. That's how I looked at it.
14  Q.   And I am also correct that if he could
15  do that, he could also change the job responsibilities
16  of a GM when he moved him? For example -- well, let's
17  say, for example -- let's give you a hypothetical to
18  which Michele will probably object, but let me ask you
19  this.
20       Let's say that Wayne Merritt had
21  decided he wanted to resign and that Mr. Coons wanted
22  Joe Freebery -- wanted somebody other than Joe
23  Freebery to be the GM. He could have appointed his
24  own GM and said to Joe Freebery, "Okay, you are now

Page 34

1  going to do Wayne Merritt's job," couldn't he?
2      A.   I assume, sure.
3      Q.   Sure. But that's not what happened.
4  Joe Freebery was simply fired from county government;
5  is that correct?
6      A.   Correct.
7      Q.   So you were elected in 2002 and the
8  indictments had come down. At that point was Sherry
9  Freebery running to succeed Tom Gordon as county
10 executive?
11     A.   Not to my knowledge.
12     Q.   When did you learn that Sherry was
13 going to run to try to succeed Tom Gordon in
14 relationship to when you came on the council?
15     A.   I would say maybe mid-2003. There was
16 talk. You know, I don't remember exactly when, you
17 know, she filed for or anything like that.
18     Q.   At what point did you learn that Chris
19 Coons was going to run for county executive? Before
20 or after Sherry Freebery declared?
21     A.   Say that again.
22     Q.   At what point did you learn Chris
23 Coons was going to run as county executive? Was it
24 before or after Sherry Freebery declared her candidacy

Page 35

1  for county executive?
2      A.   Before.
3      Q.   Before?
4      A.   Yes.
5      Q.   Prior to that point, prior to the
6  point of Sherry Freebery being indicted -- well, let
7  me ask you this. Prior to Chris Coons either formally
8  declaring or at least making it known that he was
9  running for county executive, did you ever hear him
10 say anything negative about Sherry Freebery?
11     A.   Sure. You know, only -- again, you
12 know, put it in perspective. The indictments came
13 down in September, so that was -- I was elected in
14 November. And there was a long period of time --
15     Q.   So you were --
16     A.   There was a lot of talk about what had
17 transpired. And, you know, I don't think -- I think
18 Chris was, you know, doing the same thing everyone
19 else was doing; you know, connecting the dots and
20 things. So, you know, he probably -- yes, he
21 definitely said some disparaging things about Sherry
22 Freebery.
23     Q.   Did you ever hear him say any
24 disparaging things about Joe Freebery?

Page 36

1      A.   No, no. I can't say that I did.
2      Q.   Up to the point when Joe Freebery was
3  terminated from his position with the county, did you
4  ever hear Chris Coons say anything bad about Joe
5  Freebery's substantive performance as the general
6  manager of the Department of Special Services?
7      A.   Other than this conversation we had in
8  the parking garage one time when I approached Chris,
9  you know, Chris to ask him what, you know, what he was
10 going to do about Joe Freebery, because, you know, he
11 is hanging out there, he and Charlie both. So --
12     Q.   Right. But even then, as I recall
13 your testimony, he didn't say -- all he said was "If
14 you were in the position, wouldn't you try to show
15 more to me"?
16     A.   Yes. He said wouldn't you -- yes,
17 exactly. You know, I don't know whether that is --
18 that was Chris's -- what Chris was looking for.
19 That's not necessarily, you know, a knock on Joe
20 Freebery.
21     Q.   Sure. But you didn't hear him in that
22 conversation say anything about, well, he can't do the
23 job or he doesn't know what he is doing or he is
24 incompetent?

Page 37

1      A.   No, no, no.
2      Q.   He just said he wasn't trying to show
3  me what he could do?
4      A.   Right. Exactly.
5      Q.   Okay. I just need another minute or
6  two here. (Pause)
7           After hearing that comment from Chris
8  Coons in the parking garage in that conversation, can
9  you think of anything Joe Freebery could have done to
10 show Chris Coons that he could do the job and should
11 have been kept on?
12     A.   I don't know how -- you know, quite
13 honestly, no, I don't.
14     Q.   I mean, put on a glitter suit and
15 juggle or something? What else could he have done
16 other than having done the job for 23 years?
17     A.   You know, I had no concept of what
18 Chris was driving at, you know.
19     Q.   And he didn't explain it to you?
20     A.   No, he didn't.
21     Q.   And then is it fair to say the next
22 you heard of that was Joe had been offered the chance
23 to resign or was terminated; is that correct?
24     A.   Yes. But that was a couple months. I

Page 38

1  mean, I don't think that was, you know, immediate.
2     Q.   Right. And again, the chief
3  administrative officer after Chris Coons took over was
4  a guy named Singleton?
5     A.   Yes.
6     Q.   What is his first name?
7     A.   Dave.
8     Q.   Do you know if after Dave Singleton
9  took over that whether or not Joe was working with
10 Mr. Singleton on a daily basis or however as needed
11 basis as the GM of the Department of Special Services?
12    A.   I had no knowledge of that if it was.
13    Q.   Okay. During the two-month period of
14 time between Chris Coons getting elected and Joe
15 Freebery being fired, were there any catastrophic
16 fires within the Department of Special Services that
17 you are aware of?
18    A.   No.
19    Q.   Were there any problems in the
20 Department of Special Services that you are aware of?
21    A.   None that I was aware of.
22    Q.   And you were the chairman of the
23 council committee that oversaw that; is that correct?
24    A.   Correct.

Page 39

1     Q.   Are you aware of -- again, I might
2  have asked this. Are you aware of anything Joe
3  Freebery did during that two-month period of time to
4  show you that he couldn't work with the Coons
5  administration?
6     A.   No, not at all.
7     Q.   Did you ever hear him saying anything
8  bad about Chris Coons behind his back?
9     A.   No, other than he was concerned about
10 his job.
11    Q.   By the way, did you follow the
12 political campaign for county executive, the primary
13 between Chris Coons and Sherry Freebery?
14    A.   Not really. At a distance, you know.
15 That was a Democratic thing. I am a Republican.
16    Q.   You didn't even go to the cocktail
17 parties, huh?
18    A.   Well, you know, you are right. I
19 didn't.
20    Q.   Were you aware of whether or not Joe
21 Freebery publicly supported Sherry Freebery when she
22 was running for the Democratic nomination for county
23 executive?
24    A.   Yes, I think I was. I mean --

Page 40

1     Q.   Was he?
2     A.   Pardon me?
3     Q.   Was he?
4     A.   Oh, sure.
5     Q.   To your knowledge, when he was
6  supporting Sherry Freebery, did that public support of
7  his sister include any public criticisms of Chris
8  Coons?
9     A.   Not to my knowledge.
10    Q.   He was, to your knowledge, just
11 exercising his First Amendment right of freedom of
12 speech?
13       MS. ALLEN: Objection.
14 BY MR. LAWLESS:
15    Q.   You can answer. As far as you know,
16 he was just exercising his First Amendment right of
17 freedom of speech in supporting his sister?
18    A.   If he did. You know, if there were --
19 if he verbalized it or anything, I assume he was.
20       MR. LAWLESS: Very good. That's a
21 perfect distinction.
22       Michele, can I have a 30-second break?
23       (Recess taken.)
24

Page 41

1  BY MR. LAWLESS:
2     Q.   Two other questions I meant to ask.
3     A.   Okay.
4     Q.   After Mr. Freebery was dismissed as
5  the general manager of the Department of Special
6  Services, am I correct that he was replaced by a
7  fellow named Rich Pryzwara?
8     A.   Correct. Pryzwara.
9     Q.   Pryzwara. To your knowledge, did
10 Mr. Pryzwara have any experience in county government
11 or running a department like a department of special
12 services in a county government?
13    A.   Not to my knowledge.
14    Q.   And I believe you either said
15 something to me or I have heard somewhere that it was
16 your opinion that Mr. Pryzwara was a very hard worker
17 and tried very hard to bring himself up to speed on
18 how that department was run --
19    A.   Yes.
20    Q.   -- is that a fair statement?
21    A.   That's fair.
22    Q.   But it is also a fair statement that
23 he had to basically bring himself up to speed on how
24 that kind of a department is run? He had to learn it.

Page 42

1  He hadn't done it before. Is that a fair statement?
2    A.   Yes.
3    Q.   Now, who is currently the director --
4  I am sorry -- the general manager of the Department of
5  Special Services? Is there one or is it just an
6  acting general manager?
7    A.   No. Tracy Surles is acting director.
8    Q.   How long has she been acting director?
9    A.   I would say six months.
10   Q.   Okay. Am I correct that she was
11 brought into the Department of Special Services
12 originally by Joe Freebery, if you know?
13   A.   I don't know that to be a fact.
14   Q.   Okay. Do you know if she was trained
15 by Joe Freebery? I thought you told us that she
16 worked in the department when Joe was there. She was
17 one of his subordinates.
18   A.   Yes.
19   Q.   Do you know of any reason why Tracy
20 Surles could carry out the mission or the vision of
21 Chris Coons and Joe Freebery couldn't?
22        MS. ALLEN: Objection; calls for
23 speculation.
24

Page 43

1  BY MR. LAWLESS:
2    Q.   You can answer.
3    A.   Do I -- is there any reason why --
4    Q.   Why Surles could do it, who was
5  brought in by Freebery and trained by Freebery and
6  worked under Freebery, why she could do the job for
7  Coons but Freebery couldn't?
8    A.   No, no, I don't think so.
9    Q.   Do you think it might have had
10 something to do with Freebery's last name?
11        MS. ALLEN: Objection; calls for
12 speculation.
13        THE WITNESS: You could connect the
14 dots.
15 BY MR. LAWLESS:
16   Q.   Let me ask you another question. Am I
17 correct you are still a member of county council?
18   A.   Yes.
19   Q.   Am I also correct that you have to
20 work with other members of county council and the
21 Coons administration?
22   A.   Probably more so than other council
23 members because I am one of the -- I think I am the
24 only Republican. But there are two Republicans.

Page 44

1        MR. LAWLESS: I will connect the dots.
2  I won't ask you the next question.
3        I have nothing further. Thank you.
4  BY MS. ALLEN:
5    Q.   Councilman, you had told us that I
6  guess you were interviewed by the grand jury; is that
7  correct?
8    A.   Yes.
9    Q.   Or interviewed by the U.S. Attorney's
10 office?
11   A.   Yes.
12   Q.   Did you testify in front of the grand
13 jury?
14   A.   Yes.
15   Q.   Did some of the allegations and
16 investigation arise around your actual election and
17 your campaign?
18   A.   Yes.
19   Q.   Do you have an opinion as to whether
20 or not Sherry Freebery did anything improper?
21   A.   No.
22   Q.   No, you don't have an opinion or no,
23 she didn't do anything improper?
24   A.   Oh, do I have an opinion? Well --

Page 45

1        MR. LAWLESS: Could you just --
2        THE WITNESS: I really don't know
3  whether Sherry Freebery made the decision or Tom
4  Gordon made the decision, but somebody made the
5  decision they were going to support me.
6        MS. ALLEN: Okay.
7        THE WITNESS: And there were some
8  people that worked on the campaign who I guess it is
9  not alleged anymore; they admitted that, yes, they
10 worked on the campaign during their working hours, and
11 that's -- is there any other way to answer that or --
12 BY MS. ALLEN:
13   Q.   Do you think Sherry Freebery -- the
14 allegations that were brought against Sherry Freebery,
15 do you think that -- do you think that she did -- oh,
16 gosh. How am I trying to say this? Do you think that
17 Sherry Freebery did anything wrong with respect to the
18 allegations that were brought against her?
19        MR. LAWLESS: Just to interrupt, could
20 we define "wrong"? The objection is could you be a
21 little more precise.
22 BY MS. ALLEN:
23   Q.   In your opinion, did Sherry Freebery
24 do anything improper?

William J. Tansey

13 (Pages 46 to 49)

Page 46

1    MR. LAWLESS: Again, same objection.
2    Could you just differentiate between "improper" and
3    "illegal"?
4        I will ask the follow-up question. I
5    am sorry. Go ahead.
6        THE WITNESS: Truly, Michele, if you
7    could define a little bit better.
8    BY MS. ALLEN:
9        Q.   Okay. Did you -- let me ask you this:
10   When you testified in front of the grand jury, did you
11   state that Sherry Freebery did anything improper?
12       A.   Improper. At that time they were
13   still formulating some kind of charges. You know, I
14   don't -- so I don't -- no, I don't think -- you know,
15   if it was strictly on my campaign, was there anything
16   that she did improper, not to my knowledge.
17       Q.   Okay. And I believe you already
18   testified with respect to the allegations of the loan
19   and the Fieldstone -- her inquiries into the
20   Fieldstone planning with the land use department, you
21   do not believe that she did anything improper with
22   respect to that?
23       A.   No, I don't believe that was improper.
24       Q.   And that's what you told the U.S.

Page 47

1    Attorney's office?
2        A.   I don't think they asked me that.
3        Q.   Okay.
4        MR. LAWLESS: Off the record.
5        (Discussion off the record.)
6    BY MS. ALLEN:
7        Q.   What district are you the council
8    person of?
9        A.   Third.
10       Q.   And who is currently your aide?
11       A.   Nellie Manlove.
12       Q.   And prior to you taking office, who
13   was the aide of the Third District?
14       A.   I didn't have one.
15       Q.   There was no Third District?
16       A.   No. Well, there was a Third District,
17   but I didn't have an aide because -- the thing was, I
18   defeated Rich Abbott in September, and when I took
19   office in November, I mean, they had cleared out,
20   literally cleared out. They left nothing and no aide.
21       Q.   Has Nellie Manlove always been your
22   aide?
23       A.   No.
24       Q.   Who was your aide prior to that?

Page 48

1        A.   Arthur Jenkins.
2        Q.   And why is he no longer your aide?
3        A.   Because he was offered a job with the
4    city, and I encouraged -- which was a promotion, and I
5    encouraged him to take it.
6        Q.   You had stated that you had heard when
7    Chris Coons was elected to county executive that there
8    was going to be turnover of all of the general
9    managers or most of the general managers.
10       A.   Well, you know, it didn't happen,
11   like, at one time. You know, one person would leave,
12   and then another person would leave, another person
13   would leave. Subsequently the only two that were left
14   were Charlie and Joe. That's -- they went to
15   different jobs. Some retired. So --
16       Q.   You had heard talk that or you had
17   testified that you had heard talk that Joe Freebery
18   was going to be removed. Do you recall who you heard
19   that from?
20       A.   That he was -- that -- oh, no. The
21   statement that the person made was "I can't believe
22   that -- there is no way that Chris can retain Joe
23   Freebery." So that means that he was going to get rid
24   of him, and you can draw that conclusion.

Page 49

1        Q.   And you don't know who you heard that
2    from? You don't recall?
3        A.   No. There was a lot of talk at that
4    time from different people. But I remember, again,
5    you know, another conversation in the elevator or in
6    the parking lot or something or the parking garage.
7    But, you know, I would not say -- I couldn't identify
8    a person because, you know, my memory, it is four
9    years ago.
10       Q.   And it was that person's opinion. Did
11   they say that they had heard any of that from Joe
12   Freebery?
13       A.   From Joe Freebery?
14       Q.   I mean from Chris Coons.
15       A.   No.
16       Q.   Would you say that there is a
17   contentious relationship between council and the
18   executive office now or the executive administration?
19       A.   To some degree, yes. Maybe there
20   always is. Maybe it is, you know, the animal, you
21   know. It is just --
22       Q.   You had said that Chris had suggested
23   to you that Joe Freebery was not aggressive enough,
24   indicating that he did not take more of a leadership

Page 50

1  role.
2         MR. LAWLESS: Objection. That is a
3  mischaracterization.
4         THE WITNESS: No. It wasn't
5  leadership involved. It was just, you know, his just
6  actions in the interim, between when Chris got elected
7  and when he was trying to make his decision as to what
8  he was going to do, he just gave me -- he told me
9  that, you know, he thought Joe should have given, you
10 know, been more aggressive in his desire to continue.
11        You know, it was hard to interpret
12 what Chris was actually looking for, but his words
13 were, you know, as I said -- he asked me, "What would
14 you do if you wanted to continue as general manager?
15 Wouldn't you be, you know, more forward with it and,
16 you know, more trying to show me that you can do the
17 job?" that type of thing.
18 BY MS. ALLEN:
19     Q.   So he indicated to you that Joe
20 Freebery was showing him that he couldn't do the job?
21     A.   No, no, no. I didn't say that. You
22 said that. I am just saying that he was showing -- he
23 wasn't showing him that he could do the job, not that
24 he couldn't do the job.

Page 51

1      Q.   Right. It was Chris's impression that
2  Joe Freebery was showing him that he couldn't do the
3  job?
4      A.   No. It was Chris's impression that
5  Joe was not showing that he could do the job. If you
6  can interpret that because he wasn't showing that he
7  could do the job that that meant that he was showing
8  that he couldn't do the job, then, you know, I think
9  we are getting tied up on words here.
10          You know, the only thing he said, he
11 said, "If it were you, Bill, wouldn't you be more, you
12 know, aggressive trying to show me that you could do
13 the job?"
14     Q.   Okay.
15     A.   That's, you know -- that's the only
16 thing that I can attest to.
17     Q.   Was it your impression of Joe Freebery
18 when he was general manager of special services that
19 he had the people underneath of him give the
20 presentations during the special services committee
21 meetings?
22     A.   Yes.
23     Q.   Did he take like a hands-off approach?
24     A.   Yes. Well, you know, if we were going

Page 52

1  to talk about parks, he would have Jonathan Husband do
2  it. If we were going to talk about sewers, you know,
3  Wayne would do it or, you know, different -- you know,
4  he delegated, which was his style. I mean, that's --
5  I don't think that's, you know -- that's just a style
6  of management.
7      Q.   You had indicated or you had stated
8  earlier that you did not see anything that could be
9  considered cause for removing Joe Freebery.
10     A.   Correct.
11     Q.   Can you define for me what you mean by
12 "for cause"? What would you consider for cause?
13     A.   Well, you know, cause to me would
14 be -- it would have to be something dramatic, like
15 spending money that he shouldn't have spent or, you
16 know, doing things with the capital budget that he
17 shouldn't be doing or, you know, spending library
18 money or things like that. I don't know. You know,
19 or, you know, if he physically had an altercation with
20 someone, with one of his subordinates or one of his --
21 or with somebody else, one of the principals. I don't
22 know.
23          The only one he works for would be the
24 executive or the CAO, the chief of staff. You know,

Page 53

1  there could be an altercation or something that was --
2  you know, would show insubordination. I would think
3  it would have to be pretty dramatic to have a
4  person -- take a person's job away from them.
5      Q.   So if there was some sort of
6  insubordination or ignoring the issues or ignoring
7  requests from the executive office, you would agree
8  that that is a justification for cause termination?
9      A.   I am not sure. It could lead to it.
10 You know, there has to be a process.
11          You know, again, I think Joe asked me,
12 you know, whether, you know -- if I was that familiar
13 with the merit system. I know that in any other
14 personnel action, you have to have a paper trail
15 before you -- you know, so there had to be -- you have
16 warnings, et cetera. There has to be records put in
17 the files. By the time you get to the point of
18 termination, it is well-founded that this person is
19 not performing the way they should and they continued
20 to not perform the way they should.
21     Q.   But that was not the case with respect
22 to the general manager positions at the time Joe
23 Freebery was terminated?
24     A.   Not to my knowledge.

William J. Tansey

15 (Pages 54 to 57)

Page 54

1  Q. They could be gotten rid of for any
2  reason?
3  A. At that time. Well, I don't -- that's
4  right. I mean, if you are not -- I am talking about
5  merit system versus, you know, appointed.
6      That's right. You serve at will when
7  you are in an appointed position. We have -- like, my
8  aide serves at will. Council staff serves at will, so
9  they all know that, you know, if there is change of
10 administration, there is a good likelihood they are
11 not going to be around.
12 Q. Do you know what the salary is of the
13 general manager, roughly, of special services?
14 A. Boy, you know, it would be a guess. I
15 would say in the range of 130, 140,000.
16 Q. And if in the merit system you were to
17 move somebody into a lateral position, they would
18 still have to make that same salary; correct?
19 A. I don't know. I can't answer that.
20 Q. Okay. If they were to have brought in
21 directors above general managers, would you agree that
22 the salary would be the same or if not more than the
23 general managers were making?
24 A. No, I wouldn't -- I wouldn't agree to

Page 55

1  that, you know, no. The county is kind of -- you
2  know, they have got step increases. Like if you have
3  been there ten years, you max -- you know, I wouldn't
4  agree that that would be necessarily true.
5      I mean, you could bring in a director
6  at whatever, you know, whatever you wanted to pay him
7  if you could convince him that he is going to --
8  Q. Do you think it would be likely to be
9  able to convince somebody to take that position if
10 they were the head of the department, they would be
11 making less than everybody else?
12 A. You know, for that position director,
13 if there is a general manager doing all the work and
14 you are just a figurehead, you know, I would -- you
15 know, my opinion would be, you know, you could
16 probably work for less.
17 Q. Do you think that's duplicative,
18 having a director and a general manager?
19 A. Oh, definitely.
20 Q. You had said that Joe Freebery
21 publicly supported Sherry during the primary. What
22 did he do?
23 A. Oh, you know, publicly. I mean, I
24 knew that -- I don't know -- I don't know in what

Page 56

1  detail. I mean, I assumed, you know, he worked on her
2  campaign, but what he did, I have no idea.
3  Q. Do you know for a fact whether or not
4  he worked on her campaign?
5  A. You know, I heard that he did. And I
6  assumed -- I made the connection -- you know, I didn't
7  have any reason to doubt that he did.
8  Q. But you didn't see or hear anything?
9  A. No, not really. Like I said, you
10 know, that was a campaign that I was kind of at arm's
11 length.
12 Q. When Rich Pryzwara was general manager
13 of special services, did he seem to have a hands-on
14 approach?
15 A. Yes. More so, I think, you know, he
16 was just -- he was trying to, you know, probably
17 doing -- and this is -- again, this is my assumption.
18 He was probably trying to do the same thing I was
19 doing. Like, you know, special services to me was a
20 word, and so, you know, I wanted to know as much about
21 the job as I -- you know, what was going on in the
22 department as I could. And I assume that Rich was the
23 same way.
24 Q. He attended all the meetings,

Page 57

1  committee meetings?
2  A. Yes. I assume -- again, you are
3  testing me. We met every two weeks, so I would assume
4  he was there most of the meetings.
5  Q. Seemed competent and knowledgeable?
6  A. If he didn't, you know, he relied on
7  the people that knew more about it. You know, he
8  was -- I think, you know, I think he did a
9  satisfactory job. I can't criticize him.
10 Q. And have you not stated anything here
11 today during your deposition due to the fact that you
12 still hold a position as council and that you have to
13 work with Chris Coons?
14 A. Not really. You know, I think I have
15 been honest. That's all I can attest to.
16 Q. If you were no longer councilperson,
17 what additional information would you add?
18 A. I tried to answer the questions.
19 That's, you know -- I can't say that -- you know,
20 do -- you know, do I think Chris Coons is the devil
21 incarnate? No, I don't. I think he is doing what he
22 thinks he should be doing. I don't have any undue
23 criticism of him.
24      You know, if he was inclined to let

**Page 58**

1 somebody go without justification or, you know, for
2 whatever reason, you know, he has got -- he has got to
3 live with that, not me.
4     MS. ALLEN: I don't have any further
5 questions.
6 BY MR. LAWLESS:
7     Q. Councilman Tansey, I have to ask you a
8 question now that I didn't want to ask you, based on a
9 question asked by Ms. Allen. She asked you if you
10 weren't in a position of being a councilman, is there
11 anything you would say that you haven't said. Do you
12 have an opinion as to why Joe Freebery was fired?
13     A. You know, as I said, you know, anybody
14 can connect the dots. People are --
15     Q. I am asking you to connect the dots.
16 Why was he fired?
17     MS. ALLEN: Objection; calls for
18 speculation.
19     MR. LAWLESS: The only reason I am
20 asking you that is because she asked you that
21 question.
22     THE WITNESS: Okay. From my opinion,
23 from my opinion, because of the relationship with the
24 former CAO.

**Page 59**

1     MR. LAWLESS: I apologize for having
2 to ask that question. I wanted to try to avoid it.
3     THE WITNESS: Well, I can't see any
4 other reason.
5 BY MR. LAWLESS:
6     Q. Let me ask you another question. When
7 Chris Coons said that -- you had that conversation
8 with him in the parking garage about, you know, if you
9 were in Joe Freebery's position, what would you do --
10     A. Right.
11     Q. -- did you -- and again, maybe this
12 all -- did you get the impression that he meant that
13 Joe Freebery should have been a little more
14 self-promoting? Here is what --
15     A. I think. That's the impression I got.
16     Q. Is Joe Freebery, your impression, in
17 your experience, a self-promoting kind of guy?
18     A. Not at all --
19     Q. Is he kind of a quiet guy?
20     A. -- not at all. That is not his
21 personality, from my observation, again. I suppose --
22 I tell you guys, 1:30 I am supposed to meet my
23 interior decorator.
24     Q. Let me give you 30 seconds more.

**Page 60**

1 During this period of time when Mr. Coons said Joe
2 Freebery wasn't showing him anything, was he working
3 on a $17 million flood project? Do you recall whether
4 that was going on at that time?
5     A. Oh, sure. It was in the department.
6 Exactly.
7     Q. And that was being run by the
8 Department of Special Services?
9     A. Yes.
10     Q. You don't know if that showed
11 Mr. Coons what he was looking for?
12     MS. ALLEN: Objection.
13 BY MS. ALLEN:
14     Q. Just to follow up on that, what leads
15 you to make that conclusion of connecting the dots for
16 the reasons for Joe Freebery's termination?
17     A. Well, okay. In a political
18 environment, when you work on someone's campaign
19 against someone else and, you know, you have the call
20 and you want to, you know, set the table straight, you
21 want your people in there rather than someone that,
22 you know -- who was just got through a very
23 contentious primary working for you. The thing you
24 would do would have that -- you know, do something

**Page 61**

1 with that person, not have them, you know -- like, you
2 look at your staff. You know, you are sitting around
3 the table. You look at your staff. They all better
4 be loyal people.
5     And I don't know. Maybe -- you know,
6 if I were in Chris's position, would I -- you know,
7 would I question Joe's loyalty after what I just went
8 through? Probably not. And so, you know, that would
9 be my assumption. I don't know whether I would have
10 fired the person, but I would have, you know,
11 neutralized him.
12     You know, again, politics, that's the
13 way politics is. You know, you live it and you die
14 it.
15     Q. But you don't have -- nothing was said
16 to you --
17     A. By who?
18     Q. -- from Chris Coons or anybody that
19 these were the reasons why Joe was terminated?
20     A. No, no. I have no -- you know, I
21 don't know. No. No one said to me --
22     Q. It is just your speculation, your
23 opinion?
24     A. That's right. Exactly. It is totally

William J. Tansey

17 (Pages 62 to 64)

## Page 62

1  my opinion.
2         MS. ALLEN: I don't have anything
3  further.
4  BY MR. LAWLESS:
5     Q.  You are a Republican?
6     A.  I am a Republican. And I have been in
7  politics since I was -- I used to go to
8  St. Elizabeth's School. When I was in the eighth
9  grade, I used to go down to Democratic headquarters to
10 work there on campaigns.
11    Q.  But you are a Republican and Chris
12 Coons is a Democrat?
13    A.  Yes.
14    Q.  Do you think Chris Coons would be dumb
15 enough to come to you and say, "I fired Joe Freebery
16 because he supported his sister"?
17        MS. ALLEN: Objection.
18        THE WITNESS: No. He isn't going to
19 share anything with me. He wouldn't share anything
20 with me or anyone else.
21        MR. LAWLESS: You have the option,
22 Bill, of reading the deposition to double-check it and
23 make sure it is accurate, and if there is any
24 corrections you need to make, you can write them on a

## Page 63

1  little sheet. Do you want to read and sign it or are
2  you confident that she will transcribe it properly?
3         THE WITNESS: No. I am sure she will
4  transcribe it properly.
5             - - -
6         (Deposition concluded at 1:20 p.m.)
7             - - -
8              INDEX
9  WITNESS                          Page
10 WILLIAM J. TANSEY
11    By Mr. Lawless------------------------  3
      By Ms. Allen-------------------------- 44
12    By Mr. Lawless------------------------ 58
      By Ms. Allen-------------------------- 60
13    By Mr. Lawless------------------------ 62
14            - - -
15       (There were no exhibits marked.)

## Page 64

CERTIFICATE

I, LORRAINE B. MARINO, Registered Diplomate Reporter and Notary Public, do hereby certify that the witness, WILLIAM J. TANSEY, after being duly sworn by me, was examined by counsel for the respective parties and the questions of said witness and his answers were taken down by me in stenotype notes and thereafter transcribed into typewriting at my direction.

I certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that reading and signing of the deposition were waived.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


Registered Diplomate Reporter and Notary Public
Certificate No. 181PS/Exp.: Permanent

Date: 1/26/08