# EXHIBIT "C"

Joseph R. Woods

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOSEPH J. FREEBERY,                         :

                    Plaintiff,    :

                vs.                  :      Civil Action No.
                                            05-748 KAJ
CHRISTOPHER COONS, in his        :
official capacity as County
Executive of New Castle County :
and in his individual capacity;
and NEW CASTLE COUNTY, a         :
municipal corporation, and JOHN
DOES 1-25,                       :

                    Defendants.   :
                                 - - -

            Deposition of JOSEPH R. WOODS, taken

pursuant to notice in the law offices of Richard R.

Wier Jr., P.A., Suite 200, Two Mill Road, Wilmington,

Delaware, on Monday, January 21, 2008, at 10:13 a.m.,

before Lorraine B. Marino, Registered Diplomate

Reporter and Notary Public.

                                 - - -

                    CORBETT & WILCOX
                  230 North Market Street
                 Wilmington, Delaware 19801
                      (302) 571-0510
          Corbett & Wilcox is not affiliated with
             Wilcox & Fetzer, Court Reporters

Joseph R. Woods

2 (Pages 2 to 5)

Page 2

1 APPEARANCES:
2        JOSEPH F. LAWLESS, ESQ.
         843 Mt. Morrow Road
3        Villanova, PA 19085
           for Plaintiff
4
       MICHELE D. ALLEN, ESQ.
5        Richard R. Wier, Jr., P.A.
         Two Mill Road - Suite 200
6        Wilmington, DE 19806
           for Defendants
7
  ALSO PRESENT:
8
       JOSEPH J. FREEBERY
9
          - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1        JOSEPH R. WOODS, having been first duly
2  sworn, was examined and testified as follows:
3        MR. LAWLESS: Before we start, can I
4  just go off the record for a second.
5        (Discussion off the record.)
6        MR. LAWLESS: For the record, I am
7  here representing Joe Freebery, and Michele Allen,
8  Esquire, is here, and she can put on the record who
9  she is representing, but it is clear on the record in
10 this case that Michele had previously been here as an
11 assistant county solicitor on behalf of the county,
12 and we just discussed off the record what impact, if
13 any, her change in employment status as now an
14 associate at Dick Wier's firm will have on this case.
15 I just asked Michele if she would put on the record
16 what that was so we don't have any conflict issues
17 down the road, and she graciously agreed to do so.
18 So --
19        MS. ALLEN: Michele Allen for Dick
20 Wier's office, representing Christopher Coons, New
21 Castle County, and I think that's it so far. And any
22 John Does 1 through 25.
23        I was a former assistant county
24 attorney. Richard Wier's office has always

Page 4

1  represented all the defendants in this case. I
2  participated solely as a liaison in this case. All
3  defendants are aware of the change in my employment
4  status and that this case is continuing to be
5  represented by Mr. Wier's office and myself.
6        MR. LAWLESS: Thanks.
7  BY MR. LAWLESS:
8        Q.    Could you again state your full name
9  for the record?
10       A.    Joseph R. Woods.
11       Q.    Mr. Woods, I am Joe Lawless. I
12 represent Joe Freebery in connection with a lawsuit
13 that he filed against New Castle County and
14 Christopher Coons in both his official and his
15 *individual capacity in connection with his termination*
16 from his position as the general manager of the
17 Department of Special Services for New Castle County.
18       And have you ever given a deposition
19 before?
20       A.    Yes, I have.
21       Q.    And so you realize you are under oath
22 and that you are testifying today as if you would be
23 testifying in a courtroom in front of a judge or a
24 jury?

Page 5

1        A.    Yes.
2        Q.    Okay. So I won't give you the
3  15-minute speech. I will give you the short version.
4  If I ask a question and you don't understand the
5  question, ask me to rephrase it. That goes for
6  anything Ms. Allen might say, although she tends to be
7  a little clearer than I am. But if you don't
8  understand it, ask. We will rephrase it.
9        If you give an answer, we are going to
10 be acting on the assumption that you understood the
11 question. And we don't want you to misstate or be
12 misunderstood in any way.
13       A.    Okay.
14       Q.    How are you currently employed?
15       A.    I am currently very retired.
16       Q.    And enjoying it, I assume?
17       A.    Every -- almost every minute of it,
18 yes.
19       Q.    Okay. Am I correct that at some point
20 in time you were a member of the New Castle County
21 Council?
22       A.    Yes, you are.
23       Q.    And just before we get to that, could
24 you just give us your educational background? You are

Joseph R. Woods

Page 6

1  a graduate of St. Elizabeth High School; is that
2  correct?
3      A.    Various parochial schools in the City
4  of Wilmington and eventually graduated grade school
5  St. Elizabeth, stayed and graduated from the high
6  school, started University of Delaware; in my great
7  wisdom decided that wasn't for me and quit after one
8  semester. So that's the extent of my education.
9          I would add that as an apprentice
10  sheet metal worker, I had four years of a trade
11  school, which I consider to be extended education.
12      Q.    That was my next question. After you
13  realized that University of Delaware wasn't for you,
14  what did you do in terms of your employment?
15      A.    Well, my dad had said to me, "You are
16  either going to get a college degree or learn a trade,
17  so go down to sign up to be a sheet metal worker," and
18  that's what I did. Started in June of 1965 as an
19  apprentice.
20      Q.    And how long were you a sheet metal
21  worker?
22      A.    I was a sheet metal worker working
23  with the tools until 1984. '84 I was elected as the
24  business agent to handle the State of Delaware, and --

Page 7

1      Q.    The entire state?
2      A.    Entire state, and continued in that
3  capacity until I retired from sheet metal workers in
4  September of 2002.
5      Q.    Okay. Did there come a point in time
6  where you became involved in the government of New
7  Castle County?
8      A.    Yes.
9      Q.    When was that?
10      A.    1989. There was a vacancy on county
11  council, and I had been asked by members of organized
12  labor if, since I resided in the district that was
13  vacant, if I would consider being county councilman,
14  at which time I said absolutely not. And --
15      Q.    What caused you to change your mind?
16      A.    People pestered me, and I guess some
17  people convinced me that I was not going to be the
18  person that they pushed for, but eventually that
19  became the case. So I finally did get appointed to
20  council in December of 1989 by the then county
21  executive, Dennis Greenhouse.
22      Q.    At that time I assume once you became
23  a member of county council, you familiarized yourself
24  with the structure of county government?

Page 8

1      A.    Yes.
2      Q.    When you started in '89, was the
3  structure of county government then the same as it is
4  now or when you left the county council?
5      A.    No. It was much different.
6      Q.    Okay. In terms of -- how was it
7  different in terms of, say, the Department of Special
8  Services? What was the predecessor of the Department
9  of Special Services?
10      A.    Well, I guess it was Department of
11  Public Works, and there was a -- you know, after the,
12  I guess, the Gordon administration took office, they
13  had some studies and things which they had initiated,
14  and it came back with some good recommendations, we
15  felt, to restructure the way the government was set
16  up. So some departments were combined with others,
17  and then we -- so we went to a little different system
18  of structure at that point.
19      Q.    Okay. In terms of the Department of
20  Public Works and the Parks Department, did that become
21  a new department or were they merged together? How
22  did that happen?
23      A.    Well, they were merged together under
24  the Department of Special Services.

Page 9

1      Q.    Okay. Would it be fair -- do you
2  recall whether or not there were some of the functions
3  of the administrative services department that were
4  also made part of the Department of Special Services?
5      A.    I believe there might have been.
6  There was a lot of mishmash. There was some
7  discussion amongst members of council as to where
8  certain things should end up, like libraries and
9  whatnot, because as we restructured, we tried to -- I
10  guess there were about 15 different areas, if you
11  will. I think it was condensed down to nine. So
12  there were some -- we tried to figure out what was the
13  correct fit, and -- but certainly public works and
14  sewer and those types of things stayed in special
15  services department, I guess some administrative
16  services as well.
17      Q.    Was this restructuring or reorganizing
18  of county government, was that -- did that process --
19  and I think you have already kind of implicitly
20  answered the question, but did that process include
21  debate, examination, I guess the advise and consent,
22  if you will, of county council?
23      A.    Absolutely. Yes, as I said, there was
24  some discontent among members of council about where

Joseph R. Woods

4 (Pages 10 to 13)

Page 10

1  certain things should have ended up, and it was a
2  difficult process, because I guess for so many years
3  everybody was used to the structure being the way it
4  was. And different councilmen had different areas of
5  expertise and became, you know, like I was -- at one
6  time I was the chairman of the libraries committee --
7  and so forth, and different people wanted things to
8  remain the way they were, because it was going to be a
9  problem as to how we were going to restructure and
10  what councilperson would then represent what
11  organization.
12          We thought there was going to be --
13  you know, we had to do a lot of restructuring
14  ourselves as a result. So --
15      Q.    And when you say in terms of
16  restructuring, do you mean in terms of setting up like
17  committees --
18      A.    Resetting up committees --
19      Q.    -- things like that?
20      A.    -- and -- right. Correct. So there
21  was some resistance to that. But we eventually found,
22  I guess, a common denominator, if you will.
23      Q.    When you first came into county
24  government, when you were first appointed, the

Page 11

1  different departments, the Parks Department, Public
2  Works Department, et cetera, what was the title of the
3  individual or the individuals who ran each department?
4  Because right now I know they are called general
5  managers. What were they called before?
6      A.    I guess they were called directors. I
7  guess that was the title, director.
8      Q.    Do you know -- and was that position
9  provided for by law --
10      A.    I --
11      Q.    -- if you know?
12      A.    I am not sure. I am not absolutely
13  sure if it was.
14      Q.    Okay. Do you know what the merit
15  system is in New Castle County?
16      A.    Yes.
17      Q.    Could you give me very briefly your
18  understanding of the merit system?
19          MS. ALLEN: Just objection as to at
20  what time the merit system?
21          MR. LAWLESS: Let's start now.
22  BY MR. LAWLESS:
23      Q.    Yes, what is it now, if you know, or
24  what was it when you left county government? What was

Page 12

1  the merit system?
2      A.    The merit system from my perspective
3  has always been simply your positions were not there
4  from a political-based nature, mostly more from a --
5  you know, an attained position, if you will. You kind
6  of worked your way up through the ranks. The merit
7  position protected you from, to me, outside undue
8  influence.
9          Under the merit system people had
10  reasonable expectation that if there were problems,
11  they had representation, and I guess having -- not
12  having the merit system protection would subject you
13  to almost anything at somebody's whim. And I think we
14  always felt that the merit system was designed to put
15  some kind of, you know, permanency and sanctity, I
16  guess --
17      Q.    Continuity?
18      A.    Continuity is really the correct word,
19  yes.
20      Q.    Do you know -- and I will lead you a
21  little bit here so we can kind of get to the point.
22  But did the merit system provide for graduated
23  disciplinary action and removal only for cause?
24      A.    Yes, yes, to my knowledge.

Page 13

1      Q.    Okay. When the directors were the
2  heads of the various county departments, were they
3  merit system positions or were they political
4  positions, if you know?
5          MS. ALLEN: Objection to the term
6  "political."
7          MR. LAWLESS: Good point.
8  BY MR. LAWLESS:
9      Q.    Were they merit system -- I will
10  rephrase it. Were they merit system-protected
11  positions or were they positions whereby the
12  department head served at the pleasure of the county
13  executive?
14      A.    They served at the pleasure of the
15  county executive and the approval of council to some
16  degree.
17      Q.    Okay. Did there come a point in time
18  when that was changed?
19      A.    Yes.
20      Q.    And do you recall was that in
21  connection with -- again, if I can lead a little bit,
22  was that in connection with the reorganization of
23  county government that you just told us about?
24      A.    I don't know if it was done exactly

Joseph R. Woods

Page 14

1  then. The timing, I think, wasn't at the same time.
2  I think it was done at a later point in time.
3      Q.    Okay. But it was changed so that the
4  heads of the department were merit system-protected?
5      A.    Yes.
6      Q.    Was there a change in the title of
7  those positions? Is that when it became directors?
8      A.    That's when it changed to general
9  managers.
10     Q.    Okay. I am sorry. General managers.
11  If you know, were the directors'
12  position -- and this was all by statute; correct?
13     A.    Yes.
14     Q.    Was it a county statute or a state
15  statute or combination; do you know?
16     A.    I believe it had to be a state
17  statute.
18     Q.    Okay.
19     A.    It had to be changed in Dover.
20     Q.    Do you know were the directors were
21  made the heads of the county departments -- I am
22  sorry -- general managers were made heads of the
23  county departments and protected by the merit system,
24  if the position of directors was ever eliminated, or

Page 15

1  did those positions still exist at least in the law?
2      A.    I think they still existed in the law.
3      Q.    Okay. When did you first meet Joe
4  Freebery, if you remember?
5      A.    I had been aware of Joe simply because
6  being a Notre Dame football fan and him being about
7  the same age, and I remember him playing football in
8  high school and from Notre Dame. But I guess I
9  probably met him probably on or about 1990 or
10 thereabouts. Not long after I had been on council.
11     Q.    Okay. And am I correct that at that
12 point, when you met him, Joe Freebery was serving in
13 county government?
14     A.    Yes.
15     Q.    Do you recall what position he held
16 when you first met him?
17     A.    I believe he was probably working in
18 drainage division of public works or something.
19     Q.    Do you know if he had a leadership
20 position in the Department of Public Works when you
21 met him, again, if you remember?
22          And, Bob, just so it is clear, "if you
23 remember" is kind of a predicate to every question I
24 am asking.

Page 16

1      A.    Right.
2      Q.    If you don't remember, obviously, just
3  say you don't remember; you are not sure. And you can
4  give some context to your answer.
5      A.    Well, he wasn't a director of a
6  department or anything, but he had a leadership
7  position in the position in which he was -- the field
8  he was working.
9      Q.    Okay. Do you recall when it was you
10 first met -- well, first heard of and/or met Sherry
11 Freebery, his sister?
12     A.    Oh, gee. Sherry, well, Sherry was a
13 police officer, and so she began to -- I guess my
14 first time I would have been aware of Sherry was
15 probably a committee meeting at public works when she
16 began to attend those meetings because of the fact of
17 her status. I guess she was a major or captain, I
18 forget which; a major at that time.
19     Q.    So --
20     A.    She attended those meetings and she
21 had a role in public safety.
22     Q.    Okay. So you met them both in a
23 professional context in connection with county
24 government?

Page 17

1      A.    Sure.
2      Q.    Okay. Did there come a point in time
3  after the county government was reorganized that you
4  became aware that Joe Freebery had attained the
5  position of general manager of the Department of
6  Special Services?
7      A.    Sure, yes.
8      Q.    In your context as a member of county
9  council, did you have dealings with the Department of
10 Special Services when Joe Freebery was the general
11 manager?
12     A.    Yes.
13     Q.    Were you aware of the operations of
14 the Department of Special Services, how it was run,
15 what it was doing, that sort of thing?
16     A.    Somewhat. I was no specialist in it,
17 but yes.
18     Q.    By the way, was there a committee for
19 county council that dealt with the Department of
20 Special Services?
21     A.    Yes.
22     Q.    And what was that committee called?
23     A.    You are talking from council?
24     Q.    Yes.

Joseph R. Woods

6 (Pages 18 to 21)

Page 18

1    A.    Special services committee.
2    Q.    And who was the chairman of that
3    committee?
4    A.    I don't know if initially it was Bill
5    Tansey, but it was when I left.
6    Q.    Okay. Now, in terms of your exposure
7    to the Department of Special Services and your
8    understanding of how it operated, et cetera, were you
9    familiar with any specific projects that the
10   Department of Special Services was involved in that in
11   any way either influenced things in your district or
12   just sticks out in your mind?
13   A.    Sure, I would imagine all of us in
14   some fashion -- the biggest thing for me was my
15   district seemed to me was worse than any other
16   district in the county in terms of flooding issues.
17   So at least every time there seemed to be a major
18   flood, some portion of my district was
19   disproportionately affected. So I had occasion or
20   reason to have more contact with the special services
21   from that perspective than probably any other.
22   But as a result of our at least
23   monthly committee meetings of special services, we
24   discussed a number of things that affected the entire

Page 19

1    county. Probably more specifically, one of the things
2    we spent a lot of time on was sewer, septic and sewer
3    elimination and those types of things, septic
4    elimination.
5    Q.    Tell me about the septic tank
6    elimination, because that seems to have come up a few
7    times. What was the issue and how was special
8    services under Joe Freebery's stewardship involved in
9    that?
10   A.    Well, septic, I think the first
11   meeting when I got on county council in 1989 was on
12   septic elimination, my best recollection, because you
13   remember those initial things.
14   Q.    Switch from septics to sewers?
15   A.    Yes. There was a lot of discussion
16   about, you know, pollution and, you know,
17   proliferation of septic systems and all. And it took
18   a long, long time until the county finally started to
19   focus in on the fact that do we want to try to
20   eliminate septics or not allow more septics to be
21   installed. Difficult to remove those that were
22   already in place, but at least moving forward, with
23   the developments taking place in the county, let's
24   move toward a central sewer system.

Page 20

1    So that became a focus of a lot of
2    discussion in the special services
3    division/department, committee meetings, et cetera.
4    Septic elimination was a big issue because we had some
5    districts, some areas in some districts in the county
6    that were failing, and people needed some help and
7    assistance, and council members took that to heart and
8    focused on that issue.
9    Q.    In terms of that issue, did you ever
10   have occasion to have any exchanges or observe any
11   exchanges between Joe Freebery individually and other
12   members of the council --
13   A.    Sure.
14   Q.    -- at meetings or at hearings or
15   whatever?
16   A.    Oh, at meetings, at meetings it was a
17   constant -- pretty much a constant that those
18   questions always came up.
19   Q.    To your knowledge, was Mr. Freebery
20   engaged in that issue? Did he understand it?
21   A.    Yes, absolutely.
22   Q.    Did he present at those meetings
23   either sufficient information or his staff people
24   present sufficient information to council to enable

Page 21

1    council to do its job?
2    MS. ALLEN: Objection to form.
3    BY MR. LAWLESS:
4    Q.    You can answer.
5    A.    Yes, I think -- I believe so. It was
6    always very contentious and it was always a lot of
7    pros and cons on different directions that we could
8    go. So, you know, there was a lot of healthy debate.
9    Q.    You were the finance chair or the
10   chairman of the finance committee for county council
11   at one point?
12   A.    Yes.
13   Q.    When was that?
14   A.    Probably from about 19 -- I don't
15   remember the exact date, but I am going to say around
16   maybe 1993 to about 2003.
17   Q.    Am I correct --
18   A.    That was about ten years.
19   Q.    Okay. That must have been a fun job.
20   A.    Yes, it was.
21   Q.    Am I correct that as chairman of the
22   finance committee, you held hearings on the budgets
23   for all the departments of county government?
24   A.    Yes.

Joseph R. Woods

Page 22

1    Q.    And their proposed budgets and any
2    budget changes over the year, et cetera?
3    A.    Yes.
4    Q.    Without holding you to a specific
5    dollar amount, do you have a general recollection of
6    what the budget was of the Department of Special
7    Services when Joe Freebery was the general manager?
8    Again, ball park.
9    A.    Probably in the area of 30 million,
10   high 20's, low 30's, maybe 30 million.
11   Q.    Do you know what their operating
12   budget was?
13   A.    Well, that's what I would be referring
14   to basically.
15   Q.    Obviously, the records of the county
16   would kind of firm up that number either way, but
17   that's your recollection of it?
18   A.    Well, I recall that the police always
19   seemed to be the highest, and they were probably in
20   the $35 million. That's why I say around 30 million.
21   Q.    Were you also involved in budget
22   hearings before county government changed over, when
23   Joe Freebery was the superintendent of the Parks
24   Department?

Page 23

1    A.    Sure.
2    Q.    And was he present at those hearings
3    and would present or have his staff present the
4    budgets or the budget proposals to the county council?
5    A.    Always. That was always the practice
6    of the government.
7    Q.    Okay. Based upon your observations,
8    did Mr. Freebery appear to be knowledgeable and in
9    command of the budgetary requirements and requests and
10   needs of his department?
11   A.    Yes.
12   Q.    Do you know whether or not Joe
13   Freebery was involved at all when he was the general
14   manager of the Department of Special Services in
15   dealing with issues involving unions and county
16   employees?
17   A.    I am sure he was, yes. All the
18   directors somehow would get involved in that to some
19   degree if it affected their or someone in their
20   department.
21   Q.    Do you have any knowledge as to
22   whether or what his relationship was with the unions
23   and the county employees?
24   A.    Joe, having come from that background,

Page 24

1    had a good rapport with the union and the union
2    employees.
3    Q.    When did Christopher Coons become a
4    member of county council, if you remember?
5    A.    2000, the year 2000, I believe.
6    Q.    Just back up for a second. Do you
7    recall a project called the southern sewer project,
8    the southern sewer district?
9    A.    Will never forget it. Yes.
10   Q.    Why will you never forget it?
11   A.    Because it took years and years for
12   consensus to be reached by council about the cost and
13   the implementation, concerns with the community at
14   large, the development community. It was one of the
15   big-profile things in county government.
16   Q.    And do you recall or are you familiar
17   with the extent of Joe Freebery's involvement in the
18   southern sewer project and his dealings with council
19   in that regard?
20   A.    Yes. I mean, Joe obviously was
21   actively involved in that, because it became the
22   subject just almost of almost every meeting. You
23   would have to take some councilperson and say, "We are
24   not here to discuss that today. That's not on our

Page 25

1    agenda."
2         But it was a big focus for a long,
3    long time because when we finally had made the
4    decision that we were going to go with the sewer
5    system versus septic for what we felt, I think the
6    majority of council felt the public good, it was just
7    a matter of how we would implement it, how much was it
8    going to cost. And so it was lots and lots of time
9    devoted into that.
10   Q.    How much was that project? What was
11   the projected cost of that project; do you remember?
12   A.    Initially we started talking, it was
13   $100 million. I think it probably escalated, you
14   know, over the years as we planned for it. So in
15   excess of 100 million.
16   Q.    When you say over the years, when did
17   that project -- you might have just answered and I
18   might have just missed it. When did that project
19   start? When did that --
20   A.    The planning on it?
21   Q.    Yes.
22   A.    It probably started in my mind at
23   least the year 2000, maybe prior to that. We really
24   started to devote more and more time toward that goal.

Joseph R. Woods

8 (Pages 26 to 29)

| Page 26 |
|---|
| 1  Q.  Okay. But is it fair to say that it |
| 2  started at a point in time when Joe Freebery was the |
| 3  GM of the Department of Special Services? |
| 4  A.  It certainly escalated during that |
| 5  time. |
| 6  Q.  Did anybody on county council ever say |
| 7  or suggest to you that we need to get somebody in |
| 8  there other than Joe Freebery who can handle this |
| 9  because Joe Freebery can't handle running this kind of |
| 10  project? |
| 11  A.  I don't recall that ever being said, |
| 12  no. |
| 13  Q.  Was there any -- other than |
| 14  disagreeing on issues, was there ever any complaints |
| 15  or concerns voiced by any members of county council |
| 16  about what Joe Freebery was doing in the context of |
| 17  the southern sewer project? |
| 18  A.  I think there was some frustration by |
| 19  some members of council, but a couple in particular |
| 20  really come to mind. |
| 21  Q.  Who? |
| 22  A.  Chris Coons and Bob Weiner. |
| 23  Q.  And what was that frustration, if you |
| 24  can explain it? |

| Page 27 |
|---|
| 1  A.  Well, I think that, from my |
| 2  perspective, I think it was more generated from more a |
| 3  political view than an actual point of view of |
| 4  performance. But that was just my opinion at the |
| 5  time. |
| 6  Q.  Okay. When you say a political view, |
| 7  what would the political issue have been? |
| 8  A.  Well, I just think that there was some |
| 9  frustration that started to develop between those |
| 10  particular members of council and the fact that Joe |
| 11  was a general manager, Sherry was the CAO, and maybe |
| 12  just the potential tie-ins between those people's -- |
| 13  Q.  Okay. All right. |
| 14  A.  Relatives. |
| 15  Q.  Let me just back up a second. Would |
| 16  it be fair to say then that what you are describing in |
| 17  terms of the political friction, I guess, for want of |
| 18  a better word -- |
| 19  MS. ALLEN: Objection to form. |
| 20  BY MR. LAWLESS: |
| 21  Q.  -- was between Mr. Coons and the |
| 22  Gordon administration, specifically Sherry Freebery, |
| 23  on that issue, and Joe happened to be the chairman, |
| 24  the GM of that department? |

| Page 28 |
|---|
| 1  MS. ALLEN: Objection as to form. |
| 2  THE WITNESS: That's -- I think that's |
| 3  a fair description, yes. I would describe it as the |
| 4  same. |
| 5  BY MR. LAWLESS: |
| 6  Q.  Okay. Other than Mr. Coons -- by the |
| 7  way, just again in terms of the politics, what is |
| 8  Mr. Weiner's first name? |
| 9  Is it Weiner or Weiner? I don't want |
| 10  to mispronounce it. |
| 11  MS. ALLEN: Weiner, I believe. I |
| 12  believe it is Weiner. |
| 13  THE WITNESS: I always pronounced it |
| 14  Weiner because he was a whiner. |
| 15  BY MR. LAWLESS: |
| 16  Q.  Okay. In terms of your observations |
| 17  of council -- by the way, I hate to ask, but what is |
| 18  your political party? |
| 19  A.  Totally Democrat. |
| 20  Q.  And what was Sherry Freebery's |
| 21  political party? Democrat? |
| 22  A.  Democrat. |
| 23  Q.  Do you know what Joe Freebery was |
| 24  registered as a member? |

| Page 29 |
|---|
| 1  A.  I really don't know. |
| 2  Q.  You could guess. It would probably be |
| 3  an educated guess. |
| 4  A.  I assume he was a Democrat, but -- |
| 5  Q.  Yes. And Chris Coons is a Democrat? |
| 6  A.  Yes. |
| 7  Q.  Bob Weiner is a Democrat? |
| 8  A.  Republican. |
| 9  Q.  Republican. How did Mr. Weiner and |
| 10  Mr. Coons -- let me find a way to phrase this. Excuse |
| 11  me. Mr. Weiner, could you describe Mr. Weiner and |
| 12  Mr. Coons as political allies on some issues? |
| 13  MS. ALLEN: Objection to form. |
| 14  BY MR. LAWLESS: |
| 15  Q.  You can answer. |
| 16  A.  They seemed to become that way the |
| 17  last few years I was on the council. |
| 18  Q.  When you say the last few years, what |
| 19  were those years, the last few years? |
| 20  A.  '03, '04. |
| 21  Q.  Okay. Did there come a point in time |
| 22  in that period, '03, '04, when you became aware that |
| 23  Sherry Freebery was considering or had decided to run |
| 24  to succeed Tom Gordon as county executive? |

Joseph R. Woods

Page 30

1    A.    Sure. I was aware of that.
2    Q.    And was that around the same time,
3  '03, '04, as the alliance between Weiner and Coons
4  appeared to manifest itself at least to you?
5    A.    Close. It was pretty close in
6  proximity.
7    Q.    And during the first period -- the
8  first years that Mr. Coons was on county council, how
9  would you describe his relationship with the Gordon
10 administration?
11   A.    I think initially it was great. I
12 think there was a lot of cooperation, collaboration,
13 for the first year, year and a half maybe, and then
14 for some reason it seemed to deteriorate.
15   Q.    Do you recall something called the
16 Brandywine sewer project?
17   A.    Yes.
18   Q.    What was the Brandywine sewer project?
19   A.    Well, the northern part of the county,
20 the Brandywine sewer system I guess is the oldest
21 system in the county's system, and due to the fact it
22 was the oldest, it started to have problems:
23 deterioration, leaks. So there were -- I guess we
24 started to do smoke testing, looking for, you know --

Page 31

1  there was a lot of people in that area who had illegal
2  tie-ins, for example, that had storm water management
3  tied into the septic. And so in the process of trying
4  to determine how much cost would be involved and how
5  much of a project that we had to really go and pretty
6  much replace that which needed to be replaced, a lot
7  of time and effort got put into that process.
8    Q.    Go ahead and finish. I am sorry. I
9  didn't mean to interrupt.
10   A.    And it started to -- I guess at the
11 same time that we were talking about putting in a
12 brand new central sewer system in the southern part of
13 the county, all of a sudden we became aware that, yes,
14 we probably have infrastructure problems as well.
15 That became a focus of Councilman Weiner's at that
16 point, because that was pretty much his district where
17 those problems were prevalent.
18   Q.    Do you recall the approximate value or
19 cost of the Brandywine sewer project, what --
20   A.    I don't know if we had a handle on it
21 initially, but we were going to try to do it, I think,
22 in separate steps, if you will, and -- but it was
23 going to be costly, probably in the 50 to $80 million
24 range. I really don't have a figure in my head, but

Page 32

1  it was -- I don't think anybody had a clear idea
2  substantially what it was going to cost until we
3  really probed into it to see what the damages were and
4  so forth.
5    Q.    And am I correct that that project
6  would have been managed through the Department of
7  Special Services?
8    A.    Yes.
9    Q.    And that would have been done at a
10 time when Joe Freebery was the GM of the Department of
11 Special Services?
12   A.    I assume it would be, sure.
13   Q.    Sure. At that point or during the
14 period of time you were on council until you left,
15 while that project was still active, did anyone on
16 council ever complain about Joe Freebery's competence
17 in managing that kind of a project? Not disagreements
18 on the mechanisms. Did anybody just say, "This guy is
19 incompetent. He shouldn't be in that job because of
20 this"?
21   A.    You started to just hear some
22 innuendos and those types of things, I suppose, you
23 know, maybe at the end of a council hearing, a meeting
24 where special services or something of that nature,

Page 33

1  but only from those individuals I already mentioned.
2  I never really heard it from anyone else.
3    Q.    And that would be --
4    A.    And that's why I took it at face value
5  to be more political than substantial, you know,
6  substance.
7    Q.    And that would be Mr. Coons and
8  Mr. Weiner?
9    A.    Yes.
10        MR. LAWLESS: Can we take two minutes?
11        MS. ALLEN: Yes. I would appreciate
12 that.
13        (Recess taken.)
14 BY MR. LAWLESS:
15   Q.    Let me back up for a second if we can,
16 Mr. Woods, and ask you this. You had -- and if I am
17 misstating what you said, interrupt me. But you had
18 stated that the objections that came from Mr. Coons
19 and Mr. Weiner appeared to you to be more politically
20 based than factually based or that sort of thing in
21 terms of the projects.
22   A.    I took them that way.
23   Q.    Okay. And are you saying that it is
24 your belief, based on what you observed, that those --

Joseph R. Woods

10 (Pages 34 to 37)

Page 34

1  that political observation -- political opposition
2  directed to those projects in the Department of
3  Special Services and Joe Freebery was based on the
4  fact of who Joe Freebery was?
5       MS. ALLEN: Objection to form.
6       THE WITNESS: I believe so, yes.
7  BY MR. LAWLESS:
8       Q.   Okay. So if it had been somebody
9  other than Joe Freebery, while there might have been
10 objections or problems factually --
11      A.   There might have been less of an
12 objection and maybe a little more articulate or not as
13 just --
14      Q.   Because he was a Freebery?
15      MS. ALLEN: Objection to form.
16      THE WITNESS: That was my belief.
17 BY MR. LAWLESS:
18      Q.   Did that political opposition -- I
19 don't know if "animosity" is the right word -- or
20 challenges to projects of the Department of Special
21 Services increase or stay the same once it became
22 known that Sherry Freebery was going to run to succeed
23 Tom Gordon?
24      A.   It at least continued. Whether it

Page 35

1  escalated somewhat, probably that's a fair way of
2  characterizing it.
3       Q.   During the period of time that you
4  were a member of council, did you have dealings with,
5  other than Joe Freebery, with other employees of the
6  Department of Special Services?
7       A.   I am sure from time to time, yes, when
8  you had something specific and you were directed to
9  some particular person or engineer or whoever the case
10 may be.
11      Q.   During the whole period of time that
12 you were on county council, did any employee of the
13 Department of Special Services ever come to you and
14 complain about the way Joe Freebery was running the
15 department?
16      A.   Never.
17      Q.   Did you ever hear of that being done
18 from any other council members, that someone in the
19 Department of Special Services came to them and
20 complained about Joe Freebery?
21      A.   I can't say specifically, but my best
22 recollection would be that I may have heard something
23 said from one of those two individuals aforementioned,
24 just in complaints, you know.

Page 36

1       Q.   Coons and Weiner?
2       A.   Yes.
3       Q.   Okay. Do you know how many employees
4  there were in the Department of Special Services while
5  Joe Freebery was the general manager?
6       A.   I could take an educated guess on it.
7  I guess perhaps 280.
8       Q.   Could it be closer to 475?
9       A.   Yes, it could be. You know, I am
10 always thinking of police.
11      MS. ALLEN: Objection.
12      THE WITNESS: But special services, I
13 am trying to think what we merged in there and what
14 came under the auspices of that in terms of it. But,
15 you know, at first I was going to say 350, but I
16 thought maybe it wasn't quite that high.
17 BY MR. LAWLESS:
18      Q.   But it was a lot of people?
19      A.   Well, I was trying to think of
20 different -- you know, unions and the size of the
21 unions was more my graphic, but --
22      Q.   Did there come a point in time in 2002
23 when there was an attempt to change the law, taking
24 the general managers out from under the merit system

Page 37

1  and change that to their serving at the pleasure of
2  the county executive?
3       A.   Yes.
4       Q.   Okay. And do you recall -- what do
5  you recall about that? When did that occur? How did
6  it happen? What do you know about it?
7       A.   My best recollection is that it came
8  about -- we became aware of it when, you know, at some
9  point it was brought out that there were state
10 legislators that were pursuing that avenue. And I
11 want to say it certainly wasn't at the direction of
12 the council or the administration. It came from
13 somewhere else.
14      Q.   Do you know where it came from?
15      A.   In other words, it wasn't a vote of
16 council or anything. I am sure it came from probably
17 Chris Coons primarily.
18      Q.   Okay. How do you know that?
19      A.   I think he admitted to that in an open
20 meeting, a public meeting, when the issue may have
21 came forth, that he just felt that that was something
22 that needed to be changed.
23      Q.   Okay. Do you know at that point in
24 time, was that before or after it became known that

Joseph R. Woods

Page 38

1  Sherry Freebery was going to run to succeed Tom
2  Gordon?
3      A.    I am not --
4      Q.    Or did it coincide with it?
5      A.    It probably was around the same time.
6  I am not sure of the timeframe.
7      Q.    Do you know whether or not there was a
8  requirement in that timeframe for any changes in the
9  law affecting the structure of county government
10 having to be approved by or at least reviewed or
11 considered by county council before those changes were
12 proposed?
13     A.    I don't believe that came to us first.
14     Q.    So it could be done by anyone who
15 wanted to simply go to the legislature and suggest
16 they do it?
17     A.    Since it was a state, you know, the
18 state basically governed us, yes.
19     Q.    And when Mr. Coons discussed that in
20 an open meeting, was that the first time you had heard
21 about it being done by anyone from council?
22     A.    I believe it was, yes.
23     Q.    To your knowledge, other than
24 Mr. Coons -- well, I guess I asked you that question.

Page 39

1  Was Councilman Weiner involved in that as well, if you
2  know?
3      A.    I think he was, because it was a
4  legislator from up in his district, and I thought that
5  that was the connection.
6      Q.    Who was the legislator who proposed
7  it, if you know, the legislator from his district?
8      A.    I believe -- and I could be
9  misinformed on this. I think it was maybe Greg
10 Lavelle.
11     Q.    Do you know a fellow named Shawn
12 Tucker?
13     A.    Sure.
14     Q.    Was he involved in proposing that
15 legislative change or drafting the statute or lobbying
16 for it? Do you know if he was involved at all?
17     A.    Allegedly, he might have been, but I
18 have no visible confirmation of that in any fashion.
19 But very possibly. I think there were innuendos to
20 that.
21     Q.    Do you know why that was proposed, why
22 that change was proposed?
23     A.    I can only speculate.
24     Q.    Well, why don't you speculate, and we

Page 40

1  will put it in that context.
2      A.    Well, my speculation was that Chris
3  Coons expected to run for county executive and win,
4  and he did not want to be saddled with the fact that
5  he had to keep somebody around that he was -- you
6  know, that would have been unpleasant for him. He
7  wanted to have the ability to make those appointments
8  and not have those to be part of the merit system,
9  where they were protected.
10     Q.    Who was that person who it would have
11 been unpleasant for him to keep around?
12     A.    Joe Freebery, of course.
13     Q.    Am I correct that the description of
14 that change in law that was proposed, was that
15 referred to as the Joe Freebery Law or something like
16 that among members of county council?
17     A.    Probably.
18     Q.    Let me ask you a question, though, and
19 just in that context. Am I correct, based on what you
20 told us earlier about the structure of county
21 government, that a director for the Department of
22 Special Services could have been appointed at any time
23 to run the Department of Special Services over whoever
24 the general manager would have been? Is that correct?

Page 41

1      A.    That's correct.
2      Q.    Now, let me also ask you this. And
3  you probably are more familiar with the merit system
4  than I am. Is there anything about the merit
5  system -- well, strike that. Let me back up and see
6  if I can do this a little bit more clearly.
7          Am I correct that the merit system
8  protects someone's employment in the county? Is that
9  correct?
10     A.    That would be my understanding.
11     Q.    And that they can't be removed unless
12 it is for cause?
13     A.    Yes.
14     Q.    Does the merit system prevent that
15 employee from being moved laterally to another
16 position? For example, could someone be a director
17 and have the county executive change and the county
18 executive come in and say, "Okay, I am going to
19 appoint my own director. You are now just a member of
20 the Department of Special Services"? Could that be
21 done, if you know?
22     A.    I think it could be done, but I think
23 the only way it could be done is -- the pay raise was
24 a big deal. I think the pay had to remain the same or

Joseph R. Woods

12 (Pages 42 to 45)

Page 42

1  it had to be a lateral move in that respect.
2      Q.    Okay. And you may not be aware of
3  this, and if you are not, fine. But have you ever
4  been aware of any situation where something like that
5  has been done, not necessarily for a GM position, but
6  when a county executive or county administrative
7  officer came in and wanted to move someone out of one
8  position and put someone else there, where they were
9  moved laterally or given another position?
10     A.    Yes.
11     Q.    And that happened prior to Joe
12 Freebery --
13     A.    Yes.
14     Q.    -- being fired?
15     A.    Yes.
16     Q.    Do you know what the difference would
17 be between the pay of a general manager and someone
18 who was serving in a department who had equal time in
19 the county but just wasn't a GM, maybe just a member
20 of the department? What was the difference in pay?
21     A.    The general managers weren't always
22 the highest-paid person in a given division. I guess
23 we had, you know, like maybe a chief engineer probably
24 made more than the general manager. Again, you know,

Page 43

1  I don't know what that was based on, longevity, I
2  guess, things of that nature; as well as the fact that
3  the county executive obviously wasn't the highest-paid
4  person in the county, which we always thought was a
5  little disingenuous, kind of funny, but sure, yes.
6      But the general manager would be, you
7  know, relatively -- you know, certainly would have
8  been in the top three to five people, I guess. Maybe
9  like in the law department there would be attorneys
10 that would make -- well, there wasn't a general
11 manager of the law department. I guess that wasn't
12 his title, or I guess there was a general manager,
13 but -- so yes. But generally speaking, the general
14 managers were well paid.
15     Q.    Okay. But you don't really know what
16 the differential would have been?
17     A.    It wouldn't have been much of a
18 percentage. It could have been 5,000 or 10,000. You
19 know, it depends on your perspective.
20         I do recall looking at the budget and
21 seeing some people that made more money than general
22 managers, and, of course, they were engineering
23 degrees and things of that nature.
24     Q.    Okay. In terms of the other members

Page 44

1  of the Department of Special Services that were in
2  there when Joe Freebery was the GM, did you have
3  dealings with any of them?
4      A.    Yes, sure.
5      Q.    Can you give us the names of some of
6  those people?
7      A.    Special services, well, Tracy Surles
8  comes to mind.
9      Q.    By the way, Tracy Surles, what were
10 your dealings with her?
11     A.    We had -- well, I had a situation that
12 I was proactive in in getting prevailing wage
13 legislation passed in New Castle County. And after
14 that legislation got passed, a committee was
15 formulated with members of, you know, the construction
16 industry, the general public, special services, trying
17 to figure out how to implement that legislation.
18         And Joe chaired in the beginning,
19 initiated those meetings, and I think had a lot to do
20 with setting up the composition of it, and then Tracy
21 lent some expertise. I think she might have concluded
22 some of that in the end because of her legal
23 background. There was a lot of legalese that we were
24 involved in.

Page 45

1      Q.    Did you ever have any dealings with a
2  guy named Jon Husband?
3      A.    Yes, Jon, yes.
4      Q.    Your dealings with them were cordial,
5  amicable, professional?
6      MS. ALLEN: Objection.
7      THE WITNESS: Well, Jon originally was
8  in parks and recreation. He was a planner, and so I
9  knew him from that capacity. And Joe, of course,
10 attended. I mean, Jonathan always attended the -- I
11 guess he almost always attended special services
12 meetings when we were talking about parks and planning
13 and things of that nature.
14 BY MR. LAWLESS:
15     Q.    Did either of them at any time while
16 you were in county government ever come to you and
17 complain about anything having to do with Joe
18 Freebery?
19     A.    Never.
20     Q.    Are you aware of any other people that
21 Joe Freebery brought into the Department of Special
22 Services?
23     A.    You mean to committee meetings or
24 things of that nature?

Joseph R. Woods

Page 46

1  Q.    No. Just who he brought in to work in
2  his department. Was there ever any criticism of the
3  people he was hiring to work in the department or help
4  run the Department of Special Services?
5  A.    I don't recall. Another individual
6  comes to mind who was very involved, who was Dave
7  Hofer.
8        MS. ALLEN: I am sorry. Who?
9        THE WITNESS: Dave Hofer. I am trying
10 to think of names. Dave was very involved in the
11 sewer, septic elimination, things of that nature.
12 That was kind of his baby.
13 BY MR. LAWLESS:
14 Q.    Do you recall a gentleman named
15 Pryzwara? Am I pronouncing his name properly?
16 A.    Yes, Rich Pryzwara, yes.
17 Q.    And what position did he take, if any,
18 in the Department of Special Services after Joe
19 Freebery left?
20 A.    That was probably after I left
21 council, I think. But he became -- I think he became
22 general manager.
23 Q.    Okay. Do you ever recall anything
24 Mr. Pryzwara said about the organization or operation

Page 47

1  of that department when he took it over?
2  A.    Well, like I said, that was -- I was
3  probably gone at that point.
4  Q.    Okay. Getting back to I guess what
5  you had described as kind of the increased
6  political --
7  A.    Tension.
8  Q.    -- tensions that arose as we got
9  closer involved to the campaign, do you recall a point
10 in time when it became known that there was a grand
11 jury investigation being conducted of the Gordon
12 administration and specifically Tom Gordon and Sherry
13 Freebery?
14 A.    Yes.
15 Q.    And to your knowledge, at some point
16 did it come or did it become a topic of conversation
17 or debate in council regarding the payment of Tom
18 Gordon and Sherry Freebery's legal fees?
19 A.    Yes, it became a very contentious
20 debate --
21 Q.    When you say --
22 A.    -- or discussion.
23 Q.    When you say contentious debate --
24       MS. ALLEN: Objection as to relevance.

Page 48

1  BY MR. LAWLESS:
2  Q.    -- what was the issue regarding the
3  payment of legal fees for Gordon and Freebery by the
4  county?
5  A.    Well, there seemed to be an initiative
6  from Coons and Weiner to really, really focus in on
7  legal representation and who deserved it and why they
8  deserved it, and it became a really contentious --
9  there were people outside of county government who
10 were trying to influence the council into taking
11 certain directions as to, you know -- and my
12 perspective was a lot of people were prejudging.
13 Q.    To your knowledge, did the county have
14 an obligation to pay the legal fees of county
15 employees who were being investigated by or subpoenaed
16 by the grand jury that was conducting the
17 investigation?
18 A.    Yes, yes. It was always my belief
19 that anybody employed by the county should have been
20 protected and represented by the county.
21 Q.    Were there any other -- by the way,
22 when you are talking about debate, contentious debate,
23 would I be correct that the contentious debate was
24 that certain persons' legal fees should not be paid?

Page 49

1  A.    Yes.
2  Q.    And who were the people on county
3  council who took the position that certain people's
4  legal fees should not be paid?
5  A.    The two I originally mentioned were
6  pretty much the ringleaders of that discussion.
7  Q.    Mr. Weiner and Mr. Coons?
8  A.    Yes.
9  Q.    And whose legal fees did they argue
10 should not be paid by the county?
11       MS. ALLEN: Objection again as to
12 relevance with respect to anything with the legal
13 fees.
14       THE WITNESS: Sherry.
15 BY MR. LAWLESS:
16 Q.    And Tom Gordon, both of them, or just
17 was the focus on Sherry?
18 A.    Well, both, but it seemed like most of
19 the discussion centered on Sherry for some reason.
20 Q.    Do you think it might have had
21 anything to do with the fact that Sherry was thinking
22 of running for the position of county executive?
23 A.    I always thought --
24       MS. ALLEN: Objection to the form.

Joseph R. Woods

14 (Pages 50 to 53)

Page 50

1  BY MR. LAWLESS:
2      Q.    Go ahead.  You can answer the
3  question.
4      A.    I always thought for sure it had had
5  some -- you know, that that figured into the
6  discussion.
7      Q.    Was there any objection or question
8  raised by Councilman Coons -- at that point, by the
9  way, was he the president of county council?
10      A.    Yes, yes.
11      Q.    Was there any other objection raised
12  by Council President Coons regarding the payment of
13  legal fees for any other county employees that were
14  involved in the grand jury investigation?
15      A.    Yes, I believe it did.  It sort of
16  became the subject, and anybody, any and everybody
17  became under that blanket in a sense.  I do recall the
18  county attorney being part of that discussion.
19      Q.    During the period of time that you
20  were on council, did you ever hear Chris Coons say
21  anything about Joe Freebery in terms of him
22  personally, his performance, his public support of his
23  sister or anything like that?
24      A.    Not specifically but just, you know,

Page 51

1  just gestures, very short comments at the end of
2  meetings or things of that nature.  Nothing specific
3  at all to talk about competency.  It was just, you
4  know --
5      Q.    Never talked about competency?
6      A.    No.
7      Q.    Never said he was incompetent?
8      A.    No, I don't recall that, no.
9      Q.    Never heard Chris Coons say he
10  couldn't do the job, he wasn't qualified to be in his
11  position?
12      A.    No.
13      Q.    Ever hear Bob Weiner say that:  He
14  wasn't competent, couldn't do the job, wasn't
15  qualified to be in his position?
16      A.    I don't think so, but I know he wasn't
17  their favorite person to deal with, so the sentiments
18  seemed to be going in that direction.
19      Q.    Do you know if it had anything to do
20  with anything other than the fact his name was
21  Freebery?
22          MS. ALLEN:  Objection to form.
23          THE WITNESS:  I never assumed it was
24  anything other than just that.

Page 52

1  BY MR. LAWLESS:
2      Q.    After Chris Coons got elected county
3  executive, did you continue to be in a position or did
4  you leave county government at that point?  I am
5  sorry.
6      A.    I left before Chris Coons was
7  appointed county executive, before he took office.  I
8  left in November of 2004, two weeks after the
9  election.
10      Q.    Okay.  Had you ever had or did you
11  ever talk to Joe Freebery about his plans for his
12  future in terms of working for New Castle County?
13      A.    No.
14      Q.    You didn't know whether he planned to
15  stay on, leave, resign, make it a career, anything
16  like that?
17      A.    I assumed that Joe -- that was a
18  career position for him, that he had contended -- I
19  mean, his whole life had been spent in that
20  organization.
21      Q.    After the attempt to change the
22  position of general manager from a merit position to
23  serving at the pleasure of the county executive, let
24  me ask you, do you believe that that would have been a

Page 53

1  change for the better or a change for the worse?
2      A.    The worse.
3      Q.    Why was that?
4      A.    Because when the discussion first
5  began as to whether that was a good idea, we had that
6  discussion, public discussion at meetings, and I think
7  it was a consensus of the majority of council that
8  that was a good direction to take simply because, you
9  know, it kept some continuity, cohesion with the
10  government, and that people did not deserve to be
11  removed simply because, you know, a new person took
12  over.  If they were competent in doing their job, that
13  they should remain as such.
14      Q.    When the attempt was made to change
15  the law, do you know an individual by the name of
16  Carol Dulin?
17      A.    Yes, of course.
18      Q.    When the attempt was made to change
19  the law in 2002, what was Carol Dulin's position, if
20  any, with county council?
21      A.    I don't know if Carol -- I don't know
22  what her official position might have been, but -- I
23  probably shouldn't say.  I mean, I am not that
24  certain.

Joseph R. Woods

Page 54

1    Q.    Did she work in some way with council,
2    if you are aware?
3    A.    Well, she was drawn into everything
4    because she was, you know, the county council's
5    attorney, so people would go to her and ask for, you
6    know, what was your opinion on, things of that nature.
7    And I think her -- I really -- I probably shouldn't
8    say, because I am not certain I had that much
9    conversation with her about that issue.
10    Q.    Okay. I don't want you to guess.
11    When the change was made in county
12    government and the general managers were made merit
13    system-protected, prior to that, when you had the
14    directors in place who were serving at the pleasure of
15    the county executive, political appointees, would it
16    be a fair statement to say that even though those
17    directors were coming in and serving at the pleasure
18    of the county executive, that the people who were
19    actually running the departments on a day-to-day basis
20    were the merit system employees in the department?
21    Was that one of the reasons that change was made --
22    MS. ALLEN: Objection; leading, calls
23    for speculation.
24

Page 55

1    BY MR. LAWLESS:
2    Q.    -- to make them merit system-protected
3    and actually give them the title when they were doing
4    it practically speaking anyway?
5    MS. ALLEN: Objection; calls for
6    speculation.
7    THE WITNESS: I always assumed so,
8    yes.
9    BY MR. LAWLESS:
10    Q.    Why do you think Joe Freebery got
11    fired?
12    A.    Because of his name. Because he
13    supported his sister in running for county executive,
14    obviously.
15    MR. LAWLESS: Thank you. I have no
16    further questions.
17    (Discussion off the record.)
18    BY MS. ALLEN:
19    Q.    Councilman, I am going to have some
20    follow-up questions with respect to your testimony.
21    You had indicated that you had been -- had your
22    deposition taken before.
23    A.    Yes.
24    Q.    Can you tell me in what capacity and

Page 56

1    in what cases?
2    A.    I have given depositions as a member
3    of county council for various legal proceedings
4    against the county.
5    Q.    Do you know specifically what the
6    names of the cases were?
7    A.    The one that comes to mind was we did
8    a down-zoning of a subdivision way back when Phil
9    Cloutier was president of council, and we were sued by
10    one of our constant sue-ees, Frank Acierno.
11    Q.    Any other cases?
12    A.    In conjunction with investigation of
13    corruption on county council back in the early '90's,
14    I guess -- I don't know how to refer to it. The
15    Roberts debacle.
16    Q.    Was that deposition taken by the
17    Attorney General's office, if you recall?
18    A.    Then I think it was somebody from the
19    Attorney General's office, I believe, yes.
20    Q.    And it was taken in your capacity as a
21    county councilperson?
22    A.    Yes.
23    Q.    And were you represented by anybody at
24    that proceeding?

Page 57

1    A.    I am sure I was, but I just have to
2    think who was there at that time. I know it was an
3    attorney from the county probably. It wasn't you --
4    Q.    No.
5    A.    -- I don't think. No. I just don't
6    recall who it was. Someone was always present, I
7    think, with us.
8    Q.    Any other testimony that you have
9    given in a deposition?
10    A.    Other than those two cases, I think I
11    have given a deposition probably as a sheet metal
12    worker business agent for something, but I can't
13    recall specifics, what it was.
14    Q.    Okay. And what about testimony before
15    the grand jury that Mr. Lawless was referencing, the
16    investigation into Tom and Sherry?
17    A.    Yes, I think I was deposed once, yes,
18    I am quite sure.
19    Q.    Do you know by whom?
20    A.    I am not dead certain. If I could
21    think -- I know it was a fellow who used to work for
22    the FBI. I just can't recall his name, because I
23    remember chitchatting with him. And he passed away,
24    if I am not mistaken.

Joseph R. Woods

16 (Pages 58 to 61)

Page 58

1    MR. LAWLESS: Michele, if I could
2 interrupt, when you say "deposition" and you say "the
3 grand jury," were you actually in front of a grand
4 jury with people sitting there listening to you?
5    THE WITNESS: Oh, no.
6    MR. LAWLESS: It was just an
7 interview?
8    THE WITNESS: Yes.
9    MR. LAWLESS: Was there a court
10 reporter there or was it just an FBI interview?
11    THE WITNESS: Yes. That probably
12 wasn't an official deposition. I think it was just --
13 yes, you are correct. I think. I don't think there
14 was a court reporter. No, because it was done in my
15 office.
16 BY MS. ALLEN:
17    Q.    Was there legal counsel present?
18    A.    No, no.
19    Q.    Was legal counsel ever retained for
20 yourself by the county in conjunction with the grand
21 jury investigation?
22    A.    No.
23    Q.    And I believe that you said that you
24 resigned as councilperson in November 2004?

Page 59

1    A.    Correct.
2    Q.    And your reasoning?
3    A.    My mother had gotten ill. I had built
4 a home in lower Delaware and couldn't seem to pry my
5 wife away from it. She kept urging me to -- you know,
6 I had retired from my full-time job, if you will, as a
7 business agent and thought that the county council
8 position would be much easier to assume, and I didn't
9 find that quite worked into my plans, so that sort of
10 led to my, you know, my decision to finally retire.
11    Q.    Was there any investigation into your
12 residency with respect to being a councilperson?
13    A.    No.
14    Q.    When it switched over from directors
15 to general managers, there were acting general
16 managers before the legislation came into place; is
17 that correct?
18    A.    Yes.
19    Q.    And were those acting general managers
20 appointed?
21    A.    Yes.
22    Q.    And do you know whom they were
23 appointed by?
24    A.    They were appointed by the county

Page 60

1 executive with the -- also with the, I guess, the
2 approval of county council, although it wasn't
3 necessarily required. It was always an accepted
4 practice, I believe. It was still the county
5 executive's prerogative, but usually it was done with
6 kind of the approval of council.
7    Q.    When you say "kind of with the
8 approval of council," did it go for a vote?
9    A.    We would interview the potential
10 nominees and we would probably have some kind of a
11 vote, but I don't know if it had anything to do with
12 the rule of law, so to speak.
13    Q.    So for all of the acting general
14 managers that took the place, I guess, of directors,
15 they were interviewed by council?
16    A.    I am sure they were introduced and so
17 forth by council. I don't actually remember the exact
18 process.
19    Q.    Do you recall whether or not, once the
20 law creating the general manager positions was
21 changed, what the process was to put somebody in that
22 job permanently?
23    A.    I don't recall the formal process, to
24 be quite honest with you. After the government was

Page 61

1 reorganized, a lot of the people that were obviously
2 there were, you know, moved into those positions. I
3 guess some were eliminated, because we went from, I
4 think, 15 departments to, I guess, nine. So some
5 general managers were sort of moved into a lateral
6 position, I suppose.
7    Again, I think that they probably
8 couldn't have -- their pay raises probably weren't
9 cut, but they were maybe just demoted in a sense.
10    Q.    So would it be fair to say that if
11 somebody was appointed to the general manager
12 position, that when the law then became effective to
13 make those positions merit, that they were just then
14 made the general manager?
15    A.    I think that was the process.
16    Q.    You referred to, I guess, several
17 projects in special services: The southern sewer, the
18 septic tank elimination, and the Brandywine project.
19 Who generally would give the presentations during the
20 county council committee meetings with respect to
21 special services?
22    A.    Well, Joe would always -- Joe would
23 always chair the meeting, and he would have different
24 people with him. And when specifics about projects

Joseph R. Woods

Page 62

1  were questioned, then, you know, for example, if it
2  was an engineering, Dave Hofer, that was kind of his
3  baby, Dave would take that question. So there were
4  different areas of expertise but, you know, always
5  under Joe's guidance.
6      Q.    So he would not give the initial
7  presentation? He would more just chair the meeting?
8      A.    Sometimes he did the initial
9  presentation, too, as well; either/or.
10     Q.    Would you say that he was in
11 attendance -- what would you say his attendance was
12 with respect to the special services committee
13 meetings?
14     A.    It was very good.
15     Q.    You don't recall him being absent from
16 the meetings?
17     A.    I don't recall any issues with his
18 absence where it created problems that stick out in my
19 mind.
20     Q.    And you indicated, I believe, in your
21 prior testimony that you said Joe Freebery appeared to
22 be knowledgeable on these different issues. What do
23 you base that opinion on?
24     A.    By probably on the way he conducted

Page 63

1  himself at the meetings, in response to questions and
2  answers.
3      Q.    You indicated a lot through your
4  deposition that Chris Coons and Bob Weiner seemed to
5  be -- I thought you had said initially had problems
6  with Joe Freebery as general manager of special
7  services, but you believe it was for political reasons
8  as opposed to anything involving his work.
9      A.    Correct.
10     Q.    Can you be more specific as to what
11 led you to believe that?
12     A.    Probably just the line of questioning
13 sometimes or comments or frowns.
14     Q.    Let's start with the line of
15 questioning. Did you feel that the questions by Chris
16 Coons or Bob Weiner were inappropriate?
17     A.    No. I never thought questions --
18 questions were always appropriate. Sometimes it is
19 just the delivery.
20     Q.    Can you be more specific?
21     A.    I think there might have been
22 occasions where the questions were delivered in such a
23 fashion that they were derogatory. I don't know how
24 else to express it.

Page 64

1      Q.    Can you give an example?
2      A.    Well, just maybe someone would ask a
3  question, "Well, Joe, do you know?" you know, kind of
4  condescending.
5      Q.    When that type of question would come
6  up, did Joe seem to have an answer?
7      A.    I thought so, to my satisfaction, yes.
8      Q.    And did it seem to be to the
9  satisfaction of Chris or Bob?
10     A.    Generally.
11     Q.    Were there questions posed by Chris
12 Coons and Bob Weiner that Joe Freebery couldn't
13 answer?
14     A.    I would imagine that would go to every
15 department. But I don't think Joe was any different
16 than any other general manager.
17     Q.    Did Chris or Bob seem to have a
18 problem with any other of the general managers?
19     A.    None that really comes to mind, no.
20     Q.    Were there any comments --
21     A.    Exception.
22     Q.    Okay.
23     A.    After legalities seemed to escalate,
24 the general manager, if that's the correct title, of

Page 65

1  the law department, Eric Episcopo, seemed to get
2  some -- also that type of disrespect I guess is my
3  best word.
4          MR. LAWLESS: I am sorry. Could you
5  just read that back?
6          (The court reporter read back as
7  requested.)
8  BY MS. ALLEN:
9      Q.    You didn't hear anything with respect
10 to from Chris Coons and Bob Weiner, though, that it
11 had anything to do with who Joe Freebery was or who
12 Eric Episcopo was?
13     A.    I don't know if that ever was said
14 specifically, but it always just seemed to be the
15 underlying assumption.
16     Q.    And what leads you to that assumption?
17     A.    Again, just the way in which comments
18 or just general displeasure at an answer or the way
19 someone would show that they were unhappy with the
20 answer that they may have gotten or things of that
21 nature, just faces.
22     Q.    And I am clear and I think I
23 understand that it is your opinion and belief that
24 Chris and Bob were displeased and in that displeasure

Joseph R. Woods

18  (Pages 66 to 69)

Page 66

1   acted disrespectful and condescending in their tone to
2   Joe Freebery and at some times Eric Episcopo?
3        What I am trying to find out is you
4   are attributing that to be something I believe you
5   said political in nature or frustration with the
6   political, and I am just trying to figure out what
7   leads you to make that leap.
8        A.   Oh, I think myself and other members
9   of the council -- I am only here speaking for myself,
10  but I think there was a belief among council that
11  those particular individuals had an agenda, and the
12  agenda seemed to be those people that they judged in
13  their opinion had some reference of guilt in something
14  or association with something, and I think that led to
15  their mannerisms.
16       Q.   So then not politically related but
17  if -- and correct me again if I am misstating, but you
18  are saying then that the belief was that Joe Freebery
19  may have been involved in some illegality, and
20  therefore, that is why the tone was taken?
21       A.   No. I think it was simply the fact
22  that he was related to somebody that they believed
23  that about.
24       Q.   And my question is:  What makes you

Page 67

1   make that leap or that belief?
2        A.   Again, just the manner in which things
3   were said and, you know, utterances.  I can't be
4   specific about utterances, if that's your next
5   question.  But just the general undertone at meetings
6   from time to time would go in that direction as a
7   result of just displeasure with who was sitting at the
8   other end of the table answering questions, my
9   opinion.
10       Q.   But there was nothing political or no
11  utterances or statements made that connected the tone
12  of displeasure with the fact that it was Joe Freebery
13  and somebody else?
14       A.   I don't -- I am not sure if I
15  understand exactly the way you are asking it.  You
16  know, the fact of the matter was when legal issues
17  developed and indictments and the threat of
18  indictments seemed to permeate into the air, those two
19  individuals in council just kept that tone with every
20  committee meeting that we had where it would involve
21  somebody that they had some -- that had associations
22  with those people that were being in question.
23       I don't know how else to phrase it,
24  but the general thread of things deteriorated in that

Page 68

1   direction from those two individuals.
2        Q.   Were there other people other than Joe
3   Freebery and Eric Episcopo that you believed were
4   associated with the investigation?
5        A.   That's the only two that come to mind
6   for me in reference to general managers.
7        Q.   What about Charlie Baker?
8        A.   I think there was an element of time
9   when Charlie's name, but I don't think Charlie got
10  treated in that type of fashion.  I didn't recognize
11  that Charlie was one of those people that kind of felt
12  in the same quandary as Eric did or Joe because of his
13  relationship with the CAO.
14       Q.   And you would agree that this is pure
15  speculation and your belief that you are addressing
16  this from?  It is nothing that was said?
17       A.   Well, I can't be specific, but I am
18  just saying there was just that general undertone all
19  the time after that situation developed that was just
20  no -- there was no let-up.  There was constant -- just
21  a constant barrage of discontent permeated throughout
22  committee meetings when those individuals were
23  involved.
24       Q.   You had said previously that you had

Page 69

1   heard from Coons and Weiner that other employees of
2   special services had complained to them about Joe
3   Freebery.  Do you recall what those complaints were?
4        A.   You better rephrase that.  I am not
5   sure if I said that.
6        Q.   I thought the question was -- and
7   correct me if I am wrong.  Well, then I will ask it.
8        Did you ever hear complaints -- I
9   believe initially Mr. Lawless asked you did you ever
10  hear -- were you ever told of complaints of other
11  employees from special services about Joe Freebery and
12  you said no.  And then I thought the question was --
13  and maybe I misunderstood -- did you ever hear of any
14  complaints from employees, and --
15       A.   No, no, I never did, not unless you
16  count county councilmen as employees.
17       Q.   So did Coons and Weiner complain to
18  you about Joe Freebery?
19       A.   Not profusely, but I think they
20  probably did it less around me because I think they
21  felt that I wasn't somebody who would listen to that
22  kind of garbage.
23       Q.   Okay.  Did they complain at all to you
24  about Joe Freebery?

Joseph R. Woods

Page 70

1    A.    Well, I don't remember specifically,
2  but I think I recall, you know, after committee
3  meetings of special services that there would always
4  be some kind of displeasure with the way the tone of
5  the meeting might go simply because -- well, I
6  think -- I just think there was a whole lot of
7  discontent with special services because, again,
8  because Joe was the chairman. You know, he was the
9  general manager, and, you know, there is just --
10  discrediting Joe discredited the CAO. That's just the
11  way I took it.
12    Q.    And that is your opinion?
13    A.    It is an opinion.
14    Q.    And with the displeasure that Chris
15  Coons or Bob Weiner would have after these special
16  services meetings, did the displeasure seem to suggest
17  that they did not receive the answers that they had
18  wanted from the general manager of special services?
19    A.    I don't know if that would be exactly
20  specific, the answer. I just think that there was --
21  I think what I am more referring to is the simple fact
22  that they were looking for reasons to make complaints
23  and displeasure with the way meetings might have went,
24  but nothing as specific, because there were always

Page 71

1  meetings where you couldn't -- you know, you couldn't
2  come to a conclusion on an answer or a presentation,
3  that we were still in the throes of discussing a
4  certain piece of legislation or some action by the
5  special services committee and there wasn't consensus
6  yet. But they would express their displeasure with
7  what their beliefs were, which might have been
8  contrary to other members of council, including me.
9    Q.    So they did express displeasure for
10  the results of the meeting, either that there were no
11  answers or that there was not -- it was not
12  knowledgeable or --
13    A.    I just -- I can't say specifics,
14  again, but just because I wouldn't be able to cite
15  specifics. But I remember times where you would be
16  getting up from the table and somebody would just say,
17  "Eh, you know, what do we expect?" or things of that
18  nature. So it was never really specific but you knew
19  the tone of it, what it was intended to be.
20    Q.    I believe you had said previously that
21  you believe that it would be unpleasant to keep Joe
22  Freebery around. That's what Chris had felt or
23  something.
24        MR. LAWLESS: I am going to object to

Page 72

1  the characterization. But I think I know where you
2  are going. I just object to the characterization.
3  BY MS. ALLEN:
4    Q.    What led you to that belief?
5    A.    Well, I think, again, the general tone
6  of the way things progressed and, you know, we got
7  charged -- politics was in the air constantly at that
8  point with Chris running for county executive and, you
9  know -- so I think people believed that points would
10  be scored anytime that somebody could discredit the
11  administration or the general managers of the
12  administration that they had displeasure with. There
13  were political points to be scored.
14    Q.    And who was trying to score the
15  points? I am sorry. Was it Chris Coons when he was
16  acting as president, Bob Weiner, other council
17  members?
18    A.    I think it was Chris Coons acting, you
19  know, in his capacity and running as a candidate for
20  county executive, and Bob Weiner simply because Bob
21  Weiner expected to be around, and Bob Weiner, as was
22  his normal procedure, always coddled up to the county
23  executives from whatever party, the political party
24  they belonged to. And I think he had hitched his

Page 73

1  horse to that wagon.
2    Q.    Just so that I am clear, though, you
3  never heard any comments by Chris Coons that it would
4  be unpleasant for him to keep Joe Freebery around?
5    A.    No.
6    Q.    And I believe that you had said
7  that -- and I am not exactly clear if this is, I
8  guess, because you were not there at this time. The
9  attempt to change the general managers out of the
10  merit system in 2002, you had said you had heard that
11  referred to as the Joe Freebery Law or bill.
12    A.    I think it commonly got thrown around
13  to be that. Yes, that was probably the --
14    Q.    And do you know who specifically you
15  heard that from?
16    A.    No. Probably, you know, it was
17  probably stated by a number of people, but I couldn't
18  be very specific. You just heard those titles. It
19  could have even been aides to council people.
20    Q.    And you don't recall any specific
21  names?
22    A.    No. I wouldn't want to say. It could
23  have been --
24    Q.    Do you recall whether or not you

Joseph R. Woods

20 (Pages 74 to 77)

## Page 74

1  contacted any of the members of the General Assembly
2  to express either that you were for or against that
3  state law change?
4      A.    I didn't especially contact anyone,
5  although it might have been mentioned in conversation,
6  because I am friendly with members of the General
7  Assembly, some members of the General Assembly.
8      Q.    And what may you have said to them in
9  general terms?
10     A.    That I didn't think it was -- you
11 know, that we thought it was fine the way it was and
12 it didn't need to be -- it didn't need to be changed.
13     Q.    Was there a change in the legislation
14 regarding how the legal fees were paid and how legal
15 representation was determined while you were on
16 council?
17     A.    Yes.
18     Q.    And do you know whether or not you
19 voted for or against the change?
20     A.    I think we finally found consensus and
21 we supported everything, but it was always
22 contentious, the legislation, because once we got to
23 the legal -- we had it in the correct format to pass
24 muster and it eventually satisfied everyone on

## Page 75

1  council, the contentiousness just over those issues
2  continued because of not ordinances, those specific
3  ordinances, but the whereases and the whyfores leading
4  up to, you know, the basic ordinance always -- the
5  constant battles with the same two people over
6  putting, inserting language that was always
7  inflammatory toward the CAO.
8          MR. LAWLESS:  The CAO being whom?
9          THE WITNESS:  Sherry Freebery.  And
10 that became more the basis of the argument as opposed
11 to the substance of the ordinance as the whys and the
12 wherefores.
13 BY MS. ALLEN:
14     Q.    But the ordinance would apply wholly
15 to all county employees, not just the CAO; correct?
16     A.    I think it -- yes, I think it was a
17 complete change in policy for anyone that --
18     Q.    And you would agree that it would be
19 county council's obligation to make sure that the
20 person that the county was paying the legal fees
21 for -- strike that.
22          And I just want to get this timeframe
23 down.  When you resigned in November of 2004, Joe
24 Freebery was still the general manager of special

## Page 76

1  services?
2      A.    I believe so.
3      Q.    So you didn't see how Joe Freebery
4  performed as general manager of special services when
5  Chris Coons was county executive?
6      A.    No.  I wasn't present.
7      Q.    And you indicated that you believe
8  that Joe Freebery was fired because of his -- I assume
9  his last name?  Was that what you had stated?
10     A.    Absolutely.
11     Q.    And what leads you to believe that?
12     A.    Everything I testified to in this
13 deposition has led me to believe that that's exactly
14 why it was done.
15     Q.    Did you specifically hear from anyone
16 that that's why Joe Freebery was terminated?
17     A.    No, I had no reason to talk to anybody
18 after I left, and the termination was done after I
19 left.
20     Q.    Since Joe Freebery was terminated from
21 New Castle County, have you spoken to him -- I think
22 it was in April of 2005 -- from April of 2005 until
23 present?
24     A.    I spoke to Joe -- yes, I spoke to Joe

## Page 77

1  last March, because I was away in Florida, and I ran
2  into an old guy just out of the clear blue sky on
3  St. Patrick's Day who was a Notre Dame football coach,
4  and we got to talking and we got to talking, and he
5  amazed me with his recollection, because he was 82.
6          He said, "Where are you from?"  And I
7  said, "Oh, I am from Delaware."  And he said Bart
8  Matthew and Freebery were two football -- and it just
9  jumped right out at me.  And I said, "Well, yes."  And
10 I said, "As a matter of fact, Joe, I worked with Joe for
11 quite a while at New Castle County."
12         And so when I came back -- I hadn't
13 had his number with me in Florida.  When I came back,
14 I called to tell him about meeting this individual.  I
15 thought it was just some circumstance.
16     Q.    Have you talked to him at all
17 regarding this lawsuit?
18     A.    Joe only called to tell me that I
19 would get a call from Joe Lawless and what it was in
20 regard to.
21     Q.    After you resigned as county
22 councilman and Joe was still working for the county,
23 did he call you at all in the interim and say anything
24 to you?

Joseph R. Woods

Page 78

```
 1      A.    No.
 2      Q.    When were you contacted by
 3   Mr. Lawless?
 4      A.    Gee, I don't know what the timeframe
 5   was. It has been almost a year.
 6           MR. LAWLESS: Yes, yes.
 7   BY MS. ALLEN:
 8      Q.    And have you only spoken to him once?
 9   How many times have you spoken to Mr. Lawless?
10      A.    Once or twice, you know, when he
11   called and we were trying to set up a date, and I
12   said, well, I will be away in such and such a month.
13   and so -- up until just recently.
14      Q.    Did you discuss the litigation at all?
15      A.    With Joe?
16      Q.    With Joe Lawless.
17      A.    Just the format of the deposition in
18   terms of where we were going to be, what the
19   discussion would center around obviously, and just be
20   honest.
21      Q.    Did you ever tell Joe Freebery or Joe
22   Lawless that you believed Joe Freebery was terminated
23   because of his name and who who he was?
24      A.    I probably said that, because that's
```

Page 79

```
 1   why I would be willing to testify in his behalf.
 2      Q.    Do you recall when you may have said
 3   that?
 4      A.    Probably at the first -- probably at
 5   the first phone call from Joe, when he told me he was
 6   representing -- Joe Lawless, when he was representing
 7   Joe Freebery.
 8      Q.    Did you review any documents in
 9   preparation for your deposition here today?
10      A.    They are all -- they have all been put
11   in the shredder long ago or a Dumpster.
12      Q.    Careful.
13           MR. LAWLESS: Yes, shredder is a bad
14   word.
15           THE WITNESS: Yes, I shouldn't say
16   that.
17           I don't have any documents.
18   BY MS. ALLEN:
19      Q.    Have you talked to anybody else
20   regarding this litigation other than Joe Freebery or
21   Joe Lawless?
22      A.    Anybody with the county, for example?
23      Q.    Anybody at all.
24      A.    Oh, gee, I don't know. I might have
```

Page 80

```
 1   talked to a lot of people in terms of that just in
 2   casual conversation, but no, not that it was the topic
 3   of anything, you know.
 4           MS. ALLEN: I think that's all I have.
 5   Just give me one second.
 6           What is your -- strike that. I have
 7   nothing further.
 8   BY MR. LAWLESS:
 9      Q.    Mr. Woods, I just have a couple of
10   quick ones. When you talked to me and we talked about
11   you coming in to give a deposition, what did I tell
12   you to do?
13      A.    Be honest.
14      Q.    Did I tell you to say anything that
15   wasn't true?
16      A.    Absolutely not. Nor would I.
17      Q.    You say that Eric Episcopo got a
18   little bit of the same treatment you described being
19   given to Joe Freebery by Chris Coons. Do you recall
20   whether or not -- Eric Episcopo at that point was the
21   acting county attorney; is that correct?
22      A.    Yes.
23      Q.    Do you recall whether or not Eric
24   Episcopo started to get that treatment after he gave
```

Page 81

```
 1   an opinion that it was appropriate for the legal fees
 2   of the people under investigation to be paid by the
 3   county?
 4           MS. ALLEN: Objection; leading.
 5   BY MR. LAWLESS:
 6      Q.    Do you know if that's when that
 7   started with respect to Eric Episcopo?
 8      A.    I am sure that that escalated it at
 9   that point, if it hadn't already.
10      Q.    Do you know if Eric Episcopo is still
11   employed by the county?
12      A.    No, I don't. Is he? Am I allowed to
13   ask a question?
14      Q.    We will find that out down the road.
15           Now, you talked that there was a
16   little bit of heat towards Charlie Baker at some
17   point, but it wasn't as bad as towards Episcopo or Joe
18   Freebery.
19      A.    Yes, yes. I recall that.
20      Q.    Do you know whether or not Charlie
21   Baker was -- you said you were interviewed by the
22   grand jury in connection with the investigation. Do
23   you know if Charlie --
24      A.    Not the grand jury.
```

Joseph R. Woods

22 (Pages 82 to 85)

| Page 82 |
|---|
| 1    Q.    I am sorry. Do you know if Charlie<br>2  Baker was interviewed or was a witness before the<br>3  grand jury?<br>4    A.    I assumed he was. I don't know if I<br>5  had heard that from someone, that he might have been.<br>6    Q.    Okay. So you wouldn't know whether or<br>7  not he was going to testify against Tom Gordon and<br>8  Sherry Freebery in the criminal case, do you?<br>9    A.    No. Wait a minute. Wait a minute.<br>10  Let me back up a little bit now.<br>11         Charlie had come to council because he<br>12  started to get some legal -- yes, he had been, I<br>13  guess, interviewed or whatever, and he was concerned,<br>14  I think, about, you know, where he was going to be in<br>15  this process. I think he had --<br>16    Q.    Did he tell council that he had gotten<br>17  a target letter?<br>18    A.    What do you mean exactly "target<br>19  letter"?<br>20    Q.    It is just a phrase. If you have<br>21  never heard the phrase, that is fine.<br>22    A.    No. I have to think. I am trying to<br>23  recall. I don't know if he ever did. I think someone<br>24  else said that he had. |

| Page 84 |
|---|
| 1  when the official announcements were made, but yes.<br>2  They were certainly the same, pretty close to the same<br>3  timeframe.<br>4    Q.    Okay. Would it be fair to say that<br>5  any public opposition to the paying of legal fees for<br>6  Tom Gordon and Sherry Freebery or any public criticism<br>7  of Joe Freebery would be politically beneficial for<br>8  somebody who wanted to run for county executive and<br>9  oppose Sherry Freebery?<br>10         MS. ALLEN: Objection to form; calls<br>11  for speculation.<br>12  BY MR. LAWLESS:<br>13    Q.    You can answer the question.<br>14    A.    I think that was the belief of some,<br>15  of many.<br>16    Q.    Was it your belief?<br>17    A.    Yes.<br>18    Q.    Were there any other councilpersons<br>19  who shared that belief, to your knowledge?<br>20    A.    That felt the same as I did?<br>21    Q.    Yes, or believed the same as you just<br>22  told us.<br>23    A.    I would believe the majority of<br>24  council. |

| Page 83 |
|---|
| 1    Q.    Now, am I correct that -- do you know<br>2  how long Joe Freebery worked for the county before<br>3  Chris Coons became county executive?<br>4    A.    Well, if Chris came in in 2000, I am<br>5  sure Joe had been there since late '70's, middle<br>6  '70's.<br>7    Q.    He had been there something over 20<br>8  years?<br>9    A.    Twenty-five, yes, 20, 25 years, you<br>10  know. So do my math, at least 1980, I guess.<br>11    Q.    Okay. So 20 years?<br>12    A.    Yes.<br>13    Q.    And he was fired within two months of<br>14  Chris Coons becoming county executive; is that<br>15  correct?<br>16    A.    I don't know what the dates were. I<br>17  don't really know.<br>18    Q.    Do you recall whether or not Chris<br>19  Coons's criticism of the payment of legal fees for<br>20  Gordon and Freebery arose at about the same time Chris<br>21  Coons made it known that he was going to run for<br>22  county executive? Is that around the same time?<br>23    A.    I am sure that's a fair assumption.<br>24  In trying to look at the timeframes, I don't recall |

| Page 85 |
|---|
| 1    Q.    Is Bill Tansey on council?<br>2    A.    Is he or was he?<br>3    Q.    Bill Tansey, is he on council?<br>4    A.    Yes, he was.<br>5    Q.    Was he the chairman of the --<br>6    A.    Special services.<br>7    Q.    -- special services committee?<br>8    A.    Yes.<br>9    Q.    Let me ask another question. In your<br>10  experience as someone who has been around government<br>11  politics now for a pretty long period of time, just as<br>12  a general rule, do people who have a political agenda<br>13  come right out and say, "I am doing this because I<br>14  have a political agenda"?<br>15         MS. ALLEN: Objection; calls for<br>16  speculation.<br>17  BY MR. LAWLESS:<br>18    Q.    You can answer the question.<br>19    A.    No, they don't.<br>20    Q.    Would you consider Chris Coons a smart<br>21  fellow --<br>22    A.    Yes.<br>23    Q.    -- bright guy?<br>24         He is a lawyer, I think, isn't he? |

Joseph R. Woods

23 (Pages 86 to 88)

Page 86

1    A.    Yes.
2    Q.    Would you think that if Chris Coons
3    had a political agenda in his challenge to Joe
4    Freebery, he would have come right out and said it?
5           MS. ALLEN: Objection.
6           THE WITNESS: No, he wouldn't be that
7    foolish, I don't think.
8           MR. LAWLESS: That is all the
9    questions I have. Thank you.
10          You have the right, if you want to, to
11   read over your deposition and basically proofread it
12   to make sure it reflects what you said and then sign
13   it and get it back to us. Would you like to do that?
14          THE WITNESS: Yes, sure.
15          MR. LAWLESS: As soon as it is
16   prepared, I will get it to you, and you will be given
17   an errata sheet, and if there is any changes you have
18   to make, you can make them. Usually there aren't any,
19   but sometimes if a comma is in the wrong place or a
20   word is allied, you get to write down where your
21   corrections are.
22          THE WITNESS: Okay.
23          - - -
24          (Deposition concluded at 11:58 a.m.)

Page 87

1                    INDEX
2    WITNESS                    Page
3    JOSEPH R. WOODS
4       By Mr. Lawless--------------------    3
        By Ms. Allen--------------------    56
5       By Mr. Lawless--------------------   80
6          - - -
7       (There were no exhibits marked.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 88

1                 CERTIFICATE
2           I, LORRAINE B. MARINO, Registered
3    Diplomate Reporter and Notary Public, do hereby
4    certify that the witness, JOSEPH R. WOODS, after being
5    duly sworn by me, was examined by counsel for the
6    respective parties and the questions of said witness
7    and his answers were taken down by me in stenotype
8    notes and thereafter transcribed into typewriting at
9    my direction.
10          I certify that the foregoing is a true
11   and correct transcript of the testimony given at said
12   examination of said witness.
13          I further certify that the deposition
14   was made available to the witness for reading and
15   signing.
16          I further certify that I am not
17   counsel, attorney, or relative of either party, or
18   otherwise interested in the event of this suit.
19
20
21
22   Registered Diplomate Reporter and Notary Public
        Certificate No. 181PS/Exp.: Permanent
23
     Date: 1/26/08
24