# APPENDIX

# 3

Joseph J. Freebery

Page 50

10:23    1        Q    Did anybody tell you that general manager

        2 position, that was in the classified service, could

        3 not be removed from the classified service by

        4 legislation?

10:23    5        A    No.  To my knowledge, it had never been

        6 done so it wasn't even a question that I would have

        7 asked.

10:23    8        Q    Did you obtain any legal advice when you

        9 accepted the position of general manager as to its

        10 status?

10:23   11                   MR. LAWLESS:  I'm going to object.

        12 You can answer.

10:23   13                   To the extent you're asking for any

        14 kind of privileged communication or information --

10:23   15 BY MR. WIER:

10:23   16        Q    Did you seek legal advice as to your

        17 protection?

10:24   18        A    No.  I didn't see any reason to.

10:24   19        Q    In November of 2003, did you seek any

        20 legal advice as to your status?

10:24   21        A    I have talked to the County attorney, but

        22 I can't say when or what I even talked to him about

        23 now.

10:24   24        Q    And that would be in --

Joseph J. Freebery

Page 54

10:27  1                    MR. LAWLESS:  And when you say

       2 "this document," just so we're clear, Dick, that's

       3 Exhibit 4; right?

10:27  4                    MR. WIER:  That's Freebery 4.

10:27  5                    MR. LAWLESS:  Okay.

03:59  6 BY MR. WIER:

10:27  7         Q    And can you tell me your best

       8 recollection of what was said.

10:27  9         A    We went through the document and read it.

      10 And they said they wanted to clarify in everybody's

      11 mind, with this document, the rights of the merit

      12 system position that we occupied.

10:28 13         Q    Okay.  Was there any other discussion

      14 about this document?  Other than them reiterating

      15 what it says.

10:28 16         A    There were general questions from various

      17 members of the general managers back and forth, but I

      18 don't remember the specifics of them.

10:28 19         Q    You would agree with me that you

      20 understood, because the memo says this -- that state

      21 law could be changed?

10:28 22         A    Yes.

10:28 23         Q    Okay.

10:28 24         A    I didn't understand it until after Coons

Joseph J. Freebery

Page 55

1 went to Dover, but it became very clear after that.

10:28  2        Q    Well, the document itself, Freebery 4

3 says, of course someone could change state law,

4 doesn't it?

10:28  5        A    But I never thought about.

10:28  6        Q    But there's nothing unclear about that in

7 this document?

10:29  8              MR. LAWLESS:  I'll object -- no, go

9 ahead.  You can answer.  Object on the grounds it's

10 argumentative.

10:29  11             MR. WIER:  All right.  I'll

12 rephrase.

10:59  13 BY MR. WIER:

10:29  14       Q    You never thought about it.  But you were

15 told in November that someone could change the

16 statute; correct?

10:29  17       A    They made me aware of that possibility.

10:29  18             MR. WIER:  Okay.  Take a break?

10:29  19             MR. LAWLESS:  Sure.

10:31  20       (Brief recess.)

10:43  21             MR. WIER:  Back on the record.

22 We'll have Freebery 5.

10:43  23             (Document marked Freebery Exhibit 5

10:43  24             for identification.)

Joseph J. Freebery

Page 62

10:53  1        Q    Is that right?

10:53  2        A    I think, yes.

10:53  3        Q    Okay.  And then there was a general

4 election between September and November of '04; is

5 that right?

10:53  6        A    Yes.

10:53  7        Q    And then Mr. Coons was elected in

8 November.

10:53  9        A    Yes.

10:53 10        Q    And he was sworn in in January of '05.

10:53 11        A    Yes.

10:53 12        Q    And you were terminated in April of '05;

13 correct?

10:53 14        A    Yes.

10:53 15        Q    Okay.  So going back to this effort to

16 unionize, the genesis of that was that Mr. Coons, as

17 president of County Council, had sought legislation

18 in Dover to remove the general managers from the

19 merit system, in substance; is that right?

10:54 20        A    In substance, yes.

10:54 21        Q    And that was defeated, was it?

10:54 22        A    Yes.

10:54 23        Q    And was your -- did you go down and

24 oppose that legislation?

Joseph J. Freebery

Page 63

| 10:54 | 1 | A | I did. |

10:54  2      Q    Tell me --

10:54  3      A    I got -- I got down there after it had

4 passed the House.  But then it got held up in Senate.

10:54  5      Q    Tell me what your involvement was in

6 connection with opposing that legislation.  What did

7 you say or do?

10:54  8      A    Well, there really wasn't a whole lot to

9 it by the time I got down there.  It had passed the

10 House and it got bottled up in the Senate.  So there

11 really wasn't a whole lot for me to do.

10:54 12      Q    Well, okay.  So when you got down there,

13 did you speak with anyone in the Senate?

10:55 14      A    Probably.  I probably spoke to people

15 that I'm familiar with about the issues, yes.

10:55 16      Q    "The issues" being what?

10:55 17      A    The proposed legislation.

10:55 18      Q    Okay.  Do you remember who you spoke

19 with?

10:55 20      A    Not off the top of my head, no.

10:55 21      Q    Do you remember what you said?

10:55 22      A    Specifics, no.  I just remember that I

23 would have said that I'm against that and I would

24 appreciate them not supporting it.  But obviously, it

Corbett & Wilcox

Joseph J. Freebery

Page 85

1 about during the primary, during the general, up to

2 the time he took office, did you have any discussions

3 with Chris Coons about your position with respect to

4 in his administration?

11:22  5        A    No.  I was -- I thought I had a friendly

6 relationship with Chris.  I definitely had a

7 friendship with Annie, his wife.  I always thought I

8 was very businesslike and objective with Chris in all

9 my professional dealings with him.

11:22 10                    Had minor social dealings with him.

11 I was invited to their wedding.

11:23 12        Q    And he said nothing or did nothing to

13 indicate that --

11:23 14        A    Well, prior to the primary, I would have

15 thought it would have been inappropriate anyhow.

11:23 16        Q    Right.  Well, let's just deal with the

17 primary, the general.

11:23 18                    During that discussion, did Chris

19 Coons ever say anything to you that would indicate to

20 you that he didn't share your view?

11:23 21        A    He didn't share my view?

11:23 22        Q    That it was a friendly relationship --

11:23 23        A    No.

11:23 24        Q    -- that there's a mutual --

Joseph J. Freebery

Page 89

```
         1 Council; is that right?
11:27    2       A    Certainly.
11:27    3       Q    On occasion?
11:27    4       A    Yes.
11:27    5       Q    And was that in your capacity as
         6 superintendent of Parks?
11:27    7       A    General manager.
11:27    8       Q    Okay.  Was it in connection with your
         9 information as acting director?
11:27   10       A    Probably.  I don't specifically remember
        11 going in front of Council while I was acting, but
        12 it's -- it's possible that I did.
11:27   13       Q    Okay.  And based on whatever interaction
        14 you had in that capacity, he said nothing to indicate
        15 that he harbored any kind of ill will against you --
11:28   16       A    No.
11:28   17       Q    -- because of your relationship with
        18 Sherry Freebery or Tom Gordon?
11:28   19       A    No.
11:28   20       Q    And, in fact, he reiterated that in your
        21 first meeting with him after the election?
11:28   22       A    First one-on-one.
11:28   23       Q    Right.
11:28   24       A    I mean, since that time I would see him
```

Joseph J. Freebery

Page 90

1 at various -- an employee meeting that he had.  And

2 he would always come over, you know, and speak very

3 cordially or make a little joke.

11:28   4                    One time we had a nighttime meeting

5 with the public, and he went around the room,

6 introducing himself, this and that.  And when he came

7 to me, I stood up and said, "Congratulations, Boss."

11:28   8                    And he said, "Oh, you don't need to

9 call me boss."

11:28   10                    And I said, "It goes with the

11 territory."

11:28   12                    And he said, "Nah, don't treat me

13 like that."

11:28   14        Q    And when was that?

11:29   15        A    One of the early -- what do they call

16 them -- civic association -- civic meetings.

11:29   17        Q    Okay.

11:29   18        A    Another time we were having a big

19 employee meeting.  And he came walking over to me --

20 he was in a crowd going in the door, and he saw me

21 and he came walking over to me.  And he said, "You

22 never told me it was going to be like this."

11:29   23                    And I said, "I tried to tell you."

24 I said, "You got a better chance of getting to

Joseph J. Freebery

Page 91

1 Washington by being president, not by executive."

11:29   2        Q      And what did he say?

11:29   3        A      Just laughed.  "Too late now."

11:29   4        Q      So this was after the election?

11:29   5        A      Yes.

11:29   6        Q      Was all this prior to Dave Singleton

7 telling you that Chris was down in Dover or

8 subsequent to that?

11:29   9        A      Mostly subsequent.

11:29   10       Q      And there were similar comments after?

11:29   11       A      Uh-huh.

11:29   12       Q      So after the legislation was changed, he

13 also -- you felt you had a good working relationship

14 with him?

11:29   15       A      I did.

11:29   16       Q      After the legislation --

11:29   17       A      I worked my tail off for him.

11:29   18       Q      Yeah.  And after the election was --

19 after the legislation was passed, what comments or

20 discussions did you have with him about your

21 position?

11:30   22       A      Nothing.  Most of it came -- well, it

23 came from Singleton.

11:30   24       Q      Okay.  Now, up -- all right.

Joseph J. Freebery

Page 99

1 fill the other five positions, so it had to be

2 directed towards me.  And looking back at it, I was

3 the only one that was terminated.

11:39  4      Q    Now, what evidence do you have -- and

5 that's the sum and substance of your evidence that --

6 is that right?

11:39  7                   MR. LAWLESS:  That's his answer to

8 your question.

11:39  9 BY MR. WIER:

11:39 10      Q    Is that you believe -- well, do you have

11 any other evidence as to Chris Coons' motive in

12 terminating you?

11:39 13      A    Well, I can just point to the fact that

14 he said he was going to appoint the directors, and

15 then for some reason he decided to change and go over

16 merit system general managers.

11:40 17                   And then another debate of his, he

18 stated that -- when talking about the general

19 managers, he said, "For example, how would you like

20 to have Joe Freebery, Sherry's brother, as the head

21 of the largest department in New Castle County?"

11:40 22                   Obviously, a derogatory reference

23 to me -- and the relationship to Sherry, obviously.

11:40 24      Q    Now, when did he say this?

Joseph J. Freebery

Page 102

11:51  1                    MR. LAWLESS:  Allege?

11:51  2                    MR. WIER:  Uh-huh.

11:51  3                    MR. LAWLESS:  "Allege" is a legal

4 term.  Are you asking him if he ever said that to

5 anybody?

03:39  6 BY MR. WIER:

11:51  7        Q     Well, I don't want to assume that there's

8 a conversation.

11:51  9                    Did you ever allege to anyone, did

10 you ever say that you had a contract of employment?

11:51  11        A     I didn't think about it.

11:51  12        Q     So the answer to my question is no?

11:51  13        A     No, I didn't think about that aspect.  At

14 that point in time, I was merely trying to -- I was

15 still hoping that Chris was -- would obviously keep

16 me as a general manager.  And there was -- Singleton

17 said things like, Don't worry about it; we'll

18 evaluate you; you evaluate us, you know; we'll decide

19 what you -- you know, what you want to do.

11:52  20                    But -- that's just the kind of

21 discussions that went on.

11:52  22        Q     Let's try to focus on that.

11:52  23                    When Chris Coons took office, you

24 continued as a general manager of Special Services;

Joseph J. Freebery

Page 122

1 discussion that you were going to be terminated?

12:13    2        A    None.

12:13    3        Q    And there were no threats that you would

4 be fired, after HB29 was passed?

12:13    5        A    No.

12:13    6        Q    And the meeting -- the termination

7 meeting was held where and when?

12:14    8        A    In Chris Coons' executive office at

9 3 o'clock, April 6th.

12:14    10       Q    And who was there?

12:14    11       A    Chris Coons, Dave Singleton, and Rich

12 Pryzwara.

12:14    13       Q    And tell me what was said.

12:14    14       A    I don't remember all the details.  But I

15 walked in and I looked at this group, looked at their

16 faces, and went, Well, this is serious.

12:14    17                  Sat down, and they put three papers

18 in front of me, and said, You can sign the "I quit,"

19 you can sign the "I retire," or we're going to give

20 you the "you're terminated."

12:14    21                  I said, "I have no intentions of

22 quitting.  I'm certainly not going to retire.  I

23 intend to spend my entire career at the County."  I

24 said, "What's this all about?"

Joseph J. Freebery

Page 149

1 that Ms. Freebery was a target of the Grand Jury and

2 after her eventual indictment, you were privately

3 supportive of her.

01:47  4          Can you explain that.  Tell me

5 what, when and how.  Let's deal with your private

6 support, then deal with your public support.

01:47  7    A    I think she's innocent.

01:47  8    Q    No, no.  I need to know what your private

9 support was.  What did you say, what did you do, to

10 whom, how did you support her?  What does this mean,

11 that you were privately supportive?  I mean, just in

12 your own mind you were supportive?

01:47 13    A    No, I told her I thought she was

14 innocent.  I told her that I'm there for her.  I'm

15 her brother.  I'm --

01:48 16    Q    The private support were communications

17 you had with her?

01:48 18    A    Yes.

01:48 19    Q    Not with other people?

01:48 20    A    Well, I had conversations with other

21 people when they would ask me different things about

22 the primary.  Obviously, I supported her.  I still

23 thought she was the best candidate.

01:48 24    Q    Well, I'm really not talking about that.

Joseph J. Freebery

Page 163

1 sister."

02:00 2 BY MR. WIER:

02:00 3       Q    Tell me the factual basis for that
4 allegation.

02:00 5       A    I think what has happened to Sherry
6 and -- or Tommy and Sherry is a political smear.

02:00 7       Q    I didn't really ask you that.  I asked
8 you, what truthful public statements did you make?

02:00 9       A    I'm trying --

02:00 10      Q    I want to know what you made, not your
11 opinion.

02:00 12      A    I'm trying to get to that.

02:00 13             I maintained, and contrary to the
14 government's theory, that Sherry and Tommy committed
15 no crime.

02:00 16      Q    All right.  My question, sir, is this:
17 What, when, where and how did you make and what did
18 you say -- truthful public statements.  What did you
19 say, when did you say it, how did you say it, and to
20 whom did you say it?

02:01 21      A    I can't give you specific dates or times
22 or individuals.  It was just the position that I
23 always maintained whenever these discussions were
24 brought up.  I maintained Sherry's innocence and

Joseph J. Freebery

Page 167

02:04  1                    MR. WIER:  I mean her brother

       2 and --

02:04  3                    MR. LAWLESS:  Her as his sister.

02:04  4                    MR. WIER:  -- as his sister.

02:04  5 BY MR. WIER:

02:04  6        Q    Right?

02:04  7        A    Yes.

02:04  8        Q    Okay.  And you would make these comments

       9 to people that would ask?

02:04  10        A    Discussions that I would be in

       11 informally.  It depends on the situation.

02:04  12                    Did I go on a speaking tour, no.

       13 But if the discussion came up or people asked me what

       14 I thought or what my opinion was, I would tell them.

02:05  15        Q    And these questions would come in the

       16 context of not during work hours, I take it; is that

       17 right?

02:05  18        A    Not usually.  Sometimes somebody would

       19 say to me, "What's going on," or something like that,

       20 at work.  And I would just say, "Bunch of bullshit."

       21 Let it go.

02:05  22        Q    So that was basically your public support

       23 of her?

02:05  24        A    At work.

Joseph J. Freebery

Page 168

| | | | |
|---|---|---|---|
| 02:05 | 1 | Q | And how about outside of work? |
| 02:05 | 2 | A | It could be more in detail. |
| 02:05 | 3 | Q | Like what? |
| 02:05 | 4 | A | Sometimes people would want to go into |

5 more specifics of the particular charges or cases or

6 whatever.  And at the time, when I was more familiar

7 with them, I would sit down and explain, you know,

8 that there's another side to everything.

| | | | |
|---|---|---|---|
| 02:05 | 9 | Q | So you would explain her side? |
| 02:05 | 10 | A | Yes. |
| 02:05 | 11 | Q | Or just that there was a side? |
| 02:05 | 12 | A | Both. |
| 02:05 | 13 | Q | What was her side? |
| 02:05 | 14 | A | I don't remember the specifics of each |

15 case.  But as I remember going through them, that

16 each one of them I thought was wrong, that the

17 charges were false.

| | | | |
|---|---|---|---|
| 02:06 | 18 | Q | And you had your own -- I guess this was |

19 your opinion, as her brother; is that right?

| | | | |
|---|---|---|---|
| 02:06 | 20 | A | Yes. |
| 02:06 | 21 | Q | I mean, you were not the Grand Jury; |

22 correct?

| | | | |
|---|---|---|---|
| 02:06 | 23 | A | No. |
| 02:06 | 24 | Q | You were not a jury?  You were not |

Joseph J. Freebery

Page 200

02:53 1                              Prior to your termination, you were

2 not aware of any such comments; is that not correct?

02:53 3        A    No, I was not.

02:53 4        Q    Okay.  And so you didn't hear any of

5 them?

02:53 6        A    No.

02:53 7        Q    Okay.  Because you've told us that there

8 was a cordial relationship between you and Chris up

9 through April 6th of 2004?

02:53 10       A    I thought so.

02:53 11       Q    Okay.  So you were not aware, from any

12 source, that he had made any comments as alleged in

13 this paragraph; is that right?

02:53 14       A    What I was trying to say in this

15 paragraph was that, when I was terminated, Allison

16 Taylor Levine or Allison Levine Taylor -- I don't

17 remember what her exact name is -- not that there was

18 no room:  That Joe Freebery did not fit in the kind

19 of administration that was Chris -- that Chris Coons

20 was trying to create.

02:54 21       Q    Okay.  So the basis for this allegation

22 is that -- and in Paragraph 56, it says, "there would

23 be no room in his administration."

02:54 24                             What I'm unclear about is, you've

Joseph J. Freebery

Page 201

1 now told me that Allison Levine Taylor, said, after

2 you were terminated, that you did not fit.

02:54  3      A    Yes.

02:54  4      Q    So was there any -- is there any factual

5 basis for an allegation that Mr. Coons publicly and

6 privately, during the primary and general elections,

7 stated that should he be elected, there would be no

8 room for you?

02:55  9      A    This -- I meant to say that -- not during

10 the primary or general election.  I meant to say that

11 Allison Levine Taylor said Joe Freebery would not fit

12 into the administration of Chris Coons.  Based on --

13 what the hell was it -- accountability, openness,

14 professionalism and leadership.

02:55 15      Q    All right.  Let me just try to

16 understand.  During the election --

02:55 17      A    No.  This was said at my termination.

02:55 18      Q    Okay.  But this paragraph says that Coons

19 publicly and privately stated certain things during

20 the campaign.

02:56 21            So there's no factual basis -- you

22 can't give me any facts to support that allegation?

02:56 23      A    Did I hear him say it?  No.

02:56 24      Q    Well, did anyone tell you he said it?

Joseph J. Freebery

Page 202

02:56   1        A    I took it from Allison Levine Taylor's

        2 statement that it came from Chris Coons.

02:56   3        Q    I'm talking about during the campaign.

02:56   4        A    I said that.  That was -- that was wrong.

02:56   5        Q    Okay.  This is wrong?

02:56   6        A    It should have been at my termination.

02:56   7        Q    Okay.  So Paragraph 56 and

        8 Paragraph 57 -- let's talk about Paragraph 56.

02:56   9             Paragraph 56 is inaccurate; is that

        10 right?  In terms of what you know.

02:56   11       A    I should have been more direct in terms

        12 of quoting Allison.  Did not mean to put "primary"

        13 and "general election" in there.  But the "no room"

        14 should have been "did not fit."

02:57   15       Q    And "should he be elected," that wasn't

        16 said either?

02:57   17       A    No.  This was a post statement, not --

02:57   18       Q    All right.  Are you aware of any other

        19 statements by Chris Coons, other than what you

        20 attribute to Allison Taylor Levine, as it relates to

        21 you?

02:57   22       A    Just that from Tom Balascio, who was

        23 supposed to be a good friend of his or close to him,

        24 that, you know, you were fine, you were safe, Chris

Joseph J. Freebery

Page 203

1 is going to keep you.

02:57  2    Q    Okay.  Well, paragraph -- so have we

3 established that after Chris was elected and prior to

4 his election, he did not make any statements as to

5 your role in his administration, to your knowledge?

02:58  6    A    No.  I just took it upon -- I just took

7 Allison Taylor Levine's statement as representing

8 Chris' wishes.

02:58  9    Q    After you were terminated?

02:58  10    A    Yes.

02:58  11    Q    While you were being let go?

02:58  12    A    Yes.

02:58  13    Q    Okay.  Now, Paragraph 57, what are the

14 facts -- it says that "Defendant Coons and/or

15 authorized agents/representatives of Defendant Coons

16 stated publicly and privately, during both the

17 primary and general elections, that Coons intended to

18 run an administration, quote, of free of corruption,

19 end quote, and that there would be, quote, no room,

20 end quote, for, quote, someone like Freebery, end

21 quote, in any Coons administration."

02:58  22              What's the factual basis for that?

23 Is this again the Allison Levine statement?

02:58  24    A    You know, I'm not sure.  I don't

Joseph J. Freebery

Page 207

03:03  1                    MR. WIER:  Okay.  That's at 10?

03:03  2                    MR. LAWLESS:  Yes.

03:03  3 BY MR. WIER:

03:03  4        Q    Is that what you're referring to,

       5 Mr. Freebery?

03:03  6        A    Yes.

03:03  7        Q    Any other statements that you allege

       8 Mr. Coons made about you?

03:03  9        A    I can't remember.

03:03 10        Q    Okay.  Where does it say that there would

      11 be no room for someone like Joe Freebery in his

      12 administration?

03:04 13        A    Well, what I was talking about was --

03:04 14        Q    Well, can you answer that question first?

03:04 15        A    No, I can't specifically.

03:04 16        Q    It's not in here, is it?

03:04 17        A    No.

03:04 18        Q    Is there any statement in here that links

      19 you with an administration, quote, free of

      20 corruption?

03:04 21        A    Links me?

03:04 22        Q    Yeah.

03:04 23        A    No.

03:04 24        Q    So what's the factual basis for the

Joseph J. Freebery

Page 208

       1  allegation in Paragraph 57, if any?

03:04   2      A   Well, to me the inference is "free of

       3  corruption" was a statement that Chris used to

       4  describe his administration going forward.  And the

       5  fact that I was separated says to me that I'm a

       6  corrupt individual.

03:04   7      Q   So during the campaign, he said he

       8  wanted -- he made statements that he wanted an

       9  administration free of corruption?

03:05  10      A   Yes.

03:05  11      Q   But you're not alleging that he said --

     12  he's tied you into that?

03:05  13      A   Not directly.  Not specifically.

03:05  14      Q   The allegation, as I understand it -- and

     15  I don't want to put words in your mouth.  But your

     16  allegation is he made those statements back during

     17  the campaign; is that right?

03:05  18      A   Yes.

03:05  19      Q   And that therefore, when you were let go,

     20  you thought -- it's your belief that there was,

     21  therefore, a connection?

03:05  22      A   It's my belief that that's what I

     23  believed, and that's what people told me they had the

     24  impression of what had happened.

Joseph J. Freebery

Page 227

```
03:30    1        A    Yes.

03:30    2        Q    Okay.  So I'll reserve the right to ask

         3   you questions later on about those.

03:30    4        A    Sure.

03:30    5             MR. LAWLESS:  And, Dick, just so

         6   it's clear on the record, when I get them copied,

         7   I'll give you copies of them.

03:31    8             MR. WIER:  Sure.

03:31    9             THE WITNESS:  I'm sorry.  I

        10   remembered the other one.  The other one is Allison

        11   Levine Taylor when she was talking to Jerry Fulchur

        12   on the radio.

03:31   13   BY MR. WIER:

03:31   14        Q    Okay.  Tell me what is said on those

        15   tapes that you consider improper.

03:31   16        A    Well, Allison said, "Chris wants to

        17   create an open, professional, ethical government with

        18   great leadership, and Joe Freebery is just not a

        19   fit."

03:31   20             That's a fairly accurate quote.  It

        21   might be one word off.

03:31   22        Q    And that was made in connection -- with

        23   what?  Was it a phone call to Jerry Fulchur, did you

        24   say?
```

Joseph J. Freebery

Page 228

03:31 1      A    It was a radio show.  And Allison Levine,

2 I guess, was asked to call in.

03:32 3      Q    Whose radio show was it?

03:32 4      A    WDEL.  The Rick and Jerry show.

03:32 5      Q    Jerry Fulchur?

03:32 6      A    Jerry Fulchur.

03:32 7      Q    Okay.  And the tape is of her calling in

8 and saying this to Mr. Fulchur?

03:32 9      A    And the conversation back and forth.

03:32 10     Q    And what was the -- anything else in that

11 statement that was improper?

03:32 12     A    Just Fulchur talking about me getting my

13 position politically and --

03:32 14     Q    That's Fulchur saying that?

03:32 15     A    Yes.

03:32 16     Q    Have you sued Fulchur in this lawsuit?

03:32 17     A    No.

03:32 18     Q    Okay.  What evidence do you have that

19 Mr. Coons was part of that statement?  That he

20 authorized it or that she was quoting the --

03:33 21     A    She was his -- she was his media person.

22 She was speaking for the administration.

03:33 23     Q    Okay.  Anything else on those tapes that

24 you consider improper?

Joseph J. Freebery

Page 229

03:33   1       A     I can't remember anything.

03:33   2       Q     Well, how about -- we have the radio show

        3 and then we have a debate.

03:33   4       A     Ingleside.

03:33   5       Q     What was said in the debate that you

        6 remember?

03:33   7       A     It was Chris saying that he intended to

        8 keep the general managers and then put directors over

        9 the top of them.  And then later on in the show, when

        10 they were talking back and forth, he started to

        11 explain, How would you like to have Job Freebery,

        12 Sherry's brother, as the head of the largest

        13 department in the County?

03:34   14              MR. LAWLESS:  I'm sorry.  Was that

        15 a show or a debate, did you say?  Was it a debate or

        16 a show?

03:34   17              MR. WIER:  It was the Ingleside

        18 debate.

03:34   19              THE WITNESS:  I'm sorry.  It was

        20 the debate.

03:34   21 BY MR. WIER:

03:34   22       Q     And what did Sherry say, if anything?

03:34   23              MR. LAWLESS:  In response to what

        24 Coons said?

Joseph J. Freebery

Page 231

03:35  1       Q    Did you have any discussions with Chris

2 Coons about that bill?

03:35  3       A    I did.

03:35  4       Q    Did you do that in Dover?

03:35  5       A    I did.

03:35  6       Q    Who was present?

03:35  7       A    Again, I thought it was Ron Morris, John

8 Wayne Merritt, Jim Sapp, Diane Baker.  There was a

9 group of us.

03:35 10              And we saw -- after everything was

11 done, you know, we saw Chris walking up the side of

12 Legislative Hall.  And we went out to talk to him and

13 said, "What are you doing?  What's going on?"  He

14 started to hem and haw and this and that.

03:36 15              I said, "Chris, let me ask you just

16 one question:  If this legislation had've passed,

17 what would my job be?"

03:36 18              He said, "You would still be the

19 general manager Special Services."

03:36 20              And I said then, "I don't

21 understand," and I just let it go at that.

03:36 22       Q    Well, at the time, you were general

23 manager of Special Services?

03:36 24       A    Yes.

Corbett & Wilcox

Joseph J. Freebery

Page 255

04:13    1        Q      Paragraph 113, the speech that you allege

         2  is the speech that you've discussed?  That is --

04:13    3        A      Yes.

04:13    4        Q      -- supporting your sister?

04:13    5        A      Yes.

04:14    6        Q      Were you in a policy-making position as a

         7  general manager in charge of a half-a-billion-dollar

         8  department?

04:14    9        A      I certainly recommended policy to the

         10  administration.

04:14   11        Q      And made decisions?

04:14   12        A      Yes.

04:14   13        Q      Implemented those decisions?

04:14   14        A      Yes.

04:14   15        Q      And you served -- when you were general

         16  manager, you served and reported directly to the

         17  County Executive?

04:14   18        A      Directly was to the CAO.

04:15   19        Q      And that was the next highest position in

         20  the County below the County Exec?

04:15   21        A      Yes.  The -- even the directors reported

         22  to the CAO.

04:15   23        Q      Were there directors after you were

         24  general manager?

Joseph J. Freebery

Page 257

1 services.

04:16   2        Q    You're in charge of the County buildings,

3 parklands, the fleet --

04:16   4        A    Buildings, grounds, fleet, sewers, pump

5 stations, treatment plants, County property,

6 inventory.  Basically the infrastructure that was

7 owned by the taxpayers

04:16   8        Q    Including the funding for libraries and

9 those types of things?

04:16   10       A    We did all the capital programming.  We

11 budgeted and designed and built and obviously

12 maintained all County buildings.

04:16   13       Q    And that was all under your --

04:16   14       A    Yes.

04:16   15       Q    -- jurisdiction?

04:16   16       A    Yes.

04:16   17       Q    And you suggested improvements and

18 responded to those kinds of issues to the County Exec

19 and the CAO?

04:16   20       A    Say again.

04:16   21       Q    You responded on issues relating to all

22 of that -- on policy decisions with respect to the

23 County Exec and the CAO?

04:17   24       A    Yes.  When you talk about policy

Joseph J. Freebery

Page 293

04:57  1        Q    Interrogatory No. 3, Plaintiff recalls
       2 discussing his firing with his wife, daughter,
       3 sister, Sherry Freebery.
04:58  4             You only have one sister?
04:58  5        A    No, I have three.
04:58  6        Q    Did you discuss it with any of your other
       7 sisters?
04:58  8        A    No.  One is in California, and the other
       9 one is still employed by the County, and I wouldn't
       10 talk to her about it.
04:58  11       Q    When did you discuss your firing with
       12 your sister and what was said?
04:58  13       A    It -- just about the case and, you know,
       14 periodically it comes up in conversation and we talk
       15 about it.  Nothing specific.  Where are you now, what
       16 are you doing.
04:58  17       Q    Okay.  How about with your daughter?
       18 What's her name?  Kristen?
04:58  19       A    Kristen.
04:58  20       Q    Where does she work?
04:58  21       A    She doesn't.
04:58  22       Q    Is she a lawyer?
04:58  23       A    Hopefully someday.
04:58  24       Q    Well, I mean, did she work in the County?

Joseph J. Freebery

Page 309

1    supposed to work on the timely basis that it was set up,

2    the information would come back.  Sometimes there were

3    pieces that I had to put together in response.  Sometimes

4    I would write the -- an e-mail, or write the response and

5    it was a "see attached" and we would combine, you know,

6    the information that had been given to us.  And sometimes

7    it would go through Tracy Surles and Wayne Merritt and

8    would come back under their signature, and we would send

9    it over to them.

10                   I mean, there was never any effort to

11   give anybody the impression that I was writing every word

12   in all these responses.

13        Q.    Okay.  After your separation from the County,

14   did you ask for any type of hearing or grievance

15   procedure?

16        A.    That's interesting.  I was -- at that point in

17   time, I immediately sought counsel.  At the same time, I

18   was being told that I am, or I was being told when I was

19   at the County that I'm being -- that I am now nonunion, I

20   am unclassified.

21                   There isn't a hearing associated with

22   that.  Had I been under the merit system, or had I --

23   normally under the merit system you do have a hearing

24   process, even though you are considered nonunion.  And I

Joseph J. Freebery

Page 310

1  would have availed myself to that.  But when they

2  classified me nonunion, there is no appeal process.

3      Q.  Okay.  When you left the County, how much were

4  you making as the general manager of special services?

5      A.  You know, I'm not really sure of that, but I

6  want to say 135 sounds like that.

7      Q.  And do you recall what the County Executive

8  was making at the time?

9      A.  No, I don't.

10      Q.  Do you recall what the Chief Administrative

11  Officer was making?

12      A.  No, I don't.

13      Q.  Do you recall whether or not your position was

14  the highest paid general manager's position?

15      A.  No.

16      Q.  No, it was not?

17      A.  No.  The Chief of Police was the same as mine.

18  The director of -- or the general manager of finance was

19  the same as mine.  Might have been somebody else, but I'm

20  not sure of that.

21      Q.  Do you know whether or not that salary was

22  higher than the County Executive's and the Chief

23  Administrative Officer's?

24      A.  No, I don't.  But I thought I worked harder,

Joseph J. Freebery

Page 324

1  people in McDonald's that I had to terminate at the

2  County, and it's like they're standing there going "hmm,

3  hmm, hmm, hmm, hmm."  That's me laughing.  That's hard.

4  That's awkward.  It's like they're laughing at the

5  situation that, you know, you got fired, too.

6              I had to -- there were jobs that I had

7  to apply for that I knew I didn't have a chance to get

8  because they did work for the County, and there is no way

9  they were going to take a chance on me.  There were even

10  situations where I was on the verge of applying to

11  companies that I had to rule against in the County in

12  contracts that they had in the County, and cost them

13  thousands and thousands of dollars in settlement.  I was

14  dealing -- looking at developers, trying to find a

15  position, that I had to turn down for sewer capacity,

16  because engineeringly their project didn't fit, didn't

17  work.  That's awkward.  That's awkward.

18              My daughter comes back, she's out

19  applying for a job, she walks into an employment agency,

20  and she's working with this one woman, and she says to

21  Kristen, take your name off the top of your letterhead.

22  Kristen said, why?  She said, because you don't want to

23  be associated with that Sherry Freebery.

24              Kristen was devastated.  She got up and

Joseph J. Freebery

Page 330

1      A.   No, no.  I certainly would go to work for

2   anybody, and if they had County contracts.  That would be

3   fine with me.

4                I didn't want to put anybody in a

5   situation of losing contracts because I was working for

6   them.

7      Q.   Okay.  What gives you that impression, that if

8   you went to work for somebody, that they would not get a

9   County contract?

10     A.   What gives me that impression?

11     Q.   Yes.

12     A.   Well, a lot of professional contracts are

13  subjective in their selection process.  And my guess is

14  that if I was employed by somebody, that that selection

15  process might be very selective.

16     Q.   So nothing other than just your guess?

17     A.   Well, I did see, when I first was there, I saw

18  them -- Batta had a contract for the drainage project,

19  $17 million drainage project that was early on in the

20  Coons administration, and Duffield Associates had a

21  similar contract, but to do other work associated with

22  it.  And in the very first meeting, with no rhyme or

23  reason, Singleton reversed it.

24     Q.   Reversed the contract?

Joseph J. Freebery

Page 337

1    go back to the other one.

2                    In our budget, at one point in time,

3    police -- who was it?  Police and special services, and I

4    don't know whether there was a third department or not,

5    helped fund three people or two people at the front desk.

6    And the theory was, you know, they are representatives of

7    the government.  You know, we should be paying our fair

8    share.  People were coming there to do County business.

9    And so some of those people at one point in time might

10   have been executive assistants, I don't know.  But we

11   funded it, or share funded.

12       Q.   Okay.  Now, with respect to you participated

13   in the recommendation for discipline and for terminations

14   of your employees?

15       A.   Usually after there was an employee that had a

16   series of infractions, if they moved up the steps of

17   discipline, it might -- it might ultimately get to the

18   point of there is nothing we can do to salvage this

19   employee.  There is nothing the employee is willing to do

20   to help improve his performance, or whatever it is that

21   we were concerned about.  That ultimately we, as a

22   department, would make, and I as the general manager

23   would make a recommendation to the Personnel Department

24   that someone be suspended and/or terminated.

Joseph J. Freebery

Page 338

1            Then a meeting was set up.  If it was

2   for termination, a meeting would be set up and, you know,

3   the pros and cons of the situation would be viewed, and

4   then the personnel director or chief human resources

5   officer would make the final decision, I'm sure with

6   input from the CAO or the County Executive.

7            And then after that happened, if the

8   person was union, they would file a grievance, and the

9   steps in the grievance would proceed again, which the

10  first -- the second step would be -- I think in

11  termination the first step was with the CAO and the human

12  resource officer.  And then, depending on what union it

13  was or what time in the chronology of the County's labor

14  transitions, whether it was an outside hearing officer.

15  Sometimes it was.  Other times it was a different form.

16  And then ultimately an arbitration would be held, and

17  then an arbiter would rule one way or the other.

18            That's if you were in the union.

19            If you were in the merit system, but not

20  in the union, you would go through the merit system

21  process and go in front of the Human Resources Advisory

22  Board ultimately, and they would make the final

23  determination.

24      Q.   Okay.  You had input on ordinances that went

Joseph J. Freebery

Page 339

1   before County Council?

2        A.   Usually we were requested to, either by

3   Council or the administration, to put together a package

4   on a particular issue, whatever it may be.  And then we

5   would send it over to the Executive Office, and it would

6   be reviewed and usually redone.  I mean, I don't remember

7   any of my words ever making it to the Council floor.

8        Q.   And as general manager of special services,

9   you would help prepare the budget for special services?

10       A.   Actually, the County -- the way the County is

11  set up, the one who is charged with the responsibility of

12  the budget, preparing the budget, is the CAO.  Ultimately

13  it's the County Executive's budget, but by law the CAO is

14  charged with putting that budget together.

15            We do, like all the departments do,

16  calculate our past spending practices and different line

17  items, account for inflation and gas or that type of

18  thing.

19            Then we sit with finance and go through

20  the budget and come up with something that we feel we can

21  live with.  And then we take it over to the

22  administration, and then we have administration hearings.

23  And then the budget gets changed around, based on their

24  priorities, their projects, things that they're

Joseph J. Freebery

Page 343

1   County.  Is it Exton?

2        A.    Eckstein.  I think it's E-C-K-S-T-E-I-N.

3        Q.    Is she the only other sibling that works for

4   New Castle County?

5        A.    Presently?

6        Q.    Yes.

7        A.    Yes.

8        Q.    Okay.  Other than Sherry, Jan, and yourself,

9   did anybody else work at New Castle County that were your

10  brothers and sisters?

11       A.    That were my brothers and sisters?  Yeah.

12  Yes, my brother, Mike, was a police officer 20 years ago

13  or so.  Got injured on the job and was put off on

14  disability.

15       Q.    Okay.  Anybody else?

16       A.    Not brothers or sisters.  But there is a lot

17  of Freeberys that have been County employees through the

18  history of the County.

19       Q.    Okay.  And your sister, Jan, still works for

20  the County.  Correct?

21       A.    I would assume so.  I have not heard any

22  different.

23       Q.    When was the last time that you talked to her?

24       A.    Last night at a funeral.

Joseph J. Freebery

Page 354

1    Q.    Okay.  Did you have any other discussions with

2    him?

3    A.    No.

4    Q.    And anything else that you believe supports

5    your claims or defenses with respect to Wayne Smith?

6    A.    The only thing I can say is as hearsay

7    somebody told me he ended up doing County bond work after

8    he left the legislature.

9    Q.    Anything else?

10   A.    No.

11   Q.    Allison Levine Taylor, have you spoken to her

12   regarding your lawsuit?

13   A.    I have not.

14   Q.    Do you know whether or not anyone has spoken

15   to her on your behalf, such as your lawyer?

16   A.    I do not.

17   Q.    And other than what you testified to in your

18   first deposition, anything else in addition to that that

19   you believe, information that Allison Levine Taylor has

20   that supports your claims or defenses?

21   A.    I think she could -- I think she could testify

22   as to the instructions that Mr. Coons gave her in how to

23   respond going on that radio show, or in general

24   commenting on my illegal termination.

Joseph J. Freebery

Page 355

1      Q.   Do you know whether or not anyone has, on your

2   behalf, has tried to ascertain that information from her?

3      A.   I do not.

4      Q.   So you don't know what, if any, instructions

5   she was given when she made her statements on the radio

6   station?

7      A.   I'm sorry?

8      Q.   So you don't know what, if any, instructions

9   she was given by Mr. Coons with respect to her radio

10  conversation?

11     A.   Do I know what Mr. Coons' instructions were to

12  her about the radio station?  No, I do not.

13     Q.   Anything else with respect to Allison Levine

14  Taylor, information that you believe she has that would

15  support --

16     A.   I can't think of anything.

17     Q.   What about Bob Merrill?

18     A.   I'm not really -- I'm not certain about Bob

19  Merrill, other than the fact that I do know when they

20  first came in, he had -- he seemed to have a deep-seated

21  interest in the cars that I was assigned, the mileage, if

22  I had changed off cars.

23               He had a long and uncomfortable

24  conversation with my garage supervisor, who called me and

# APPENDIX

# 4

Christopher A. Coons

Page 22

1    in-house counsel to W.L. Gore and Associates, Inc., of

2    Newark, Delaware.  I served in that capacity for eight

3    years.  Four years into my work with Gore, I was elected

4    County Council President.  And so served jointly as, or

5    at the same time, actually, as County Council President

6    from '01 to '05 and as in-house counsel to the Gore

7    Company.

8        Q.    Would you state for the record, please,

9    exactly what the I Have A Dream Foundation is and what

10   your job was there?

11       A.    The I Have A Dream Foundation, which was

12   founded by Eugene M. Lang in 1981, promises full tuition

13   scholarships to college for whole classes of low income

14   kids from typically intercity neighborhoods.

15              My mother, Sally Gore, and I launched

16   one here in Delaware in 1989.

17              I also helped organize and launch one in

18   New Haven, Connecticut.

19              It's an organization on whose national

20   board I still serve that has helped provide long-term

21   personal engagement, mentoring, tutoring and tuition

22   assistance to about 14,000 or 15,000 children in more

23   than 60 cities nationwide.

24       Q.    And you had mentioned that your mother is

Christopher A. Coons

Page 37

1          A.     -- a number of years ago.

2          Q.     And am I correct that it's a memo from Joseph

3     Freebery, or to Joseph Freebery, General Manager,

4     Department of Special Services from Thomas P. Gordon,

5     County Executive, and Sherry L. Freebery, Chief

6     Administrative Officer?

7          A.     Correct.

8          Q.     And am I correct that Mr. Gordon's functions

9     and duties as County Executive were governed by the same

10    -- same provisions of Title 9, generally, that yours

11    were.

12                        Is that a fair statement?

13         A.     Yeah.   Except to the extent that they were

14    amended.   Yes.

15         Q.     Right.   And we all -- we're going to get to

16    that one.   But it was, essentially, the same obligations,

17    responsibilities, et cetera?

18         A.     Yes.

19         Q.     Okay.   Did you have occasion to listen to

20    transcripts or tape-recordings of any of the debates in

21    connection with your campaign and the primary prior to

22    coming here today?

23         A.     No.

24         Q.     Have you ever listened to any tapes of the

Christopher A. Coons

Page 42

1        Q.    We'll give you a copy.  We have a copy of it

2    for you.

3        A.    In order to put comments in context.

4        Q.    Absolutely.  Don't want you not to.  And if

5    you have to -- so you're clear -- in any -- at any time

6    during this deposition, if you need to put anything in

7    context, please do.

8              MR. WIER:  Well, the problem with -- the

9    problem producing this now is that my client is not going

10   to have an opportunity -- we're not going to have an

11   opportunity to listen to it.

12              So, to the extent that you produce

13   something without any prior notice to us, or in response

14   to any appropriate request for production, I reserve the

15   right to have my client listen to it outside of the

16   deposition, and if we make a decision that we need to

17   supplement the record, we will take that position.

18              MR. LAWLESS:  I have -- and -- and if

19   you do, I have no problem with any of that.

20                   (Playing of the cassette tape.)

21                   (Moderator, Mark Fowser)

22              MR. FOWSER:  Chris Coons, you have up to

23   two minutes for uninterrupted rebuttal at this time.

24              MR. COONS:  Thank you, Mark.  I think my

Christopher A. Coons

Page 44

1    views on quite a few different things and how quite a few

2    different things have come to happen legislatively

3    recently and a year ago and, frankly, throughout my

4    entire term of service in County government.

5                    The current law and the current

6    situation would produce a situation where the next County

7    Executive, whether any of the three of us before you,

8    would have Ms. Freebery's brother running the largest

9    department in New Castle County Government.

10                   If Mr. Bush were to have as his Attorney

11   General the Attorney General from the Clinton

12   administration, or the Secretary of Defense from the

13   Clinton administration, or the Secretary of Education

14   from the Clinton administration, you'd say, I suspect,

15   that that prevents the president from carrying forward

16   the policy agenda on which he was elected.

17                   What I was simply trying to accomplish

18   was to restore what has historically been the case, which

19   was that the County Executive has the freedom to put

20   above General Managers political appointees who are

21   directors who could carry the forward policy agenda of

22   the newly elected County Executive.

23                   We disagree, of course, as to the

24   history and the intended purpose of that legislation.

Christopher A. Coons

Page 45

1          I pledged back on June 30th of last year

2    that I would make no more efforts to change the law in

3    this regard.  We would simply let the electorate decide.

4          And I want each of you to focus on that,

5    because as Ms. Freebery has said, her management team

6    will be the same going forward the next four years as it

7    has been the last eight.

8          MR. FOWSER:  And that's two minutes

9    there.  So, we can segway right into our cross-fire

10   segment.

11          (End of cassette tape.)

12   BY MR. LAWLESS:

13       Q.   Mr. Coons, do you recognize the voice on that

14   tape?

15       A.   Yes.

16       Q.   And that was your voice.

17          Correct?

18       A.   Yes.

19       Q.   And was the gentleman who was the moderator,

20   did you recognize Mr. Bowser's voice?

21       A.   Bowser?  No.  Mark Fowser.

22       Q.   Fowser.  Thank you.

23       A.   Fowser.

24       Q.   Do you recall that debate?

Christopher A. Coons

Page 48

1   departments of County Government, were no longer folks

2   who were -- who served at the pleasure of the County

3   Executive.

4                   So, I mean, I think that is a fairly

5   accurate summary of what Ms. Freebery and I were

6   disagreeing about in that debate.

7       Q.   Okay.  But in -- in the debate you -- you

8   specifically mentioned Sherry Freebery's brother.

9                   Is that correct?  You didn't make the

10  general statement.  You followed it up with the general

11  statement.

12      A.   Right.

13      Q.   You specifically mentioned Sherry Freebery's

14  brother?

15                  Do you agree with me there?

16      A.   I gave the example of, if President Bush,

17  there's a transition, too, I think I said President

18  Clinton, and at that point I went through several

19  different members of the cabinet at the presidential

20  level.  I could have, or should have gone through several

21  different examples and said, the person who is currently

22  the head of General -- the General Manager of Special

23  Services, the General Manager of Community Services, the

24  County Attorney, the Chief Procurement Officer and so

Christopher A. Coons

Page 136

1    why I was more aggressive in staying out of the details

2    of these cases was because Mr. Neuberger, as I think I

3    said two or three times, is an aggressive advocate.  And

4    my job is to try and run the County and not get dragged

5    into the details of resolution of these legal matters.

6        Q.    Okay.  Why did you fire Joe Freebery?

7        A.    Mr. Freebery was given the opportunity to

8    resign, or retire, or ultimately be terminated for a

9    variety of reasons.

10            Most importantly was the recommendation

11   to me of my Chief Administrative Officer at the time,

12   David Singleton, based on several months of experience of

13   supervising Mr. Freebery and working with him.

14            It was a combination of two things.

15   Nonperformance, nonresponsiveness to David and failure to

16   follow through on a lot of things from the small to the

17   large from the policy to the day to day.

18            More importantly for me, or equally

19   importantly, was he didn't fit the -- what I was looking

20   for, for my senior team, which was a more proactive

21   policymaking and -- and team participation in addressing

22   what were a lot of unresolved matters that are our

23   administration had to tackle.

24       Q.    You do understand that Mr. Freebery had worked

Christopher A. Coons

Page 139

1                      And I said to David, We got a huge task

2    here.  There's a lot of unresolved issues.  I want you to

3    come in and manage all of the general managers in this

4    administration.  Give them a fair shot.  Give them a

5    tough look.  Make sure that you're being fair and being

6    clear and see which of them is going to work out and

7    which of them is not.

8                      And so, in terms of the day to day and

9    the responsiveness and the operational issues, I had real

10   confidence that David had the background and the

11   experience and the ability to do that.

12                     But David also had no -- he had no prior

13   history of -- of working in the County or leading the

14   County.  I did.  I had been County Council President for

15   four years.

16                     Now, a legislative role is quite

17   different from an executive role.

18                     My impressions of the general managers,

19   who were then the incumbents, was largely formed by the

20   annual budget hearings, by the regular committee

21   hearings, by interactions we had in the course of my four

22   years as counsel president.

23        Q.   Okay.

24        A.   I also got input from other folks in Council

Christopher A. Coons

Page 144

1   relationship.  We -- we tried to maintain -- you know --

2   even, frankly, even when there were -- you know --

3   tensions otherwise with County Executive and CAO, Mr.

4   Freebery was always -- you know -- a pleasant,

5   professional direct.

6       Q.   You were aware that he was campaigning for his

7   sister when she was running against you.

8                Is that correct?

9       A.   Modestly.  He appeared a few times.

10      Q.   A few times.  Okay.

11               Did -- was he -- from what you saw, was

12   he campaigning for her, or was he campaigning against

13   you?

14      A.   Neither, particularly.  Help -- rephrase, if

15   you will.

16      Q.   Well, let me -- let me -- how would you

17   describe, when you saw Joe Freebery in campaigning

18   settings, what was he doing other than just being there

19   with his sister?

20      A.   Really just being there.  If -- if I could,

21   again, context I think is helpful.

22      Q.   Sure.

23      A.   When the campaign -- when her campaign began

24   when she first filed, it really was not a very serious

Christopher A. Coons

Page 145

1    effort.  It was not -- most political campaigns that are

2    serious, when they begin, they have a great, big kickoff

3    and a big office and raise lots of money and they have

4    websites and so forth.

5                        For the -- my recollection is, for the

6    first couple of months that she was a candidate, it was

7    really in name only.  It did not seem to have much energy

8    or effort behind it.  And I -- I don't recall seeing Mr.

9    Freebery --

10        Q.    Mum-hum.

11        A.    -- in any active role early on.

12        Q.    Did Mr. Freebery do anything with respect to

13   the campaign that you took a personal affront to?

14        A.    No.

15        Q.    And, I think, you described him as -- as --

16   your relationship with him as pleasant, professional?

17        A.    Yes.  And I have a specific recollection of --

18   it was -- it was the morning of the AFL-CIO endorsement

19   vote at the UAW hall on Old Baltimore Pike.

20        Q.    Mum-hum.  Excuse me.

21        A.    You know -- there were -- I don't know --

22   maybe a dozen volunteers in Coons shirts and a dozen

23   volunteers in Freebery shirts.

24        Q.    Uh-huh.

Christopher A. Coons

Page 155

1    presenting to him.

2                    So I ask that he be permitted to

3    complete his answer.

4                    THE WITNESS:  Sorry.  I lost the track

5    of the answer.  Excuse me.

6                    MR. WIER:  Well, the question --

7    BY MR. LAWLESS:

8        Q.   You were talking about your first --

9                    MR. WIER:  The question is --

10                   MR. LAWLESS:  What interaction with

11   Tracy Surles.

12                   MR. WIER:  -- did Tracy -- what was the

13   basis for your termination, and did you -- did you have

14   discussion with Tracy Surles and John Husband?

15   BY MR. LAWLESS:

16       Q.   Do me a favor, Mr. Coons?  If we could limit

17   it first to Tracy Surles, and then goes to John Husband,

18   and I'll try not to interrupt you.

19       A.   The -- the recollection I have today is that

20   the impressions I got from conversations with Tracy was

21   that -- that Ms. Surles was doing her level best to stay

22   on top of important projects that she was very concerned

23   about the extent to which they were not getting

24   completed.  That she was concerned I would have the

Christopher A. Coons

Page 157

1    meetings?

2        A.    Well, two context.  In -- when I was County

3    Council President, we'd have a committee meeting,

4    committee hearing or a budget hearing.  There would be a

5    whole series of people, which the gentleman who was

6    responsible for capital financing, for example, or a

7    person who was responsible for sewer system issues, like

8    David Hofer, or a person who was responsible for parks

9    operations, like Joe Dougherty, if I remember correctly,

10   or Jeff Walker, who would be talking about -- you know --

11   facilities and operations.

12                And so, in -- in -- in sessions like

13   that often we break up after the committee meeting and --

14   you know -- be sort of milling around for five minutes

15   before everybody left.  This is, particularly, I think

16   earlier on, perhaps, I'm -- I'm just speculating about

17   dates.

18       Q.    Okay.  This is when you were Council

19   President?

20       A.    Yes.

21       Q.    Okay.

22       A.    But these were not frequent or long or

23   detailed.  It was just -- I -- I got from her a sense of,

24   as a professional, she was concerned about my apparent

Christopher A. Coons

Page 158

1    dissatisfaction with the execution of major projects?

2         Q.   Okay.  So, then, in order -- and what she did

3    then after the record -- the on-the-record session when

4    you would be, I think you said, milling around

5    afterwards, that's when you first recall her raising

6    these concerns to you?

7         A.   No.  Well, let me be clear, then.

8              The -- the first time I had any

9    conversations with Tracy that sort of housed the

10   operations of the department would have been in that --

11        Q.   Okay.

12        A.   -- context.

13        Q.   Right.

14        A.   That's how I initially got to know all of

15   these people.

16        Q.   Okay.

17        A.   Folks like Jeff Walker and Butch Scott and Joe

18   Dougherty were not --

19        Q.   Mum-hum.

20        A.   -- social acquaintances of mine.  They weren't

21   people I knew beforehand in County Government.

22              What I was trying to do is lay the

23   groundwork about where did you ever meet these people.

24   Why would they have ever come up to you on the street or

Christopher A. Coons

Page 159

1    talk to you or me.

2              Once I was County Executive, I did not

3    have regular occasion to talk to them.  But when we do

4    things like -- we just did a County employee of the year

5    -- breakfast in Special Services.

6         Q.    Mum-hum.

7         A.    When I would go over to the department or be

8    out in the field or be at a function, it today, routinely

9    happens, that people who are sort of second or third tier

10   within departments will come over to talk to me about

11   things.

12             My impression is that at one or two of

13   those kinds of occasions, I said, Gee, Tracy, David is

14   really frustrated with -- you know -- where things are

15   going in the department.  And she made a passing comment

16   that -- that Joe was struggling.  That he was -- he was

17   spending a lot of time in his office and not engaging and

18   moving the department forward.

19        Q.    Who is running the Department of Special

20   Services now?

21        A.    Tracy Surles.

22        Q.    When did she -- and what's -- what's her

23   title?

24        A.    She is Acting General Manager.

Christopher A. Coons

Page 166

1                     And, frankly, to be blunt, the reason

2     Mr. Baker remains a General Manager today is that his

3     policy memo showed I think a thorough grasp of these

4     issues.  And he personally really engaged actively in

5     tackling some of these challenges that were left and that

6     were difficult.

7                     I mean, the number of tough issues

8     facing the County overall far exceeded the ability of any

9     County Executive and CAO working together to resolve.

10    They needed the engagement of the experienced senior

11    professionals in the government to step forward and say,

12    Okay, here's these 12, 15 whatever major issues.  I've

13    been here.  Here's how we're going to tackle them.

14    Here's a solution.  Here's how to -- here's how to do

15    this.

16         Q.   Didn't -- didn't you consider Joe Freebery

17    with 23 years an experienced senior professional in

18    County Government?

19         A.   Yes.

20         Q.   Then, why did you fire him and just kick him

21    out of County Government?

22         A.   Because, in my view, he was not showing the

23    same, and this is largely based on his interactions with

24    Mr. Singleton, but he was not showing the same level of

Christopher A. Coons

Page 167

1    willingness to step up and say, Here's the issues.

2    Here's proposed solutions.  Here's how we're going to get

3    this done and engage.

4        Q.    Okay.  How long was Charles Baker the Chairman

5    of the Land -- or the General Manager of the Land Use

6    Committee -- Department, do you recall?

7        A.    I'm not certain.  Probably, I think, four

8    years at that point.

9        Q.    Okay.  And -- and -- and it's your belief or

10    recollection that -- that a lot of these issues were as a

11    result of his memo that he submitted about changes that

12    had to be made within his own department?

13        A.    No.  I'm sorry if I confused the issue.

14        Q.    I misunderstood.  I'm not sure.

15        A.    There are two different documents here.  A

16    transition is a difficulty time.  You're -- you're trying

17    to get your hands, as the newly elected whatever,

18    Governor or County Executive, around a lot of different

19    issues.

20                    And each of the departments, the General

21    Managers were asked to write a memo that summarized

22    internally -- you know -- here's what we see as the

23    issues.  And then externally it brought in these teams

24    and it's detailed at the end as to who they were.  These

Christopher A. Coons

Page 182

1          A.    The conversations with John -- I mean, I'll be

2     brief if I can.  You can ask more if you want.

3                      The conversations with -- with John,

4     basically, reenforced that same observation that -- there

5     were long-standing unaddressed issues within the

6     department.

7                      John's concerns are far more around land

8     acquisitions, parks, facilities operations things.

9                      Tracy's were more in the area of legal

10    matters, sewers, stormwater, that sort of thing.

11                     But John had a similar observation that

12    he was conscious of my being visibly unsatisfied with the

13    answers I was getting during some hearings.  And, at

14    least, once while I was Council President wanted to get

15    some reassurance that I was clear that he was doing his

16    best to try and professionally tackle what were some

17    difficult issues.

18                     And my impression is that we had at

19    least one conversation after I became County Executive

20    along the same lines.

21         Q.    Did you think that it was appropriate for

22    either "Mr." Surles or "Ms." Husband -- sorry -- "Ms."

23    Husband or "Mr." Surles to go behind their boss's back to

24    the President of County Council informally and complain

Christopher A. Coons

Page 189

1    other people come forward that made comments?  You

2    mentioned two.

3                    The question is, Did you finish your

4    answer?  That's all.  Because he followed up with a

5    question.  I didn't think you finished your answer.  You

6    may have.  I don't know.

7                    THE WITNESS:  Well -- but I recall my

8    then Chief of Staff, Rich Przywara, also giving input.

9                    But it was really not specifically about

10   Joe Freebery.  It was -- just his general direction is

11   that he really thought we should be replacing the

12   appointed folks right when I became County Executive

13   because Mr. Freebery was not appointed at that point.

14   BY MR. LAWLESS:

15       Q.   And, in fact, I believe Mr. Przywara testified

16   just the other day that he had made that recommendation

17   generically was his belief as to how --

18       A.   He and I had different views.

19       Q.   Did any of the members of the Special Service

20   Committee that were involved in the transition,

21   examination, preparation of the Transition Team Report,

22   did any of them report things directly to you or in

23   writing recommend that Joe Freebery be replaced?

24       A.   My -- my recollection is that several members

Christopher A. Coons

Page 190

1    of that committee expressed concern about whether Mr.

2    Freebery was up to the tasks of the department.

3                    But I -- I, frankly, can't associate

4    that committee, specific names with specific

5    conversations with a specific date.

6                    The question you asked before and the

7    answer I gave before about the Transition Team Report and

8    was it reduced to writing, there were discussions about

9    the strengths and skills of the General Managers of

10   several departments with several transition committees.

11        Q.   Okay.  But then, just so I'm clear, your

12   testimony is that you -- you have a general impression

13   that there were concerns voiced, but you can't give us

14   specific names or specific comments.

15                    Is that correct?

16        A.   You have a list of who was on the --

17        Q.   Right.

18        A.   -- committee.

19        Q.   Right.

20        A.   I don't specifically remember Kash Srinivasan

21   saying, Oh, he's terrific, and Mike Houghton saying, Oh,

22   he's not.

23                    My recollection is that the transition

24   team and the policy memo both started me off with some

Christopher A. Coons

Page 191

1    real concerns about his strengths.

2        Q.   Did you do anything to see if there was a way

3    to keep Joe Freebery in County Government?

4                   MR. WIER:  Objection.

5                   MR. LAWLESS:  To what?

6                   MR. WIER:  Because he was kept in County

7    Government after House Bill 29 was passed.  So, that's a

8    misleading question.

9    BY MR. LAWLESS:

10       Q.   Am I misleading you, Mr. Coons, or do you

11   understand my question?

12                  MR. WIER:  He served at the pleasure of

13   the County Executive, and he was kept on.  That question

14   is misleading.  That's what he did.

15                  MR. LAWLESS:  You're going to keep

16   making these kinds of objections?

17                  MR. WIER:  Yeah.

18                  MR. LAWLESS:  Not my time.

19   BY MR. LAWLESS:

20       Q.   Mr. Coons, at some point, prior to April 6,

21   2005, you made the decision to terminate Joe Freebery.

22                  Is that correct?

23       A.   That's correct.

24       Q.   As part of that process, did you make any

Christopher A. Coons

Page 192

1   effort to see if was a way he could be kept in County

2   Government?

3          A.   My impression is that David Singleton, my then

4   Chief Administrative Officer, and I had a conversation

5   about it.  Was there -- was it appropriate, was it

6   practical to have Mr. Freebery retreat into the merit

7   system.

8               Part of that was occasioned by David

9   having -- Mr. Singleton having been in the State system.

10  Before coming to County Government, I had no experience

11  with a merit system.  The company for which I worked for

12  does not have a system like this.

13              In the State, if -- and this is, again,

14  my impression, there are what are called retreat rights,

15  or bumping rights where someone who has been in the merit

16  system comes out of it, can go back in and bump people

17  out.

18              My impression is that the County merit

19  system does not have that provision.  And I may be

20  incorrect.

21              David and I had a conversation about,

22  Could Joe Freebery go back into the merit system.  The

23  challenge is, having been the General Manager for a

24  number of years and the head of this large department,

Christopher A. Coons

Page 193

1    David had real doubts whether Mr. Freebery could return

2    to being a sort of mid to senior level official and work

3    comfortably under the direction of -- of folks that had

4    previously been under his direction.

5              The way the County merit system works,

6    as I understand it, we would have had to create a

7    position and have him compete for it.  So, there was no

8    -- you -- you cannot direct somebody into a position.

9    You would have to post a relevant position and have him

10   compete for it.

11             So, there was no guarantee that he would

12   end up in that position.  And -- and, frankly, at the

13   end, it just seemed more awkward, expensive and difficult

14   than was appropriate.  But I know we had a conversation

15   about could he return to the merit system within the

16   County.

17        Q.   Did you ever discuss that with the Director of

18   Human Relations, Pat Lutz DiIenno?

19        A.   The former Chief Human Resource Officer --

20        Q.   I'm sorry.

21        A.   -- for the County.  No.

22        Q.   She was there at the time Mr. Freebery was

23   fired; wasn't she?

24        A.   I may be miss remembering.  I thought she was

Christopher A. Coons

Page 194

1    already gone.  I may be miss remembering the time line.

2    As I said several times, I don't remember exactly who

3    left in February, March, April.

4         Q.   So, the answer to my question is, you don't

5    believe you did, or you just don't know?

6         A.   I don't recall.

7         Q.   Is it fair to say that as the Director of

8    Human Resources, she would have been the one in your

9    administration who was most knowledgeable as to the

10   workings of the merit system?

11        A.   Correct.  But on the question of bumping

12   rights, someone, either David or me, consulted with

13   someone in HR.  I don't remember exactly in detail.

14                  COURT REPORTER:  Coons 7.

15                  MR. WIER:  A copy or not?

16                  MR. LAWLESS:  Yes.

17                  (Two-page document dated September 23,

18   2004 entitled The Shotgun Ticket of Coons and Clark was

19   marked as Coons Exhibit No. 7 for identification.)

20                  THE WITNESS:  Mr. Lawless, would you

21   like to introduce, or give some context to this?

22   BY MR. LAWLESS:

23        Q.   Sure.  It has been marked as Coons 7, which is

24   a newspaper article dated September 23, 2004.

Christopher A. Coons

Page 195

1           And I'll direct your attention to the

2    second page.

3           I'm assuming Mr. Wier is aware of this.

4    If he isn't, we may have to stop for a moment.

5           I have a stipulation with Ms. Allen that

6    the third paragraph on the second page where it says in

7    quotes, We need people who are independent from Gordon

8    and Freebery.  Paul tells me that's where he is, unquote.

9           Coons says, quote, I'm going to take

10   that at face value.  He's a Democrat, unquote.

11          And the stipulation that I had with Ms.

12   Allen was that, in the context of the article and the way

13   it is described here, it's stipulated that you said what

14   was actually in the quotation marks.

15       A.   Yes.  With the amendment or the clarification

16   that this is a reference to Tom Gordon and Sherry

17   Freebery.

18              MR. WIER:  Right.

19              THE WITNESS:  The rest of the article,

20   that's what it's about.  Yes.

21   BY MR. LAWLESS:

22       Q.   Are you -- who, actually, told Joe Freebery he

23   was fired?

24       A.   I believe David Singleton and I sat down with

Christopher A. Coons

Page 196

1   him in person to have the conversation.  There may have

2   been one other person in the room.  But that's who I

3   remember.  We had a conversation about whether he thought

4   it was appropriate for him to retire or resign.

5                        He said, my recollection is, he said,

6   No.

7                        And I said, Then, this is not working

8   out.  And we are going to have to terminate your service

9   with the County.

10       Q.    How would you describe Mr. Freebery's reaction

11  to the meeting?

12       A.    Visibly upset, but professional.

13       Q.    He didn't say Fuck you, or anything like that;

14  did he?

15       A.    No.

16       Q.    So, if David Singleton or Richard Przywara

17  testified under oath that he said, Fuck you, you wouldn't

18  have a recollection -- recollection of that; do you?

19       A.    He may have said that to them in the hallway

20  or something.  But I don't -- his interaction with me, my

21  recollection was, he was upset, but professional.

22       Q.    Okay.  Just so we're clear on the record, was

23  -- was Pat DiIenno at that meeting?

24       A.    I don't recall.  I don't think so.

Christopher A. Coons

Page 197

1           COURT REPORTER:  Coons 8.

2           (One-page document entitled Coons fires

3    Freebery was marked as Coons Exhibit No. 8 for

4    identification.)

5                VIDEOGRAPHER:  Off the record at 2:16.

6                (Off the record.)

7                VIDEOGRAPHER:  Back on the record at

8    2:17.

9                MR. WIER:  Off the record I raised an

10   objection to the document, which is Coons 8 in that the

11   Xerox copy that I have does cut off the left-hand column.

12   And, therefore, doesn't clearly set forth all that was

13   said.

14                There is a paragraph on the left-hand

15   column, which Mr. Lawless said he's not going to ask my

16   client about, but I just want to -- I just want to get

17   the quote and make sure it's accurate.

18                It said, Coons disagreed.

19                Do you see that, Mr. Lawless?

20           MR. LAWLESS:  Yeah, I do.

21           MR. WIER:  I would ask my client just to

22   read that quote, if he can read it, and see whether that

23   is an accurate quote.  That way, we, at least, know what

24   that paragraph says.

Christopher A. Coons

Page 233

1          Q.    Is it fair to say that the general parameters

2    of the basis for your decision were the -- his lack of

3    performance in the position as reported to you by Dave

4    Singleton, as you observed, and as you've testified to?

5          A.    Correct.

6          Q.    Did you -- as part of that decision, I think

7    you mentioned there was -- there was a transition memo

8    and, in part, that was part of the reasoning that entered

9    into your decision.

10                     Is that right?

11         A.    Two things, if I might, Mr. Wier.

12                     As we discussed in testimony at the

13   direction of plaintiff's counsel, there was a Transition

14   Committee Report I think it's Coons 6 in evidence here.

15   That was an outside committee.  And there was a report

16   presented to me.  There was a summary of their findings.

17                     There was also a policy memo that as the

18   newly elected County Executive, I asked for from each

19   General Manager.  What I think you're referring to is

20   that I briefly mentioned both of them in response to Mr.

21   Lawless' question.

22                     The policy memo that was generated by

23   Mr. Freebery in his senior department leadership as I was

24   in this transition period, I was struck it had a certain

Christopher A. Coons

Page 234

1    mindset, which was, essentially, Tell us what to do and

2    we'll do it.  And -- and that's -- that's fine.  That's

3    one view of what one would want from departments and

4    their senior leadership.  It was not my view.  And it was

5    not the set of values that I talked about both in the

6    campaign, in the transition and as the newly elected

7    County Executive.

8                As we touched on, every one of our

9    departments had significant challenges, policy and

10   operational and fiscal challenges.  I was looking for

11   General Managers who were -- I wanted to work with and

12   retain General Manager who were willing to step up to

13   those tasks, tackle them, solve them.

14       Q.    Be proactive?

15       A.    And be -- be assertive and proactive.  And so,

16   whether it was in bringing forward issues like Southern

17   Sewer, or our stormwater ponds, or operational concerns

18   at facilities, or the status of neighborhood parks or

19   management of the vehicle fleet, I was expecting and

20   asking General Managers each of whom had experience in

21   their own departments to say, Here are the problems in

22   our department.  Here's the solutions we propose to them.

23                Now, I -- I'll rarely accept, that is a

24   different style than the previous County Executive and

Christopher A. Coons

Page 236

1    fair.

2                        MR. LAWLESS:  But not tell him what he's

3    going to say.

4    BY MR. WIER:

5          Q.    The policy -- did the policy memo that Mr.

6    Freebery's department produced, was that a factor in the

7    decision as you evaluated his performance moving forward

8    --

9          A.    Yes.

10         Q.    -- as General Manager and in the past?

11         A.    Yes.

12         Q.    And was Mr. Freebery proactive and the kind of

13    manager in -- in the way he reacted and dealt with

14    problems either that you observed or that Dave Singleton

15    mentioned to you that you wanted?

16         A.    No.

17         Q.    And I think you, in your testimony, you

18    mentioned Charlie Baker as an example of someone who did

19    come forward and was proactive --

20         A.    Yes.

21         Q.    -- and did handle issues.

22                        Is that correct?

23         A.    Yes.  He had tough issues facing his

24    department.  His transition memo, his policy memo was

Page 237

1    excellent.  And he genuinely threw himself into the task

2    of identifying policy challenges and -- and addressing

3    them.

4                    MR. WIER:  Thank you.  That's all I got.

5    BY MR. LAWLESS:

6        Q.   Mr. Coons, I just want to make sure that I'm

7    clear.

8                    Are you testifying that you fired Joe

9    Freebery from a 23-year position with the County because

10   you didn't like his style?

11                   MR. WIER:  Objection.

12   BY MR. LAWLESS:

13       Q.   You can answer.

14       A.   Okay.  No.  I'm testifying that there was a

15   combination of several different factors.  But an

16   important one of them was how I wanted the General

17   Managers of County Government to behave going forward.

18   This isn't a matter of style like what tie you wear, or

19   what you wear for dinner.  This is a matter of -- of

20   professional style, meaning how you handle the challenges

21   facing the government.

22                   And to the extent that what I just

23   testified to was that Mr. Freebery did not fit with the

24   proactive engaged team approach I had asked for and was

Christopher A. Coons

Page 238

1   looking for, that's correct.  But that's not the only

2   factor.

3                  I was relying on Mr. Singleton's regular

4   report to me that Mr. Freebery wasn't responsive on a

5   wide range of things.  Small to large.  Some of them

6   minor, operational concerns, some of them sort of

7   significant policy issues.

8                  The reference to the policy memo was to

9   the bigger end of things.  How are we going to do moving

10  forward of tackling some of big, unresolved policy

11  issues.  So, this is not, as you simply put it, a matter

12  of style.

13      Q.   Okay.  And did you just testify that you had

14  made it clear to the General Managers that that's what

15  you were looking for in these memos that you're talking

16  about?

17      A.   I believe I did.  I believe when I was sworn

18  in, and gave my sort of inaugural speech, that sounds

19  grand for a County Executive, the first time I spoke upon

20  being sworn in, I talked about a commitment to giving

21  everyone a fair shot, but looking for a different style,

22  different approach and a different set of values.

23                  I believe at the first General Managers

24  meeting I said similar things.  It was a significant

Christopher A. Coons

Page 251

1       A.    Yes.

2       Q.    Do you recall ever seeing that memo?

3       A.    Yes.

4       Q.    And that is a memo to you from Dennis Siebold,

5    Acting County Attorney, re:  House Bill 29; correct?

6       A.    Yes.

7       Q.    And that's dated January 7, 2005?

8       A.    No.

9       Q.    I'm sorry, that's dated January 27, 2005?

10      A.    Correct.

11      Q.    Am I correct, by the way, that January 27,

12   2005, is the day that the House Bill 29 was passed by the

13   Delaware Senate?

14      A.    I'm not certain of that.

15      Q.    Whatever the date is is public record, and

16   that's what the date is, you will agree?

17      A.    Yes.

18      Q.    Did you rely on this document to take any

19   action with respect to Joe Freebery?

20      A.    I have a clear present recollection, as I did

21   when I previously deposed, that House Bill 29 was

22   effective when passed.  It required no more action by

23   county council and was legally sound.  I do not have a

24   concrete or a specific recollection of meeting with

Christopher A. Coons

Page 252

1   Dennis Siebold to review this memo, but it's my belief

2   that I relied on this memo in coming to that conclusion

3   that there were no further actions required after the

4   passage, the enactment of House Bill 29.

5       Q.   Just so I am clear, you relied on the opinion

6   rendered in this memo in terms of your belief of the

7   effectiveness of that bill without having to get county

8   council's approval?

9       A.   I believe so, yes.

10      Q.   Okay.  It says on the first line, "I have been

11  asked whether any county action will be necessary to

12  implement the provisions of House Bill 29, "and the

13  sentence continues to the end.

14           Do you know who asked Mr. Siebold that

15  question?

16      A.   I don't, whether me or David Singleton.

17      Q.   It was one of the two of you?

18      A.   I am not certain.  I would suspect so.

19      Q.   Did you rely on any other advice from any

20  other attorney with respect to anything you did regarding

21  the termination of Joe Freebery?

22      A.   If you are asking me did I receive any other

23  advice from Dennis Siebold, I don't have a specific

24  recollection of any other concrete advise from Dennis