# APPENDIX

# 5

Thank you Mr. President, I think we have to ask that all necessary rules be suspended, huh, cause this was laid on the table but it was not through committee, for the purpose of working house bill 29.

Hearing no objections, we'll suspend all necessary rules for the purpose of lifting from the table house bill #29. Madam reading clerk, would you read by title only house bill 29.

House bill #29 sponsored by representative Smith and others "An Act to Amend Title IX of the Delaware Code Relating to New Castle County Executive and County Department". Mr. President this concludes the reading of house bill #29 for the purpose of the suspension of all necessary rules and from lifting from the table.

Thank you Madam reading clerk. House bill #29 is before the senate under the suspension of necessary rules for its consideration. Sokola.

Thank you Mr. President. Members of the senate this bill reinstates the New Castle County Executives authority to appoint heads of executive branch agencies. This authority was deleted in the 1998 reorganization of New Castle County government. I do have, uh the new county executive here and at this time I'd like to ask for the personal privilege of the floor for Chris Coons.

Hearing no objections, will the New Castle County executive please come forward. Welcome to the senate, please state your name and position for the record.

Coons:     Thank you Senator, my name is Chris Coons and I'm the county executive of New Castle County, Delaware. I'm here to speak for you, for a dew moments about house bill 29 and will be happy to welcome any questions. This is a piece of legislation that will enable me and subsequent county executives to ensure that they have a cabinet that is alined with their values and their policy vision, as does the governor, the mayor and the president and the executive heads of other governments throughout this country. It was a change made, for I think policy reasons back in 1998 and I think current circumstances argue fairly heavily in favor of allowing the newly elected county executive to seek just in the six positions named in this bill, folks who are willing and able to continue to serve the way that my CAO, David Singleton does, which is at the pleasure of the county executive. I welcome any questions.

Sokola :   Thank you Mr. President, first of all I welcome for the first time on the center floor, in this capacity as the county executive. This, this effects six positions?

Coons:     That's correct.

Sokola:    I will yield to any other senator questions.

1

Sarah Simpson:    Thank you Mr. acting President. Mr. Coons can you tell me why it was changed in 1998?

Coons:    I can not.  I can only speculate, but I can tell you that in discussions that I had recently with folks who were in county government at the time.  The belief was there's two different arguments for this.  One of the sponsors of this legislation over in the house says that it was simply an error.  That there was a 50 page Omnibus County Reconciliation.  A package that came through, that reorganized government and it was an inadvertent deletion.  This was representative Smith, so that he certainly was a sponsor of that package and was unaware that this power was being removed.  There are folks currently within county government that say differently, that say this was intentional and that the best policy argument for this change was that subsequent county executives would not be able to change the leadership of the county government.  That it would be a civil service government all the way to its top levels and that would ensure some sort of consistency in the delivery of services.  Obviously, state government has not chosen to follow that path, but there is an argument to be made on the other side of this case.

Simpson:    Has county counsel reviewed this bill and approved the bill?  What was the vote?

Coons:    County counsel has not reviewed and approved this bill.  And I'll be clear on that. I am here speaking only for myself as county executive.  County counsel has not approves this bill.  I have discussed it with the counsel president who has leant his support to it, although he hasn't, I believe officially communicated that to you and I have discussed it with many members of counsel, but I do not stand before you with a resolution of county counsel endorsing this legislation.

Simpson:    Was there a reason why you did not seek a resolution of counsel to do this?

Coons:    No, there was no particular reason for that.

Simpson:    I would, I would just rather see the county counsel request something like this. Which leads me to believe that there was a reason in 1998 to have changed. Thank you for...

Coons:    If I might senator, I'll simply say this.  I discussed this with counsel president Clark at our very first meeting after he and I were both in office and I did not, I leave it to him as the head of that body to choose whether or not to seek further discussion in one of his executive committee meetings or to seek resolution.  If it would please this body, I would make certain that before I come before you seeking some legislative change in the future, I will have some statement or

2

response from counsels about it.

Simpson:        Who presently appoints the heads of the executive branch agencies?  Who is currently doing that?

Coons:          They're all holdovers, they are merit system employees.  Who by virtue of being in the merit system remain there.  So the ultimate decision, were one of them to retire, and two of them have already indicated an intention to retire very shortly. We would go through the merit system process to select a successor.  But the county executive would ultimately be able to chose from among the five deemed qualified by the selection board, the candidate that would ultimately become that, one of these six positions.

Simpson:        During the last six years that the present system has been in effect, is that the procedure that has been followed in naming heads of executive branch agencies?

Coons:          I can not speak as to the procedures followed by the Gordon Administration in choosing their top leadership.  I wasn't privy to there work.

Simpson:        Thank you.

Coons:          Thank you, senator.

Senator McDowell:    Thank you Mr. President.  Welcome to the senate, Senator Coons.

Coons:          Thank you, Senator.

McDowell:       I think maybe for clarification, we should, and I think it was stated before, but just to stress it.  This is essentially your team as the chief executive of the county.

Coons:          That is correct.

McDowell:       And in previous times, they were, it was three or four of the county executives to select his or her own team.

Coons:          That's correct.

McDowell:       It's inaloguos to a cabinet at the government level, right?

Coons:          That's right.

McDowell:       And, I think...

Each of these individuals are heads of departments of county government.

Right.  Will stay on the county government.

And the other, the other thing that comes to play, you mentioned it but I think maybe again for some emphasis, that if you were required to go through the merit system process, which all other   county employees are, that's a cumbersome process and a time consuming process and it would deprive you of having your team on board, at perhaps a critical time.

Coons:      That's right. I think this is a particularly an important moment in county history. And this is simply restoring us to the situation that prevailing from its reorganization in 1968 until 1998.

McDowell:   And it's largely for those reasons that it didn't seem that it was necessary of even appropriate for you to have to consult the legislative branch before you went forward.

Coons:      That's right, senator.  This is essentially about my leadership team that will be running the government that I was elected to lead.  I will, I will add, if I might expand just a little bit, that I chose to insert in this legislation, that county counsel has confirmation power.  Something that was also removed in 1998 but I think that's important to have the checks and balance and that was something that the counsel president and I discussed and I think made him even more comfortable with it.

McDowell:   Thank you very much.

Coons:      Thank you, Senator.

Senator Peterson:     Yes, Mr. Coons, we had a chance to briefly discuss this and as you know from last year I support the right of a county executive to choose their own team.  One thing that concerns me, I wasn't, obviously wasn't here when the senate decided to put all these folks into the merit system, but I do know that back in 1982 when I was still on county counsel, there was a debate about the chief of police.

Coons:      Right.

Peterson:   And, we at that time, elected to put the chief into the merit system, because there is a lot of politics around that.  We went through a couple of police chiefs real fast because of politics and so to stabilize that office and to protract somebody that we would want and would offer some job security too, we put that into the merit

4

system. For whatever reason the senate and the house put these positions in the merit system, I don't know. But I do have a concern about people who may have taken these jobs because there was some stability and that is they could not be removed without just cause. And now we're kind of changing the rules after they've, maybe left other jobs, to take these believing that there was some, some job security here that we're now pulling out from under them. And that's kind of a long way of getting to a question, and I don't want to delay this thing, but would you, you said that two are planning to leave which would leave four others...

Coons:      Yes.

Peterson:   Would you be willing to consider an amendment, as people leave, whether for just cause or unjust cause or that they retire that at that point, you can replace them with non merit system employees so that we don't change the rules on anybody in the middle of a stream. And that's kind of what bothers me about this, because I think that there were some professionals who left other jobs believing that there was security, who otherwise may not have taken these positions if there hadn't been that merit system security.

Coons:      I appreciate your concern and let me speak to a few points that you raised there. First, as you know, but just to round out the discussion for the other folks here in front of us in this body. The chief of police is not covered by this legislation. He is specifically covered by a legislation enacted by this body by the general assembly that covers all chiefs of police in Delaware and is given some process rights which may or may not have happened after the point in 1982, you referenced when county counsel took some action around chief of police. I understand there is a tension, there is a balance between the protects offered by a civil service or a merit system for employees for serving in a senior management position and thus also being charged with being alined tightly with the policy agenda of the executive being served. Certainly given my legislative efforts around this issue a year and a half ago, no one who is a general manager of New Castle County government can be surprised that this is something that I would move forward and that I would value and that I would try and change. So, I think any expression on the part fn a current general manager that they are surprised that I am pursuing this is just ingenuous at best. I think at this point, I would not consider as a friendly amendment, a move that would require me to keep the folks who are there, all there until they chose to retire. But I will consider with some real sympathy, and work with individuals who come to me, as one did yesterday and say I really only took this, as you say, because it was a merit system job, although, high paying, although responsible, although visible, although a policy position, they would not have taken it, this individual said, had it been at the will of. And we're talking about whether we could find him an appropriate merit position to go back into. Folks do not have bumping rights in New Castle

County's merit system I am not obligated to return them to the merit system, but they are free to and will be encouraged to compete for a merit system opening that is appropriate for their skill level. So, I hope that answers your questions.

Peterson: Mr. President, I am not sure. I was following you there until the end. Would you be proposing to and I have not discussed this with any of your people, so I am not referring to a particular person. Would you be keeping people in these positions unless there was just cause to move them out or, do you expect to kind of do a clean sweep and try to find places elsewhere? Is that what I, is that what you were saying and put new people in all these spots? Is that kind of accurate?

Coons: Well, I've asked David Singleton and Lynn Howard and Rich Prziward and (?) who are four folks who I've brought in from outside county government to do a fresh analysis. David has been doing a lot of work with the folks who are the general managers. I obviously have a lot of history with them as four years as counsel president. And we are reviewing each individual and we're gonna sit down, if this were to pass, we're gonna sit down with them and say, can we work together, can we find a common agenda, can we find a common set of values and approach governments. And, so far I am fairly optimistic about their willingness to work with me, but they will serve at the pleasure. I am not going to be required to come back and have a show cause hearing in front of counsel or this body. Which I frankly think is appropriate. I mean I think it helps keep folks focused on being responsive to the policy agenda of the executive to know that they serve at the pleasure rather than being civil service protected.

Peterson: So, you're talking about possibly keeping some of them or in their current position...

Coons: That's right. Depending on the outcome of...

But, it's up to them and their ability and willingness to work with us.

Peterson: I guess my point was that, I do know that you have the right to put directors over these people.

Coons: That's correct.

Peterson: And although you don't want to add a million dollars a year to the budget or whatever that price tag is, I was thinking of that more as a temporary measure until these people kind of through attrition or through just cause, if someone is not carrying out your policies, than of course, you'd have just cause to terminate their employment. But to kind of do that on a temporary basis until through attrition, they're gone, and then replace them with non merit people. So that people know

6

coming in what the rules are and not changing the rules in the middle...

Coons:          I understand your concern about the fairness of some change in the rules, but these are folks who earn $120,000 a year on average and who are in senior leadership positions and one of the things I am struggling with as I try to get our spending under control and as I try to manage county finances we did look at the alternative of simply creating a whole rash of new positions that would cost more than $120,000 each to mange down and I thought that was unnecessary. So, I'll be attentive to your concern about fairness and changing the rules in midstream for folks, but I do think there was plenty of advance notice about how I viewed this particular issue. There was 30 years of history during which county government you had directors at the tops of these departments, and in my view I'm not going to happily assent to having people stuck as general managers, merit system protected until they reach retirement. Cause in many case that would be ten to twelve years or more.

Peterson:       And I note to that the other side to that is at least from my years as county counsel you see people would come and go and it would be a quick turnover and disruptive to departments. So I could see the arguments in trying to stabilize that which I imagine that this was an effort to do. But on the other side, I guess my department of labor background says it's not fair to change the rules of employment in the middle of the game and so and you know that they have been my concerns. Thank you.

Coons:          Thank you.

Senator Cicola:      Thank you Mr. President. If there are no further questions I would ask the witness be excused.

                    There are no further questions, thank you Mr. Coons for coming today.

Coons:          Thank you.

Roll call:

Senator Adams
Senator Ambick
Blevins
Bennini
Bonteen
Cutier
Connor
Cook

Coplin
Deluca
Henry
Marshall
McBride
McDowell
Peterson - not voting
Simpson
Soccola
Sorenson
Still
Vaughn
Venivilles

declared passed the senate.

# APPENDIX

# 6

 

# State of Delaware
## The Official Website for the First State

Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & L

State Directory | Help | Search Delaware:                              Citizen Services | Business Services | `

## Delaware General Assembly

○ **Back**

Home
**Bill Tracking**
Senate
   Agenda
   Ready List
   Meeting Notices
   Roll Call
House
   Agenda
   Ready List
   Meeting Notices
   Journal
   Roll Call
All Legislation
Current Day's Action
Recent Legislation
Signed Legislation
Calendar
Reports:
   By Sponsor
   By Status
   By Date Introduced
   By Date Signed
Archives
Contact Info
House
Joint Committees
Legislative Divisions
Legislative Info
Meeting Schedules
Online Publications
Regulations
Schedule
Senate
Virtual Tour
Who's my Legislator

Bill Search:

## Delaware State Senate
### 143rd General Assembly
### Session 1 Day 8

### HB 29 Smith PASSED
AN ACT TO AMEND TITLE 9 OF THE DELAWARE CODE RELATING TO
NEW CASTLE COUNTY EXECUTIVE AND COUNTY DEPARTMENTS.

**Date:** 01/27/2005 04:15 PM **Passed**

**Vote Type:SM**

| Yes: 20 | No: 0 | Not Voting: 1 | Absent: 0 |
|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Adams | Y | Cook | Y | Peterson | X |
| Amick | Y | Copeland | Y | Simpson | Y |
| Blevins | Y | DeLuca | Y | Sokola | Y |
| Bonini | Y | Henry | Y | Sorenson | Y |
| Bunting | Y | Marshall | Y | Still | Y |
| Cloutier | Y | McBride | Y | Vaughn | Y |
| Connor | Y | McDowell | Y | Venables | Y |

Session ▾

Bill Type ▾   No.

OR

Full Text Search   Go

─────────────────

*my* **LIS**

Register          Login

**LEGISLATIVE**
Actions Notice
Subscribe/Manage

site map  |  about this site  |  contact us  |  translate  |  delaware.gov



# State of Delaware
## The Official Website for the First State



Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & L

State Directory | Help | Search Delaware: [　　　　　] (Go)    Citizen Services | Business Services | ʼ

**Delaware General Assembly**

◀ Back

Home
**Bill Tracking**
Senate
   Agenda
   Ready List
   Meeting Notices
   Roll Call
House
   Agenda
   Ready List
   Meeting Notices
   Journal
   Roll Call
All Legislation
Current Day's Action
Recent Legislation
Signed Legislation
Calendar
Reports:
   By Sponsor
   By Status
   By Date Introduced
   By Date Signed
Archives
Contact Info
House
Joint Committees
Legislative Divisions
Legislative Info
Meeting Schedules
Online Publications
Regulations
Schedule
Senate
Virtual Tour
Who's my Legislator

Bill Search:

## HOUSE OF REPRESENTATIVES
### 143rd General Assembly
### Session 1 Day 6

**HB 29 Smith PASSED**
AN ACT TO AMEND TITLE 9 OF THE DELAWARE CODE RELATING TO
NEW CASTLE COUNTY EXECUTIVE AND COUNTY DEPARTMENTS.

Date: 01/25/2005 05:38 PM Passed

Vote Type: SM

Yes: 39    No: 0    Not Voting: 2    Absent: 0

| | | | | | |
|---|---|---|---|---|---|
| Atkins | Y | Hudson | Y | Roy | X |
| Booth | Y | Johnson | Y | Schooley | Y |
| Buckworth | Y | Keeley | Y | Schwartzkopf | Y |
| Carey | Y | Lavelle | Y | Smith | Y |
| Cathcart | Y | Lee | Y | Stone | Y |
| Caulk | Y | Lofink | X | Thornburg | Y |
| DiPinto | Y | Longhurst | Y | Ulbrich | Y |
| Ennis | Y | Maier | Y | Valihura | Y |
| Ewing | Y | McWilliams | Y | VanSant | Y |
| Fallon | Y | Miro | Y | Viola | Y |
| George | Y | Mulrooney | Y | Wagner | Y |
| Gilligan | Y | Oberle | Y | Williams | Y |
| Hall-Long | Y | Outten | Y | Spence | Y |
| Hocker | Y | Plant | Y | | |

Session ▾

Bill Type ▾  No.

OR

Full Text Search  Go

my**LIS**

Register    Login

**LEGISLATIVE**
Actions Notice

Subscribe/Manage

site map  |  about this site  |  contact us  |  translate  |  delaware.gov

# APPENDIX

## 7

1100 Lovering Avenue
Park Plaza – Suite 710
Wilmington, DE 19806

January 28, 2005

Mr. Christopher A. Coons
County Executive
New Castle County
87 Reads Way
New Castle, DE 19720

*He will be working 2/11 and eeturing 2/12  good.*

Dear Chris:

I hereby advise you of my retirement effective February 11, 2005.

During my 30+ years in County government, I have enjoyed the opportunity to improve the financial condition of New Castle County, as well as working with many fine individuals. It is now time to enjoy retirement and pursue other opportunities.

Best wishes to you and your governance of New Castle County.

Sincerely,

Ronald A. Morris

*Gaylee good
mike GMD
Patti  —
then fee*

3609 Squirrel Hill Court
Duncan Woods
Wilmington, DE  19808
December 6, 2004

Thomas P. Gordon
County Executive
87 Reads Way
New Castle, DE  19720

Sherry L. Freebery
Chief Administrative Officer
87 Reads Way
New Castle, DE  19720

Christopher A. Coons
County Executive-Elect
800 N. French Street, 8th Floor
Wilmington, DE  19801

Dear Tom, Sherry, and County Executive-Elect Chris Coons:

After 32 years of continuous service with New Castle County Government, I am submitting my formal notice of *retirement effective February 12, 2005*. My last day on the payroll will be Friday, February 11, 2005.  I will be utilizing vacation beginning January 31 through February 11; however, I am committed to working with the new County Executive in order to transition my replacement, if needed.

I am thankful that I have been provided with the opportunity to fill the position of Chief Human Resources Officer for the last eight years. Although our office is small in number, when I took over there were three distinct sections that rarely interacted with each other. One of my most challenging accomplishments was bringing those three groups of employees into one cohesive, responsive office.  I have had the opportunity to work with five excellent core team members consisting of Patti DiEmidio, Mike Dill, Gayle Logan, Donna McCullin, and Helen Wallace.  I am proud to say that our motto of "Small but Mighty" has been a successful adage for us over the last eight years.  I am confident that my replacement will be able to transition into this position with strong staff support among a great team of employees.

I wish the new Administration and each of you the best of luck in your future endeavors.

Sincerely,

Patricia Lutz DiIenno, Ed.D.
(302) 995-9165

cc:    Patricia M. DiEmidio
       P. Michael Dill
       Gayle M. Logan
       Donna M. McCullin
       Helen M. Wallace
       Personnel File



...pher A. Coons
...ty Executive

Diane J. Baker
General Manager

**Department of Community Services**

January 31, 2005

The Honorable Christopher A. Coons
County Executive
New Castle County Government Center
87 Reads Way
New Castle, DE  19720

Dear Chris:

After 34+ years of service with New Castle County Government, I am submitting my notice of retirement effective April 2, 2005, with April 1 being my last day on the payroll.

I have enjoyed working with an excellent staff that assisted in bringing diverse services together in the Department of Community Services.  It has been a unique experience working with libraries, housing, a museum, adult activity centers, seniors, cultural arts, sports and special events.

Without the dedication of managers Anne Hampton and Patrick McHugh and their staff, the many successful programs and service would not have been possible.  I feel confident that my replacement will receive strong support from my management staff.

I am looking forward to my retirement and spending some of my leisure time at New Castle County's fine facilities and parks.

Best wishes in all your endeavors.

Sincerely,

*Diane J. Baker*

Diane J. Baker
General Manager

Cc:     David Singleton

87 Reads Way, New Castle, DE 19720                    Phone: 302-395-5600  Fax: 302-395-5592

ler A. Coons
Executive



James H. Sapp
Chief Procurement Officer

## Office of Administrative Services

## MEMORANDUM

To:   David W. Singleton
      Chief Administrative Officer

From: James H. Sapp
      Chief Procurement Officer



RECEIVED
APR 1 4 2005
NCC PURCHASING

Re:   Request to Use Leave Time

Date: April 11, 2005

---

I request that my last day of active involvement with the Office of Administrative Services be April 15, 2005.  Also, I request that I be paid leave time through May 3, 2005 (3 hours compensatory time, 18 hours special events time, and 75 hours vacation) with any balance of vacation and sick hours to be paid as severance.

Thank you for your consideration.

# APPENDIX

# 8



# State of Delaware
## The Official Website for the First State



Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & L

State Directory | Help | Search Delaware: [_____]      Citizen Services | Business Services |

**Delaware General Assembly**

| | |
|---|---|
| Home | |
| **Bill Tracking** | |
| Senate | |
|   Agenda | |
|   Ready List | |
|   Meeting Notices | |
|   Roll Call | |
| House | |
|   Agenda | |
|   Ready List | |
|   Meeting Notices | |
|   Journal | |
|   Roll Call | |
| All Legislation | |
| Current Day's Action | |
| Recent Legislation | |
| Signed Legislation | |
| Calendar | |
| Reports: | |
|   By Sponsor | |
|   By Status | |
|   By Date Introduced | |
|   By Date Signed | |
| Archives | |
| Contact Info | |
| House | |
| Joint Committees | |
| Legislative Divisions | |
| Legislative Info | |
| Meeting Schedules | |
| Online Publications | |
| Regulations | |
| Schedule | |
| Senate | |
| Virtual Tour | |
| Who's my Legislator | |
| | |
| Bill Search: | |

◐ **Back**

## 143rd General Assembly
### House Bill # 29

| | | |
|---|---|---|
| **Primary Sponsor:** | Smith | **Additional Sponsor(s):** Rep. Gilligan & Sen. DeLuca & Sen. Still |
| **CoSponsors:** | Reps. Cathcart, DiPinto, Hudson, Lavelle, Lofink, Maier, Miro, Spence, Ulbrich, Valihura; Sens. McDowell, Blevins, Henry, Sokola | |
| **Introduced on :** | 01/25/2005 | |
| **Long Title:** | AN ACT TO AMEND TITLE 9 OF THE DELAWARE CODE RELATING TO NEW CASTLE COUNTY EXECUTIVE AND COUNTY DEPARTMENTS. | |
| **Synopsis:** | This Bill reinstates the New Castle County Executive's authority to appoint heads of Executive branch agencies. This authority was deleted in the 1998 reorganization of New Castle County government. | |
| **Current Status:** | Signed **On** 02/09/2005 | |
| **Volume Chapter** | 75:9 | **Fiscal Note:** Not Required |
| **Date Governor acted:** | 02/09/2005 | |
| **Full text of Legislation: (in HTML format)** | Legis.html | |
| **Full text of Legislation: (in MS Word format)** | Legis.Doc (You need Microsoft Word to see this document.) | |

**Voting Reports:**

House vote: () Passed 1/25/2005 5:38:09 PM——————>

Senate vote: () Passed 1/27/2005 4:15:40 PM——————>

**Actions History:**

Feb 09, 2005 - Signed by Governor
Jan 27, 2005 - Passed by Senate
Jan 27, 2005 - Necessary rules are suspended in Senate

Session ▾

Bill Type ▾   No.

OR

Full Text Search   Go

*my* **LIS**

Register      Login

**LEGISLATIVE**
Actions Notice

Subscribe/Manage

Jan 27, 2005 - Lifted From Table in Senate
Jan 26, 2005 - Laid On Table in Senate
Jan 25, 2005 - Passed by House of Representatives
Jan 25, 2005 - Necessary rules are suspended in House
Jan 25, 2005 - Introduced in House

site map   |   about this site   |   contact us   |   translate   |   delaware.gov



SPONSOR:  Rep. Smith & Rep. Gilligan & Sen. DeLuca & Sen. Still
Reps. Cathcart, DiPinto, Hudson, Lavelle, Lofink, Maier, Miro,
Spence, Ulbrich, Valihura; Sens. McDowell, Blevins, Henry, Sokola

HOUSE OF REPRESENTATIVES

143rd GENERAL ASSEMBLY

HOUSE BILL NO. 29

AN ACT TO AMEND TITLE 9 OF THE DELAWARE CODE RELATING TO NEW CASTLE COUNTY EXECUTIVE AND COUNTY DEPARTMENTS.

1      WHEREAS, in our traditional system of democratic government, an Executive, whether they be the President, the

2  Governor, or the County Executive, is empowered to appoint heads of Executive branch agencies; and

3      WHEREAS, prior to the reorganization of New Castle County government in 1998, elected Executives in New Castle

4  County were granted such power by State law pursuant to 9 Del.C. § 1120(b); and

5      WHEREAS, the 1998 reorganization of New Castle County government deleted in its entirety 9 Del.C. § 1120(b) from

6  State law; and

7      WHEREAS, because of the deletion of 9 Del.C. § 1120(b) in its entirety, the historical power granted by the General

8  Assembly to New Castle County Executives was removed from State law; and

9      WHEREAS, present and future County Executives, subject to the advice and consent of County Council, should be

10  empowered to select heads of County departments as former New Castle County Executives were empowered.

11  NOW THEREFORE:

12  BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

13      Section 1. Amend § 1120, Chapter 11, Title 9, Delaware Code by striking said Section in its entirety and substituting in

14  lieu thereof the following:

15          "§ 1120. Power to Appoint Chief Administrative Officer and Department Directors.

16          (a)      The County Executive shall appoint a Chief Administrative Officer who shall serve at the pleasure of the

17          County Executive. The Chief Administrative Officer shall be qualified by education, training and experience for

18          the duties to be performed.

19          (b)      The County Executive, with the advice and consent of the County Council, shall appoint the General

20          Manager of Land Use, the General Manager of Special Services, the General Manager of Community Services,

HR : RDS : AFJ
0801430056

21    the Chief Procurement Officer, the Chief Financial Officer, the Chief Human Resources Officer, as well as the

22    heads of any subsequently created departments, who shall each serve at the pleasure of the County Executive.

23    (c)    Notwithstanding any other provision of State or county law, upon the effective date of this Section, any

24    persons then serving in any of the positions enumerated in this Section shall cease to be classified service

25    members of the New Castle County Merit System, but may thereafter continue to serve at the pleasure of the

26    County Executive.".

27    Section 2.  Amend § 1122, Chapter 11, Title 9, Delaware Code by striking said Section in its entirety and adding a new

28 § 1122 to read as follows:

29    "§ 1122.  County Executive Restructuring Power.

30    The County Executive of New Castle County shall have the power to merge, establish, rename, and modify

31    departments, boards, agencies, commissions, and offices of the County and may prescribe the functions and

32    management systems of all departments, boards, agencies, commissions and offices of the County, subject to

33    approval of County Council.  The authority granted pursuant to this Section shall supersede any conflicting

34    provisions within this Title.".

35    Section 3.  Severability clause.  If any provision of this Act or the application thereof to any person or circumstance is held

36 invalid, such invalidity shall not affect other provisions or applications of the Act which can be given effect without the invalid

37 provision or application, and, to that end, the provisions of this Act are declared to be severable.

38    Section 4.  This Act is effective upon its enactment into law.

<u>SYNOPSIS</u>

This Bill reinstates the New Castle County Executive's authority to appoint heads of Executive branch agencies.  This authority was deleted in the 1998 reorganization of New Castle County government.

Page 2 of 2

# APPENDIX

# 9

legis.delaware.gov - Official web site of First State Legislature                    Page 1 of 1

 

## State of Delaware
### The Official Website for the First State

Visit the Governor | General Assembly | Courts | Elected Officials | State Agencies

State Phone Directory | Help | Search [        ] (go)       Citizen Services | Business Services | Tourism Info.

**Delaware General Assembly**

Home
Bill Tracking
Contact Info
House
Joint Committees
Legislative Divisions
Legislative Info
Meeting Schedules
Online Publications
Press Releases
Regulations
Schedule
Senate
Virtual Tour
Who's my Legislator

Bill Search:

[ Session ▼ ]
[ Bill Type ▼ ] [ No.     ]
OR
[ Full Text Search ] [ Go ]

*my*LIS

Register      Login

**LEGISLATIVE**
Actions Notice
Subscribe/Manage

### Events Calendar

⇦ Previous Month                                         ⇨ Next Month

🔖        **January 2005**

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|--------|---------|-----------|----------|--------|----------|--------|
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 Legislature is in Session | 12 Legislature is in Session | 13 Legislature is in Session | 14 | 15 | 16 |
| 17 State Offices Closed | 18 Legislature is in Session Governor Minner's Inauguration | 19 Legislature is in Session | 20 No Session | 21 | 22 | 23 |
| 24 | 25 Legislature is in Session | 26 Legislature is in Session | 27 Legislature is in Session | 28 | 29 | 30 |
| 31 | 1 JFC Hearings - No Session | 2 JFC Hearings - No Session | 3 JFC Hearings - No Session | 4 | 5 | 6 |

⇦ Previous Month                                         ⇨ Next Month

site map | about this site | contact us | translate | delaware.gov

legis.delaware.gov - Official web site of First State Legislature                    Page 1 of 1



# State of Delaware
## The Official Website for the First State



Visit the Governor  |  General Assembly  |  Courts  |  Elected Officials  |  State Agencies

State Phone Directory  | Help  | Search [　　　　　　] 〔GO〕          Citizen Services  |  Business Services  |  Tourism Info.

**Delaware General Assembly**

Home
Bill Tracking
Contact Info
House
Joint Committees
Legislative Divisions
Legislative Info
Meeting Schedules
Online Publications
Press Releases
Regulations
Schedule
Senate
Virtual Tour
Who's my Legislator

Bill Search:

[ Session ▼ ]

[ Bill Type ▼ ] [ No. ]

OR

[ Full Text Search ] 〔Go〕

## Events Calendar

⇐ Previous Month                                          ⇒ Next Month

 ### February 2005

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 31 | 1 JFC Hearings - No Session | 2 JFC Hearings - No Session | 3 JFC Hearings - No Session | 4 | 5 | 6 |
| 7 JFC Orientation | 8 JFC Hearings - No Session | 9 JFC Hearings - No Session | 10 JFC Hearings - No Session | 11 | 12 | 13 |
| 14 JFC Orientation | 15 JFC Hearings - No Session | 16 JFC Hearings - No Session | 17 JFC Hearings - No Session | 18 | 19 | 20 |
| 21 State Offices Closed | 22 JFC Hearings - No Session | 23 JFC Hearings - No Session | 24 JFC Hearings - No Session | 25 | 26 | 27 |
| 28 JFC Orientation | 1 JFC Hearings - No Session | 2 JFC Hearings - No Session | 3 JFC Hearings - No Session | 4 | 5 | 6 |

⇐ Previous Month                                          ⇒ Next Month

### *my*LIS

Register        Login

**LEGISLATIVE**
Actions Notice
Subscribe/Manage

site map  |  about this site  |  contact us  |  translate  |  delaware.gov

legis.delaware.gov - Official web site of First State Legislature                    Page 1 of 1

 State of Delaware
The Official Website for the First State 

Visit the Governor | General Assembly | Courts | Elected Officials | State Agencies

State Phone Directory | Help | Search [_____] (GO)          Citizen Services | Business Services | Tourism Info.

**Delaware General Assembly**

Home
Bill Tracking
Contact Info
House
Joint Committees
Legislative Divisions
Legislative Info
Meeting Schedules
Online Publications
Press Releases
Regulations
Schedule
Senate
Virtual Tour
Who's my Legislator

Bill Search:

[ Session ▼ ]

[ Bill Type ▼ ] [ No. ]

OR

[ Full Text Search ] [Go]

*my***LIS**

Register    Login

**LEGISLATIVE**
Actions Notice
Subscribe/Manage

## Events Calendar

⇐ Previous Month                                    ⇒ Next Month

 **March 2005**

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 28 JFC Orientation | 1 JFC Hearings - No Session | 2 JFC Hearings - No Session | 3 JFC Hearings - No Session | 4 | 5 | 6 |
| 7 JFC Orientation | 8 JFC Hearings - No Session | 9 JFC Hearings - No Session | 10 JFC Hearings - No Session | 11 | 12 | 13 |
| 14 | 15 Legislature is in Session | 16 Legislature is in Session | 17 Legislature is in Session | 18 | 19 | 20 |
| 21 | 22 Legislature is in Session | 23 Legislature is in Session | 24 Legislature is in Session | 25 State Offices Closed | 26 | 27 |
| 28 | 29 Easter Break - No Session | 30 Easter Break - No Session | 31 Easter Break - No Session | 1 | 2 | 3 |

⇐ Previous Month                                    ⇒ Next Month

site map   |   about this site   |   contact us   |   translate   |   delaware.gov

legis.delaware.gov - Official web site of First State Legislature



## State of Delaware
### The Official Website for the First State



Visit the Governor | General Assembly | Courts | Elected Officials | State Agencies

State Phone Directory | Help | Search [_____] 🔍

Citizen Services | Business Services | Tourism Info.

**Delaware General Assembly**

### Events Calendar

Home
Bill Tracking
Contact Info
House
Joint Committees
Legislative Divisions
Legislative Info
Meeting Schedules
Online Publications
Press Releases
Regulations
Schedule
Senate
Virtual Tour
Who's my Legislator

Bill Search:

[ Session ▾ ]
[ Bill Type ▾ ] No. [____]

OR

[ Full Text Search ____ ] [Go]

⇦ Previous Month

⇨ Next Month

 **April 2005**

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|--------|---------|-----------|----------|--------|----------|--------|
| 28 | 29 Easter Break - No Session | 30 Easter Break - No Session | 31 Easter Break - No Session | 1 | 2 | 3 |
| 4 JFC Orientation (Grants-In-Aid) | 5 Easter Break - No Session JFC Hearings (Grants-In-Aid) | 6 Easter Break - No Session JFC Hearings (Grants-In-Aid) | 7 Easter Break - No Session JFC Hearings (Grants-In-Aid) | 8 | 9 | 10 |
| 11 | 12 Legislature is in Session | 13 Legislature is in Session | 14 Legislature is in Session | 15 | 16 | 17 |
| 18 | 19 Legislature is in Session | 20 Legislature is in Session | 21 Legislature is in Session | 22 | 23 | 24 |
| 25 Bond Hearings | 26 Legislature is in Session | 27 Legislature is in Session | 28 Legislature is in Session | 29 | 30 | 1 |

⇦ Previous Month

⇨ Next Month

*my*LIS

Register       Login

**LEGISLATIVE**
Actions Notice
Subscribe/Manage

site map  |  about this site  |  contact us  |  translate  |  delaware.gov

legis.delaware.gov - Official web site of First State Legislature                    Page 1 of 1



# State of Delaware
## The Official Website for the First State



Visit the Governor | General Assembly | Courts | Elected Officials | State Agencies

State Phone Directory | Help | Search [_____] [Go]        Citizen Services | Business Services | Tourism Info.

**Delaware General Assembly**

## Events Calendar

⇦ Previous Month                                                          ⇨ Next Month

### May 2005

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 25 Bond Hearings | 26 Legislature is in Session | 27 Legislature is in Session | 28 Legislature is in Session | 29 | 30 | 1 |
| 2 | 3 Legislature is in Session | 4 Legislature is in Session | 5 Legislature is in Session | 6 | 7 | 8 |
| 9 | 10 Legislature is in Session | 11 Legislature is in Session | 12 Legislature is in Session | 13 | 14 | 15 |
| 16 JFC Budget Markup | 17 JFC Markup - No Session | 18 JFC Markup - No Session | 19 JFC Markup - No Session | 20 | 21 | 22 |
| 23 JFC Budget Markup | 24 JFC Markup - No Session | 25 JFC Markup - No Session | 26 JFC Markup - No Session | 27 | 28 | 29 |
| 30 State Offices Closed | 31 Legislature is in Session | 1 Legislature is in Session | 2 Legislature is in Session | 3 | 4 | 5 |

⇦ Previous Month                                                          ⇨ Next Month

**Sidebar navigation:**

Home
Bill Tracking
Contact Info
House
Joint Committees
Legislative Divisions
Legislative Info
Meeting Schedules
Online Publications
Press Releases
Regulations
Schedule
Senate
Virtual Tour
Who's my Legislator

Bill Search:

[Session ▼]

[Bill Type ▼]  No. [____]

OR

[Full Text Search]  [Go]

*my* LIS

Register        Login

**LEGISLATIVE**
Actions Notice
Subscribe/Manage

site map    |    about this site    |    contact us    |    translate    |    delaware.gov

legis.delaware.gov - Official web site of First State Legislature                    Page 1 of 1



# State of Delaware
## The Official Website for the First State



Visit the Governor | General Assembly | Courts | Elected Officials | State Agencies

State Phone Directory | Help | Search [                    ] (go)                    Citizen Services | Business Services | Tourism Info.

**Delaware General Assembly**

| | | |
|---|---|---|
| Home | | |
| Bill Tracking | ⇐ **Previous Month** | ⇒ **Next Month** |
| Contact Info | | |
| House | **Events Calendar** | |

### June 2005

⇐ **Previous Month**                                                                 ⇒ **Next Month**

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 30 State Offices Closed | 31 Legislature is in Session | 1 Legislature is in Session | 2 Legislature is in Session | 3 | 4 | 5 |
| 6 | 7 Senate is in Session | 8 Legislature is in Session | 9 Legislature is in Session | 10 | 11 | 12 |
| 13 | 14 Legislature is in Session | 15 Legislature is in Session | 16 Legislature is in Session | 17 | 18 | 19 |
| 20 | 21 Legislature is in Session | 22 Legislature is in Session | 23 Legislature is in Session | 24 | 25 | 26 |
| 27 | 28 Legislature is in Session | 29 Legislature is in Session | 30 Legislature is in Session | 1 Legislature is in Special Session | 2 | 3 |

Left sidebar navigation:
- Home
- Bill Tracking
- Contact Info
- House
- Joint Committees
- Legislative Divisions
- Legislative Info
- Meeting Schedules
- Online Publications
- Press Releases
- Regulations
- Schedule
- Senate
- Virtual Tour
- Who's my Legislator

Bill Search:

[ Session ▼ ]

[ Bill Type ▼ ] No. [    ]

OR

[ Full Text Search ]  [ Go ]

**myLIS**

Register    Login

**LEGISLATIVE**
Actions Notice
Subscribe/Manage

⇐ **Previous Month**                                                                 ⇒ **Next Month**

site map  |  about this site  |  contact us  |  translate  |  delaware.gov

# APPENDIX
# 10

Christopher A. Coons
County Executive



Dennis J. Siebold
Acting County Attorney

## OFFICE OF LAW
## M E M O R A N D U M

TO:          The Honorable Christopher A. Coons
             County Executive

FROM:        Dennis J. Siebold
             Acting County Attorney

RE:          House Bill No. 29

DATE:        January 27, 2005

--------------------------------------------------------------------------------

     I have been asked whether any County action would be necessary to implement the provisions of House Bill No. 29, which would provide, among other things, that all General Managers would upon enactment thereof "cease to be classified service members of the New Castle County Merit system, but ... thereafter continue to serve at the pleasure of the County Executive." The Bill also provides that the County Executive shall appoint the General Managers "with the advice and consent" of County Council." The question may arise, therefore, whether County Council's "advice and consent" is necessary to continue the existing General Managers in their current positions.

     In my opinion, no action by County Council would be necessary to implement the mandate of the House Bill. The House Bill is clear that its provisions are effective "[n]otwithstanding any other provision of State or county law, upon the effective date" of the section. The Bill is equally clear that the incumbents' change in status is effected by the passage of the State statute; it envisions no subsequent action by County Council to make it effective.

     Statutes may be made contingent upon the happening of a future event, such as County Council taking some type of action. City of Newark v. Township of Hardyston, 667 A.2d 193 (N. J. Super. A. D. 1995), cert. den. 677 A.2d 277; 75 Am.Jur.2d Statutes §366. For example, the General Assembly granted the counties the power by 9 Del. C. §8102 (a) to levy a Realty Transfer Tax, but that tax did not become effective until imposed by the County government by ordinance. Significantly, no such requirement is included in House Bill No. 29.

     For this reason, I conclude that the provisions of House Bill No. 29 are automatic and, upon its enactment into law the incumbent General Managers who are enumerated in

the text will, by operation of State law, automatically become unclassified service employees serving at the pleasure of the County Executive.

Similarly, the Bill states in subsection (c) that the incumbents "may continue to serve ...." It does not envision that Council's "advice and consent is a prerequisite for that service. Accordingly, I conclude that Council action is not necessary unless the County Executive wishes to replace one or more of the incumbent General Managers with a new nominee.

Please let me know if you have any further questions or if I can be of additional assistance in this matter.

cc:     Mr. David W. Singleton
        Mr. Richard Pryzwara
        Mr. Charles L. Baker
        Mr. Joseph J. Freebery
        Ms. Diane J. Baker
        Mr. James H. Sapp
        Mr. Ronald A. Morris
        Dr. Patricia Lutz DiIenno

DJS/p:hb29.mem

# APPENDIX

# 11

David W. Singleton

Page 15

1          Q.    Is there a gentleman named Charlie Baker?

2          A.    Mr. Baker is the manager of land use.

3          Q.    So we are talking Morris, Sapp, Baker, Diane,

4    McAllister, Freebery, and who did I leave out?

5          A.    Well, there was an acting county attorney.

6          Q.    And who was that?

7          A.    Dennis -- I am drawing a blank on the name.

8          Q.    Okay.  Am I correct that either prior to

9    Mr. Coons taking office or shortly thereafter -- strike

10   that for now.

11               At what point did you learn you were

12   going to become the CAO of New Castle County?

13         A.    Again, I can't give you an exact date, but I

14   would say it was probably mid-December of 2004.

15         Q.    And were you involved in Mr. Coons' campaign

16   for county executive?

17         A.    My only involvement was to make a campaign

18   contribution and attend a fundraiser.

19         Q.    I'm not going to ask you the number, it's

20   public record anyway, but you made a campaign

21   contribution to Mr. Coons' campaign?

22         A.    I did.

23         Q.    Did you attend more than one fundraiser?

24         A.    I attended one that I believe was for his

David W. Singleton

Page 16

1  campaign for county council president.  For county

2  executive, one or two.

3       Q.   How long had you known Chris Coons prior to

4  becoming CAO?

5       A.   I can't tell you when I first met him.  I did

6  not know him terribly well.  I had certainly met him

7  probably, probably sometime in the late '90s, I had first

8  met him.  I can't really tell you.

9       Q.   Would you describe Mr. Coons as a friend or an

10  acquaintance?  A friend being closer than an

11  acquaintance.

12       A.   I would say an acquaintance..

13       Q.   Would I be correct, then, that you and

14  Mr. Coons' family and your family have never socialized

15  together outside of office functions?

16       A.   I can't recall any occasion when we

17  socialized.

18       Q.   Can you give me -- and I apologize for not

19  having asked this.  Could you give me your educational

20  background, please?

21       A.   I hold a Bachelor's degree in Sociology and

22  Anthropology.

23       Q.   And where did you obtain that degree?

24       A.   Swarthmore College.

David W. Singleton

1          Q.    Do you have any graduate degrees?

2          A.    I do not.

3          Q.    Could you give me your employment history from

4     the time you graduated from Swarthmore, as best you can?

5     We actually had a witness start with, "I had a paper

6     route when I was 9."  Let's start with when you graduated

7     from college.

8                    MR. WIER:  Was that you?

9                    MR. LAWLESS:  No.  I never had a paper

10    route.

11                   THE WITNESS:  I did.

12                   After graduating from college --

13                   MR. LAWLESS:  Did dishes.  Go ahead.

14                   THE WITNESS:  -- initially, I worked at

15    Philadelphia General Hospital in a program treating sex

16    offenders.  I then was employed by the RCA Corporation,

17    in the personnel department.

18                   In 1971, I came to Delaware, was

19    employed by the City of Wilmington from 1971 to 1984.

20                   In 1984, I went to work for JP Morgan

21    and Company and remained with JP Morgan until 1999.

22                   At the beginning of 2000, I went to work

23    for what was then MBNA Corporation, now Bank of America.

24    BY MR. LAWLESS:

David W. Singleton

Page 46

1    government generally or, 2, remain as the head of the

2    Department of Special Services in any capacity?

3        A.    I did.

4        Q.    And what was that recommendation and when did

5    you make them?

6        A.    The recommendation was that Mr. Freebery

7    should be replaced.

8        Q.    When you say "replaced," did you say replaced

9    to Mr. Coons?  Did you say fired?  Did you say removed

10   from the position and placed elsewhere?  What

11   specifically did you say to Mr. Coons?

12       A.    I'm afraid that three years later I can't tell

13   you the exact words.  The sense of them was that he

14   should be terminated from the position of general manager

15   of the Department of Special Services.

16       Q.    And upon what did you base that

17   recommendation?

18       A.    Upon a number of factors.  One being --

19              MR. WIER:  We are getting into probably

20   a lengthy subject, can we take a quick break?

21              MR. LAWLESS:  Sure.  No problem.

22              THE VIDEOGRAPHER:  Off the record at

23   10:49.

24              (A brief recess was taken.)

David W. Singleton

Page 61

1    question; it's not a question.

2                    MR. LAWLESS:  I asked him if he knew

3    what I meant.

4                    MR. WIER:  I am just objecting to the

5    form of your questions, and I am objecting to that one.

6    BY MR. LAWLESS:

7         Q.    Do you understand what I mean, sir, when I ask

8    that question?

9         A.    I have an idea of what you may mean.

10        Q.    Okay.  Answer the question in that context.

11        A.    I think the answer would be, yes.

12        Q.    Okay.  And tell me what that was.

13        A.    Well, I can say a number of examples, and I

14   can also give you a general impression.

15        Q.    Okay.  I'm sorry.  Finish.  Go ahead.

16        A.    You have a large number of e-mails here, and

17   if they are what I am guessing they are, they would

18   substantiate that Mr. Freebery was often very slow in

19   responding to requests for information, for

20   recommendations, for explanations, which certainly

21   doesn't help to enhance the stature of an administration

22   to have a general manager be unresponsive or slow to

23   respond to requests of that nature.

24                    There was one incident, one situation

David W. Singleton

Page 62

1    that we felt reflected badly on the administration, and

2    it was Mr. Freebery's involvement with the Police

3    Athletic League, which it was, concerned primarily

4    actions that had taken place previously, but which, we

5    felt were disturbing.  We had asked him to sever his

6    relationship with the Police Athletic League, which my

7    recollection is that he initially agreed to do that, but

8    never followed through and actually resigned from that

9    board.

10            So if I am understanding your question

11   correctly, I would say, yes, there were a number of ways

12   in which Mr. Freebery's performance was not supportive of

13   what the new administration was trying to achieve.

14       Q.   Okay.  Let's start with the first group.  You

15   indicated that it was your recollection that Mr. Freebery

16   had been slow in responding to requests for information,

17   recommendations, and explanations.

18            Were those inquiries made by you, that

19   you are referring to?

20       A.   Many of them were.

21       Q.   And can you give us examples of those

22   inquiries, what they were, and what your problem was with

23   the response?

24       A.   I'm not going to be able to give you too many

David W. Singleton

Page 66

1  that Lynne Howard has already testified that what you

2  have just described coming to her from Tracy Searles has

3  also never been reduced to writing by either Lynne Howard

4  or Tracy Searles.  You are aware of that, aren't you?

5        A.  I am not aware of that.

6        Q.  Would that surprise you?

7        A.  No.

8        Q.  So can you give me -- again, this is for the

9  record.  Can you give us one example of a situation where

10  you made a request for Joe Freebery that was too long in

11  coming, as far as you were concerned?

12        A.  I cannot give you one off the top of my head.

13  Well, actually, I probably can.  I know there were, I had

14  a series of questions -- let's see.  I know one instance,

15  one situation involved a county employee that we had

16  received a complaint that this individual, an employee in

17  the Department of Special Services, while perhaps off

18  duty, was engaging in survey work, and actually had

19  performed a survey erroneously.  And I recall asking

20  Mr. Freebery to investigate that and let me know what he

21  determined in terms of whether this happened and what

22  actions was appropriate.

23              And I recall there -- I couldn't tell

24  you exactly how long, but I recall needing to ask at

David W. Singleton

Page 67

1    least once or twice, What's going on with this?  Because

2    I had not gotten an answer.

3        Q.    Do you recall how long that period of time was

4    that you were concerned about having not gotten an

5    answer?

6        A.    I couldn't tell you precisely.  It was

7    probably a couple of weeks, a week or two, two or three

8    weeks, something like that.

9        Q.    Do you recall the person who you were

10    inquiring about, their name?

11        A.    It was something -- it was Michael Carolon or

12    Cartolin, something like that.

13        Q.    You don't recall the name?

14        A.    I'm sorry?

15        Q.    I'm having trouble hearing you.

16        A.    I'm not certain of the name, I think it might

17    have been Carolon or something like that.

18        Q.    Do you recall what the ultimate result of your

19    inquiry to Mr. Freebery was?

20        A.    I do.

21        Q.    What was the result?

22        A.    He informed me, eventually, that he had dealt

23    with it.  Apparently, I guess he told me, confirming that

24    indeed, this individual had broken the rules by engaging

David W. Singleton

Page 68

1   in this work.  And that Mr. Freebery, rather than giving

2   him any discipline or involving the personnel department,

3   that Mr. Freebery had gotten him to promise that he would

4   retire some months down the line, six months, eight

5   months down the line.

6        Q.   Do you know if he was ever suspended from his

7   position by anyone?

8        A.   I don't recall that he was.

9        Q.   Do you know if he was reduced in rank in his

10  position, at any time, after this incident?

11       A.   I don't recall that.

12       Q.   Did you or anyone else in the Coons

13  Administration make a formal complaint about this

14  individual to the department of human resources under the

15  merit system?

16       A.   I asked the director of human resources to

17  join us for a discussion.  And my recollection -- for the

18  discussion with Mr. Freebery.  And my recollection is

19  that she was disturbed and concerned that she had not

20  been consulted by Mr. Freebery in this matter, and that

21  he had chosen to resolve it without consultation with

22  her.

23       Q.   Okay.  So at least your testimony is that she

24  was upset he chose to resolve it without her involvement?

David W. Singleton

Page 72

1   receives a significant subsidy, financial subsidy from

2   county government.  And many, but not all of the board

3   members, are county officials.  I became aware that

4   Mr. Freebery, while serving as a board member, had not

5   recused himself when his wife was a candidate for

6   employment and was hired by the Police Athletic League.

7   I also became aware that he had become involved in issues

8   of her, I believe her vacation time, which seemed highly

9   inappropriate that an individual would play that role,

10  play any role regarding a spouse's employment and terms

11  of employment.

12              I had asked him to resign from the board

13  because of this.  He had agreed to do so.  And I think

14  that's another one that I believe I followed up on a

15  number of occasions, Where does this stand?  And the best

16  I know, he may serve to this day.  I don't believe he

17  ever resigned from that board.

18      Q.   How did you become aware of all of this,

19  Mr. Singleton?  Were you on the board of the Police

20  Athletic League?

21      A.   I was not.

22      Q.   How did you become aware of this?

23      A.   Given the fact that the county, the county's

24  intimate involvement with the Police Athletic League, and

# APPENDIX

# 12

Sherry L. Freebery

1          A.    By Tom.  The county executive made those

2    selections.

3          Q.    With your input?

4          A.    Yes.

5          Q.    I mean, you supported your brother in coming

6    from acting director to the general manager position?

7          A.    Most days I did, yes.

8          Q.    And Tom listened to you, did he not?

9          A.    50/50 on that one.  I had free input, and he

10   made his own decisions.

11         Q.    When you went down to Dover, did you tell any

12   legislator, that the legislation did away with the county

13   executive's pre-existing authority to hire and fire the

14   heads of the various departments?

15         A.    I'm sorry.  Can you repeat that, again?

16         Q.    When you went down to Dover or in any

17   discussions you had with legislators who were considering

18   your reorganization, did you state to anyone, any

19   legislator that your proposed legislation did away with

20   the authority of the county executive to terminate the

21   heads of the various executive departments?

22         A.    Can you read back the very end, the authority

23   of the county executive to terminate?

24         Q.    Right.  To get rid of the heads of the

# APPENDIX

# 13

Patricia Lutz DiIenno, Ed.D.

Page 51

1    him, Joe, we would like you to step down as the general

2    manager of the Department of Special Services?

3         A.    I don't know.

4         Q.    During the period of time that Mr. Coons was

5    county executive until you left -- I'm sorry -- until Joe

6    Freebery left, were you aware of anything that Joe

7    Freebery did in his capacity as general manager of the

8    Department of Special Services that in any way conflicted

9    with or ran contrary to the policies of the Coons

10   administration in terms of how that department should be

11   run?

12                  MS. ALLEN:   Objection.

13   BY MR. LAWLESS:

14        Q.    Do you remember the question?

15        A.    Yes, I do.  There were managers' meetings that

16   we would have every Tuesday with the Chief Administrative

17   Officer that was with all of the general managers.  And I

18   do remember in some of those meetings Joe was not -- he

19   was not an active participant in the meetings as he had

20   been in the past.

21                  And there were some concerns that I

22   observed from the Chief Administrative Officer, Mr.

23   Singleton, at the time that possibly Joe was attending

24   the meetings, but when he went back to his office, that

Patricia Lutz DiIenno, Ed.D.

Page 52

1   he was not following the directions of that

2   administration.

3        Q.   Now, how did you reach that conclusion?  Did

4   you have a conversation with Mr. Singleton about that?

5        A.   No.  I did not.

6        Q.   How did you reach that conclusion?

7        A.   Because there were comments made in the

8   managers' meetings.  There was some dialogue between Mr.

9   Singleton and Mr. Freebery.

10       Q.   And what do you recall Mr. Singleton saying

11  and what do you recall Mr. Freebery saying that lead you

12  to reach that conclusion?

13       A.   Questions as to why something may not have

14  been done or completed or brought to the meeting.  And

15  just a lack of response from Mr. Freebery or...

16       Q.   So, then, I guess, I want to go back and make

17  sure that I'm clear as to what your earlier testimony

18  was.

19            You had mentioned that you thought that

20  the only person you heard say anything negative about Mr.

21  Freebery was Mr. Przywara.  And my notes say, you weren't

22  sure about what Mr. Singleton might or might not have

23  said that was critical of Joe Freebery.

24            Is it now your testimony that you recall

Patricia Lutz DiIenno, Ed.D.

Page 53

1   during these managers' meetings exchanges between Mr.

2   Singleton and Mr. Freebery that leads you to conclude

3   that Mr. Singleton believed that Mr. Freebery was acting

4   in a manner not consistent with what the Coons

5   administration wanted done?

6       A.   Just to be clear, Mr. Singleton in relation to

7   your first question, never said anything to me about Mr.

8   Freebery.  So, I want to be clear about that.  And what

9   you have just said, I believe, is correct in relation to

10  the meetings that I attended.  But that was not a

11  conversation that I had with Mr. Singleton.

12      Q.   You can only recall generalities.

13           Can you recall any specific project, or

14  specific function, or task?

15      A.   No, I don't.

16      Q.   How many times do you recall this happening in

17  the managers' meetings?

18      A.   I don't remember.

19      Q.   Was it your understanding or the conclusion

20  that you drew that Mr. Freebery was attending the

21  meetings, but then going back to the office and doing

22  things to try to in someway undermined the Coons'

23  administration?

24      A.   I'm not sure it was undermining.  But, I

Patricia Lutz DiIenno, Ed.D.

Page 54

1    believe, that he felt that it was business as usual under

2    the prior administration.

3         Q.   I kind of lost you on that.

4              MR. LAWLESS:  Could you repeat back what

5    she said?  I'm not sure I followed her answer.

6              (The court reporter was requested to

7    read back from the record.)

8    BY MR. LAWLESS:

9         Q.   When you say you think he felt, who do you

10   mean when you say, you think he felt it was business as

11   usual under the prior administration?

12        A.   Mr. Freebery.

13        Q.   I'm not sure I understand what you mean.

14        A.   Whatever I would tell you would be my

15   perception.

16        Q.   I understand.  That's all you can tell us

17   anyway.

18        A.   My perception was, he would attend the

19   meetings.  He would not participate.  And whatever was

20   discussed at the meetings relating specifically to

21   Special Services were just that a discussion.

22              However, he would return to his office,

23   and it would be just whatever they normally had been

24   doing, not necessarily the new direction that they were

# APPENDIX
# 14

# Coons fires Freebery

### By Andrea Miller
### Staff Reporter

New Castle County Executive Christopher Coons has fired Special Services Department General Manager Joseph Freebery.

Freebery, 58, a 23-year county veteran who was a merit-system employee until state law was changed in February to make general managers appointed positions, said he believes the termination was political.

He has retained Wilmington attorney Blaire DeMatteis, and intends to sue the county.

"Mr. Coons has intentionally and purposefully violated the intent of the merit system, which was designed to protect employees from this very thing," Freebery said.

Coons disagreed.

"The statute is clear as a bell, the position serves at the pleasure of the executive regardless of any previous circumstances," Coons said.

Delaware Code Title 9 Chapter 11 states that general managers, "serve at the pleasure of the County Executive. Notwithstanding any other provision of state or county law, on February 9, 2005, any persons then serving in any of the positions enumerated in this section shall cease to be classified service members of the New Castle County Merit System, but may thereafter continue to serve at the pleasure of the County Executive."

See Freebery, page 12

## Freebery from page 1

Of the seven general managers who served under the previous administration, which included Freebery's sister Sherry Freebery as chief administrative officer, five have retired or stepped down. Only Land Use Department General Manager Charles Baker has kept his job.

Executive appointment of general managers was included in state law when county government was established in 1967. It was deleted from the Delaware Code in 1998, when then County Executive Thomas Gordon reorganized county government. The Special Services Department was created at that time by combining several smaller departments, including Parks and Recreation, which Freebery headed.

In an interview Friday Freebery said he would have applied for a lower level job in 1998 rather than bid for general manager if he had known it could turn into an at will position before he was eligible for full retirement.

Freebery's salary this year was $134,900. Based on similarly-paid recent retirees, he estimated that his retirement would have been about $70,000 to $80,000 if he reached the 30-year full vesting mark. But because he was terminated, he may not be eligible for retirement benefits. The matter is under review by the Human Resources Department.

Coons said it is typical for a new administration to appoint new cabinet level managers soon after it takes office, but he waited several weeks to give Freebery a chance to demonstrate he could work within the new structure, and he didn't.

"It is time for a change. I want a team that shares my vision, priorities and values," Coons said.

Freebery said Coons had not spoken with him since his first day in office, and no one in the administration sat down with him to do any sort of good-faith probation period evaluation, leadership direction or guidance.

Coons disagreed.

"I am not going to go through all of the e-mails, phone calls and meetings," Coons said. "But if his expectation is that it is o.k. to sit in his office and wait for me to come over and do a checklist evaluation, that is a perfect example of what I am talking about.

"When asked or ordered to do something, he certainly did. But I look for more from someone who is running one of the largest departments. I expect initiative and communication—in short, a different style, particularly when this department came with a long list of inherited problems" from failing sewers to flooding, a lack of capital program strategy, and a major disconnect between Special Services and other departments involved with land issues.

Freebery, however, said he thought he was doing a good job.

"I have served successfully under several executives. I thought I was performing up to the last day until I was called in Wednesday at 3:30 p.m. and was shown three sheets of paper, one was a resignation, one was a retirement letter and one was letter of termination," he said. He said he wasn't about to resign or retire.

Administration Communications Director Allison Taylor Levine said the route Freebery chose is disappointing, and the administration would have preferred that he retire or resign.

Freebery, the second of seven children, is a native of New Castle County. He went to Salesianum High School, earned a degree in sociology with a minor in economics from Notre Dame, and worked for a construction company before starting his own. He applied for a job with the county in 1982.

He said he has no immediate plans to look for another job, and intends to spend some time gather thoughts and decide what is in his family's best interests. Freebery is married and has one adult child who works in the county's law department.

# APPENDIX

# 15

**Democratic Candidates for County Executive Debate Excerpt**

Chris:    Thank you, Mark. I think my own history with the Democratic Party, having the support of organized labor in my first election in 2000. Having been an active volunteer and supporting many different candidates across the spectrum within the Democratic Party for the last 15 years speaks for itself. And, I think, it is important as Democratic voters think about who they are going to support in the primary on Saturday, September 11th that they look at who's got a record of service and engagement with the Delaware Democratic Party. I was also at a convention. I was a delegate in 1996 and as my wife and I have watched some of the proceedings up in Boston this week, we've been reminded of why we are democrats and why we care deeply about the values and principles of the Democratic Party. I'll speak briefly to the comments that Ms. Freebery made and try and set the record straight on this. We've got two different visions for how the top management layer of New Castle County government ought to operate. And the legislation that I supported, and members of the General Assembly put in was not as she put it, crafted by a developer and snuck through in the dead of night. But obviously, we've got different views on quite a few different things and how quite a few different things have come to happen, legislatively, recently and a year ago and frankly, throughout my entire term as service in county government. The current law and the current situation would produce a situation where the next County Executive, whether any of the three of us before you, would have Ms. Freebery's brother running the largest department in New Castle County government. If Mr. Bush were to have as his Attorney General, the Attorney General from the Clinton Administration or the Secretary of Defense from the Clinton Administration or the Secretary of Education from the Clinton Administration, you'd say, I suspect that, that prevents the President from carrying forward the policy agenda on which he was elected. What I was simply trying to accomplish was what has historically been the case, which was that the County Executive has the freedom to put above General Managers, political appointees who are directors who could carry forward the policy agenda, of the newly elected County Executive. We disagree, of course, as to the history and the intended purpose of that legislation. I pledged back on June 30 of last year, that I would make no more efforts to change the law in this regard, we'd simply let the election decide. And I want each of you to focus on that, because as Ms. Freebery has said, her management team will be the same going for the next four years as it has been the last eight.

# APPENDIX 16

THOMAS P. GORDON
COUNTY EXECUTIVE

SHERRY L. FREEBERY
CHIEF ADMINISTRATIVE OFFICER



EXECUTIVE OFFICE

## MEMORANDUM

**TO:** ▮▮▮▮▮▮▮▮▮▮▮

General Manager, Department of Special Services

**FROM:** Thomas P. Gordon
County Executive

Sherry L. Freebery
Chief Administrative Officer

**RE:** **Conditions of Employment**

**DATE:** November 24, 2003

Seven years ago, this administration began an incredible journey to re-invent government. We succeeded! New Castle County Government has become a model of public service due to your hard work, professional excellence, and personal dedication.

Our accomplishments as a team could never have been attained if you, as an experienced County employee, had not stepped up as leader. It took your perseverance, your creativity and your knowledge from years of government service to actually have the courage to change New Castle County.

Lest some forget the promises that were made to you when you accepted the promotion to General Manager, these same promises are hereby re-stated so that you may rely upon them legally. The politically-appointed position of "director" was intentionally deleted from state law as the head of each department. In its place, a merit system title of "General Manager" was used to denote the head of each department.

Of course, someone could change state law, or even without a change, could re-hire political appointees as department directors, as in the days of old. Thus, a political appointee could direct you and your subordinates. We eliminated these costly positions to save money, and to induce you to accept a leadership role in your department, immune from political pressure, and still secure in a merit system position. You accepted your position as general manager based on that understanding.

Freebery
EXHIBIT NO. 1
7-28-06   84

CONFIDENTIAL
NCC 0060

87 READS WAY, NEW CASTLE, DE  19720              1              PHONE: 302-395-5104    FAX: 302-395-5268

Today, it is again re-stated. You may rely upon your position as general manager remaining as a merit system position, devoid of political whims and pressures. No threat of termination may affect you, except for just cause, or non-performance. You are entitled to the same job security as all other merit system employees and should fully enjoy your career as a government professional.

This letter is meant to be retained by you, and a copy retained in your personnel file. It is intended that you may legally rely upon the representations in this letter as binding as an employment contract.

If in the future, someone "wants you out" of your position, this government must be prepared to buy you out fully: salary, benefits, and all your time toward pension, and all attendant pension benefits. As with all merit positions, you can not be politically removed. Any attempt to do so would equate to an unlawful discharge, for which you must be fully compensated.

Your contributions to this government will be realized by our citizens for decades into the future. Thank you for agreeing to serve our community by accepting the position of general manager. You·are an incredible asset to New Castle County.

SLF:tla

cc:     Personnel File
        Law Department

CONFIDENTIAL
NCC 0061

# APPENDIX

# 17

witnesses and compel the production of books and papers pertinent to any investigation or hearing authorized by this Chapter. Any person who shall fail to appear in response to a subpoena or to answer any questions or produce any books or papers pertinent to any such investigation or hearing or who shall knowingly give false testimony shall be guilty of a misdemeanor.

(Ord. No. 98-047, § 1(26-17), 5-12-1998)

## Sec. 26.01.018. Prohibitions and penalties.

A.  The following prohibitions shall be applicable under this Chapter:

1.  No person shall be appointed to or removed from or in any way favored or discriminated against with respect to any County position or appointed County administrative office because of race, color, national origin, gender, age, physical disability, political or religious opinions or affiliations or other nonmerit factors, except where specific age, gender or physical requirements constitute a bona fide occupational qualification necessary to proper and efficient administration.

2.  No person shall willfully make any false statement, certificate, mark, rating or report in regard to any test, certification or appointment made under any section of this Chapter or in any manner commit or attempt to commit any fraud preventing the impartial execution of this Chapter and rules and regulations of the merit system.

3.  No person shall directly or indirectly give, render, pay, offer, solicit or accept any money, service or other valuable thing for, or in connection with, any test for, appointment to, proposed appointment to, promotion to or proposed promotion to any County position or appointed County administrative office.

4.  No person shall defeat, deceive or obstruct any person in his or her right to examination, eligibility, certification or appointment under this Chapter or furnish to any person any special or secret information for the purpose of affecting the rights or prospects of any person with respect to employment in the classified service.

[5.  Reserved.]

6.  Consistent as necessary with existing bargaining agreements, there will be a freeze through January 5, 2005 on all new hires, promotions, terminations, transfers and reclassifications of County employees. In addition, there shall be no pay step increases administered, other than those arising from the proper timely completion of the normal annual employee performance appraisal process or other date set by collective bargaining agreements for administering performance appraisals and merit pay increases. Exceptions shall be for temporary/seasonal/part-time employees, crossing guards, New Castle County Council staff (due to the General Assembly-mandated increase in County Council size), and positions funded in full by outside grants. There also shall be exceptions for exigent circumstances to take personnel actions essential to the public welfare, which exceptions shall be made only upon recommendation and enunciation of the exigent circumstances by the Chief Human Resources Officer and department general manager and approval by a majority of the Council Personnel Committee.

B.  Any person who by himself or herself or with others willfully violates this Section shall be guilty of a misdemeanor and upon conviction thereof shall be punished as provided in Section 1.01.009 of this Code. Any person convicted under this Section shall be ineligible, for a period of five (5) years thereafter, to hold any County office or position and, if he or she is an officer or employee of the County, he or she shall immediately forfeit his or her office or position.

(Ord. No. 98-047, § 1(26-18), 5-12-1998; Ord. No. 04-138, § 1, 10-12-2004)