IN THE UNITED STATED DISTRICT COURT
FOR THE EASTERN DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **JOSEPH J. FREEBERY** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **C.A. No. 05-748-PSD** |
| | : | |
| **CHRISTOPHER COONS, in his official** | : | |
| **capacity as County Executive of New Castle** | : | |
| **County and in his individual capacity; and** | : | |
| **NEW CASTLE COUNTY, a municipal** | : | |
| **corporation; and JOHN DOES 1-25** | : | |
| **Defendants** | : | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**OF COUNSEL**:
Joseph F. Lawless, Esq.
PA Id. No. 23691
843 Mt. Moro Road
Villanova, Pennsylvania  19083
484.380.3760
jlaw6@comcast.net
Counsel for Joseph J. Freebery

Date:  May 27, 2008

**KNEPPER & STRATTON**
Barbara H. Stratton, Esq.
P.O. Box 1795
1228 North King Street
Wilmington, Delaware  19801
302.658.1717
Delaware Bar ID # 2785
bhs@knepperstratton.net
Counsel for Joseph J. Freebery

# TABLE OF CONTENTS

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

II.   SUMMARY OF ARGUMENT.......................................................................... 1

III.  COUNTER-STATEMENT OF FACTS ................................................................ 2

IV.   ARGUMENT ..................................................................................................... 11

  A.  Summary Judgment Standard........................................................................ 11

  B.  Summary Judgment Should Be Denied As To Count I Of The Complaint .......... 12

      1.  The Conduct Complained of Was Committed by The County Executive
      of New Castle County Acting Under Color of State Law ....................................... 13

      2.  The County Executive Is A Final Policymaker for New Castle County
      and His Actions May be Imputed to the County for Purposes of  Liability
      Under § 1983. ...................................................................................................... 14

      3.  Coons is not entitled to qualified or legislative immunity on any of
      plaintiff's claims. ................................................................................................. 15

      4.  Plaintiff Had a Protected Property Interest Cognizable Under the
      Fourteenth Amendment ......................................................................................... 18

  C.  Summary Judgment Should Be Denied as to Counts II & III of the
      Complaint ............................................................................................................ 37

      1.  Political Association................................................................................... 37

      2.  Familial Association .................................................................................. 38

      3.  Defendants Admit Plaintiff Was Engaged in Constitutionally Protected
      Activity For Purposes of this Motion .................................................................... 39

      4.  The Policymaker Exception to Political Retaliation Claims Does Not
      Apply in this Case ................................................................................................. 39

      5.  The Evidence Supports the Conclusion that Plaintiff Was Fired For
      Engaging in Protected Activity............................................................................... 41

  D.  Summary Judgment Should Be Denied as to Count VI of the Complaint........... 49

  E.  Summary Judgment Should Be Denied as to Count VII of the Complaint .......... 54

V.    CONCLUSION ..................................................................................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Harlow v. Fitzgerald,*
457 *U.S.* 800 (1982) ................................................................................ 15, 17, 48, 49

*Agresta v. Sambor,*
687 F. Supp. 162 (E.D. Pa. 1988) .................................................................... 38

*Alvin v. Suzuki,*
225 F.3d 107 (3d Cir. 2000) ........................................................................... 13

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ....................................................................................... 11

*Behm v. Luzerne County Children & Youth Policy Makers,*
172 F. Supp. 2d *575* (M.D. Pa. 2001) ............................................................. 38

*Bellanca Corp. v. Bellanca,*
53 Del. 378, 169 A.2d 620 (1961) ................................................................... 53

*Board of Regents v. Roth*
408 U.S. 564 (1972) ................................................................................... 18, 20

*Branti v. Finkel,*
445 *U.S.* 507 (1980) ................................................................................... 37, 39

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................... 11, 12

*City of St. Louis v. Proprotnik,*
485 U.S. 112 (1988) ....................................................................................... 14

*Cleveland Board of Education v. Loudermill,*
470 U.S. 532 (1985) ............................................................................... 18, 19, 35

*Elrod* v. *Burns,*
427 U.S. 347 (1976) ................................................................................... 37, 39

*Emory v. Astra-Zenecca Pharm. LP,*
401 F.3d 174 (3d Cir. 2005) ........................................................................... 11

*Goodman v. Pennsylvania Turnpike Com'n,*
293 F.3d 655 (3d Cir.2002) ............................................................................ 37

*Goss v. Lopez,*
    419 U.S. 565 (1975) .................................................................................. 18

*Hickey v New Castle County,*
    428 F. Supp. 696 (D.Del. 1977) .............................................................. 20

*Jett v. Dallas Indep. Sch. Dist.,*
    491 U.S. 701 (1989) .................................................................................. 14

*Knotts v. Bewick,*
    467 F. Supp. 931 (D.Del. 1979) ........................................................ 19, 20

*Linan-Faye Const. Co., Inc. v. Housing Authority of Camden,*
    49 F.3d 915 (3d Cir. 1995) ..........................................16, 21, 31, 48

*McLaughlin* v. *Watson,*
    271 F.3d 566 ..................................................................................... 15, 48

*Memphis Light, Gas & Water Div. v. Craft,*
    436 U.S. 1 (1978) ...................................................................................... 18

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978) .................................................................................. 14

*Morrissey v. Brewer,*
    408 U.S. 471 (1972) ............................................................................ 19, 35

*Mt. Healthy City Sch. Dist. v. Doyle,*
    429 U.S. 274 (1977) .................................................................................. 38

*Parrat v. Taylor,*
    451 U. *S.* 527 (1981) *overruled on other grounds, Daniel v. Williams,* 474 U.
    S. 327 (1986) ...................................................................................... 12, 13

*Paul v. Davis,*
    424 U.S. 693 (1976) .................................................................................. 18

*Perry v. Snyderman,*
    408 U.S. 593 (1972) ..........................................................................18, 20, 21

*Peters v. Del. River Port Auth.,*
    16 F.3d 1346 (3d Cir. 1994) ..................................................................... 39

*Reagan v. United States,*
    182 U.S. 419 (1901) .................................................................................. 18

*Robertson* v. *Fiore,*
    62 F.3d 596 (3d Cir.1995) ........................................................................ 37

*Saldana v. Kmart Corp.,*
  260 F.3d 228, 43 V.I. 361 (3d Cir. 2001)..................................................... 11, 12

*Saucier v. Katz,*
  *533 U.S.* 194 (2001) ......................................................................... passim

*Stephens* v. *Kerrigan,*
  *122* F.3d 171 (3d Cir.1997) .......................................................................... 37

*Trincia v. Testardi,* 30
  Del. Ch. 182, 57 A.2d 638 (1948) ............................................................... 52

*Tse v. Ventana,*
  297 F. 3d 210 (3d Cir. 2002) ....................................................................... 11

*Unger v. National Residents Matching Progam,*
  928 F.2d 1392 (3d Cir. 1991) ............................................................... passim

## S<small>TATUTES</small>

21, 9 Del. Code §§ 1111(a) ...................................................................... 14

21, 9 Del. Code §1111 (b) ......................................................................... 13

21, 9 Del. Code §1111, *et seq* ................................................................. 13

21, 9 Del. Code. § 1116(9) ........................................................................ 23

42 U.S.C. § 1983 ..........................................................................1, 12, 13, 14

Title 9 of the Delaware Code ..................................................................... 13

Ohio Rev. Code Ann.  124.11 (1984).......................................................... 18

Uniform Commercial Code § 2-202 ............................................................ 51

## O<small>THER</small> A<small>UTHORITIES</small>

53 Am.Jur.2d § 43 ............................................................................. 30, 31

Restatement, 2nd of Contracts.  Section 209...................................... 51

Restatement 2nd, Contracts, § 209 ..................................................... 52

U.S. Const. amend. XIV, § 1 ....................................................................... 12

United States Constitution ..................................................................... 1, 12

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This is a civil rights action brought by plaintiff against New Castle County, Delaware ("NCCo") and Christopher Coons under 42 U.S.C. § 1983, the Fifth and Fourteenth Amendments of the United States Constitution and for various state law claims.  Defendants have moved for summary judgment.  In so doing, defendants violate the fundamental tenet of summary judgment practice by presenting a decidedly one-sided version of the record in which the "facts" are distorted and cast in the light most favorable to the moving party. Indeed, without unnecessary disparagement, defendants abuse the summary judgment motion by ignoring virtually all disputed facts which go the core of the issues presented.  While defendants may dispute the evidence of record, the facts viewed in the light most favorable to the plaintiff easily support the conclusion that NCCo defendants further ignore the widely accepted precept that cases such as this are most often proved by circumstantial, rather than direct, evidence and there is rarely a smoking gun.

Plaintiff will not pursue his claims under Courts IV, V, VII, IX and X.

## II.    SUMMARY OF ARGUMENT

Plaintiff was offered and accepted the position of General Manager of the NCCo Department of Special Services.  At the time he was offered the position, the GM posts were "classified" under the NCCo Merit System, meaning that they had "civil service" type job protection with termination only for just cause, notice and opportunity to be heard before any disciplinary action, graduated disciplinary procedures and appeal rights following any such action.  At the time plaintiff was considering accepting the position, both the County Executive and Chief Administrative Officer met with the GM

applicants and expressly promises that that, if they accept the positions, they would always be afforded merit system protection. These oral promises constituted an employment contract under Delaware law. The oral promises were later reiterated in a written memorandum. The County Executive expressly intended to contractually convey a constitutionally protected property right and knew and intended that the GMs detrimentally rely on his promise in accepting the jobs. This contractual commitment was separate and apart from any legislative action which might try to change the existing law.

Under the law in this Circuit, a contract with a government entity which contains a "for cause only" termination provision conveys a constitutionally protected property interest. Plaintiff's constitutional rights were violated when he was fired without being afforded the procedures guaranteed by his contract, as well as the prior law.

The evidence also supports plaintiff's claims that he was fired in violation of his constitutional rights to political and familial association and his state contract rights.

There are numerous issues of material fact in this case and defendants are not entitled to judgment as a matter of law. Summary judgment should be denied.

## III.    COUNTER-STATEMENT OF FACTS

Defendants' Statement of Facts presents defendants' version of the record in the light most favorable to defendants. Accordingly, Plaintiff presents this Counter-Statement of Facts.

Joe Freebery served New Castle County as a "classified" employee under the NCCo Merit System for twenty-three years. For the final seven plus years of his

career, he served as the General Manager of the county's Department of Special Services, appointed to that position through the Merit System.  After defendant Christopher Coons took office as County Executive, Mr. Freebery was wrongfully, maliciously and improperly fired and was deprived of his constitutionally protected property interest in continued employment with the county because he was the brother and political supporter of his sister, Sherry L. Freebery, a long time political opponent of Coons.

Plaintiff's record of performance with NCCo was exemplary and virtually unblemished.  Among those who had an opportunity to work with him and observe his performance, he was a highly thought of public servant.  See, e.g., Appendix, Tab 1, J. Freebery Personnel File[1]; Tab 2, Deposition of State Senator Karen Peterson[2], pp. 10-22; 37-39; 40-41; Tab 3, Deposition of County Councilman William J. Tansey, pp. 6-21; 28-38; 58-59.  Following Defendant Coons' election to and assumption of the position of NCCo County Executive, Councilman Tansey, then serving as the Chair of the County Council Special Services Committee, wrote an unsolicited letter to Coons describing plaintiff as competent, hard working, responsive and dedicated.  Councilman Tansey further noted that it was Mr. Freebery's "…twenty-five years of experience working within County Government at various levels that makes his contribution to New Castle County as a General Manager virtually irreplaceable," further urging Coons to "… continue to tap into the wealth of knowledge, skill and ability" offered by Freebery and his staff.  Tab 4, Letter of  Councilman Tansey to Christopher Coons, 2/1/05.  The advice went unheeded.

---

[1] Due to the size of Mr. Freebery's Personnel File, excerpts of the file are provided.

[2] Senator Peterson also served as President of New Castle County Council.

Plaintiff is a lifelong Delaware resident.  He attended the University of Notre Dame, where he pursued a double major in Business Economics and Sociology.  At the same time he was fulfilling the requirements of a double major, Mr. Freebery played linebacker for the Notre Dame football team (1965-69) and was a member of the legendary 1966 National Championship team. He graduated with his class and received a Bachelor of Arts Degree in 1969.  In 1984, Mr. Freebery was hired as Superintendent of Parks for New Castle County.  During the same period that plaintiff became employed by New Castle County, his sister, Sherry L. Freebery had already begun her service as a New Castle County police officer.

In 1996, former NCCo Police Chief Thomas Gordon was elected County Executive of New Castle County.  Shortly thereafter, Mr. Gordon appointed plaintiff's sister Sherry Freebery – who by this time had become the NCCo Chief of Police - Chief Administrative Officer of New Castle County.  Upon taking office in 1997, Gordon begin to reform the structure of operations of County government and to eliminate the political interference and problems often caused by the politically appointed, non-permanent Directors who ran the departments.  Ten County departments were merged into six and the General Manager post was designated to run each department.  The General Manager position was changed to "classified" status in the county merit system, with full merit system protection and the same job security as all other merit system county employees. This classification carried with it protected status and job security, with termination only for just cause, progressive discipline, notice and opportunity to be heard on disciplinary issues and appellate rights.  Gordon's goal was to  eliminate the prior patronage system of employment and replace it with a system which would provide continuity, institutional

knowledge, stability and professionalism and a measure of protection for the employee, unless there was just cause for discipline or discharge – a system based on merit, as opposed to political affiliation.  See e.g. Tab 2, Peterson Dep., p. 6; Tab 22, NCCo Merit System Manual.[3]

In 1997, the restructuring took effect and the merit system General Managers were designated to run the county departments.  The change in law removed the *requirement* that politically-appointed Directors be named by the County Executive to serve at his/her pleasure and run the department, however, this change was carefully crafted and did not eliminate the Director position from county government and Gordon or any subsequent CE could always appoint a Director over a GM to run any or all of the departments.  Executive.  Tab 5, S. Freebery Dep. at pp. 77-79; Tab 6, Gordon Dep. pp. 16; 30; 35.

Despite these changes, there were still difficulties in getting experienced county employees to take the new posts for fear of loosing their longstanding seniority with county government.  Both Gordon and Freebery met with the candidates, including plaintiff, to outline the job security they offered with the positions, promise them merit system protection and induce them to take the new positions.[4]  Tom Gordon's testimony described his conversations with and representations made to the GM applicants:

> Q.   During the time that Mr. Freebery was employed as a general manager, did you have any discussions with him about his protections in that position?
>
> A.   Yes, I'm sure I did.

---

[3] Due to the size of the Merit System Manual, excerpts are provided.

[4] The promises made to the GM applicants are described in more detail, *infra*.

Q.   Do you recall those discussions?

A.   It would have -- a little background to this.  It was a reorganization of the government.  There was a lot involved, which I started, I think, in '96, before I took office.  By '97, I had a clear idea of what I was going to do.  Based on 25 years' experience and meeting with a management company that I was dealing with, Phoenix, certainly that one of the issues was trying to get these managers to step forward and run the departments.  That was the issue that was central to this, had to do with protection.  Because many of them -- *I mean, I had a four-year term at the time, many of them had a career.  And I thought that we had insulated them so that they could not be terminated.  That would have been part of the -- they were all concerned about that.  So by going to Dover, changing that so they could step up to that.  I know they were all very concerned about -- they wouldn't have taken it if they thought they could be terminated by another administration.*

* * *

A.   Right. *But, Dick, I was familiar with detrimental reliance.  I knew what I was creating for the government.  I knew that I was assuring them from this government assurance that they could always maintain their position, and I'm sure of that.  And I can tell you that I was very clear on that.*

Q.   I'm sure you were clear, and maybe you were; but in terms of the legality of that representation --

A.   I think it was legal, and I think I had the authority to do it.

Q.   And did you ask for any kind of legal advice on that?

A.   Yes, I did.

Q.   Who did you ask?

A.   I had the law department.  I had everybody. This was not, you know -- *to assure these people who are lifetime bureaucrats, people like Ron Morris, they are very bright, bright.  They had to have iron-clad assurances that after four years they weren't going to lose their pension.  So they were convinced that I had the legal right.  I was convinced I had the legal right to do this.  And that's just -- there can be no other answer to why a Joe Freebery at 22 years, knowing that he has to get to 30, knowing that I am only guaranteeing four, would take a job that only pays a little bit more, with more responsibility, unless he thought after four years I can revert or I can't be done out of a job.*

Tab 6, Gordon Dep. pp. 4-5: 34-35 (emphasis added).  Former CAO Sherry Freebery

repeated the same promises made by Mr. Gordon.  Tab 5, S. Freebery Dep. pp. 102-104.

Later, in 2003, following an unsuccessful attempt by Coons to have the GM positions

removed from merit system protection, Gordon sent a written memo to each GM,

reiterating the promises made to each of them several years earlier.  The letter is a clear

statement of the County's contractual intent and stated, in pertinent part:

> Lest some forget *the promises that were made to you when you accepted the promotion to General Manager,* these same promises are hereby re-stated to you so that you may rely upon them legally.
>
> ***
>
> *Today, it is again re-stated.  You may rely on your position as general manager remaining as a merit system position, devoid of political whims and pressures.  No threat of termination may affect you, except for just cause or non-performance.  You are entitled to the same job security as all other merit system employees and should fully enjoy your career as a government professional.*
>
> *This letter is meant to be retained by you, and a copy retained in your personnel file.  It is intended that you may legally rely upon the representations in this letter as a binding contract of employment.*
>
> If, in the future, someone "wants you out" of your position, this government must be prepared to buy you out fully, salary, benefits and all your time toward pension, and all attendant pension benefits.  As with all merit positions, *you can not be politically removed*.  Any attempt to do so would equate to unlawful discharge, for which you must be fully compensated.

Tab7, Memorandum to Joseph J. Freebery dated.11/24/03 (emphasis added).  Coons was

aware of the memo and the memo was in Joe Freebery's personnel file.[5]  Tab 8, Coons

Dep. p. 36.  Plaintiff detrimentally relied on these representations when he accepted the

job as General Manager of the Department of Special Services.

---

[5] The memo was produced by defendants in discovery as part of plaintiff's Personnel File, Bates Stamped NCCo 0060-0061.

Gordon's promise on behalf of NCCO that the GM positions would be protected by the merit system rules was clear and unequivocal.  Mr. Gordon testified that the promise was intended to covey a property right and to induce the incoming GM's to rely on that promise and accept the positions.  Under Delaware law, NCCo entered into an employment contract with plaintiff and the other GMs which included a "just cause" termination provision.  Under the law in this Circuit, such a contract conferred a constitutionally protected property interest, separate and apart from any statutory classification of the GMs under the merit system law.

In 2000, defendant Coons was elected President of the New Castle County Council.  While Gordon, Sherry Freebery and Coons members of the same political party, Coons was a vocal, political opponent of the Gordon Administration.

In September, 2002, it became public knowledge that Gordon and Freebery were the subjects and/or targets of a federal grand jury investigation in the District of Delaware.  Despite the investigation, in February 2004, Sherry Freebery announced her candidacy for the Democratic nomination for County Executive.  Coons entered the race shortly thereafter.  The primary campaign between Freebery and Coons was mean-spirited, bitter and hotly contested.  The bitterness and vituperation spilled over onto plaintiff.  Tab 2, Peterson Dep. pp. 55-58; Tab 3, Tansey Dep. p. 11; Tab 12, Rose Dep. pp. 11-13; Tab 25, Powell Dep. p. 26.  During the course of the campaign, Coons made statements making it clear that, if elected, he intended to get rid of Joe Freebery.  Tab 9, Excerpt from Democratic Candidate Debate: Tab 10, "The Shotgun Ticket of Coons and Clark", The Delaware Grapevine.

On September 11, 2004, Coons won the Democratic nomination to run for County Executive. During the primary and general election and after Coons took office, plaintiff continued to perform his role as General Manager of the Department of Special Services in an exemplary and professional manner. Tab 11, Husband Dep., pp. 40-44; Tab 12, Rose Dep. p. 9-10; 14-15.

On January 25, 2005, at the direct request of defendant Coons and without the advice or consent of County Council, defendant Coons caused House Bill #29 to be introduced in the Delaware legislature, in order to remove the GMs from the merit system and, thus, make it easier for him to fire Joe Freebery and remove him permanently from County government. The bill itself was actually drafted by a member of Coons' staff, with Coons knowledge and approval, to specifically include then sitting General Managers and remove them from the merit system. Tab 13, Majewski Dep. pp.16-18; 33-37. At this point in time, however, three of the six holdover GMs had already told Coons administration they were resigning. Tab14, Morris Dep. pp.16-18; Tab15, D. Baker Dep. p 12; Tab16, Sapp Dep. p21-22. Another GM, the County Attorney, served at the pleasure of the County Executive. The only current GMs who could be effect by this change were plaintiff and Charles Baker, the GM of the Land Use Department.

The bill was introduced in both legislative bodies under suspension of the rules, which meant there was no referral to committee, which eliminated any hearings and the possibility that those affected by its passage would have notice or opportunity to be heard against its enactment. Tab17, Roy Dep. pp. 3-7[6]; Tab2, Peterson Dep. pp 2-7.[7]

---

[6] Mr. Roy was a member of the Delaware House of Representatives at the time the bill was proposed and served at various times in his 30 years of service as the Chair of the House Rules Committee.

The entire "debate" in both houses took a total of less than 30.minutes. Tab 18 , J. Freebery Dep. pp. 373-74, There was no testimony in the House. Defendant Coons testified in the Senate. When asked if he would consider an amendment allowing the two remaining GMs to stay in their posts, Coons rejected the amendment. Had plaintiff had notice and opportunity to be heard regarding these proposed change in the law, he would have certainly tried to take advantage of it. Tab 18, J. Freebery Dep. pp. 374-75. During the debate, one of Coons' political allies told one of her Senate colleagues that this was "the Joe Freebery bill" – the bill intended to allow Coons to fire Joe Freebery. Tab 2, Peterson Dep. pp. 57-58.[8]   At the time House Bill 29 was introduced, the only two GMs remaining were Charles Baker and Joe Freebery. The only General Manager fired was Joe Freebery. HB 29 was, indeed, "the Joe Freebery bill"

On or about February 28, 2005, Mr. Freebery was notified that his position as General Manager of the Department of Special Services had been removed from Merit System protection and that he was now serving ". . . at the pleasure of the County Executive". Tab 19, Letter DiIenno, 2/28/05. On April 6, 2005, after twenty-three years of exemplary and loyal service to New Castle County, Mr. Freebery was handed a two sentence letter from defendant Coons firing him as General Manager of the Department of Special Services as of 3:30 p.m. that same day. Tab 20, Letter of Coons to Joe Freebery. He had no notice of termination until the moment he was fired and was not permitted to return to his office.

---

[7] Senator Peterson was deposed on two separate occasions and her depositions were not consecutively paginated. The pages referenced here are in the back section of Senator Peterson's deposition excerpts at Tab 2.

[8] The Senator who made the "Joe Freebery bill" statement has not denied she made it. She simply claims to have no recollection, either way.

# IV.    ARGUMENT

## A.    Summary Judgment Standard

Summary judgment is appropriate only if movant demonstrates that there are no issues of material fact and the moving party is entitled to judgment as a matter of law. The burden rests on the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emory v. Astra-Zenecca Pharm. LP*, 401 F.3d 174, 179 (3d Cir. 2005); *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32, 43 V.I. 361 (3d Cir. 2001).

The non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986); *Tse v. Ventana*, 297 F. 3d 210, 218 (3d Cir. 2002).

Summary judgment is only permitted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232.  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.*

If the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by

the depositions, answers to interrogatories, and admissions on file, designate specific

facts showing that there is a genuine issue for trial." *Id.*; s*ee also Saldana*, 260 F.3d at

232 . The non-moving party – in this case, plaintiff – must make a showing sufficient to

establish the existence of an element essential to that party's case and on which that party

will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. 'Such affirmative

evidence, however, -- regardless of whether it is direct or circumstantial -- must amount

to more than a scintilla, but may amount to less (in the evaluation of the court) than a

preponderance.'" *Saldana,*260 F.3d at 232 (*quoting Williams v. Borough of West Chester*,

891 F.2d 458, 460-61 (3d Cir. 1989)).

    **B.**    **Summary Judgment Should Be Denied As To Count I Of The Complaint**

    Count I of plaintiff's Complaint alleges that the defendants NCCo and

Coons deprived him of his constitutionally protected property interest in continued

employment with the County, in violation of his constitutional right to due process of

law. Complaint, Count I, ¶¶ 1-101. Defendants move for summary judgment. The

motion should be denied.

    The Fourteenth Amendment to the United States Constitution prohibits

deprivations "of life, liberty, or property without due process of law". U.S. Const.

amend. XIV, § 1. Title 42 U.S.C. § 1983 provides a civil remedy for deprivations of

federally-protected rights caused by persons acting under color of state law. *Parrat v.*

*Taylor,* 451 U. S. 527, 535 (1981) *overruled on other grounds, Daniel v. Williams,* 474

U. S. 327 (1986). Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory, subjects, or causes to be
> subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or

> immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S. C. § 1983 (2003). To sustain an action under Section 1983, a plaintiff must plead and prove that: (1) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived plaintiff of his or her rights, privileges or immunities secured by the Constitution or laws of the United States. *Parratt, supra,* 451 U.S. at 535. Plaintiff easily meets this burden.

When analyzing a §1983 claim alleging a state actor's failure to accord appropriate levels of due process, the court must determine whether the asserted interest is encompassed within the Fourteenth Amendment's protection of life liberty or property. If so, the Court must then ask whether the procedures available provided the plaintiff with adequate due process. *Alvin v. Suzuki*, 225 F.3d 107, 116 (3d Cir. 2000).

### 1.    The Conduct Complained of Was Committed by The County Executive of New Castle County Acting Under Color of State Law

Plaintiff was fired by New Castle County and defendant Coons. *See* Tab 18, Letter of Termination from Coons to Joe Freebery, 4/05/05. At the time Coons fired plaintiff, he was acting in the capacity of County Executive.

The County Executive is the Chief Executive Officer of NCCo. Tab 8, Coons Dep. at 27; Tab 21, 9 Del. Code §1111 (b). The CE's duties, powers and obligations are set forth in state law Title 9 of the Delaware Code. Tab 8, Coons Dep. at 10; Tab 21, 9 Del. Code §1111, *et seq.* The County Executive also has broader, additional powers and authority based upon custom and practice. Tab 8, Coons Dep. pp. 10-12; 27-28. The County Executive is responsible for the executive and administrative operation of New Castle County. He can make appointments and execute contracts on

behalf of the County. Tab 8, Coons Dep. at 27-28.[9]; Tab 21, 9 Del. Code §§ 1111(a); 1116(3) & (9). For purposes of § 1983 and in this case, the County Executive of New Castle County was acting under color of state law.

> **2.    The County Executive Is A Final Policymaker for New Castle County and His Actions May be Imputed to the County for Purposes of Liability Under § 1983.**

Defendants' argue that summary judgment should be granted as to the County on plaintiff's §1983 claim, mistakenly concluding that the claim against the County is predicated on *respondeat superior*, arguing that the record does not establish any policy or custom. Brief for Defendants at 39. Defendants ignore "official policymaker" liability.

Under *Monell* and its progeny, it is well-settled that a municipality is a "person" for purposes of 42 U.S.C. § 1983. Liability will attach to the municipality only when the municipality itself has caused a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). A municipality may act only through natural persons, however. *City of St. Louis v. Proprotnik*, 485 U.S. 112, 122, (1988). Hence, the first task in the *Monell* analysis, and a matter of law for the court, is to identify the natural person or entity comprised of natural persons authorized to act on behalf of the municipality such that the person's or entity's action may be imputed to the municipality itself. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Based upon the description of his authority, duties and responsibilities as set forth in the Delaware statute and described above, the County Executive is unquestionably the final policymaker for New Castle

---

[9] The deposition transcript contains an uncorrected typo regarding the CEO's power to execute contracts on the behalf of the County, stating "authorized to *executive* contracts on behalf of New Castle County". A review of the videotape deposition indicates the correct phrase is "execute contracts".

County.  As the final policymaker, his actions while acting in that capacity and within the scope of his authority may be imputed to New Castle County.

>       3.       **Coons is not entitled to qualified or legislative immunity on any of plaintiff's claims.**

Qualified Immunity

Defendants argue that Defendant Coons is entitled to qualified and legislative immunity in connection with plaintiff's termination.  Brief for Defendants at 13-14; 19

Defendants correctly state the basic principals of qualified immunity, noting that "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known*." Harlow v. Fitzgerald,* 457 *U.S.* 800, 818 (1982).  There is a two-part test for determining whether qualified immunity applies. A court first must determine whether the facts, when taken in a light most favorable to the plaintiff, are sufficient to show that the individual government defendant violated a constitutional right; second, even if a constitutional violation can be made out, nonetheless qualified immunity still protects the individual defendants unless the right allegedly violated was "clearly established" at the time the defendant acted, such that a reasonable official would have known it. *Saucier v. Katz, 533 U.S.* 194, 201 (2001), 533 U.S. at 201. "Clearly established rights" in this sense "are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin* v. *Watson,* 271 F.3d 566, 571 (3d Cir. (2001).

The evidence in support of Coons violation of plaintiffs' constitutional rights are set forth throughout this Brief.

As discussed, *infra,* it is the law in this Circuit that a "for cause" termination provision in a contract with a state entity[10] confers a constitutionally protected property interest. This principle is longstanding and well established. A contract right is recognized as a property interest protected under the Fourteenth Amendment where the contract includes a provision that the state entity can terminate the contract only for cause. *Linan-Faye Const. Co., Inc. v. Housing Authority of Camden,* 49 F.3d 915 (3d Cir. 1995). The Court further stated:

> This Court recently surveyed the law concerning Fourteenth Amendment Claims based on contracts with state entities. *Unger v. National Residents Matching Progam,* 928 F.2d 1392 (3d Cir. 1991). We stated in *Unger* that it is beyond dispute today that a contract with a state entity can give rise to a property right protected under the Fourteenth Amendment. Id. at 1397. (*citing Perry v. Snyderman,* 408 U.S. 593, 599-601 (1972).
>
> * * *
>
> As we explained in *Unger,* relevant Supreme Court cases and cases from other courts of appeals instruct that two general types of contract rights are recognized as property protected under the Fourteenth Amendment: (1) where "the contract confers a protected status, such as those 'characterized by a quality of extreme dependence, in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case social security benefits"; or (2) where the contract itself includes a provision that the state entity can terminate only for cause.

*Lynan-Faye, supra*, 49 F.3d at 929.

Delaware law regarding employment contracts is also long standing and well established. *Leeds v. First Allied Connecticut Corp.*, Del. Ch., 521 A.2d 1095, 1101-02 (1986); *Norse Petroleum A/S v. International, Inc.*, Del. Super., 389 A.3d 771, 773

---

[10] Plaintiff incorporates by reference that section of this memorandum addressing the contractual commitments of NCCo.

(1978); *Industrial America Inc. v. Fulton Ind., Inc.*, Del. Super., 285 A.2d 412, 415 (1971). It since 1973, it has been equally well established that a contract for employment at-will may be modified by a contractual restriction on the right of discharge: *Haney v. Laub*, __Del. Super.__, 312 A.2d 330, 332, (1973).see also, *L.H. Doane Associates, Inc. v. Seymour*, Del.Supr., 1985 Del. LEXIS 589 (1985)(a contract for employment at will may be modified by the parties course of conduct).

It is uncontested that defendant Coons knew that the General Managers were covered by the merit system. Moreover, the Memorandum of November, 2003 reiterating the promises made to plaintiff at the time of his hiring was in plaintiff was always part of and contained in his Personnel File. Coons was aware of the memo and was certainly on notice that the County had promised the incoming GM's, including plaintiff, that positions would be subject to merit system protections. Accordingly, Coons had notice that a contractual commitment had been made to the GMs and plaintiff by the County which was clearly intended by the County to be "iron-clad"; which was intended to and did convey a constitutionally protected property right; and which was considered by plaintiff and the county to be an employment contract. Under *Harlow* and *Saucier*, Coons is not entitled to qualified immunity.

Legislative Immunity

Defendants argue Coons is entitled to "legislative" immunity, suggesting that Coons is entitled to such immunity as an extension of the immunity accorded legislators, at least insofar as his actions relating to H.B. 29. This immunity has no applicability to Coon's liability for violating the constitutionally protected property interest accorded Mr. Freebery under his employment contract with NCCo. In either instance, neither of these issues can be resolved at this stage of the proceedings.

    **4.**     **Plaintiff Had a Protected Property Interest Cognizable Under the Fourteenth Amendment**

          a.    <u>Plaintiff's Protected Property Interest Was Conferred by Statute</u>

In order to have a property interest in public employment, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it. *Board of Regents v. Roth* 408 U.S. 564, 577 (1972).  A property interest in employment can be created expressly by state statute or regulation, arise from government policy, or *arise from an implied agreement between and employer and employee.  Perry v. Sniderman,* 408 U.S. 593, 601 (1972), *cited in Jordan v. Stanziola*, 2002 U.S. Dist. LEIS 27334, *18 (M.D. Pa. 2002)(emphasis added).  As noted above, *infra*, it can also arise from contract.

The United States Supreme Court ruling in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), a case not cited by defendants, is instructive in the context of this case, on the question of the existence of protected property interest under the constitution and what process is "due" under the Fourteenth Amendment to deprive an individual of that interest:

> Respondents' federal constitutional claim depends on their having had a property right in continued employment.  *Board of Regents v. Roth*, 408 U.S. 564, 576-578 (1972); *Reagan v. United States*, 182 U.S. 419, 425 (1901). If they did, the State could not deprive them of this property without due process. *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11-12 (1978); *Goss v. Lopez*, 419 U.S. 565, 573-574 (1975).
>
> Property interests are not created by the Constitution, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law" *Board of Regents v. Roth, supra*, at 577. *See also Paul v. Davis*, 424 U.S. 693, 709 (1976). The Ohio statute plainly creates such an interest. Respondents were "<u>classified civil service employees</u>," Ohio Rev. Code Ann.  124.11 (1984), entitled to

retain their positions "during good behavior and efficient service," who could not be dismissed "except...for...misfeasance, malfeasance, or nonfeasance in office." 124.34.4[11] The statute plainly supports the conclusion, reached by both lower courts, that respondents possessed property rights in continued employment. Indeed, this question does not seem to have been disputed below.

* * *

In light of these holdings, it is settled that the "bitter with the sweet" approach misconceives the constitutional guarantee. If a clearer holding is needed, we provide it today. *The point is straightforward: the Due Process Clause provides that certain substantive rights - life, liberty, and property - cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. **While the legislature may elect not to confer a property interest in public employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards**.*" (citations omitted)

***In short, once it is determined that the Due Process Clause applies, "the question remains what process is due**.*" *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

*Loudermill, supra,* 470 U.S. at 538-42. (emphasis added)

In *Knotts v. Bewick,* 467 F. Supp. 931, (D.Del. 1979), this Court considered whether "classified" employees under the Delaware state Merit System had a property interest in public employment.  Noting that the state Merit System Rules required dismissal only for "just cause", notice of the reasons for dismissal and appeal to the State Personnel Commission[12], the Court concluded that a permanent classified

---

[11] The Ohio statute in *Loudermill* is similar to the NCCO Merit System provisions and protections. *See Tab* 22,  *Merit System manual.*

[12] The Delaware state Merit System Rules are virtually identical to the New Castle County Merit System Rules.

employee under the state Merit System had the expectation of continued employment and was entitled to due process protection under *Roth* and *Snyderman*. *Knotts, supra*, at 934.

In *Hickey v New Castle County*, 428 F. Supp. 696 (D.Del. 1977), this Court also considered the question of whether a New Castle County employee who was a "classified" employee under the New Castle County Code (the NCCo Merit System) and held that, since classified employees could only be dismissed for delinquency, misconduct, inefficiency or inability to perform their position satisfactorily; were entitled to written notice of the reasons therefore; and has post dismissal appellate rights, an NCCo classified employee had a protected property interest which entitled her to the protections of the due process clause upon her dismissal. *Hickey, supra*, 428 F. Supp. at 608-610.

Plaintiff and the other General Managers hired by the Gordon Administration were hired as "classified" employees under the NCCo Merit System. Tab 18, J. Freebery Dep. p. 370-71; Tab 14, Morris Dep. p. 14 ; Tab 23, DiIenno Dep. p. 62-63. The NCCo Merit System permitted dismissal only for "just cause"; required graduated discipline; and required notice and opportunity to be heard before andy discipline or termination. There can be no question that, once hired, they were conferred a constitutionally protected property right and once such a right is conferred, it is a substantive right which could not be deprived except by constitutionally adequate procedures.

      b.    <u>Plaintiff's Constitutionally Protected Property</u>
<u>Interest Was Also Conferred by Contract, Independent of Legislative Action</u>

Irrespective of any change in status of the GMs under the Merit System law by the passage of H.B. 29, plaintiff still maintained a protected property interest

conveyed by his contract of employment with NCCo.  The contract included the

provision that plaintiff would only be terminated for just cause and would have all the

benefits of the Merit System and was not and could not be impacted by any legislative

action.

Since 1991, the Third Circuit has recognized that a "for cause" termination

provision in a contract which confers a protected status, such as tenure, may establish a

protected property interest.  In *Linan-Faye Const. Co., Inc. v. Housing Authority of

Camden,* 49 F.3d 915 (3d Cir. 1995), the Court stated that a contract right is recognized

as a property interest protected under the Fourteenth Amendment where the contract

includes a provision that the state entity can terminate the contract only for cause.

> This Court recently surveyed the law concerning Fourteenth Amendment
> Claims based on contracts with state entities. *Unger v. National Residents
> Matching Program,* 928 F.2d 1392 (3d Cir. 1991).  We stated in *Unger* that
> it is beyond dispute today that a contract with a state entity can give rise to
> a property right protected under the Fourteenth Amendment.  *Id.* at 1397
> (citing *Perry v. Snyderman*, 408 U.S. 593, 599-601 (1972).
>
> * * *
>
> As we explained in *Unger,* relevant Supreme Court cases and cases from
> other courts of appeals instruct that two general types of contract rights are
> recognized as property protected under the Fourteenth Amendment: (1)
> where "the contract confers a protected status, such as those 'characterized
> by a quality of extreme dependence, in the case of welfare benefits, *or
> permanence in the case of tenure*, or sometimes both, as frequently occurs
> in the case social security benefits"; or (2) where the contract itself
> includes a provision that the state entity can terminate only for cause.

*Lynan-Faye, supra*, 49 F.3d at 929.

In *Perry v. Snyderman,* 408 U.S. 593 (1972), the Supreme Court held that

a teacher might have a legitimate entitlement to continued employment, even in the

absence of a formal tenure program, where a general understanding prevailed at his

employing institution would no be terminated without just cause.

In this case, plaintiff had far more than just a "general understanding".  He had express oral and written promise by NCCo that he would be *always* be afforded the merit system protections.  The promises were neither related to or contingent upon the stautory classification of the positions under the law.

          (i)    <u>The Promises Made to Induce Applicants to Accept Positions as General Managers</u>

Prior to the Gordon Administration, County Departments were run by politically appointed Directors, who served at the pleasure of the County Executive.  By the time Gordon took office, the prior, politically appointed department Directors had resigned, leaving those positions vacant.  Once he took office, Gordon appointed "acting-Directors" to run the departments (as required by state law), most of whom were Department GM's able to serve in an "acting" capacity without surrendering their current title or classified status.  Tab 6, Gordon Dep. at 7-9; Tab 5, S. Freebery Dep. at 73-74.  Gordon then sought obtained state legislation which resulted in designating the then-existing position of General Managers to run each department, placing the GM position in "classified" status and affording that position all the guarantees and protections of the Merit System, including permanent job security, with termination only for "just cause", progressive discipline and appellate rights. It was the intended goal of the new administration to induce qualified, experienced career county employees to apply for these positions and promote from within County ranks.  Those employees, however, had protected status, seniority and pension rights under the Merit System in their current jobs and would likely not be willing to apply for the GM positions absent continued Merit System protection.

The position of the politically appointed Director was not, however, eliminated by the change in status of the GM's.  It was always possible for the CE to appoint a Director, who would serve at the pleasure of the County Executive, to run the Department, in a position superior to the General Manager.  In fact, this was done on at least one occasion in the Gordon administration.  Tab 5, Freebery Dep. p.77; Tab 6, Gordon Dep. p.16.

As County Executive, Gordon had both legal and apparent authority to enter into contracts on behalf of the County.  Tab 21, 9 Del. Code. § 1116(9); Tab 23, DiIenno Dep. at 63; Tab 21, C. Baker Dep. at 55-56. Gordon also had the legal authority to delegate that power to the CAO.  Tab 8, Coons Dep. at 29.  Both Gordon and CAO Sherry Freebery met with all the candidates for the new GM positions and expressly promised each of them that, if they that if they gave up their current positions as County employees with Merit System protection and accepted the new GM positions, they would always be protected under the rules and principals of the merit system.  *See, e.g.* Tab 16, J. Freebery Dep. pp.10-18; 369-371; Tab 5, S. Freebery Dep. pp. 102-04; Tab 23, DiIenno Dep. p. 62-63

Gordon testified in detail about the representations and promises which were made and reiterated to the potential GM candidates, including plaintiff, to induce them to take the new job.  This compelling evidence is ignored by defendants':

> Q.  During the time that Mr. Freebery was employed as a general manager, did you have any discussions with him about his protections in that position?
>
> A.  Yes, I'm sure I did.
>
> Q.  Do you recall those discussions?

A.   It would have -- a little background to this.  It was a reorganization of the government.  There was a lot involved, which I started, I think, in '96, before I took office.  By '97, I had a clear idea of what I was going to do.  Based on 25 years' experience and meeting with a management company that I was dealing with, Phoenix, certainly that one of the issues was trying to get these managers to step forward and run the departments.  That was the issue that was central to this, had to do with protection.  Because many of them -- *I mean, I had a four-year term at the time, many of them had a career.  And I thought that we had insulated them so that they could not be terminated.  That would have been part of the -- they were all concerned about that.  So by going to Dover, changing that so they could step up to that.  I know they were all very concerned about -- they wouldn't have taken it if they thought they could be terminated by another administration.*

* * *

A.   Right.  *But, Dick,* <u>I was familiar with detrimental reliance.</u>  *I knew what I was creating for the government.*  <u>I knew that I was assuring them from this government assurance that they could always maintain their position, and I'm sure of that.  And I can tell you that I was very clear on that.</u>

Q.   I'm sure you were clear, and maybe you were; but in terms of the legality of that representation --

A.   I think it was legal, and I think I had the authority to do it.

Q.   And did you ask for any kind of legal advice on that?

A.   Yes, I did.

Q.   Who did you ask?

A.   I had the law department.  I had everybody.  This was not, you know -- *to assure these people who are lifetime bureaucrats, people like Ron Morris, they are very bright bright.*  <u>They had to have iron-clad assurances that after four years they weren't going to lose their pension.</u>  <u>**So they were convinced that I had the legal right.  I was convinced I had the legal right to do this.**</u>  *And that's just* <u>-- there can be no other answer to why a Joe Freebery at 22 years, knowing that he has to get to 30, knowing that I am only guaranteeing four, would take a job that only pays a little bit more, with more responsibility, unless he thought after four years I can revert or I can't be done out of a job.</u>

Tab 6, Gordon Dep. p. 4-5; 34-35;   Former CAO Sherry Freebery provided similar

testimony:

Q.   So what promise was made, just beyond the existing legislation?

A.   Oh, there were actual discussions with the general managers, with the people who were even considering putting in, because county employees in   general were timid, I guess, about even considering   coming out of the merit system.   And so over and over and over again it had to be restated these were merit-system   protected positions.   These were not --

Q.   Let's elaborate on the discussions.

A.   Okay.

Q.   What discussions did you have with, if any,   with any general manager to the effect that you are merit-system protected?

A.   Okay.  My first discussions about that topic  took place in the first six months that Tom was in office, and they were not general managers at the time. They were the county employees who were acting directors, and we were working every single day on reorganization. And my discussions with these folks, who were acting     directors, who were helping me because I didn't know about the other parts of the county government, included the discussions of the executive's vision that general managers be created to head the new merged departments, and that they would be merit-system protected jobs.  So that was the first discussion.

So these acting directors of the former old departments were all seasoned county employees.  And we, all of us together, were discussing the reorganization of the departments, the reorganization of the government, and that they would be headed by managers, merit-system-protected managers, that we would not appoint any directors.  They were the first ones. Then when the folks actually applied for   the positions of -- then the positions of general manager get authorized and created by council.  And then when folks actually applied for the positions of general   manager, it was reiterated constantly, these are merit-system positions.  They knew they were merit-system positions.  They were posted as merit-system positions.   And then once --

Q.   So the statements were made -- I don't mean to   put words in your mouth, but the statements were made by you; is that right?

A.   Yes.

Q.   And by Tom Gordon?

A.   Yes.

Q.   And by whom else?

A.  I don't know.

Q.  Okay.  But you participated in discussions personally with the acting directors and then with the applicants for the GM positions; is that fair to say?

A.  Yes.

Tab 5, S. Freebery Dep. pp. 102-104.

Following an unsuccessful attempt to change the protected status of the

GM's in November 2003 by defendant Coons, then President of County Council, Gordon

sent out a written memo reiterating the promises which were made to induce the GM

candidates to take the new positions:

> Lest some forget *the promises that were made to you when you accepted the promotion to General Manager,* these same promises are hereby re-stated to you so that you may rely upon them legally.  The politically-appointed position of "director" was intentionally deleted from state law as the head of each department.  In its place, a merit system title of "General Manger" was used to denote the head of each department.
>
> Of course, someone could change state law, or even without a change, could re-hire political appointees as department directors, as in the days of old.  Thus, a political appointee could direct you and your subordinates.  We eliminated those costly positions to save money, and **to induce you to accept a leadership role in your department, immune from political pressure, and still secure in a merit system position.  You accepted your position as general manager based on that understanding.**
>
> Today, it is again re-stated.  <u>You may rely on your position as general manager remaining as a merit system position,</u> devoid of political whims and pressures.  No threat of termination may affect you, except for just cause or non-performance.  You are entitled to the same job security as all other merit system employees and should fully enjoy your career as a government professional.
>
> **This letter is meant to be retained by you, and a copy retained in your personnel file.  It is intended that you may legally rely upon the representations in this letter as a binding contract of employment.**
>
> If, in the future, someone "wants you out" of your position, this government must be prepared to buy you out fully, salary, benefits and all your time toward pension, and all attendant pension benefits.  As with all

merit positions, you can not be politically removed.  Any attempt to do so would equate to unlawful discharge, for which you must be fully compensated.

Tab 7, Memorandum to Joseph J. Freebery dated.11/24/03.  Coons was aware of the

memo and the memo was in Joe Freebery's personnel file.  Tom Gordon testified that the

Memo reiterated exactly what was told to the incoming GM's to induce them to take their

positions *ab initio*:

> Q.  I understand that, but I guess what I am just trying to get at, and maybe we have talked about it is, in this memo in -- this was in response to what?
>
> A.  Dick, I don't remember, unless everybody was upset that they were going to be fired and they were upset about it.  If nothing more than me **to reinstall a property right that I was clear that I gave them,** and to assure them that I am standing behind the premise and the reason I did it.  Dick, none of this was to benefit anybody.  All this was thought out before I took office, to get this huge agenda today, which I got done.  Coons was helping me in my campaign in '96.  It certainly wasn't because I thought he was going to be county executive.
>
> * * *
>
> I mean, you have to go back to basics and say to yourself, honestly, why would any of these people take 9 percent more and walk out of what we all know in the government is tremendous protection of the merit system and pension.  The only way they would do it is if they were assured that after I left they couldn't get screwed. And that's what I was conveying the entire time, and I would never have done that if I thought there was a possibility somebody could go to Dover and then fire that person.

Tab 6, Gordon Dep. at 28-29.  Dr. DiIenno, General Manager of the Human Resources

Department confirms Gordon's testimony that the memo reiterated his earlier promises

and did reflect the circumstances under which the GMs were offered their jobs.  Charles

Baker, GM of the Land Use Department testified that the memo clarified the

circumstances under which he was originally hired and understood it was interned to be a

binding employment contract.  Tab 24, C. Baker Dep. pp. 53-55.

New Castle County's promise that the GM positions would be protected by the merit system rules was clear and unequivocal. The former County Executive testified that the promise was intended to covey a property right and to induce the incoming GM's to rely on that promise and accept the positions.

(ii)    Plaintiff Had a Binding Employment Contract

Defendant's motion correctly states Delaware law regarding the existence of a contract. Brief for Defendants, pp.34-35. There must be 1) an offer by one party; 2) an acceptance of that offer by the other party; 3) consideration for the offer and acceptance; 4) sufficiently specific terms that determine each party's obligation. *Leeds v. First Allied Connecticut Corp.,* Del. Ch., 521 A.2d 1095, 1101-02 (1986); *Norse Petroleum A/S v. International, Inc.,* Del. Super., 389 A.3d 771, 773 (1978); *Industrial America Inc. v. Fulton Ind., Inc.,* Del. Super., 285 A.2d 412, 415 (1971). Whether a contract has been formed turns upon a determination of whether the parties to an alleged contract intended to bind themselves contractually. *Bouchard Margules v. Gaylord,* Del. Supr., 2005 Del. Super. LEXIS 353, *14. The parties' intent is a question of fact to be determined from overt acts and statements of the parties. In other words, in order for a contract to be enforceable in Delaware, there must be a meeting of the minds. *Id.* "[I]t is elementary that he determination of the question of whether a contract has been formed essentially turns upon a determination whether the parties to an alleged contract intended to bind themselves contractually" *Leeds, supra*, 521 A.2d at 1096. "The only intent of the parties to a contract which is essential is intent to say the word or do the acts which constitute their manifestation of assent". *Id.* at 1011. The Court's inquiry is an objective one: whether a reasonable man would, based upon the objective manifestation of assent

-28-

and all of the surrounding circumstances conclude that the parties intended to be bound by contract. *Id.  See also Industrial America, supra,* 285 A.2d at 415.

The duties of the position were posted when the position was announced. Tab 18, J. Freebery pp. 9-11; 14; 26.  Plaintiff was one of several who applied for the position under the Merit System and was determined to be qualified for the job, was offered employment with termination only for just cause and accepted the job.  Tab 5, S. Freebery Dep. p. 83; Tab 23, DiIenno Dep. p. 42.

There can be no clearer manifestation of intent to be bound than that found in this case.  Both the County Executive and Chief Administrative Officer made the promises on behalf of the County.  CE Gordon intended to and did give "iron clad" assurances to the applicants that they would be terminated only for just cause and have all the other protections of the merit system.  He expressly stated that he intended to convey a property right and understood and intended that the applicants would detrimentally rely on their promise.

This contractual commitment, made by a County Executive who had the legal and apparent authority to make it, existed independent of any action by the legislature.  In other words, even if the legislature acted to change the legal status of the GM positions to unclassified under the Merit System, that change in status had no bearing on the County's contractual commitment to provide the GM's Merit System safeguards under the terms of the contract.

Defendants mistakenly argue that plaintiff's contract claim is based on the memo sent by the County Executive in November, 2003, ignoring and, again, attempting to distort the testimony of record.  The chronology of promises made is set forth above:

oral promises were made by the CEO & CAO; which promises induced the applicants to accept the positions, in detrimental reliance on those promises. The November 2003 memo was a reiteration of those promises, however, the memo then put in writing the oral promises made five years earlier and provides corroboration to the testimony of Mr. Gordon, Ms. Freebery and plaintiff.[13]

Defendants further argue that, "It is well-settled Delaware law that "[a] hiring for an indeterminate period is a hiring at will and, consequently, is terminable at the will of either party with or without cause." *Haney* v. Laub, __Del. Super.__, 312 A.2d 330, 332, (1973).

Accepting this as a general proposition for purposes of this argument, it is rather remarkable that defendants cite *Haney*, since that general proposition is not the holding of that case. Examining the paragraph *following* that cited by defendants reveals the full context of the quote:

> The law governing oral contracts of employment for an indeterminate term is well settled. A hiring for an indeterminate period is a hiring at will and, consequently, is terminable at the will of either party with or without cause. *Drake v. Hercules Powder Co*., Del. Super., 5 Terry 69, 44 Del. 69, 55 A.2d 630 (1946); Greer v. Arlington Mills Mfg.Co., Del.Super., 17 Del. 581, 1 Penne. 581, 43 A. 609 (1899).

> The crucial question here is what, if any, effect the subsequent 1968 Stock Option Agreement has on defendant's right to terminate the plaintiff's employment without cause. Undoubtedly, a hiring for an indefinite period, which is ordinarily terminable at will, **may be modified by a subsequent contractual restriction upon the right of discharge. 53 Am.Jur.2d § 43.** Plaintiff's position here is that the Stock Option Agreement modified his employment status to the point where he could no longer be discharged without cause.

---

[13] See, *infra*, regarding the impact of the writing on the contract itself.

*Haney, supra,* 312 A.2d at 332.  The Court held that a contract for employment at-will may be modified by a contractual restriction on the right of discharge: *Id.* s*ee also, L.H. Doane Associates, Inc. v. Seymour*, Del.Supr., 1985 Del. LEXIS 589 (1985)(a contract for employment at will may be modified by the parties course of conduct).

In this case, an oral agreement of employment included the contractual restriction on the right of discharge, namely that plaintiff could only be terminated for just cause, as that concept is defined in the NCCo Merit system.  Plaintiff was *not* an employee at will under Delaware law.  He had a legally binding contract of employment with NCCo.

(iii)    Plaintiff Detrimentally Relied on NCCo's Promises

Joe Freebery testified that he would not have given up Merit System security in his current position unless these promises had been made.  He detrimentally relied on in by leaving his merit system protected job to accept the new GM position. GM's Ron Morris and Dr. Pat DiIenno corroborate plaintiff's testimony on this point, testifying in like manner.  Tab18, J. Freebery Dep. pp. 370, 371; Tab 14, Morris Dep. at 13-14; Tab 23, DiIenno Dep. at 62-63.  Dr. DiIenno, the county's chief personnel officer, further testified that, to her knowledge, anyone who took the new position of General Manager took it in reliance on the idea that they were to be protected by the merit system. Tab 23, DiIenno Dep. at 63.

(iv)    Plaintiff's Contract Conferred A Protected Property Interest

As noted above, a contract with a state entity can give rise to a property right protected under the Fourteenth Amendment.  *Unger v. National Residents Matching Program,* 928 F.2d 1392 (3d Cir. 1991), cited in. *Linan-Faye Const. Co., Inc. v. Housing*

-31-

*Authority of Camden,* 49 F.3d 915 (3d Cir. 1995).  Such interest arises where the contract confers a protected status, or permanence in the case or tenure, or where the contract itself includes a provision that the state entity can terminate only for cause. *Unger, supra.*

In this case, plaintiff had an employment contract with New Castle County which included the provision that he could be terminated only for just cause as defined by the merit system.  Accordingly, Mr. Freebery had a constitutionally protected, property interest.  This interest, however, was conferred by contract and separate and apart from the classified status conferred under state law.  The merit system procedures define the terms of the contract and the parameters of the rights afforded there under, however, the contractual commitment itself was independent of the status conferred those positions under state law.  In short, regardless of what the legislature may have done with the GM classification, it could not change the county's contractual commitment.

(v)     The Merit System Law Was Changed
Without Regard to Plaintiff's Right to Due Process

Defendants argue that, since Coons was able to convince the legislature to enact H.B.29, the law took the GM's out from under merit system protection and Coons was able to legally fire plaintiff.  They further argue that the *Noerr-Pennington* doctrine bars any claim against Coons to the extent plaintiff seeks to hold Coons liable for "lobbying" the legislature.

*Noerr-Pennignton* is inapplicable here, since plaintiff is not suing NCCo or Coons for lobbying the legislature.  While Coons' actions in that regard have an independent evidentiary value in plaintiff's case, i.e. it is circumstantial evidence of Coons' intent, it is not the basis upon which plaintiff is suing the defendants.  He is suing

them for firing him in violation of his constitutionally protected property interest in continued employment.

It should be remembered that plaintiff's protected property interest had two separate and distinct sources; the merit system law *and* the contract with the County and the foregoing examination of what happened in the Delaware legislature had and has no bearing on the county's contractual commitment to plaintiff   An examination of the process by which the law was changed, however, reveals that, not only did plaintiff not have the benefit of due process, he received virtually *no* process.  NCCo and Coons were aware of that fact and still terminated plaintiff.

On January 25, 2005, Coons caused House Bill #29 to be introduced in the Delaware House.  Defendants Appendix, Tab 6.  The bill itself was actually drafted by a member of Coons' staff, with Coons knowledge and approval, to specifically include then sitting General Managers and remove them from the merit system.  Tab 13, Majewski Dep. pp.16-18; 33-37.  At this point in time, three of the four holdover GMs had told the Coons administration they were resigning.  Tab14, Morris Dep. pp.16-18; Tab15, D. Baker Dep. p 12; Tab16, Sapp Dep. p21-22.  Another GM, the County Attorney, served at the pleasure of the County Executive.

The bill was introduced in both legislative bodies under suspension of the rules, which meant there was no referral to committee, which eliminated any hearings and the possibility that those affected by its passage would have notice or opportunity to be heard against its enactment.  Tab17, Roy Dep. pp. 3-7[14]; Tab 2, Peterson Dep. pp 2-

---

[14] Mr. Roy was a member of the Delaware House of Representatives at the time the bill was proposed and served at various times in his 30 years of service as the Chair of the House Rules Committee.

7.[15]  The entire "debate" in both houses took a *total* of less than 30 minutes, and in the House lasted six minutes.  From start to finish, the "process" took less than 30 minutes spread over two days..  Tab 18 , J. Freebery Dep. pp. 373-74.

There was no testimony in the House.  Defendant Coons testified in the Senate.  When asked if he would consider an amendment allowing the two remaining GMs to stay in their posts, Coons rejected the amendment.  During the debate, one of Coons' political allies told one of her Senate colleagues that this was "the Joe Freebery bill" – the bill intended to allow Coons to fire Joe Freebery.  Tab 2, Peterson Dep. pp. 57-58.[16]  At the time House Bill 29 was introduced, the only two GMs remaining were Charles Baker and Joe Freebery.

The fundamental principal of due process is notice and opportunity to be heard.  Had plaintiff been afforded notice and opportunity to be heard regarding these proposed changes in the law, he would have certainly tried to take advantage of it.  Tab 18, J. Freebery Dep. pp. 374-75.  He had no notice, no such opportunity.  The status under the law –unrelated to the contractually conferred right – was taken away without due process.

Defendant Coons understood that due process requires notice and opportunity to be heard.  Tab 8, Coons Dep. p. 31-34.  By firing plaintiff under all the foregoing circumstances, Coons knowingly intentionally fired plaintiff without notice or opportunity to be heard and, thusly, violated his right to due process.

---

[15] Senator Peterson was deposed on two separate occasions and her depositions were not consecutively paginated.  The pages referenced here are in the back section of Senator Peterson's deposition excerpts at Tab 2.

[16] The Senator who made the "Joe Freebery bill" statement has not denied she made it.  She simply claims to have no recollection, either way.

      c.     <u>The Evidence Establishes Plaintiff Was Deprived of his Protected Property Interest Without Due Process, In Violation of His Constitutional Rights</u>

Once it is determined that the Due Process Clause applies, "the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972)*, cited in Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538-42 (1985).

In this case, the answer to the question "what process is due" is provided not only by the Supreme Court in *Loudermill*, but by the provisions of the employment contract which confer the property right. Plaintiff had the right to the procedural protections and safeguards of the Merit System, since he had a contractual commitment to provide that process from New Castle County. This included the right to be terminated only just cause, written notice and opportunity to be heard prior to any termination and the appeal process accorded permanent employees who are terminated. Tab 22, NCCo Merit System Manual, §§26.03.907; 26.03.1101: Tab23, DiIenno Dep. pp. 20-22. Plaintiff was not afforded any of these rights.

Joe Freebery's termination was abrupt and cruel. The morning he was fired, the Human Relations General Manager, Dr. DiIenno, was called and told to come to the Executive Conference Room:

Q. Was that the day he was fired or before the day he was fired?

A. My recollection is that the day Joe was going to be let go, Rich Przywara called me and told me that he was having Joe come over because he was going to terminate him.

Q. And did you respond to that?

A. I said, Don't you want to possibly have a discussion with him to talk about anything, or, at least, give him some notice or anything like that. And he said, No, he's on his way over, and I need you to come over to the conference room.

Q.   Did he say why he didn't want to do those things you suggested?

A.   I don't remember.

Q.   He might have, he might not have, you just   don't remember?

A.   I honestly don't remember.

Q.   No.  I'm not trying to challenge you.  If you   say you don't remember, I believe it.  I just want to take sure it's clear on the record.

Why did you ask Mr. Przywara, don't you want to do what you just described, why did you suggest that might be something that should be done?

A.   Because I was not aware of the reasons as to why they would be terminating him like that.  And I felt that someone who had managed the department should have   been at least terminated with some type of dignity, if you will.

Q.   For won't of a better way, there is a right way and a wrong way to do it.  And you didn't think this was the right way?

MS. ALLEN:  Objection.  Leading.

BY MR. LAWLESS:

Q.   I don't want to put words in your mouth. Describe what you mean.

A.   I didn't feel it was the proper way to terminate a general manager because I was also told that he was not going to be allowed to go back to his office.

Tab 23,  DiIenno Dep. pp. 24-26.  Plaintiff was given three prepared letters by defendant Coons.  He was told he could resign, retire or be terminated.  Mr. Freebery refused to resign or retire and was fired.

The process to which he was entitled under his contract with NCCO before he could be terminated, regardless of what changes the legislature may have made, were the process and procedures of the NCCo Merit System.  Plaintiff was deprived of his protected property interest without any process whatsoever, let alone *due* process. Summary judgment should be denied.

-36-

C.    **Summary Judgment Should Be Denied as to Counts II & III of the Complaint**

Count II of plaintiff's Complaint alleges a violation of his right to Free Speech under the First Amendment, claiming he was retaliated against for engaging in constituently protected activity, specifically supporting his sister Sherry L. Freebery in her campaign for the Democratic Party nomination for NCCo County Executive for publicly supporting her while she was under investigation by a federal grand jury. Complaint, Count II, ¶¶ 115-127.  Count IV of the Complaint alleges he was fired in retaliation for and/or in violation of First Amendment right of his familial association with his sister.  Defendants move for summary judgment.  The motion should be denied.

1.    **Political Association**

Defendants' general statement of the law on this issue is correct.  Public agencies may not constitutionally discharge employees based on their political affiliation. E*lrod* v. *Burns,* 427 U.S. 347 (1976), *Branti v. Finkel,* 445 *U.S.* 507 (1980);  *Stephens* v. *Kerrigan, 122* F.3d 171, 176 (3d Cir.1997).  The Supreme Court and the Third Circuit recognize that a public employee's First Amendment right outweighs the government's interest in maintaining a system of political patronage. *Goodman v. Pennsylvania Turnpike Com'n,* 293 F.3d 655, 663 (3d Cir.2002).

Plaintiff must establish that he worked for a public agency in a position that does not require a political affiliation. He must show that he engaged in constitutionally protected conduct" and that this conduct was a substantial or motivating factor in the government's employment decision. A defendant may defeat plaintiffs claim by proving, by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity.  *Robertson* v. *Fiore,* 62

F.3d 596, 599 (3d Cir.1995); *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287

(1977).

2.     **Familial Association**

Defendants correctly state the law with respect to "intimate" association and are also

correct that there is no Third Circuit case law as to whether a brother-sister relationship

should be according constitutional protection from state action.  This Circuit, does,

however, recognize

> . . . that 'family relationships are the paradigmatic form of protected
> intimate associations, as they "by their nature involve deep attachments
> and commitments to the necessarily few other individuals with whom one
> shares not only a special community of thoughts, experiences and beliefs
> but also distinctively personal aspects of one's life." *Behm v. Luzerne
> County Children & Youth Policy Makers*, 172 F. Supp. 2d *575*, 585 (M.D.
> Pa. 2001) (*quoting Pi Lambda Phi Fraternity, Inc. v. University of
> Pittsburgh*, 229 F.3d 435, 441-42 (2000) (*quoting Roberts v. United States
> Jaycees,* 468 U.S. 609, 615, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)).
> "First Amendment freedom of association includes the right to intimate
> association." *Behm,* 172 F. at 585 (c*iting Roberts*, 468 U.S. at 619-20)).

W.P v. Westmoreland County, __F.Supp.2d__, 2005 U.S. Dist. LEXIS 40349, *41; *see

also, Agresta v. Sambor,* 687 F. Supp. 162 (E.D. Pa. 1988).  There is no reason why, and

defendants state none, why, the relationship between a brother and sister should not be so

protected.  As noted below, defendants would appear to conceded this point for purposes

of this motion.  Brief for Defendants at 20.

Defendants' argument that that plaintiff's claim under Count III should be

dismissed is not that it was not constitutionally protected relationship, but rather because

plaintiff's right to associate with his sister was not interfered with or placed under any

undue burden.  Brief for Defendants at 20.  Defendants misstate the thrust of plaintiffs

claim.  Count III does not allege that defendants' actions violated or interfered with his

right of familial association with his sister, but rather that he was fired *in retaliation* for

-38-

his exercise of that right. Complaint, ¶¶ 115-127.   Accordingly, plaintiff must show that his exercise of that right was a substantial or motivating factor in his termination. Plaintiff easily meets that burden.

### 3.    Defendants Admit Plaintiff Was Engaged in Constitutionally Protected Activity For Purposes of this Motion

The defendants admit, for purposes of their motion, that plaintiff's involvement in politically opposing defendant Coons and his familial relationship with his sister are constitutionally protected activity.  Brief for Defendants at 16, n.15; p. 20.

### 4.    The Policymaker Exception to Political Retaliation Claims Does Not Apply in this Case

This Court is well aware of the policymaker exception in political discrimination case and defendants correctly state the law for the policymaker exception under *Branti, Elrod* and this Circuit's interpretation of those cases. *Branti,* 445 U.S. at 518; *Elrod,* 427 U.S. at 368; *Peters v. Del. River Port Auth.,* 16 F.3d 1346, 1353 (3d Cir. 1994).  Defendants are also correct in their description of Mr. Freebery's duties and responsibilities.  They were substantial and he performed them with distinction.  The policymaker exception, however, does not apply in this case

Freebery and the other GM's were hired under a contract of employment, in addition to a state statute, which gave them protected status, thus making the policymaker exception inapplicable.  Under the statute and the contact (which existed independently of the statute) plaintiff and the other GM's could accurately be described as "protected" policymakers.  While they held a "policymaker" type position, they were expressly exempted from political whim.  Political affiliation was not a job requirement for plaintiff's position or any of the GM positions because the statute exempted them.  At

the same time, their contract with NCCo contractually eliminated the "political"

requirement from plaintiff's position.[17]

County Executive Gordon and CAO Freebery, on behalf of NCCo,

promised the GM applicants that, if they accepted the new GM positions, they would be

always protected by the provisions of the merit system.  .  The County's intent to protect

the GM's from political firing was crystal clear, as explained by Mr.Gordon at

deposition:

> A.  It would have -- a little background to this.  It was a reorganization of the government.  There was a lot involved, which I started, I think, in '96, before I took office.  By '97, I had a clear idea of what I was going to do.  Based on 25 years' experience and meeting with a management company that I was dealing with, Phoenix, certainly that one of the issues was trying to get these managers to step forward and run the departments.  That was the issue that was central to this, had to do with protection.  Because many of them -- I mean, I had a four-year term at the time, many of them had a career.  And I thought that we had insulated them <u>so that they could not be terminated</u>.  That would have been part of the -- they were all concerned about that.  So by going to Dover, changing that so they could step up to that.  I know they were all very concerned about -- <u>they wouldn't have taken it if they thought they could be terminated by another administration</u>.

> * * *

> A.  Right. But, Dick, I was familiar with detrimental reliance.  I knew what I was creating for the government.  I knew that I was assuring them from this government assurance that they could always maintain their position, and I'm sure of that.  And I can tell you that I was very clear on that.

Tab 6, Gordon Dep. pp. 102-104.  As noted above, the contractual commitment was later

restated in the in a memorandum from the County Executive, on behalf of the County, in

November, 2003.  Tab 7, Memorandum to Joseph J. Freebery dated.11/24/03 (emphasis

added).  The evidence establishes that these promises were made to induce plaintiff and

---

[17] Plaintiff incorporates his arguments with respect the contract issue, *infra.*

the other incoming GMs to accept their positions, were definitely relied upon by them and constituted a binding contractual commitment under Delaware law. The County's oral promise, standing alone or as an integrated whole with the written memo of November, 2003, contractually made these positions immune from the *Branti/Elrod* policymaker exception, regardless of any subsequent legislative action.

In fact, the position of "political" policymaker department head did exist and was available to defendants, had they chosen to make such appointment. It simply was not intended to be the GM. The evidence is clear that department Directors, who served at the pleasure of the County Executive, could have been appointed to run the Departments over the GM's as their superiors and direct supervisors and defendant Coons knew it. Tab 9, Excerpt from Democratic Candidate Debate; Tab 5, S.Freebery Dep., p. 77; Tab 6, Gordon Dep. p 16: 30; Defendants chose not to do so.

**5.    The Evidence Supports the Conclusion that Plaintiff Was Fired For Engaging in Protected Activity.**

Defendants argue that plaintiff cannot show that his protected activity was a substantial or motivating factor in his firing, claiming that he was fired for the reasons set forth in the cited pages of their memorandum. Brief for Defendants, p, 18, citing Brief for Defendants, pp. 7, 8. As outlined in more detail, *infra,* the evidence adduced by plaintiff establishes defendants reasons for firing plaintiff were pretextual at best.

a.    Testimony of State Senator and Former County Council President Karen Peterson

There is substantial evidence from which a jury can conclude that plaintiff was fired for supporting his sisters campaign against Coons. Coons was aware that plaintiff was actively campaigning for his sister in her campaign against Coons. Tab 6, S. Freebery Dep, pp. 30-32;.Tab 12, Rose Dep. pp. 11-13. There substantial evidence that

the campaign was personal, hostile & bitter. Senator Karen Peterson, a former County

Council President and current State Senator described the hostilities in more detail,

establishing how the bitterness and vituperation of the political campaign extended to

plaintiff:

> Q.   You stated that you believe that Joe Freebery was terminated because he was Sherry 's  brother
>
> A.   Yes .
>
> Q.   What leads you to that opinion?
>
> A.   Just an animosity that I had seen toward the Freebery's by Chris Coons.
>
> Q.   Did you see --
>
> MR. LAWLESS: She wasn't finished . She was still talking. Go ahead.
>
> THE WITNESS: I mean, lt was like every day you picked up the newspaper and there was some other shot being fired.  Chris - - I heard him give presentations during the campaign, and he referred to the corrupt Freebery and Gordon, and how he had great ethics and he was going to clean everything up, which I thought  was a cheap shot. In my opinion, Joe had certainly done nothing but a good job, from my viewpoint.
>
> BY MS. ALLEN:
>
> Q.   Well, I have a couple of questions. You said there was animosity towards the Freeberys by Chris Coons?
>
> A.   No. I meant the other way. Chris Coons towards the Freeberys.
>
> Q.   Chris Coons towards the Freeberys. Putting aside the political race between Chris and Sherry, what animosity did you see by Chris Coons towards Joe Freebery ?
>
> A.   Well, I don't know, it was more of an anti-Freebery thing than saying Joe or Sherry or Jim or -- you know, what I mean? -- It was more, I'm going to clean house; I'm going to get rid of t h e likes of the Freeberys. You know, what I mean? It was a constant, so it's hard to say there was a particular article or – I mean, there was just open animosity there.
>
> Q.   I agree that there was open animosity between Chris Coons and Sherry Freebery. I don't recall, and I guess my question is, can you

specifically cite to anything where either a newspaper article or a debate that you heard or anything that you heard where Chris said or showed animosity toward Joe Freebery?

A.  I would have to think about it. I can't think of anything off the top of my head. <u>What crystallized it for me was when Senator Blevins said, This is the Joe Freebery bill, and I thought</u>, Well, that's not right.

Q.  Did you ever have any discussions with Chris Coons about Joe Freebery's termination?

A.  No.

Q.  Anything else other than the animosity that occurred between Chris Coons and Sherry Freebery, anything else that you base your opinion on that Joe was terminated because he was Sherry's brother?

A.  No. I would have to think about why, how I know that, through the whole thing. 1 mean, it was clear from -- this goes to political circles, because you are out at political events all the time. And, you know, County employees who expressed fear that they were all going to get bounced because the Coons versus the Gordon-Freebery camp, and anybody who was in the wrong camp, that heads were going to rol1. And people were paranoid about it. They were scared to death about it. They feared for their jobs about it. And so when the bill [H.B. 29] came along, it didn't surprise me that, you know, Patty said to me, This is the Joe Freebery bill. I thought this kind of fits in with what County employees expressed all during the campaign, about who -- well, pick your team, chose up  your sides, because when this is over, one side is going 5 to win and the other side is going to lose. And that was kind of the whole theme for the whole election process.  So, I mean, that's where I qot the impression that if you weren't on the Coons team, then you were going to pay for it.

Tab 2, Peterson Dep. pp. 55-58.

      b.  Testimony of Senator Peterson Regarding "the Joe Freebery" Bill

    Senator Peterson also testified that, the day that H.B.29 was introduced in the Senate, Mr. Coons testified and spent the morning of his appearance in the office of her colleague and Coons political ally, Senator Patty Blevens:

    Q.  Now, who is Senator Patty Blevins?

A. Senator Patty Blevins represents the Elsrnere area. She used to sit -- at the time this was being debated, she sat next to me on the floor of the Senate.

And she was a close friend of Chris Coons.

Q.  Okay.

MS. ALLEN: Objection.

BY MR. LAWLESS:

Q.   During your questioning of Mr. Coons or 14 immediately after the questioning finished of Mr. Coons, did Senator Blevins say anythinq to you regarding Mr. Coons' testimony or this bill?

A.  Yes.

Q.  What did she say?

A.  She leaned over and she said, This is the Joe Freebery bill.

Q.  What did you understand that to mean?

A.  That the bill was designed to get rid of Joe Freebery. I said, That may he the case, but it's still to fair. And from my years in the Department of Labor, this is not a fair employment practice.

Tab 2, Peterson Dep. p.  33-34.

c.      Testimony of Former County Councilperson Patti Powell

Former Coucilperson Patti Powell testified that the Freebery / Coons campaign was "hostile".  Tab 24, Powell Dep. p. 26.  She further testified that she was familiar with plaintiff's performance as GM of the Special Services Department, including time when Coons was County Executive, and that she did not know of any reason, nor could she give any substantive reason in terms of plaintiff's job performance, qualifications, capabilities, for his firing.  When ask then, if she could conclude why he was fired, since it could not have been for performance related issues, she testified "My

belief is that Joe Freebery got fired because of the fact that the CAO was his sister, and

he carried the last name of Freebery." Tab 21, Powell Dep. p. 26-27.

> d.  Testimony of Councilman, and former Chair of the
Special Services Committee, William J. Tansey

Councilman William J. Tansey was intimately involved in the supervision

of plaintiff's department in his role as Chair of the County Council Special Services

Committee and wrote the letter to defendant Coons recommending that plaintiff continue

as General Manager of the Department attached to plaintiff's Appendix.  In describing

the Freebery / Coons campaign, he testified:

> THE WITNESS:  And it was a very – from, you know, again, my – I am speaking
> for myself.  From my observation , it was a very mean-spirited primary between
> Sherry Freebery and Chris Coons.  And that – and the perception was after having
> gone through that, because of the relationship of Joe and Sherry, that, you know,
> yes, that, you know, that they couldn't continue.  I don't know, you know.

Tab 3, Tansey Dep. p. 11.  Mr. Tansey was then asked, base on his observations, why

plaintiff was fired:

> BY MR. LAWLESS:
>
> Q.  Councilman Tansey, I have to ask you a question now that I didn't
> want to ask you, based on a question asked by Ms. Allen. She asked you if
> you weren't in a position of being a councilman, is there anything you
> would say that you haven't said. Do you have an opinion as to why Joe
> Freebery was fired?
>
> A.   You know, as I said, you know, anybody can connect the dots. People
> are --
>
> Q.   I am asking you to connect the dots.  Why was he fired?
>
> MS. ALLEN: Objection; calls for speculation.
>
> MR. LAWLESS: The only reason I am asking you that is because she
> asked you that question.
>
> THE WITNESS: Okay. From my opinion, from my opinion, because of
> the relationship with the former CAO (Sherry Freebery).

Tab 3, Tansey Dep. p. 58.

                     e.       Testimony of Former Councilman Joseph R. "Bobby" Woods

         Former Councilman Bobby Woods testified and described the relationship of Coons and Sherry Freebery when she was CAO and Coons was Council president as acrimonious. He also observed plaintiff do his job as GM ad described his performance, noting that he was "engaged", knowledgeable, competent and that he the issues with which he dealt. Tab 26, Woods Dep. pp. 20, which he observed plaintiff

                     f.       Coons' Statements During the Democratic Primary Debate

         There is substantial, circumstantial evidence that plaintiff was targeted for termination well before Coons was even elected. During one of the debates leading up to the Democratic primary, Coons stated:

> The current law and the current situation would produce a situation where the next County Executive, whether any of the three of us before you, would have <u>Ms. Freebery's brother</u> running the largest department in New Castle County government. If Mr. Bush were to have as his Attorney General, the Attorney General fiom the Clinton Administration or the Secretary of Defense from the Clinton Administration or the Secretary of Education fiom the Clinton Administration, you'd say, I suspect that, that prevents the President fiom carrying forward the policy agenda on which he was elected. **What I was simply trying to accomplish was what has historically been the case, which was that the County Executive has the freedom to put above General Managers, political appointees who are directors who could carry forward the policy agenda,** of the newly elected County Executive.

Tab 9, Excerpt from Democratic Candidate Debate, Coons' statement is circumstantial evidence of his intent to remove plaintiff *solely because* he is the brother of his political opponent, Sherry Freebery. It also establishes that Coons knew that politically appointed Directors could be put above the GMs to "carry forward the policy agenda" he sought to pursue. The fact that he made this statement and then later chose to fire plaintiff rather

than appoint a department Director to run the department, despite plaintiff's twenty-three year record of outstanding service, supports plaintiff's argument that he was fired in retaliation for his political and/or familial association.  It will also corroborate plaintiff's evidence that defendants' alleged reasons for firing plaintiff are pre-textual and that Coons conduct was malicious.

g.    Coons' Statement to Reporter Claudia Cohen

In an interview during the primary campaign with reporter Claudia Cohen, Coons stated that "We need people independent of Freebery and Gordon."  Tab 10, "The Shotgun Ticket of Coons and Clark", The Delaware Grapevine.  This statement is also circumstantial evidence of Coons' intent to remove plaintiff because he was the brother of and/or politically related to Coons' opponent, Sherry Freebery.

h.    Circumstantial Evidence Supports Plaintiff's Claims

Cases such as this case  are rarely subject to proof by direct evidence, however, circumstantial evidence strongly supports plaintiff's claim.  Plaintiff's record of performance for his entire tenure with NCCo was exemplary and virtually unblemished, demonstrating an outstanding record of performance.  Tab 1, J. Freebery Personnel File. Testimony from the witnesses who had first hand, intimate knowledge of his performance as GM corroborate his competence and rebut defendants pretexutal reasons for his firing. *See, e.g.,* Tab 2, Deposition Peterson Dep., pp. 10-22; 37-39; 40-41; Tab 3, Tansey Dep., pp. 6-11; 16-21; 38-28; 58-59; Tab 24 Powell Dep. 26-27; Tab 26, Woods Dep. pp. 20.

The absence of any substantive reason for termination, coupled with the circumstances of the political campaign; the statements of Coons' intent; the conclusions drawn by the witnesses with first hand knowledge of plaintiff's performance and the animosity of Coons would permit a jury to conclude that plaintiff was fired in retaliation

for his exercise of those constitutional rights outlined in Counts II & III of his Complaint. Defendants' motion for summary judgment as to those counts should be denied.

> i.    Coons Is Not Entitled to Qualified Immunity As to Counts II & III of the Complaint[18]

Defendants argue that Coons is entitled to qualified immunity in his individual capacity as to Counts II & III he did not violate any clearly established precedent by firing plaintiff.  Defendants' argument fails.

As stated above, the court first must determine whether the facts, when taken in a light most favorable to the plaintiff, are sufficient to show that the individual government defendant violated a constitutional right.  Then the Court must determine if the right was "clearly established" at the time the defendant acted, such that a reasonable official would have known it. *Harlow v. Fitzgerald,* 457 *U.S.* 800, 818 (1982).; *Saucier v. Katz, 533 U.S.* 194, 201 (2001). "Clearly established rights" in this sense "are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin* v. *Watson,* 271 F.3d 566, 571 (3d Cir. (2001).

As previously stated, it has long been the law this Circuit that a "for cause" termination provision in an employment agreement or a contract which confers a protected status, such as a provision that the state entity can terminate the contract only for cause establishs a protected property interest. *Linan-Faye Const. Co., Inc. v. Housing Authority of Camden,* 49 F.3d 915 (3d Cir. 1995); *Unger v. National Residents Matching Progam,* 928 F.2d 1392 (3d Cir. 1991).

Delaware law regarding employment contracts is also long standing and well established. *Leeds v. First Allied Connecticut Corp.,* Del. Ch., 521 A.2d 1095, 1101-

---

[18] Plaintiff incorporates by reference his earlier argument regarding qualified immunity, *supra.*

02 (1986); *Norse Petroleum A/S v. International, Inc.,* Del. Super., 389 A.3d 771, 773

(1978); *Industrial America Inc. v. Fulton Ind., Inc.,* Del. Super., 285 A.2d 412, 415

(1971): *Haney* v. Laub, __Del. Super.__, 312 A.2d 330, 332, (1973).*see also, L.H. Doane*

*Associates, Inc. v. Seymour*, Del.Supr., 1985 Del. LEXIS 589 (1985)(a contract for

employment at will may be modified by the parties course of conduct).

        Coons knew that the General Managers were covered by the merit system.

The Memorandum of November, 2003 reiterating the promises made to plaintiff at the

time of his hiring was in plaintiff was in his NCCo Personnel File, putting Mr. Coons on

notice that a contractual commitment had been made to the GMs and plaintiff by the

County which was clearly intended by the County to be "iron-clad"; which was intended

to and did convey a constitutionally protected property right; and which was considered

by plaintiff and the county  to be an employment contract. Under *Harlow* and *Saucier*,

Coons is not entitled to qualified immunity as to Counts II & III.

      **D.**    **Summary Judgment Should Be Denied as to Count VI of the Complaint**

        Count VI of plaintiff's Complaint alleges a state court claim for Breach of

Contract.  Complaint, Count VI, ¶¶ 145-150.  Defendants move for summary judgment.

The motion should be denied. In support of his argument against summary judgment on

Count VII, plaintiff also incorporates his earlier arguments regarding the existence of an

employment contract, *supra.*

        For a binding contract to exist, there must be 1) an offer by one party; 2)

an acceptance of that offer by the other party; 3) consideration for the offer and

acceptance; 4) sufficiently specific terms that determine each party's obligation.  *Leeds v.*

*First Allied Connecticut Corp.,* Del. Ch., 521 A.2d 1095, 1101-02 (1986); *Norse*

*Petroleum A/S v. International, Inc.,* Del. Super., 389 A.3d 771, 773 (1978); *Industrial America Inc. v. Fulton Ind., Inc.,* Del. Super., 285 A.2d 412, 415 (1971).  Under Delaware law, "[I]t is elementary that he determination of the question of whether a contract has been formed essentially turns upon a determination whether the parties to an alleged contract intended to bind themselves contractually" *Leeds, supra*, 521 A.2d at 1096.  "The only intent of the parties to a contract which is essential is intent to say the word or do the acts which constitute their manifestation of assent".  *Id.* at 1011.  The Court's inquiry is an objective one: whether a reasonable man would, based upon the objective manifestation of assent and all of the surrounding circumstances conclude that the parties intended to be bound by contract.  *Id.  See also Industrial America, supra¸* 285 A.2d at 415.

Tom Gordon's testimony (more fully set forth earlier in this brief) conveyed that intent:

> A.  Right. But, Dick, I was familiar with detrimental reliance.  I knew what I was creating for the government.  I knew that I was assuring them from this government assurance that they could always maintain their position, and I'm sure of that.  And I can tell you that I was very clear on that.

***

> A.  I had the law department.  I had everybody. This was not, you know -- to assure these people who are lifetime bureaucrats, people like Ron Morris, they are very bright bright.  They had to have iron-clad assurances that after four years they weren't going to lose their pension.  So they were convinced that I had the legal right.  I was convinced I had the legal right to do this.  And that's just -- there can be no other answer to why a Joe Freebery at 22 years, knowing that he has to get to 30, knowing that I am only guaranteeing four, would take a job that only pays a little bit more, with more responsibility, unless he thought after four years I can revert or I can't be done out of a job.

Plaintiff Gordon, and Dr. DiIenno confirm that the November 2003 memo reiterated the promises originally made to induce the GM candidates to take the new positions,

Tab 7, Memorandum to Joseph J. Freebery dated.11/24/03; Tab 6, Gordon Dep. at 28-29;

Tab 23, DiIenno Dep. at  62.

Delaware has adopted the Restatement, 2nd of Contracts.  Section 209 of the Restatement 2d deals with Integrated Agreements, which provides:.

§209 Integrated Agreements

(1)  An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.

(2)  Whether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule.

(3)  Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.

The Comments to § 209 state:

c.  Proof of Integration.  Whether a writing has been adopted as an Integrated agreement is a question of fact to be determined in accordance with all relevant evidence.  The issue is distinct from the issues whether an

Agreement was made and whether the document is genuine, and also from the issue whether it was intended as a complete and exclusive statement of the agreement.  See § 210; compare Uniform Commercial Code § 2-202.  Ordinarily the issue whether there is an integrated agreement is determined by the trial judge in the first instance as a question preliminary to an interpretative ruling or to the application of the parol evidence rule.  See §§ 212, 213.  After the preliminary determination, such questions as whether the agreement was in fact made may remain to be decided by the trier of fact.  Subsection (3) states the rule that a written agreement complete on its face is taken to be an integrated agreement in the absence of contrary evidence.

Section 209 also provides the following illustration.

A orally agrees to employ B on certain terms.  B immediately writes and A receives a letter beginning, "Confirming our oral arrangement this

> morning," and fully stating the contract as he understands it.  A makes no reply but with knowledge of B's understanding accepts services from B under the contract.  The letter is a completely integrated agreement.  Even though the letter is not in all respects accurate, it operates as an offer of substituted terms, and A's acquiescence manifests assent to those terms.

Comments and Illustrations, Restatement 2nd, Contracts, § 209.  The intent of the parties was clear.  In response to a question regarding the origin of the Memorandum to plaintiff and the other GM's dated 11/24/03, Gordon testified:

> A.  Dick, I don't remember, unless everybody was upset that they were going to be fired and they were upset about it.  If nothing more than me **to reinstall a property right that I was clear that I gave them,** and to assure them that I am standing behind the premise and the reason I did it.

* * *

Tab 6, Gordon Deposition, p 37.

New Castle County's promise that the GM positions would be protected by the merit system rules was clear and unequivocal.   There was a contract of employment and the GM's were promised the protections of the merit system. This contract was binding, regardless of the legal status of the GM's under the Merit System laws.  The CE testified that the promise was intended to covey a property right and to induce the incoming GM's to rely on that promise and accept the positions.  There could be no clearer meeting of the minds.

The evidence also supports the conclusion that the parties had an implied-in-fact contract under Delaware law.  An implied in fact contract is legally equivalent to an express contract; the only difference between the two is the proof by which the contract is established. *Lawrence v DiBiase*, Del. Super., 2001 Del. Super. LEXIS 368, *20 (2001).  An express agreement is arrived at by words, while an implied agreement is arrived at by acts.  *Id.; see also Trincia v. Testardi¸* 30 Del. Ch. 182, 57 A.2d 638, 642

(1948).  The inquiry in both instances is whether the parties have indicated assent to the contract.  In other words, to prevail on a theory of implied in fact contract, the plaintiff must establish that the parties, through their actions, "demonstrated a meeting of the minds on all essential terms of the contract, including price.  *Lawrence, supra*.  The facts established in discovery and discussed herein make it eminently clear that there was both and express and implied contract, particularly since the plaintiff's course of conduct in accepting the position, pay rate and performing and outstanding job for eight years, confirm their mutual assent.

In addition to the express and implied contract established by the evidence in this case, under Delaware law quasi-contractual relationships are imposed by law in order to work justice and without reference to he actual intention of the parties.  Quasi contracts correct unjust enrichment; they are designed to remedy the "retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. *Lawrence, supra*, at *22.

To prove a quasi-contract, plaintiff must establish 1) that he performed his services with an expectation that he would receive the benefits offered by the county (merit system protection/discharge for "just cause" only); 2) that the services were performed under circumstances which should have put NCCo on notice that he expected that benefit; and 3) that NCCo obtained the benefit of his services.  *Id.*; *see also Bellanca Corp. v. Bellanca*, 53 Del. 378, 169 A.2d 620, 623 (1961).  Joe Freebery accepted NCCo's representation that he would be protected by the procedures of the Merit System and provided outstanding service to the County for eight years in the role of GM.  The County should not now be permitted to and should be estopped from claiming that no

contract existed.  An employment contract did exist and it and it was breached by New Castle County when Chris Coons fired Joe Freebery without just cause.  Defendants' motion for summary judgment as to Count VI should be denied.

    **E.**    **Summary Judgment Should Be Denied as to Count VII of the Complaint**

        Defendants move for summary judgment on Count VII of plaintiff's Complaint, which alleges a state law cause of action for Breach of the Covenant of Good Faith and Fair Dealing.  Complaint, Count VII, ¶¶ 151-154.  The evidence demonstrates that there are no issues of material fact as to this claim.  The motion should be denied.

        Defendants correctly state the law relating to the implied duty of good faith and fair dealing.  In Delaware, every employment contract [19] has an implied duty of good faith and fair dealing.  The duty of good faith and fair dealing in an employment contract can be breached by an employer in several ways: (1) the employee is terminated and the termination violated public policy; (2) if the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one"; (3) if the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; or (4) if the employer falsified or manipulated a record to create fictitious grounds to terminate the employee.  *Dial v. AstroPower, Inc.,* Del.Supr., 2000 Del. LEXIS 324, *9 (2000); *E.I. DuPont de Nemours & Co. v. Pressman,*  Del . Supr., 679 A.2d 436, 441, 444 (1996).  In this case, there is substantial evidence that Coons and Singleton falsified or

---

[19] This general principle is applicable even if the Court accepts defendants position that plaintiff was an at-will employee.

manipulated plaintiff's employment record to create fictitious grounds to terminate him, there by breaching the covenant and requiring the motion be denied.

Coons claims he relied on his dealings with plaintiff and the recommendations and "evaluation" of CAO Singleton in his decision to fire plaintiff. . Brief for Defendants at 8.  Conveniently, most of the alleged facts which they now present as part of plaintiff's employment record and which defendants claim justify his termination were never reduced to writing.  They are only the rather vague recollections of Singleton and Coons, unmemorialized by any writing anywhere.  *See, e.g.,* Tab 8, Coons Dep. at 161; Tab 26, Singleton Dep. pp. 65.  These recollections are also contradicted by substantial evidence.  The records which are in writing simply do not support the interpretation given them by the defendants.

Neither Coons nor Singleton ever read plaintiff's Personnel File.  Tab 26, Singleton Dep. at 113; Tab 8, Coons Dep. p. 34.  Singleton never gave plaintiff a written evaluation of his job performance, although, as CAO, it was his obligation to do so.  Tab 27, Singleton Dep. p. 113.  Defendants' distortion of Freebery's job performance as GM is in stark contrast to Freebery's record, as evidenced by the evaluations and commendations in his personnel file, including for outstanding service to the County.  It is also in conflict with the testimony of several current and former members of NCCo Council, who characterized plaintiff's performance as a record of "solid performance, doing a good job"; "competent, hardworking, *responsive"*; providing  "significant leadership within the Department"; as engaged in his work and doing his job; as doing "an outstanding job"…"always responsive, always knowledgeable": …See, Tab 3, Tansey Dep. pp14-15; Tab 4, Tansey Letter:  Tab 2, Peterson Dep. pp. 22; 38; Tab 28,

Venezky Dep. p. 8.  Councilman Tansey, the Chair of the County Council Special

Services Committee wrote an unsolicited letter to defendant Coons urging him to allow

plaintiff to continue as GM:

> In working over the past two years as Chairman of the Special Services
>
> Committee, I would like to take this opportunity to relay to you my opinion of the Special Services' staff, particularly the Department's General Manager and Assistant General Managers. It is not unreasonable to assume that as the new New Castle County Executive, it would be helpful to gain the perspective of County Elected Officials who have had direct working relationships with managers now under your directive. Given that assumption, I offer the following comments. Mr. Freebery and his staff are competent, hard working, responsive, and dedicated overseers of the operations administered and performed by the Department of Special Services. Mr. Freebery, especially, has shown the ability to be adaptable to the changing ambitions of Council, amicable to the public's acclaim and criticism, and insight in providing Council with options for helping to solve critical County issues.
>
> In addition to the characteristics that enable Mr. Freebery and his staff to provide such a high level of quality work, it is his over twenty-five years of experience working within County Government at various levels that makes his contribution to New Castle County as a General Manager, virtually irreplaceable. It is my wish that you continue to tap into the wealth of knowledge, skill and ability Mr. Freebery and his staff offer as your tenure as County Executive moves forward.
>
> If you have any questions, please feel free to contact me.
>
> Sincerely,
>
> William J. Tansey

Tab 4, Tansey Letter to Coons, 2/01/05.

Coons claims to have been approached by two senior managers in

Plaintiff's department who expressed serious concerns regarding Plaintiff's ability to run

the department".  Brief for Defendants, p. 7.  The managers were identified by both

Coons and Singleton as Jon Husband and Tracey Surles.  Coons testified that when he

was County Executive, Tracey Surles, "made a passing comment" that "Joe was

struggling". Tab 8, Coons Dep. p. 159. He claimed that the other senior manager, Jon Husbands, had made similar complaints. Tab 8, Coons Dep. p. 182. Surles, however, testified that she never made any complaint about Joe Freebery to anyone in the Coons administration. Tab 29, Surles Dep., pp 45-46. Husband testified that he never made any report to anyone in the Administration regarding problems with Joe Freebery. Tab 28, Husband Dep. at 39.

Coons testified that Singleton recommended that Freebery be terminated based upon "non-performance, non-responsiveness and failure to follow through on a lot of things ranging form large to small. Brief for Defendants, p. 7, *citing* Coons Dep. p. 136 & Singleton Dep. pp. 46, 61. When asked for specifics, Singleton's response was "I'm not going to be able to give you too many examples because these are, these were, these go back three years." Tab 26, Singleton Dep. p. 63-63. Jon Husband, one of Freebery's deputies and Gary Rose, a DSS employee directly contradicted Singleton the testimony that plaintiff was "non-responsive" to Singleton's inquiries.

        BY MR. LAWLESS

        Q. How about Dave Singleton?

        A. Yes.

        Q. How many interactions did you see?

        A. A dozen.

        Q. Anything unusual about them?

        MR. WIER: Objection.

        BY MR. LAWLESS:

        Q. You can answer.

        A. I mean, there were lots of questions.

Q.   From?

A.   Singleton to the department.

Q.   Directed to the department through Joe Freebery?

A.   Yes.

Q.   How did Joe Freebery respond, that you saw, to the questions from Singleton?

A.   It would be pretty much directed to -- redirected to us.

Q.   So, it was -- are you describing them requests for information?

A.   Yes.

Q.   To Freebery?

A.   Yes.

Q.   And Freebery -- did you actually see what Freebery would say back to Singleton in the conversation that you saw?

A   Sometimes.  Sometimes it was in written form.

Q.   What would you hear Freebery say to Singleton when Singleton would   ask for information?

A.   Either turn to one of us to answer or, if none of us knew, he would get back to them.

Q.   He never refused to give him information?

A.   Not that I saw.

Q.   Did you see anything antagonistic in Freebery's responses to Singleton in the context you saw?

A.   No.

Q.   Normal professional relationship, as best could you observe?

A.   Yes.

Q.   Were the questions that -- you said there were instance where is Singleton    would ask questions and Joe Freebery would ask you to respond to a question from Singleton?

A.   Yes.

Q.   Is there anything unusual about that?

A.   We would know the answers.

Q.   So, he was asking you to respond to questions that were in your area of  expertise?

A.   Yes.

Q.   Who else would get those requests from Joe Freebery, if you know, Tracy Surles?

MR. WIER:  Wait.  I am sorry.  Did you missspeak?  Oh, questions from Joe Freebery.

MR. LAWLESS:  Probably I did, sure.

BY MR. LAWLESS:

Q.   Other than questions to you from Joe Freebery saying that Mr. Singleton or the County has a question, can you get me the answer, do you know who else got those kind of inquiries from Joe Freebery?  Did Tracy Surles?

A.   Tracy did.

Q.   Anyone else?

A.   Gary rose would, Butch Scott would.

Q.   And as far as you knew, were they requests for information directed to each one of those individuals to answer questions that were in their area of responsibility or expertise?

A.   Yes.

Q.   Anything unusual about that?

A.   No.

Q.   And did you respond to those requests for information?

A.   We would respond either we knew or didn't know.

Q.   And if you didn't know, did Joe Freebery say, Well, go find out what the answer is?

A.  Yes.

Q.  Did he appear to you, in any way, to be trying to hide or prevent the flow   of information from his department to the administration?

A.  No.

Q.  Did he appear to be cooperating with the administration in their request for information?

A.  Yeah.

Q.  Did he appear to be doing anything that wasn't cooperating with the administration in the way he ran the department from January of '05 to when he was fired?  Or was he doing his job?

MR. WIER:  Objection.

BY MR. LAWLESS:

Q.  You can answer

MR. WIER:  Wait.  I object to that question and instruct him not to answer that question as framed.  You are asking this witness whether Joe Freebery is doing his job is an improper question and I instruct him not to answer that question.

BY MR. LAWLESS:

Q.  Did you see Joe Freebery do anything that, in your mind, was anything other than normally doing his job as the general manager of the department of Department of Special Services?

A.  With my limited contact, no.

Q.  Okay. So did you hear he was doing anything that was in any way intended to undermine or hurt or harm the Coons administration in the way he was running the department?

A.  No.

Q.  Did he ever ask you to do anything like that?

A.  No.

Tab 28, Husband Dep., pp. 40-44.  Gary Rose, testified that when the department started

to receive requests for information from Singleton on a daily basis (some of which came

directly from Singleton and some of which through Joe Freebery), Freebery told Rose

and his staff "To get everything to the best of our ability and as fast as we can and get

the information out to him". Tab 12, Rose Dep. p. 9-10; 14-15.

Defendants also claim that Coons relied on his "Transition Team's"

reports which voiced concerns about how plaintiff ran his department. Neither the

County, Coons or Singleton point to any specific area in the Transition Team Report

which supports their contention that it warranted plaintiff's termination. In fact, the

Transition Team Report is far more critical of Baker's Land Use Department (the one

GM who was kept on) than of Freebery's Special Services Department. Tab 30,

Summary: New Castle County Transition Team Report (0466-67; 0470-0473).

Coons claims that he was looking for GM's who would be "proactive",

who would recognize problems and who would bring them to the forefront with solutions

and identified a "policy memo" submitted by Charles Baker, GM of the Land Use

Department as an example of what he was looking for in a GM. Brief for Defendants at

7. Joe Freebery submitted a similar memo for the Department of Special Services. The

Baker and Freebery Transition Memos are attached to the appendix for this Court's

review. There is virtually no difference in form or analysis that permits anyone to draw

such distinction. Tab 31, Freebery Transition Memo; Tab 32, Baker Transition Memo. In

fact, the report demonstrates that plaintiff *was* someone who recognized problems and

brought the to the forefront with solutions. Tab 31, Freebery Transition Memo, pp 3-7

(highlighted). In reality, Freebery's transition memo is far more detailed and specific

than Bakers' memorandum. The representation by defendants that Freebery did not show

"a willingness to "step up and identify and identify what the issues were in his

department" and propose solutions" is patently and demonstrably false. Brief for Defendants at 7.

There are multiple questions of material fact on the issue of whether defendants manipulated or falsified plaintiff's employment record in order to fire him, thereby breaching the covenant of good faith and fair dealing. Accordingly, summary judgment as to Count VII is not warranted. Summary judgment as to Count VII should be denied.

## V.     CONCLUSION

This case should not be resolved by summary judgment. Joe Freebery deserves his day in court. For the reasons set forth herein, defendants' motion for summary judgment should be denied.

KNEPPER & STRATTON

s/Barbara H. Stratton
Barbara H. Stratton
**Of Counsel:**                              P.O. Box 1795
Joseph F. Lawless                            1228 N. King Street
PA Bar Id. 23691                             Wilmington, DE  19899
Law Offices of Joseph F. Lawless            (302) 658-1717
843 Mt. Moro Road                            Delaware Bar ID # 2785
Villanova, Pennsylvania 19083                bhs@knepperstratton.net
484.380.3760                                 Attorney for Plaintiff Joseph J. Freebery

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **JOSEPH J FREEBERY,** | : |
| | : |
| **Plaintiff,** | : |
| | :    **CA. No. 05-748-KAJ** |
| **v.** | : |
| | : |
| **CHIRSTOPHER COONS, in his official** | : |
| **capacity as County Executive of New Castl** | : |
| **County and in his Individual capacity; and** | : |
| **NEW CASTLE COUNTY, a municipal** | : |
| **corporation; and JOHN DOES 1-25** | : |
| **Defendants.** | : |

## CERTIFICATE OF SERVICE

      I, Barbara H. Stratton, hereby certify that on May 27, 2008, two copies of

the Plaintiff's Answering Brief in Response To Defendants Motion for Summary

Judgment were served electronically and by regular mail upon counsel set forth below.  A

copy of Plaintiff's Appendix was served on the same day by Federal Express

Richard R. Wier, Jr., Esquire
Michelle Allen, Esquire
Two Mill Road, Suite 200
Wilmington, DE 19806

Gregg E. Wilson, Esquire
87 Reads Way
New Castle, DE 19720


KNEPPER & STRATTON
s/Barbara H. Stratton

**OF COUNSEL:**
Joseph F. Lawless
PA Id. No. 23691
6 Harvey Lane
Newtown Square, PA 19083
610.356.0875
Jlaw6@comcast.net
Counsel for Joseph J. Freebery

Barbara H. Stratton
P.O. Box 1795
1228 North King Street
Wilmington, Delaware 19801
302.658.1717
Delaware Bar ID # 2785
bhs@knepperstratton.net
Attorney for Plaintiff