**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **JOSEPH J. FREEBERY** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **05-748** |
| **CHRISTOPHER A. COONS, et al** | : | |

**Diamond, J.**                                                    **November 21, 2008**

**M E M O R A N D U M**

Plaintiff Joseph Freebery alleges that Defendants Christopher Coons and New Castle County violated the United States Constitution and Delaware state law when they fired him. I grant Defendants' Motion for Summary Judgment.

**I.       BACKGROUND**

I have construed the facts in the light most favorable to Plaintiff, resolving all disputes and making all reasonable inferences in his favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

**Legislative Changes Following The 1996 County Election**

In 1996, Thomas Gordon was elected County Executive -- the highest ranking official in New Castle County's Executive Branch. (Compl. at ¶ 18.) See 9 Del. C. § 1111. Mr. Gordon appointed Plaintiff's sister, Sherry Freebery, Chief Administrative Officer -- the second highest Executive Branch position. (Compl. at ¶ 18; Freebery Dep. at 255.)

Delaware statutory law then provided that the County's ten Departments were to be headed by Directors whom the County Executive appointed and who served at the Executive's pleasure. (Id. at ¶ 17.) See also 9 Del. C. § 1120(b) (1997). In 1997, Mr. Gordon asked the Legislature to change the law so that the ten County Departments would merge into five, each

headed by a General Manager.  (Id. at ¶ 20.)  Under the Gordon proposal, GMs would be

"classified" positions within the Merit System.  (Id. at ¶ 21.)  See also 29 Del C. § 5901 et seq.

Classified employees may be terminated only "for cause," as defined in the Merit System rules.

See 29 Del C. § 5930; Ringer v. Fallis, 848 F. Supp. 519, 526 (D. Del. 1994).  In 1997, the

Delaware Legislature enacted Mr. Gordon's proposed statutory changes, which the New Castle

County Council then implemented.  (Id. at ¶¶ 25-26.)  See also 71 Laws 1998 ch. 401 §17, eff.

July 13, 1998.

### Plaintiff's Employment With New Castle County

In 1984, the County hired Plaintiff as its Superintendent of Parks.  (Compl. at ¶ 13.)  In

1997, following the Legislature's enactment of Mr. Gordon's proposal, Plaintiff was promoted to

County GM of Special Services.  (Id. at ¶ 32.)  All GMs reported directly to the CAO.  (Freebery

Dep. at 257.)  As GM, Plaintiff was among the highest paid County employees.  (Id. at 310.)

Plaintiff's responsibilities, as established by state statute, included: managing and

developing plans for public facilities and infrastructure; preparing designs and specifications for

all types of public facilities and infrastructure; managing, maintaining, and operating public

facilities, infrastructure, public water supply systems, and public buildings; and managing and

maintaining the County fleet and central garages for the storage and maintenance of equipment.

9 Del. C. § 1341.  In addition, Plaintiff testified that he recommended policy to the

Administration, and prepared ordinance packages and budgets that he submitted to the County

Executive and CAO.  (Freebery Dep. at 337-39.)  Finally, Plaintiff managed a workforce of up to

475 people, recommended employee disciplinary action, managed a $70 million operating budget

and $500 million capital budget, and negotiated contracts on behalf of the County.  (Compl. at ¶

41; Freebery Dep. at 255; 338-39.)

In 2003, Mr. Coons, who was then County Council President, proposed legislation to remove GMs from the Merit System and to reinstate politically appointed Directors to head each County Department.  (Freebery Dep. at 62-63.)  Plaintiff lobbied against the bill.  (Freebery Dep. at 62-63.)  On June 25, 2003, the Delaware House of Representatives passed the bill, which failed to pass the Senate.  (Id.; Doc. No. 176, Ex. 2.)

On November 24, 2003, Mr. Gordon and Ms. Freebery, reiterating their earlier "oral promises," wrote a memorandum to the GMs:

> Lest some forget the promises that were made to you when you accepted the promotion to General Manager, these same promises are hereby re-stated to you so that you may rely upon them legally.  The politically-appointed position of "director" was intentionally deleted from state law as the head of each department.  In its place, a merit system title of "General Manager" was used to denote the head of each department.
>
> Of course, someone could change state law, or even without a change, could re-hire political appointees as department directors, as in the days of old.  Thus, a political appointee could direct you and your subordinates.  We eliminated these costly positions to save money, and to induce you to accept a leadership role in your department, immune from political pressure, and still secure in a merit system position.  You accepted your position as general manager based on that understanding.
>
> Today, it is again re-stated.  You may rely upon your position as general manager remaining as a merit system position, devoid of political whims and pressures.  No threat of termination may affect you, except for just cause or non-performance.

(Doc. No. 183, Ex. 7.)

Before Plaintiff's 1997 promotion to GM, he served as Superintendent of Parks -- a classified position.  (Compl. at ¶¶ 13, 33; Freebery Dep. at 14.)  Plaintiff testified that when he accepted the promotion to GM, he relied on the oral and written promises made by his sister and Mr. Gordon that GMs would always be classified, regardless of changes in state law.  (Compl. at

¶¶ 34-36; Freebery Dep. at 369-71.)

### The 2004 Election And Subsequent Changes In Delaware Law

"In September, 2002, it became public knowledge that [Mr.] Gordon and [Ms.] Freebery were the subjects and/or targets of a federal grand jury investigation in the District of Delaware." (Compl. at ¶ 44.)  In February 2004, Ms. Freebery announced that she would seek the Democratic nomination for New Castle County Executive.  (Id. at ¶ 45.)  In April 2004, Mr. Coons announced his candidacy for the same nomination.  (Id. at ¶ 46.)

On May 27, 2004, the grand jury in this District returned a wide-ranging indictment against Mr. Gordon and Ms. Freebery, charging corruption and dishonesty in their operation of County government.  (Id. at ¶ 47.)  Plaintiff was "privately supportive of his sister and publicly supportive of her."  (Id. at ¶ 52.)  Despite the pending criminal charges, Ms. Freebery continued to campaign for the County Executive nomination.  The contest between her and Mr. Coons was "bitter and hotly contested."  (Id. at  ¶¶ 48-49.)

On September 11, 2004, Mr. Coons won the Democratic nomination, was elected County Executive in November 2004, and took office on January 4, 2005.  (Id. at ¶¶ 54, 60.)  Mr. Coons appointed David Singleton to serve as Chief Administrative Officer.  (Singleton Dep. at 16.)

At Mr. Coons' urging, on January 25, 2005, House Bill #29 was introduced in the Delaware Legislature.   (Id. at ¶ 63.)  The Bill stated in relevant part:

> b) The County Executive, with the advice and consent of the County Council, shall appoint the General Manager of Land Use, the General Manager of Special Services, the General Manager of Community Services, the Chief Procurement Officer, the Chief Financial Officer, the Chief Human Resources Officer, as well as the heads of any subsequently created departments, who shall each serve at the pleasure of the County Executive.

> c) Notwithstanding any other provision of state or county law, on February 9, 2005, any

persons then serving in any of the positions enumerated in this section shall cease to be classified service members of the New Castle County Merit System, but may thereafter continue to serve at the pleasure of the County Executive.

9 Del. C. § 1120.  H.B. #29 became law on February 9, 2005.  Id.

On January 27, 2005, Acting County Attorney Dennis Siebold advised Mr. Coons by memorandum (with a copy to Plaintiff) that under the new law, incumbent GMs automatically became unclassified employees, serving at the pleasure of the County Executive.  (Doc. No. 176, Ex. 10.)  Mr. Coons directed Mr. Singleton to evaluate the incumbent GMs.  (Coons Dep. at 61.) The CAO reported that "there were a number of ways in which Mr. Freebery's performance was not supportive of what the new administration was trying to achieve."  (Singleton Dep. at 61.)

On April 6, 2005, Mr. Coons fired Plaintiff. (Compl. at ¶ 72.)  Mr. Coons testified that Plaintiff was non-responsive, did not follow through on his responsibilities, and did not fit "what [Mr. Coons] was looking for, for [his] senior team, which was a more proactive policymaking." (Coons Dep. at 136.)  Mr. Coons also testified that he retained the other remaining incumbent GM, Charles Baker, in part because Mr. Baker submitted a policy memorandum demonstrating a thorough grasp of the issues.  (Id. at 166.)

## The Instant Litigation

On October 26, 2005, Plaintiff filed suit in this Court against Mr. Coons and New Castle County, including some ten Counts in his Complaint.  Plaintiff has abandoned five of these Counts.  (Doc. No. 180 at 1; Oral Arg. Tr. at 30.)  In his remaining claims, Plaintiff alleges that Defendants: 1) violated his Fifth and Fourteenth Amendment due process rights; 2) violated the First Amendment by retaliating against him for his political and familial association; 3) breached Plaintiff's employment contract in violation of Delaware law; and 4) violated Delaware's

covenant of good faith and fair dealing.

The matter was reassigned to me after I was designated to sit in this District on March 10, 2008.  Once discovery was complete, Defendants moved for summary judgment.  The matter has been fully briefed and argued.

## II.   LEGAL STANDARDS

Upon motion of any party, summary judgment is appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  The court may grant summary judgment only if the movant shows that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor regarding that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if it could affect the result of the suit under governing law.  Id.

In deciding whether to grant summary judgment, the district court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

III.    **DISCUSSION**

A.    <u>**Due Process**</u>

Plaintiff alleges that Defendants contravened the Fifth and Fourteenth Amendments when they deprived him of a protected interest in continued employment as a GM.  I disagree.  At the time of his firing, Plaintiff had no protected interest in his job.

The Constitution's Fourteenth Amendment prohibits a state from depriving a person  of "life, liberty, or property without due process of law."  U.S. Const. amend. XIV, sec. 1.  Because the Fifth Amendment's due process guarantee applies only against federal actors, it is inapplicable here.  <u>Kelly v. Borough of Sayreville</u>, N.J. 107 F.3d 1073, 1076 (3d Cir. 1997) (due process claim against state official analyzed under the Fourteenth, rather than the Fifth, Amendment); <u>Jones v. City of Jackson</u>, 203 F.3d 875, 880 (5th Cir. 2000) ("The Fifth Amendment applies only to violations of constitutional rights by the United States or a federal actor.") <u>See</u> <u>also</u> <u>Morehead v. People of State of New York ex rel. Tipaldo</u>, 298 U.S. 587, 610 (1936) ("[T]he restraint imposed by the due process clause of the Fourteenth Amendment upon legislative power of the state is the same as that imposed by the corresponding provision of the Fifth Amendment upon the legislative power of the United States.").   Accordingly, I will analyze Plaintiff's due process claim under the Fourteenth Amendment alone.

To determine whether Plaintiff was denied due process, I must determine whether: 1) "the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property' "; and 2) "the procedures available provided the plaintiff with 'due process of law.'" <u>Alvin v. Suzuki</u>, 227 F.3d 107, 116 (3d Cir. 2000).

A constitutionally protected interest in continued public employment arises only if an

7

individual has "a legitimate entitlement," to (and not just a "unilateral expectation" of) continued employment.  Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005).  "[A]n at-will employee does not have a legitimate entitlement to continued employment because she serves solely at the pleasure of her employer."  Id.  A property interest may arise from a state statute or a contract with a state entity, as long as either provides that employment may be terminated only for cause.  Linan-Faye Construction v. Housing Authority of Camden, 49 F.3d 915, 931-31 (3d Cir. 1995); Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1256 (3d Cir. 1994).  Whether a property interest exists is a question of state law.  Id.

Plaintiff contends that he was not an at-will employee, but rather that he had a protected interest in his employment as GM arising from: 1) Delaware statutory law; and 2) a "termination for cause" employment contract with the County.  The record does not support either contention.

### 1.    Delaware State Statute

I will assume, *arguendo*, that when Plaintiff accepted the GM position in 1997, he acquired a protected property right because then-existing statutory law designated the position as "classified."  The Legislature changed the law in 2005, however, so that GMs would once again "cease to be classified service members of the New Castle County Merit System," and instead would "serve at the pleasure of the County Executive."  9 Del. C. § 1120.  With the adoption of H.B. #29, Plaintiff thus became an at-will employee and lost whatever right he had in continued employment as a GM.   See Elmore, 399 F.3d at 282 (a property interest does not arise from at-will employment).

Although Plaintiff suggests that the Legislature adopted H.B. #29 with undue haste, because procedural due process protections do not extend to legislative action, the Legislature's

adoption of that law (and elimination of Merit System protection for GMs) did not violate

Plaintiff's due process rights.  See Rogin v. Bensalem Twp., 616 F.2d 680, 694 (3d Cir. 1980).

As the Third Circuit has explained:

> [T]he general theory of republican government is not due process through individual
> hearings and the application of standards of behavior, but through elective representation,
> partisan politics, and the ultimate sovereignty of the people to vote out of office those
> legislators who are unfaithful to the public will.

Id.  Because "the legislative determination provides all the process that is due," the Legislature

did not violate Plaintiff's rights when it again made County GMs politically appointed positions.

See Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982).

## 2.    Contract

Plaintiff also argues that changes in state law could not and did not impugn his

employment contract and resulting property rights:

> The merit system procedures define the terms of the contract and the parameters of the
> rights afforded there under [sic], however, the contractual commitment itself was
> independent of the status conferred those positions under state law.

(Doc. No. 180 at 32.)  Plaintiff believes that even though Delaware law provides that

employment contracts are usually at-will, the County, acting through Plaintiff's sister and Mr.

Gordon, awarded Plaintiff a "termination for cause" employment contract.  See E.I. DuPont de

Nemours & Co. v. Pressman, 679 A.2d 436, 441, 444 (Del. Super. Ct. 1996).  Plaintiff contends

that this contract became binding when he accepted the GM position.  Thus, in Plaintiff's view,

"what happened in the Delaware legislature had and has no bearing on the county's contractual

commitment to plaintiff."  (Id. at 33.)  I disagree.

**State Preemption**

Plaintiff suggests that his Merit-based employment contract continues to bind the County because there was an "offer" from Ms. Freebery and Mr. Gordon and an "acceptance" by Plaintiff.  (Doc. No. 180, 23-28.)  That simplistic analysis only begins my inquiry, however. When a municipal employer enters into a contract with its employee that the employer did not have the authority to make, the contract is *ultra vires* and unenforceable.  City of Newark v. New Castle County, 1984 WL 19834, *4 (Del. Ch.1984) (citing 10 McQuillin, Municipal Corporations, § 29.10 (3d Ed.)).  Accordingly, I must determine whether Mr. Gordon and Ms. Freebery had the authority to act in an area that had been regulated exclusively by the Legislature -- particularly where they admit that their actions in creating Plaintiff's contract were intended to evade or contravene state law.  (Doc. No. 183 Ex. 7 ("Of course, someone could change state law . . ." ))  The question answers itself.  Because they had no such authority, the contract they "offered" and Plaintiff "accepted" was *ultra vires* and unenforceable.

Delaware law provides that

> a municipality cannot act in conflict with state laws.  This rule derives from the fact that the State, as sovereign, is the original source of the legislative power, even though it has chosen to delegate much of that authority to the municipalities.

4th Generation Ltd. v. Board of Adjustment of City of Rehoboth Beach, 1987 WL 14867, *8 (Del. Super. Ct. 1987).  Delaware preemption authority -- which usually addresses the relationship between municipalities and the state -- applies to municipalities and counties alike because both are political subdivisions of the state.  See Am. Jur. 2d Municipal Corporations § 2 ("the term 'municipal government' may properly be used in characterizing the government of a county"); Hansen v. Kent County, 2007 WL 1584632, *5 n. 30 (Del. Ch. 2007) (counties are

10

sometimes viewed as municipalities, even though Delaware statutes refer to them separately).

Accordingly, the actions of a county (like New Castle) in an area governed by a state statute may

be invalidated even when the action does not directly contravene the statute.  Id. at *9.  Such

preemption is "based upon the theory that the state legislature, in enacting the statute, intended

[the statute] to be the sole legislation applicable to the situation."  Id.

Preemption certainly obtains here.   As I have described, at the urging of Messrs. Gordon

and Coons, the Legislature has alternatively removed New Castle County department heads from

the Merit System and then reinstated them.  The Legislature has thus repeatedly manifested its

intention to exercise sole authority in determining the status of those positions.  In seeking these

statutory changes, Messrs. Gordon and Coons evidently understood that this was the

Legislature's intention.  Indeed, were it not, the Legislature undoubtedly would have indicated

that the repeated statutory changes were unnecessary because New Castle County could itself

change the status of its GMs and Directors.

According to their own memorandum, Mr. Gordon and Ms. Freebery intended to create

an employment contract that would immunize Plaintiff and the other GMs from changes in state

law.  (Doc. No. 183 Ex. 7.)  That effort was certainly outside their authority.  Accordingly, the

contract based on the employment promises of Mr. Gordon and Ms. Freebery is *ultra vires* and

unenforceable.

Plaintiff suggests that his continuing employment contract was enforceable if his sister

and Mr. Gordon had only apparent authority to enter into it.  (Doc. No. 180 at 29.)  Once again, I

disagree.

First, the legislative history I have discussed -- with which Plaintiff was quite familiar -- belies his contention that Ms. Freebery and Mr. Gordon had apparent authority to offer County GMs career-long Merit protection in derogation of state law.  See 4th Generation Ltd., 1987 WL 14867, at *8-9.  Even if they had apparent authority, however, the contract they offered Plaintiff remains unenforceable.  Although Delaware courts have not explicitly addressed the issue, other courts have uniformly held that public officers with only apparent authority may not bind a governmental unit to a contract that is *ultra vires*.  See Faust v. Metropolitan Government of Nashville, 206 S.W.3d 475, 496-497 (Tenn. Ct. App. 2006) ("[I]t is well-established that when a private party deals with a municipal corporation, the doctrine of apparent authority is modified to accommodate the public interest."); Haglin v. City of Algona, 42 Fed.App'x. 55, 56 (9th Cir. 2002) ("the estoppel doctrine has no effect on the invalidity of an *ultra vires* act); Barendregt v. Walla Walla School Dist. No. 140, 26 Wash.App. 246, 250 (Wash. Ct. App. 1980) (a public agent cannot bind a governmental agency when he enters into a contract that is *ultra vires,* "even though the public body for which he acts may have clothed him with such indicia of authority that it would be estopped if it were a private person"); Gontrum v. Mayor and City Council of Baltimore, 182 Md. 370, 376-377 (Md. 1943) ("No principle of the law relating to municipal corporations is more firmly established than that those who deal with their agents or officers must, at their peril, take notice of the limits of the powers both of the municipality and of those who assume to act as its agents and officers.") (internal citations omitted).

The unenforceability of Plaintiff's employment contract is underscored by his argument respecting the County Executive's continuing authority to appoint his own "cabinet" regardless of Plaintiff's career-long classified position:

> Defendant Coons was not precluded from politically appointing a Director to run the
> Department of Special Services over Plaintiff in order to have his own "team" in place.
> He could also simply removed [*sic*] Plaintiff from the position of General Manager while
> keeping him as a County employee in that department or elsewhere.

(Pl. Reply Brief at 2.)  Thus, in Plaintiff's view, his employment contract guaranteed him Merit

System protection and a GM's salary even if he did not actually perform the GM's job.  Surely

neither the Constitution nor Delaware law requires such a result.  To the contrary, the efforts of

Ms. Freebery and Mr. Gordon notwithstanding, whether New Castle County GMs hold classified

positions is determined exclusively by state law.  Accordingly, when the state law changed in

2005, Plaintiff became an at-will employee without due process protection.  See Elmore, 399

F.3d at 282 (a property interest does not arise from at-will employment).

### Impermissible Attempt to Bind Successors

Even if state preemption does not obtain, Plaintiff's employment contract remains

unenforceable.  Delaware law limits a municipal officer's authority to bind his or her successors

through contract:

> Respecting the binding effect of contracts extending beyond the terms of officers acting
> for the municipality, there exists a clear distinction in the judicial decisions between
> governmental and business or proprietary powers. With respect to the former, their
> exercise is so limited that no action taken by the governmental body is binding upon its
> successors, whereas the latter is not subject to such limitation, and may be exercised in a
> way that will be binding upon the municipality after the board exercising the power shall
> have ceased to exist . . . it is generally held that, independent of statute or charter
> provisions, the hands of successors cannot be tied by contracts relating to governmental
> matters.

10 McQuillin, The Law of Municipal Corporations (3d Ed.), § 29.101.  See also Mele v. Fahy,

579 F. Supp. 1576, 1582 (3d Cir. 1984) (favorably citing treatise).  Thus, whether a County

Executive (or his Chief Administrative Officer) has the authority to bind the County to a contract

extending beyond his or her term turns on whether the contract relates to "governmental" or "proprietary" matters.  The reasoning underlying the distinction is compelling.  If county officers could not enter into business contracts that extended beyond their terms in office, it would be extremely difficult for the county to purchase basic services.  See e.g., Town of Smyrna v. Kent County Levy Court, 2005 WL 147933  (Del. Super. Ct. Jan. 24, 2005) (contract for sewer services was proprietary); Janice C. Griffith, *Local Government Contracts: Escaping from the Governmental/Proprietary Maze*, 75 Iowa L. Rev. 277, 311 (1990) ("Utility operations and the supply and purchase of goods that are bartered daily in the private marketplace form the main group of activities that courts have classified as proprietary.")

Contracts that directly implicate the nature of government – such as the employment contracts of an executive officer's "cabinet" – are quite another matter.  Once again, the rationale is compelling: allowing an official to bind his or her successors could well undermine freely elected county government.   See Martin Marietta Materials, Inc. v Brainard, 2007 WL 4232184, *8 (S.D. Ind. Nov. 28, 2007) ("A contract that purports to bind successor governments can undermine the ability of the electorate to vote for change.").  For instance, a county official who lost her reelection bid could nonetheless ensure that her policies continued after she left office by awarding long term-employment contracts to her chief lieutenants.  This is certainly impermissible.  See Stone v. State of Mississippi, 101 U.S. 814, 820 (U.S. 1879) (state officials "cannot give away nor sell the discretion of those that are to come after them, in respect to matters the government of which, from the very nature of things, must 'vary with varying circumstances'").  Prohibiting "governmental" contracts that extend beyond the term of the contracting official is thus vital to preserving a republican form of government.

Although some employment contracts do not relate to governmental matters and so may be extended beyond the term of the contracting official,

> where the nature of an office or employment is such that it requires a municipal board or officer to exercise supervisory control over the appointee or employee, together with the power of removal, such employment or contract of employment constitutes exercise of a governmental function, and such contracts must not be extended beyond the life of the board.

10 McQuillin, The Law of Municipal Corporations (3d Ed.), § 29.101. The Delaware Supreme Court recognized this rule, noting that "a government body may not, in the exercise of its powers, appoint an individual to a term extending beyond the term of office of the governmental body." Rawlins v. Levy Court of Kent County, 235 A.2d 840, 841 (Del. 1967).

Plaintiff's employment contract certainly relates to "governmental matters." As one of the top officials in the County Executive Branch, Plaintiff reported directly to the Chief Administrative Officer, and made recommendations to the CAO and the County Executive. Thus, the CAO and County Executive "exercised supervisory control" over Plaintiff. In fact, as the head of a County Department, Plaintiff's only "supervisors" were the CAO and County Executive. Moreover, the County Executive had the authority to remove Plaintiff. See 9 Del C. § 1116 (the County Executive retains the power to remove those he has appointed). Any employment contract with Plaintiff thus related to a "governmental" matter. See Board of Klamath County Comm'r v. Select County Employees, 939 P.2d 80 (Or. Ct. App. 1997) (employment contract with County Personnel Director related to a government function, and so was unenforceable against successor County Commissioners).

In these circumstances, Mr. Gordon and Ms. Freebery did not have the authority to tie the hands of their successors by entering into an employment contract with Plaintiff that extended

well beyond their terms of office.  Accordingly, for this reason as well, their purported contract

with Plaintiff was *ultra vires* and unenforceable.  Given that unenforceability, Plaintiff's status

was determined by H.B. # 29, which made him an at-will employee without any due process

protected property interest.  See Elmore, 399 F.3d at 282.

### B.   First Amendment Claim

Plaintiff also alleges that Defendants fired him in retaliation for his relationship with his

sister, CAO Sherry Freebery, and so violated his First Amendment rights to political and familial

association.  Although he originally alleged that Defendants also violated his free speech rights,

Plaintiff has abandoned this claim.  (Oral Arg. Tr. at 30.)

### 1.   Political Association

Recognizing that "to the victor belong only those spoils that may be constitutionally

obtained," the Supreme Court has held that the termination of a public employee because of his

or her political affiliation generally violates the First Amendment.  Rutan v. Republican Party of

Ill., 497 U.S. 62, 64 (1990); Elrod v. Burns, 427 U.S. 347 (1976); Branti v. Finkel, 445 U.S. 507

(1980).  There is a well-established exception, however, for policymaking positions.  Id.  "The

exception for 'policymaking' jobs exists because political loyalty is essential to the position

itself."  Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 -271 (3d Cir. 2007).  See

also Branti, 445 U.S. at 518 ("[T]he ultimate inquiry is not whether the label 'policymaker' or

'confidential' fits a particular position; rather, the question is whether the hiring authority can

demonstrate that party affiliation is an appropriate requirement for the effective performance of

the public office involved."); Elrod, 427 U.S. at 368 (party affiliation may be an acceptable

requirement for an employee who "acts as an advisor or formulates plans for the implementation

of broad goals").

To make out a *prima facie* case that he or she was impermissibly terminated for political reasons, a plaintiff must show that: "1) [h]e was employed at a public agency in a position that does not require political affiliation, 2) [h]e was engaged in constitutionally protected conduct, and 3) this conduct was a substantial or motivating factor in the government's employment decision." Galli, 490 F.3d at 271.  In evaluating the first element of the Galli test -- whether political affiliation is an appropriate requirement for a particular position -- courts look to several factors, including "whether the employee has duties that are non-discretionary or technical, participates in discussions or other meetings, prepares budgets, possesses the authority to hire and fire other employees, has a high salary, retains power over others, and can speak in the name of policymakers." Id. (citing Brown v. Trench, 787 F.2d 167, 169 (3d Cir. 1986)).  The Third Circuit has suggested that the "key factor" is whether the individual "has meaningful input into decisionmaking concerning the nature and scope of a [ ] program." Id. (quoting Armour v. County of Beaver, PA, 271 F.3d 417, 429 (3d Cir. 2001)).   Although the question of whether political affiliation is an appropriate criterion is usually one of fact, "summary judgment may be appropriate in some instances." Boyle, 139 F.3d at 397.  But see Ness v. Marshall, 660 F.2d 517, 522 (3d Cir. 1981) ("Where, as a matter of law, a person is determined to have occupied a policymaking position, that person's claims to protection from patronage dismissal under Elrod and Branti are disposable on a motion for summary judgment.")

As Plaintiff himself seems to concede, he was a County policymaker.  (Doc. No. 180 at 39 (Plaintiff "held a 'policymaker' type position").)  He reported directly to the second highest official in the County Executive Branch, and was among the highest paid County employees.

17

(Freebery Dep. at 255, 257, 310.)  He oversaw hundreds of employees, made final recommendations regarding the discipline of these employees, and managed enormous budgets. (Id. at 255, 337-39; Compl. at ¶ 41.)  Plaintiff was responsible for managing and maintaining all the County's public facilities and infrastructure.  (Freebery Dep. at 257.)  He prepared budgets, and proposed ordinance packages.  (Id. at 337-39.)  In these circumstances, Plaintiff clearly provided "meaningful input into decisionmaking concerning the nature and scope" of public programs relating to facilities and infrastructure.  See Galli, 490 F.3d at 271.   Accordingly, any reasonable jury would necessarily conclude that Plaintiff was a policymaker.  Compare Wetzel v. Tucker, 139 F.3d 380, 384-86 (3d Cir. 1998) (political party affiliation is an appropriate criterion for Authority Solicitor position where Authority is a policy-making body); Waskovich v. Morgano, 2 F.3d 1292, 1303 (3d Cir. 1993) (grant of summary judgment appropriate because Director of the Division of Veterans' Administrative Services is a policymaker).

The Third Circuit has recognized that "high level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their supervisor's policies, and perceived by the public as supporting their supervisors' aims . . ."  Waskovich, 2 F.3d at 1300-01 (3d Cir. 1992) (quoting Hall v. Ford, 856 F.2d 255, 263 (D.C. Cir. 1993).  This is true even where – as here – the "key deputy" and the "high level official" belong to the same political party.   See Curinga v. City of Clairton, 357 F.3d 305, 311 (3d Cir. 2004) ("Identical party affiliation does not necessarily ensure the subordinate's loyal adherence to the superior's policies."); Williams v. City of River Rouge, 909 F.2d 151, 153 (6th Cir. 1990) ("'political affiliation' refers to commonality of political purpose and support, not political party membership").  As one of the highest paid and highest ranking

members of the County Administration, Plaintiff was certainly a "key deputy" of the County Executive.  See Elrod, 427 U.S. at 368 (political affiliation may be appropriate criterion for employee who "acts as an advisor or formulates plans for the implementation of broad goals").  Accordingly, because Plaintiff was a policymaker for whom political affiliation was an appropriate criterion, he cannot make out the first element of his *prima facie* case.  See Galli, 490 F.3d at 271.

Plaintiff contends that the policymaker exception does not apply to him because he was "hired under a contract of employment, in addition to state statute, which gave [him] protected status, thus making the policymaker exception inapplicable."  (Doc. No. 180 at 39.)  Plaintiff thus believes he was a "protected policymaker . . . expressly exempted from political whim" by his employment contract and state statute.  (Id.)  I can find no authority to support the contention that the Elrod-Branti test does not apply to Plaintiff, and he has offered none.  Moreover, as I have discussed at length, Plaintiff was terminated only after the Legislature changed Delaware law to provide that GMs served at the pleasure of the County Executive.  Thus, Plaintiff did not have a valid employment contract that somehow made him an "exempt" policymaker.

In sum, because Plaintiff cannot make out the first element of the Galli Court's *prima facie* test, his claim that he was impermissibly fired on political grounds fails.

## 2.   **Familial Association**

The First Amendment protects the right of "intimate association" that "involves an individual's right to enter into and maintain intimate or private relationships free of state intrusion."  Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 442 (3d. Cir. 2000).  To make out a violation of this right, a plaintiff must show that the challenged action

19

"directly and substantially interfered with" a protected relationship.  See Lyng v. Int'l Union, et. al., 485 U.S. 360, 365 (1988); Nittoli v. Morris County Bd. of Chosen Freeholders, 2007 WL 1521490, *7 (D.N.J. May 22, 2007).  A "protected" relationship is "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." Id. (quoting Roberts v. United States Jaycees, 468 U.S. 609, 620 (1984)).  Protected relationships include "those that attend the creation and sustenance of a family-marriage, . . .  the raising and education of children, . . . and cohabitation with one's relatives." Id.

The Third Circuit has not yet determined whether the sibling relationship warrants constitutional protection.  See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) (plaintiff's relationship to brother-in-law did not warrant constitutional protection).  But see Patel v. Searles, 305 F.3d 130, 136 (2d Cir. 2002) (sibling relationship afforded protection).  I will assume arguendo that the sibling relationship is protected by the right to intimate association.  To make out a violation of this right, Plaintiff must allege – and offer supporting evidence – that Defendants' actions interfered with his relationship with his sister.  See Lyng v. Int'l Union UAW, 485 U.S. 360, 365 (1988) (the plaintiff's right to intimate association was not violated because the challenged action did not "directly and substantially" interfere with family living arrangements).  Plaintiff has made no such allegation and offered no such evidence.

Plaintiff argues that because the Lyng test applies only to claims of government interference with a protected relationship, it is inapposite here, where Plaintiff charges that Defendants retaliated against him because of his sibling relationship.  Plaintiff does not suggest what test I should apply.

20

Courts in this Circuit have refused to recognize one test for claims of government interference with protected relationships and a different test for claims of retaliation based on a protected relationship.  See Nittoli, 2007 WL 1521490 at *7 (refusing to apply a test other than Lyng); Ballas v. City of Reading, 2001 WL 856627, *4 (E.D. Pa. July 24, 2001) (right to be free from retaliation based on familial association is not clearly established).  Moreover, those Circuits that have recognized a different test have done so only with respect to marriage – a relationship that courts agree can warrant the highest level of constitutional protection.  See Soward v. Loudon County, 203 F.3d 426 (6th Cir. 2000); Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999). See also Zablocki v. Redhail, 434 U.S. 374, 382-388 (1978) (reviewing cases emphasizing the importance of the right to marry).  Accordingly, I will apply the Lyng test to Plaintiff's claim of intimate association retaliation.

Because Plaintiff has failed to show (or even allege) that Defendants' actions interfered with his sibling relationship, his intimate association claim fails.

C.    **State Law Claims**

1.    **Breach Of Contract**

Plaintiff argues that he had a contract for career-long classified employment with the County, and that Defendants breached this contract by terminating him without just cause.  As I have explained, any contract created by Mr. Gordon and Ms. Freebery was *ultra vires* and unenforceable.  City of Newark v. New Castle County, 1984 WL 19834 at *4 (Del. Ch. 1984).  Plaintiff was thus an at-will employee who could be terminated without cause.  Haney v. Laub, 312 A.2d 330, 332 (Del. Super. 1973) ("A hiring for an indeterminate period is a hiring at will and, consequently, is terminable at the will of either party with or without cause.")  Accordingly,

because Defendants were legally entitled to fire Plaintiff, they did not breach his employment contract when they did so.

### 2.   Duty Of Good Faith And Fair Dealing

Finally, Plaintiff contends that Defendants violated the duty of good faith and fair dealing, which the Delaware Supreme Court reads into every employment contract:

> The [employment at-will] Doctrine generally permits the dismissal of employees without cause and regardless of motive. Nevertheless, we hold that the Covenant [of good faith and fair dealing] permits a cause of action against an employer for the deceitful acts of its agent in manufacturing materially false grounds to cause an employee's dismissal.

E.I. DuPont de Nemours and Co., 679 A.2d at 437.  The Court cautioned, however, that where the employment at-will doctrine is broad, the covenant of good faith and fair dealing is "narrow and carefully crafted."  Id.  Thus, Delaware courts have found the covenant breached in extremely limited circumstances.  See id. (action could proceed where plaintiff's supervisor engaged in a retaliatory campaign against plaintiff, including, *inter alia*, misrepresenting plaintiff's job responsibilities so it would appear that he was not completing assignments and hiding positive information).  See also Homan v. Turoczy, 2005 WL 2000756, *18 (Del. Ch. Aug. 12, 2005) ("[T]he Delaware Supreme Court has consistently held that obligations under the covenant of good faith and fair dealing should be implied only in rare instances.")

I have deemed invalid and unenforceable the career-long "termination for cause" employment contract offered to Plaintiff by Ms. Freebery and Mr. Gordon.  Defendants concede, however, that there remained an "at-will" employment contract between Plaintiff and the County. (Oral Arg. Tr. at 10-12.)  Accordingly, I must determine whether Plaintiff's firing violated the covenant of good faith and fair dealing that was part of his at-will employment contract.

Plaintiff alleges that the County – through Messrs. Coons and Singleton – "falsified or manipulated [P]laintiff's employment record to create fictitious grounds to terminate him." (Doc. No. 180 at 54-55.)  Plaintiff offers the following evidence in support: 1) Messrs. Coons and Singleton did not reduce their evaluations of Plaintiff to writing; 2) Messrs. Coons and Singleton did not read the evaluations in Plaintiff's personnel file; 3) other County employees and officials (including Plaintiff's sister) have stated that Plaintiff was an effective GM; 4) the "Transition Team" report analyzing Plaintiff's performance was favorable; and 5) although Mr. Coons retained Mr. Baker as a GM in part because he was impressed by Mr. Baker's policy memorandum, Plaintiff's policy memo was actually more detailed and specific than Mr. Baker's. (Id. at 55-62.)

This evidence does not show that any County official engaged in the "deceitful act" of "manufacturing false grounds" to terminate Plaintiff.  The failure of Messrs. Coons and Singleton to create written evaluations of Plaintiff was not "deceitful."  Similarly, the refusal of Messrs. Coons and Singleton to read glowing evaluations of Plaintiff from the *previous* Administration, and their decision to ignore the favorable views of other County employees, is not evidence of deceit.  Moreover, although Plaintiff believes that his policy memo is superior to Mr. Baker's, Messrs. Coons and Singleton obviously do not.  That also is not evidence of deceit.  See EEOC v. Avecia, Inc., 151 Fed. App'x 162, 165 (3d Cir. 2005) (plaintiff must show that employer actually falsified or manipulated employment records).

In these circumstances, Plaintiff has shown little more than a disagreement respecting his performance as a GM.  The covenant of good faith and fair dealing did not obligate Messrs. Coons and Singleton to share Plaintiff's high opinion of himself or the opinion held by Plaintiff's

sister and Mr. Gordon.  If such disagreements make out a breach of the covenant, it is difficult to imagine an employment termination that would not.  Because there is no evidence of Defendants' deceitful acts intended to manufacture false grounds for Plaintiff's termination, his claim fails.

### D.   <u>Qualified Immunity</u>

Mr. Coons argues that he is entitled to qualified immunity from Plaintiff's legally cognizable constitutional claims.  Because I have determined that all Plaintiff's claims fail on the merits, I need not address the question of qualified immunity.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

## IV.   CONCLUSION

The attempt by Plaintiff's sister and Mr. Gordon to evade Delaware law does not afford Plaintiff "a *legitimate* entitlement" to continuing employment as a County GM.  <u>Elmore v. Cleary</u>, 399 F.3d at 282 (emphasis supplied).  If Plaintiff truly relied to his detriment on promises of a career-long classified position made by Ms. Freebery and Mr. Gordon – and I am obligated at this stage to accept that he did – his remedy may be against them, not against Mr. Coons or the County.  <u>See</u> <u>Castetter v. Delaware Dep't of Labor</u>, 2002 WL 819244, *3 (Del. Super. Ct. 2002) (setting forth elements of fraud).  The record before me thus utterly fails to support Plaintiff's claim that Defendants violated his due process rights.  Nor does the record support Plaintiff's First Amendment or state law claims.  Defendants are thus entitled to a judgment in their favor as a matter of law.

An appropriate Order follows.

**BY THE COURT.**

*/s Paul S. Diamond*

_____

**Paul S. Diamond, J.**